1

UNITED STATES DISTRICT COURT
DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>SCOTT RHODES,<br><br>Defendant. | Case No. _____<br><br>**COMPLAINT FOR RECOVERY OF CIVIL MONETARY FORFEITURE AND INJUNCTIVE RELIEF** |

Plaintiff, the United States of America, by and through the undersigned attorneys, acting upon request to the Attorney General by the Federal Communications Commission (the "FCC" or "Commission") pursuant to 47 U.S.C. §§ 401(a) and 504(a), hereby alleges as follows:

1. This action is brought by the United States against Defendant Scott Rhodes ("Defendant" or "Rhodes"), in response to Defendant's repeated violation of the Truth in Caller ID Act, 47 U.S.C. § 227(e)(1). Defendant has made thousands of telephone calls in which he has unlawfully falsified, or "spoofed" his caller identification information "with the intent to defraud, cause harm, or wrongfully obtain anything of value." § 227(e)(1).

2

2. On January 14, 2021, the FCC issued a Forfeiture Order in the amount of $9,918,000 against Defendant for 4,959 violations of 47 U.S.C. § 227(e)(1) and 47 C.F.R. § 64.1604 (the "Forfeiture Order"). Pursuant to 47 U.S.C. § 504(a), the United States seeks to enforce the Forfeiture Order.

3. Pursuant to 47 U.S.C. § 401(a), the United States seeks injunctive relief in the form of a writ of mandamus commanding Defendant to comply with the Truth in Caller ID Act.

## JURISDICTION AND VENUE

4. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1345, and 1355, as well as 47 U.S.C. §§ 401(a) and 504(a).

5. Venue is proper in this District pursuant to 28 U.S.C. §§ 1355(b), 1391(b), and 1395(a), as well as 47 U.S.C. § 504(a), because Defendant resides within this District.

## THE PARTIES

6. Plaintiff is the United States of America.

7. Defendant Scott Rhodes is a resident of Libby, Montana, which is located in this District.

## STATUTORY AND REGULATORY BACKGROUND

8. The FCC is an independent federal regulatory agency created by

3

Congress to regulate intrastate, interstate, and foreign wire and radio communications pursuant to the Communications Act of 1934, as amended (the "Communications Act" or the "Act"), 47 U.S.C. §§ 151 *et seq*.

9. The Truth in Caller ID Act, 47 U.S.C. § 227(e)(1), makes it unlawful to "cause any caller identification service" in connection with any telecommunications service or IP-enabled voice service "to knowingly transmit misleading or inaccurate caller identification information with the intent to defraud, cause harm, or wrongfully obtain anything of value." 47 U.S.C. § 227(e)(1). The practice of knowingly transmitting misleading or inaccurate caller identification ("caller ID") information referenced by the statutory provision is commonly referred to as "spoofing." Section 64.1604 of the FCC's rules implements the prohibition on unlawful spoofing. *See* 47 C.F.R § 64.1604.

10. The Act and operative rules authorize the Commission to impose a forfeiture of up to $11,766 for each spoofing violation. *See* 47 U.S.C. § 227(e)(5)(A); 47 C.F.R. § 1.80(b)(4); Annual Adjustment of Civil Monetary Penalties To Reflect Inflation, 85 Fed. Reg. 2318-01 (Jan. 15, 2020).

11. Pursuant to 47 U.S.C. § 503(b)(4), the FCC may impose a forfeiture penalty on a person for spoofing violations upon a finding that such violations occurred, if before doing so:

    a. the Commission issues a "notice of apparent liability," in writing, with respect to such person;

    b. such notice has been received by such person, or the Commission has sent such notice to the last known address of such person, by registered or certified mail; and

    c. such person is granted an opportunity to show, in writing why no such forfeiture penalty should be imposed.

12. In determining the amount of a forfeiture penalty, the Act requires that the FCC "take into account the nature, circumstances, extent, and gravity of the violation and, with respect to the violator, the degree of culpability, any history of prior offenses, ability to pay, and such other matters as justice may require." 47 U.S.C. § 503(b)(2)(E).

13. The FCC's forfeiture penalties are "payable into the Treasury of the United States" and are "recoverable . . . in a civil suit in the name of the United States[.]" 47 U.S.C. § 504(a).

14. In addition to authorizing the imposition of a forfeiture penalty for past violations, the Act also empowers the United States to take action to prevent prospective violations.

15. 47 U.S.C. § 401(a) authorizes "the Attorney General of the United

5

States at the request of the Commission" to seek a "writ or writs of mandamus commanding" a person who has violated any part of the Act "to comply with the provisions of [the Act]." The term "writ or writs of mandamus" in § 401(a) has regularly "been interpreted to include injunctions against persons alleged to be violating the Act." *United States v. Girona*, Civ. No. AWT-99-1262, 2000 WL 565496, at *2–3 (D. Conn. Mar. 27, 2000).

## FACTUAL BACKGROUND

16.     Defendant has a long history of making telephone calls with the intention of upsetting the calls' recipients and invading their privacy with unwanted and outrageous messages. These calls often involve the use of an automatic telephone dialing system or an artificial or prerecorded voice—a practice known as "robocalling."

### The Truth In Caller ID Act Violations Charged by FCC

17.     In 2018, Defendant engaged in five separate robocall campaigns in which he used a dialing platform's service to "transmit misleading or inaccurate caller identification information" on thousands of discrete occasions. § 227(e)(1). Defendant caused the dialing platform to display to recipients caller ID numbers that were not assigned to Defendant.

6

18.     In many of the robocalls, Defendant selected caller IDs that matched the locality of the recipient. For example, when calling individuals with phone numbers starting with the digits "641-522" Defendant selected the false caller ID "641-522-1488." This practice is known as "neighborhood spoofing."

19.     The robocalls did not include disclosures regarding "the identity of the business, individual, or other entity initiating the call" and "the telephone number or address of such business, other entity, or individual" required of all "artificial or prerecorded telephone messages" by 47 U.S.C. § 227(d)(3)(A) and 47 C.F.R § 64.1200(b). The robocalls did generally end with the message "paid for by theroadtopower.com"—a reference to a website on which Defendant posts a video podcast.

20.     <u>Brooklyn, Iowa Campaign</u>: The first of the five spoofed robocall campaigns targeted Brooklyn, Iowa, a small town with a population of approximately 1,500. In August 2018, Brooklyn became the focus of national media attention following the abduction and murder of resident Mollie Tibbetts by a Mexican immigrant. In his August 26, 2018 eulogy for his daughter, Tibbett's father made statements in support of the local Hispanic community.

21.     From August 28 to 30, 2018, Defendant bombarded Brooklyn with 837 spoofed robocalls, using a false caller ID matching the area code and central

office code for Brooklyn. The robocalls' voice message stated that Mollie Tibbetts had been murdered by a "biological hybrid of white and savage Aztec ancestors"; that if Tibbetts were alive she would tell supporters to "kill them all"; and that in lieu of mass murder, all such non-white Hispanic individuals should be expelled from the United States. The voice message specifically charged "relatives of Mollie Tibbetts" with falsely denying her desire to kill all "Aztec hybrids."

22. Predictably given Brooklyn's small population, family members of Tibbetts received and listened to the spoofed robocalls.

23. On information and belief, Defendant intended the spoofed robocalls to cause emotional harm to all recipients, who—believing they were receiving a call from a neighbor—instead received a highly disturbing robocall message that lacked statutorily required disclosures. Defendant intended to cause the most emotional harm to Tibbetts' grieving family and to their Hispanic neighbors. Defendant's use of spoofed caller IDs was also intended to enable Defendant to evade law enforcement scrutiny, while still raising the profile of his website.

24. <u>Sandpoint, Idaho Campaign</u>: The second spoofed robocall campaign targeted Sandpoint, Idaho, where Defendant was then staying. The campaign followed reporting by the Sandpoint *Reader*, a local newspaper, which brought undesired attention to Defendant's activities.

8

25. Between September 21 and 24, 2018, Defendant made 750 spoofed robocalls to Sandpoint telephone numbers, using a false caller ID that made it appear that the robocalls originated from a caller with a Sandpoint phone number. The robocalls' voice messages described Ben Olson, the publisher of the Sandpoint *Reader*, as a "cancer [that] must be burned out" and a "degenerate bartender with no education or training in reporting." They further exhorted listeners to "burn out the cancer."

26. On information and belief, Defendant intended the spoofed robocalls to cause emotional harm to all recipients, who—believing they were receiving a call from a neighbor—instead received a highly disturbing robocall message that lacked statutorily required disclosures. Defendant intended to cause particular harm to Olson, the Sandpoint *Reader*'s employees, and readers of the paper. On information and belief, Defendant also intended to cause financial and physical harm to Olson and the Sandpoint *Reader*. Defendant's use of spoofed caller IDs was also intended to enable Defendant to evade law enforcement scrutiny, while still raising the profile of his website.

27. <u>Florida Campaign</u>: The third spoofed robocall campaign targeted the State of Florida during the lead up to Florida's 2018 gubernatorial election. Between October 20 and 23, 2018, Defendant made 766 spoofed robocalls to

Florida telephone numbers, using a false caller ID that made it appear that the robocalls originated from a Florida caller. The robocalls' voice messages involved an individual claiming to be Andrew Gillum and using a caricatured accent making outlandish claims regarding his intentions to, *e.g.*, replace Florida's housing stock with mud huts and replace the "white man's medicine" with "the medicine of my African race," such as "puttin' the chicken feets under your pillow."

28. On information and belief, Defendant intended the spoofed robocalls to cause emotional harm to all recipients, who—believing they were receiving a call from a neighbor—instead received a highly disturbing robocall message that lacked statutorily required disclosures. Defendant intended to cause particular emotional harm to Black recipients. Defendant's use of spoofed caller IDs was also intended to enable Defendant to evade law enforcement scrutiny, while still raising the profile of his website.

29. <u>Georgia Campaign</u>: The fourth spoofed robocall campaign targeted the State of Georgia during the lead up to Georgia's 2018 gubernatorial election. Between November 2 and 3, 2018, Defendant made 583 spoofed robocalls to Georgia telephone numbers, using a false caller ID that made it appear that the robocalls originated from a Georgia caller. The robocalls' voice messages involved an individual claiming to be "the magical negro, Oprah Winfrey" making various

10

outlandish statements regarding gubernatorial candidate Stacey Abrams, including referring to her as a "poor man's Aunt Jemima," whom "white women can be tricked into voting for, especially the fat ones."

30.   On information and belief, Defendant intended the spoofed robocalls to cause emotional harm to all recipients, who—believing they were receiving a call from a neighbor—instead received a highly disturbing robocall message that lacked statutorily required disclosures. Defendant intended to cause particular emotional harm to Black recipients. Defendant's use of spoofed caller IDs was also intended to enable Defendant to evade law enforcement scrutiny, while still raising the profile of his website.

31.   <u>Charlottesville, Virginia Campaign</u>: The fifth spoofed robocall campaign targeted the town of Charlottesville, Virginia. In May 2017, members of various extremist groups held the "Unite the Right" rally in Charlottesville. During the event, an attendee named James Fields drove his car into a crowd of counter-protestors, injuring several and causing the death of Heather Heyer. Fields was charged with murder for Heyer's death, and his trial was scheduled for November 2018. Jury selection began on November 26.

32.   Starting November 27, 2018, Defendant bombarded the Charlottesville area with 2,023 spoofed robocalls. Defendant used two false caller

IDs matching the area code and central office code for Charlottesville, which were assigned to the University of Virginia and Wells Fargo & Company. The robocalls' voice message blamed Charlottesville's "Jew Mayor" and "pet Negro Police Chief" for creating mayhem during the "Unite the Right Rally"; stated that the "unhealthy, morbidly obese" Heyer was never struck by a car and instead died of a heart attack; called for the conviction and punishment of the mayor and police chief; and stated "we're no longer going to tolerate a Jewish lying press, and Jew corruption of an American legal system."

33. On information and belief, Defendant intended the spoofed robocalls to cause emotional harm to all recipients, who—believing they were receiving a call from a neighbor—instead received a highly disturbing robocall message that lacked statutorily required disclosures. Defendant intended to cause particular emotional harm to recipients with relationships with Heather Heyer, as well as to Jewish and Black recipients. Defendant also intended to cause harm to the Commonwealth of Virginia and City of Charlottesville by contaminating the jury pool for the Fields trial. He further intended to cause harm to the University of Virginia and Wells Fargo & Company by causing recipients of spoofed robocalls to falsely believe that Defendant's messages originated from individuals associated with those institutions. Defendant's use of spoofed caller IDs was also intended to

enable Defendant to evade law enforcement scrutiny, while still raising the profile of his website.

34.    On information and belief, based on news reports and other evidence, Defendant made additional spoofed robocalls following the Charlottesville campaign. The subsequent spoofed robocalls were also intended to cause harm to their recipients and to enable Defendant to evade law enforcement scrutiny, while raising the profile of his website.

### FCC's Notice of Apparent Liability and Forfeiture Order

35.    On January 31, 2020, the FCC issued a Notice of Apparent Liability for Forfeiture ("NAL") to Defendant for a monetary forfeiture of $12,910,000 for apparent violations of 47 U.S.C. § 227(e)(1) and 47 C.F.R. § 64.1604, by spoofing caller ID information with the intent to defraud, cause harm, or wrongfully obtain anything of value. The NAL charged Defendant with making 6,455 unlawful spoofed robocalls in the course of six campaigns—the five described above, as well as another campaign of 1,496 robocalls targeting California in May 2018. The $12,910,000 penalty comprised a base forfeiture amount of $1,000 for each of the 6,455 apparently unlawful calls, and an upward adjustment of 100% to reflect the seriousness, duration, and scope of Defendant's violations. The NAL ordered Defendant to pay the full amount of the proposed forfeiture, or to file a written

statement seeking reduction or cancellation of the proposed forfeiture, within 30 days. A copy of the NAL is attached as Exhibit A. The additional details regarding the robocall campaigns included therein are incorporated into this Complaint by reference.

36. Defendant filed a written response to the NAL on February 25, 2020. Defendant argued that he did not unlawfully alter caller ID information in violation of 47 U.S.C. § 227(e)(1) and that he did not unlawfully intend to cause harm or wrongfully obtain something of value. Defendant also argued that he could not be charged with violations of 47 U.S.C. § 227(e)(1) and 47 C.F.R. § 64.1604 for the 1,496 robocalls made in the campaign targeting California, because the number appearing in the caller ID used in that robocall campaign was validly assigned to Defendant. Defendant included with his response a sworn statement that he "did not make the automated phone calls and spoof caller identifications as alleged in the FCC Notice of Apparent Liability[.]" A copy of Defendant's response is attached as Exhibit B.

37. On January 14, 2021, the FCC issued a Forfeiture Order in the amount of $9,918,000 against Defendant for 4,959 violations of 47 U.S.C. § 227(e)(1) and 47 C.F.R. § 64.1604. As explained in the Forfeiture Order, the Commission found Defendant's arguments in his Response to the NAL unpersuasive, with one

14

exception; the Commission found that the caller ID used in the California robocall campaign was validly assigned to Defendant at the time of the robocalls, and that those robocalls therefore did not violate the prohibition on unlawful spoofing. The Forfeiture Order found Defendant liable for 4,959 unlawful spoofed robocalls and accordingly reduced the $12,910,000 proposed forfeiture to $9,918,000 to account for the robocalls that Defendant did not unlawfully spoof. The Commission explained that the $9,918,000 forfeiture amount was calculated by multiplying the $1,000 base forfeiture by the 4,959 spoofed calls and applying a 100% upward adjustment. The Commission concluded that, in weighing the relevant statutory factors and FCC forfeiture guidelines, the proposed forfeiture properly reflected the seriousness, duration, and scope of Defendant's violations. The Forfeiture Order directed Defendant to pay the forfeiture penalty in thirty days and provided that if he did not, the matter could be referred to the Department of Justice for enforcement. A copy of the Forfeiture Order is attached as Exhibit C. The additional details regarding the robocall campaigns included therein are incorporated into this Complaint by reference.

### FCC's Referral to the Department of Justice

38. Despite due demand, Defendant did not pay the forfeiture.

39. Pursuant to 47 U.S.C. § 504(a), the FCC referred the matter to the

15

Department of Justice for enforcement.

40. Pursuant to 47 U.S.C. § 401, the FCC also requested that the Department of Justice seek a writ of mandamus commanding Defendant to comply with the provisions of the Act. The FCC noted that the willful and repeated nature of Defendant's violations supports injunctive relief. A declaration from FCC's Acting General Counsel regarding that request is attached as Exhibit D.

## COUNT ONE: ENFORCEMENT OF MONETARY FORFEITURE

41. The United States re-alleges and incorporates by reference Paragraphs 1 through 40 of this Complaint as though fully set forth herein.

42. Defendant violated 47 U.S.C. § 227(e)(1) and 47 C.F.R. § 64.1604, by making 4,959 illegal spoofed robocalls from August to December 2018. These calls were made with the intent to defraud, cause harm, or wrongfully obtain something of value.

43. Defendant's conduct supports the FCC's determination that he intended to cause harm to: (1) Mollie Tibbetts' family; (2) Ben Olson and the Sandpoint *Reader*; (3) the Commonwealth of Virginia and the City of Charlottesville; (4) consumers; (5) numbering resources; and (6) subscribers of the spoofed numbers.

16

44. As required by the Truth in Caller ID Act, 47 U.S.C. § 227(e)(5)(A), the FCC issued an NAL to Defendant that provided him the notice required by 47 U.S.C. § 503(b)(4).

45. The FCC properly released a Forfeiture Order against Defendant on January 14, 2021, pursuant to 47 U.S.C. § 227(e)(5)(A), in which it imposed a forfeiture penalty in the amount of $9,918,000 against Defendant for his violations.

46. By reason of the foregoing, Defendant is liable to the United States for the forfeiture amount of $9,918,000 pursuant to 47 U.S.C. § 503(b), 47 U.S.C. § 227(e)(5)(A)(ii), and 47 C.F.R. § 1.80.

47. Demand has been made upon Defendant by the United States for the sum due, but the amount due remains unpaid.

48. The Certificate of Forfeiture is attached hereto as Exhibit E.

## COUNT TWO: INJUNCTIVE RELIEF

49. The United States re-alleges and incorporates by reference Paragraphs 1 through 40 of this Complaint as though fully set forth herein.

50. Starting in 2018 at the latest, Defendant has willfully and repeatedly violated 47 U.S.C. § 227(e)(1) and 47 C.F.R. § 64.1604 by making thousands of unlawful spoofed robocalls with the intent to defraud, cause harm, or wrongfully obtain something of value.

51. Defendant has refused to accept responsibility for his unlawful acts or acknowledge their wrongful nature.

52. In the absence of an injunction, Defendant will likely violate 47 U.S.C. § 227(e)(1) and 47 C.F.R. § 64.1604 in the future.

53. Under 47 U.S.C. § 401(a), a district court may issue a writ of mandamus commanding any person to comply with the provisions of the Act and the regulations issued thereunder including the provisions cited in Paragraph 52 above.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiff requests that the Court:

A. Order the enforcement of a forfeiture penalty in the amount of $9,918,000, plus all applicable prejudgment and post-judgment interest, recoverable against Defendant Scott Rhodes;

B. Issue a writ of mandamus that permanently enjoins Defendant Scott Rhodes from violating the provisions of the Communications Act and its implementing regulations, including 47 U.S.C. § 227(e)(1) and 47 C.F.R. § 64.1604.

C. Award such other and additional relief as the Court may deem just and proper.

18

DATED: September 27, 2021     Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

ARUN G. RAO
Deputy Assistant Attorney General

GUSTAV W. EYLER
Director, Consumer Protection Branch

LISA K. HSIAO
Assistant Director

/s/     Michael J. Wadden
MICHAEL J. WADDEN
PATRICK R. RUNKLE
Trial Attorneys
United States Department of Justice
Attorneys for Plaintiff United States