# EXHIBIT A

**Before the**
**Federal Communications Commission**
**Washington, DC 20554**

| | |
|---|---|
| In the Matter of | ) |
| | ) File No.: EB-TCD-18-00028178 |
| Scott Rhodes a.k.a. Scott David Rhodes, Scott D. | ) NAL/Acct. No.: 202032170002 |
| Rhodes, Scott Platek, Scott P. Platek | ) FRN: 0029168846 |
| | ) |

## NOTICE OF APPARENT LIABILITY FOR FORFEITURE

**Adopted: January 30, 2020**                              **Released: January 31, 2020**

By the Commission: Chairman Pai and Commissioners O'Rielly and Starks issuing separate statements; Commissioner Rosenworcel dissenting and issuing a statement.

## I.    INTRODUCTION

1.      Combating unlawful, unwanted telephone calls—including unlawfully spoofed calls—is the top consumer protection priority for the Federal Communications Commission (FCC or the Commission). Spoofing occurs when caller ID information is manipulated or altered to display anything other than the originating telephone number. Spoofing is unlawful under the Truth in Caller ID Act when it is done with the intent to defraud, cause harm, or wrongfully obtain anything of value.[1] This Notice of Apparent Liability advances the Commission's ongoing efforts to crack down on unlawful robocalls by taking action against a particularly egregious spoofing scheme that targeted various vulnerable individuals and communities with disruptive prerecorded voice message calls.

2.      Scott Rhodes (Rhodes) apparently made more than 6,000 unlawful spoofed robocalls between May 2018 and December 2018. Rhodes altered his caller ID information to appear as local numbers as part of his campaign to send provocative prerecorded voice message calls. The Commission identified six distinct calling campaigns, each of which targeted voters in districts during political campaigns or residents in communities that had experienced major news events relating to or involving white nationalism, immigration, or other public controversies. For example, Rhodes made hundreds of neighbor-spoofed robocalls to residents of Brooklyn, Iowa immediately following the much-publicized murder of Mollie Tibbetts, a college student who grew up in that small town, by an illegal alien. In another campaign, Rhodes harassed and attempted to silence his local newspaper in retaliation for the paper revealing that Rhodes had made controversial robocalls. The Commission and local law enforcement received numerous complaints from consumers who received Rhodes's spoofed robocalls.

3.      We find that Rhodes apparently violated the Truth in Caller ID Act by making spoofed robocalls with the apparent intent to cause harm and wrongfully obtain something of value. As discussed herein, we propose a forfeiture of $12,910,000.

## II.    BACKGROUND

4.      *Legal Background.* Congress recognized that consumers have embraced caller ID as a vital part of voice telephone service, depending on it to help them decide whether or not to answer the phone. Caller ID is only valuable, however, if it is accurate.[2] The Truth in Caller ID Act prohibits

---

[1] 47 U.S.C. § 227(e); 47 CFR § 64.1604.

[2] 156 Cong. Rec. H2522, H2524 (2010) ("Now, if you see a caller ID and you see it has a phone number, most people think that it's ironclad that that's the actual phone number that's calling them when in truth it's not."); 155 Cong. Rec. S170-02, S173 (2009) ("Consumers expect caller I.D. to be accurate because it helps them decide whether to answer a phone call and trust the person on the other end of the line.").

"caus[ing] any caller identification service" in connection with any telecommunications service or Internet Protocol-enabled service to "knowingly transmit misleading or inaccurate caller identification information with the intent to defraud, cause harm, or wrongfully obtain anything of value[.]"[3]

5.      Spoofing on a large scale is often coupled with illegal robocalling activity.  In enacting the Telephone Consumer Protection Act (TCPA), Congress determined that unwanted prerecorded voice message calls are a greater nuisance and invasion of privacy than live calls and that such calls delivered via wireless phones can be costly.[4]  Through the TCPA, Congress provided greater protections for consumers from such calls.[5]  The statute and the Commission's implementing rules prohibit prerecorded voice message calls to wireless telephone numbers without subscribers' prior consent—unless made for an emergency purpose,[6] and mandate inclusion of the telephone number of the entity responsible for initiating the call.[7]  The Commission has found that spoofing, when employed in an unlawful robocalling campaign, can indicate an intent to cause harm.[8]  Political prerecorded voice message calls are not exempt from these prohibitions.[9]

6.      *Factual Background.*  Throughout the summer and fall of 2018, consumers across the country received spoofed robocalls from "The Road to Power."  The robocalls contained prerecorded voice messages targeting political campaigns or communities that had recently experienced major news events relating to or involving white nationalism, immigration, or other public controversies.[10]  The robocalls also directed consumers to a website called "theroadtopower.com" hosted by BitChute.[11]  News organizations identified the individual behind the website as Scott Rhodes,[12] who was at that time a

---

[3] 47 U.S.C. § 227(e)(1).  The prohibition does not apply to lawfully authorized investigative, protective, or intelligence activities of a law enforcement agency of the United States, the states, or a political subdivision of a state, or of an intelligence agency of the United States or to activity allowed pursuant to a court order that specifically authorizes the use of caller ID manipulation.  47 CFR § 64.1604(b); *see also* 47 U.S.C. § 227(e)(3)(B)(ii); 47 U.S.C. § 227(e)(7).  Those exceptions do not apply here.

[4] *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, Report and Order, 18 FCC Rcd 14014, 14115, para. 165 (2003) (*2003 TCPA Order*).  Similarly, courts have routinely agreed that robocalls are an invasion of privacy, an injury in fact sufficient for Article III jurisdiction.  *Mims v. Arrow Financial Services, LLC*, 565 U.S. 368, 372 (2012) (finding that robocalls are an invasion of privacy); *Frisby v. Schultz*, 487 U.S. 474, 484 (1988) (recognizing that preserving the sanctity of the home is an important value); *LaVigne v. First Community Bancshares, Inc.*, 215 F. Supp. 3d 1138, 1146-47 (D. NM 2016).

[5] 47 U.S.C. § 227(b), (d)(3).

[6] 47 U.S.C. § 227(b)(1)(A)(iii); 47 CFR § 64.1200(a)(1)(iii).

[7] 47 U.S.C. § 227(d)(3)(A); 47 CFR § 64.1200(b)(2).

[8] *Best Insurance Contracts, Inc., and Philip Roesel, dba Wilmington Insurance Quotes*, Forfeiture Order, 33 FCC Rcd 9204, 9218-19, para. 40 (2018) (*Roesel Forfeiture Order*); *Abramovich, Marketing Strategy Leaders, Inc., and Marketing Leaders, Inc.*, Notice of Apparent Liability, 32 FCC Rcd 4965, 5423, para. 16 (2017) (*Abramovich Notice of Apparent Liability*).

[9] *Biennial Reminder for Political Campaigns About Robocall and Text Abuse, Enforcement Advisory,* 31 FCC Rcd 1940, 1941 (2016); Federal Communications Commission, *Political Campaign Robocalls & Robotexts*, https://www.fcc.gov/political-campaign-robocalls-robotexts (last visited Dec. 17, 2019).

[10] As noted in a prior enforcement action, our determination here does not turn on the content of the relevant communications.  *See Kenneth Moser dba Marketing Support Systems*, Notice of Apparent Liability for Forfeiture, FCC 19-135, paras. 18-19 (2019).

[11] BitChute is a video hosting website similar to YouTube.  Julia Alexander, *Controversial YouTubers head to alternative platforms in wake of 'purge'*, Polygon (Mar. 7, 2018), https://www.polygon.com/2018/3/7/17087668/steemit-dtube-bitchute-youtube-purge.

[12] Rhodes also goes by the name Scott Platek, which is apparently the surname of Rhodes's adopted family.  Cameron Rasmusson and Ben Olson, *Rhodes breaks silence amid police investigations*, Sandpoint Reader (Jan. 19, 2018), http://sandpointreader.com/rhodes-breaks-silence-amid-police-investigations/.  A public records search using

resident of Sandpoint, Idaho.[13]  The website contained several videos apparently uploaded by and featuring Mr. Rhodes providing similar commentary as the robocalls.[14]  While all of the robocalls caused an originating phone number to be displayed on the recipients' caller ID, none of those phone numbers were assigned to either The Road to Power or Rhodes.

7.      The FCC and the Federal Trade Commission received complaints about the robocalls.[15]  Based on consumer complaints, FCC Enforcement Bureau (Bureau) staff traced the robocalls to a specific dialing platform.[16]  The Dialing Platform identified Scott Rhodes as the originator of the robocalls.[17]  The Dialing Platform's service allows customers to dial numbers from a list and play a prerecorded voice message once the call connects to the recipient.[18]  The service requires users to enter a 10-digit caller ID to make calls.[19]  Customers can either provide their own caller ID numbers or request numbers provisioned to the Dialing Platform.[20]  Rhodes did not use any Dialing Platform numbers; instead, Rhodes provided the numbers that appeared in the caller ID.[21]  Rhodes's user agreement with the Dialing Platform required him to transmit accurate and truthful caller ID information.[22]

8.      Rhodes made thousands of calls using the Dialing Platform's service.[23]  Bureau staff identified six distinct calling campaigns, for a total of 6,455 robocalls, by matching the call detail records with news coverage of calling campaigns for which the Bureau had recordings or transcripts of the prerecorded voice messages.[24]



(Continued from previous page…)

Westlaw CLEAR shows that Rhodes has used both names.  Any entity that is a "Small Business Concern" as defined in the Small Business Act (Pub. L. 85-536, as amended) may avail itself of rights set forth in that Act, including rights set forth in 15 U.S.C. § 657, "Oversight of Regulatory Enforcement," in addition to other rights set forth herein.

[13] *See* Ben Olson and Cameron Rasmusson, *Suspected racist CD distributor appears to be responsible for robocalls in California*, Sandpoint Reader (*May Sandpoint Reader Article*) (May 24, 2018), http://sandpointreader.com/suspected-racist-cd-distributor-appears-responsible-robocalls-california/ (identifying the man in the videos as Scott Rhodes).  The Road to Power is only the name of Rhodes's website and his online persona.  It is not a legal entity.

[14] *Id.*

[15] *See, e.g.*, FCC Consumer Complaint #2737716 (Aug. 29, 2018) ("Most disturbing and unwanted phone call I've ever received."); FTC Consumer Sentinel Complaint #Rec. 99424202 (Aug. 29, 2018); FTC Consumer Sentinel Complaint #99381822 (Aug. 28, 2018).

[16] ███████████ Subpoena Response (Nov. 27, 2018) (on file in EB-TCD-18-00027696) (identifying ███████ (Dialing Platform) as the dialing platform).

[17] ██████████████████ Traceback Subpoena Response (Nov. 29, 2018) (on file in EB-TCD-18-00028178).

[18] ████████████ Narrative Subpoena Response (Feb. 21, 2019) (on file in EB-TCD-18-00028178) (Dialing Platform Response).  Some recipients listened to the robocalls "live" while others listened to the robocalls from voicemail.

[19] *Id.*

[20] *Id.* The Dialing Platform subscribes to numbers that can be used by its customers.  *Id.*

[21] *Id.*

[22] *Id.*

[23] ████████████ Subpoena Response (Feb. 21, 2019) (on file in EB-TCD-18-00028178) (Call Detail Records).

[24] The recordings or transcripts were obtained from complaints, news reports, or local law enforcement.  Rhodes made 34,277 robocalls using the Dialing Platform in 2018, but this NAL is limited to the verified robocalls.  *See* Call Detail Records.  To ensure that the robocalls were related to the verified campaigns, Bureau staff removed any robocalls made to recipients outside the geographic area targeted by Rhodes in each campaign.  Transcripts of the prerecorded voice messages are included in Appendix, *infra*.

9.    <u>May California Campaign—Dianne Feinstein.</u>  In May 2018, Rhodes used the Dialing Platform to send calls about the 2018 California U.S. Senate primary, where several challengers attempted to unseat incumbent Senator Dianne Feinstein.[25]  The robocalls contained (1) an endorsement of candidate Patrick Little; (2) comments about Senator Feinstein's Jewish heritage; and (3) allegations that Senator Feinstein "is an Israeli citizen pretending to be an American" who "kills our children."[26]  Between May 14, 2018, and May 18, 2018, Rhodes made 1,496 robocalls to California consumers.[27]  Rhodes used a number in the 415-295-xxxx exchange as his caller ID,[28] a number that was assigned to an individual who does not have any association with Rhodes.[29]

10.    <u>August Iowa Campaign—Mollie Tibbetts.</u>  In late August 2018,  Iowa residents began receiving prerecorded voice message calls referring to the apprehension of an illegal alien from Mexico whom prosecutors had charged with the murder of Mollie Tibbetts, a college student from Brooklyn, Iowa.[30]  Ms. Tibbetts had been abducted and murdered just outside of her hometown.[31]  A local sheriff described how the murder completely shook the "tight-knit community where everyone knows everyone."[32]  Rhodes selected a number in the 641-522-xxxx exchange,[33] an unassigned number matching the area code and central office code for Brooklyn, as his caller ID.[34]  In total, he made 837 robocalls to Iowa consumers between August 28, 2018, and August 30, 2018—two days after Ms. Tibbetts's funeral at her hometown high school.[35]  The majority of the calls were directed to consumers in the Brooklyn, Iowa area.  These robocalls received considerable local and national media attention.[36]

---

[25] Greg Price, *California Senate Candidate Endorses Call to 'Rid America of Traitorous Jews Like Dianne Feinstein'*, Newsweek (May 18, 2018), www.newsweek.com/senate-california-traitorous-jews-feinstein-republican-934761.

[26] Appendix.

[27] Call Detail Records.

[28] 415-295-███.

[29] ███ Subpoena Response (Mar. 14, 2019) (on file in EB-TCD-18-00028178).

[30] Linh Ta, Shelby Fleig, & Robin Opsahl, *Mollie Tibbetts search: An undocumented immigrant has been charged with first-degree murder*, Des Moines Register (Aug. 21, 2018), https://www.desmoinesregister.com/story/news/local/2018/08/21/mollie-tibbetts-found-dead-missing-iowa-student-search-brooklyn-update-latest-girl-facebook-reddit/1050165002. Brooklyn is a town of 1,468 people. United States Census Bureau, *Brooklyn City* (2010), https://factfinder.census.gov/faces/nav/jsf/pages/community_facts.xhtml.

[31] Linh Ta, Shelby Fleig, & Robin Opsahl, *Mollie Tibbetts search: An undocumented immigrant has been charged with first-degree murder*, Des Moines Register (Aug. 21, 2018), https://www.desmoinesregister.com/story/news/local/2018/08/21/mollie-tibbetts-found-dead-missing-iowa-student-search-brooklyn-update-latest-girl-facebook-reddit/1050165002.

[32] Kat Russell, *A year after Mollie Tibbetts tragedy, a community changes*, The Gazette (July 18, 2019), https://www.thegazette.com/subject/news/public-safety/mollie-tibbetts-murder-brooklyn-iowa-one-year-later-20190718.

[33] 641-522-███.

[34] ████████████████████████ Subpoena Response (Sept. 10, 2018) (on file in EB-TCD-18-00028178).

[35] Call Detail Records; Luke Nozicka and Kevin Hardy, *'Today, we need to turn the page. We're at the end of a long ordeal,' Rob Tibbetts tells crowd at daughter's funeral*, Des Moines Register (Aug. 26, 2018), www.desmoinesregister.com/story/news/crime-and-courts/2018/08/26/mollie-tibbetts-funeral-missing-iowa-body-found-family-update-death-brooklyn-murder-cristhian-rivera/1103580002.

[36] *See generally* Artemis Moshtaghian, *Robocalls and graffiti after Mollie Tibbetts' death worry Iowa Latinos*, CNN (Sept. 1, 2018), https://www.cnn.com/2018/09/01/us/iowa-latinos-tension/index.html (reporting to CNN's national audience on the robocalls); Tamar Lapin, *Tibbetts murder exploited by racist group in creepy robocall*, New York Post (Aug. 30, 2018), https://nypost.com/2018/08/30/tibbetts-murder-exploited-by-racist-group-in-creepy-robocall/

11.     The prerecorded voice message used a deep, shouting male voice along with a brief female voice—apparently intended to impersonate Ms. Tibbetts and saying, "kill them all."[37]  The roughly minute-and-a-half robocall contained the following prerecorded voice message:

> The body of 20-year-old Mollie Tibbetts was found in a corn field after she was stabbed to death by an invader from Mexico.  A biological hybrid of white and savage Aztec ancestors, who also killed with knives during their mass human sacrifices on top of pyramids they didn't build.  Some relatives of Mollie Tibbetts are implying that despite having been murdered by a non-white, savage intruder, she would still support the invasion of America by a brown horde currently at a staggering 58 million.  But you know in your heart they are wrong.  If after her life has now been brutally stolen from her, she could be brought back to life for just one moment and asked, "What do you think now?" Mollie Tibbetts would say, "Kill them ALL."  We don't have to kill them all, but we do have to deport them all.  The Aztec hybrids, known as Mestizos, are low-IQ, bottom-feeding savages, and is why the country they infest are crime-ridden failures.  That's now America's fate too unless we re-found America as whites-only and get rid of them now!  EVERY LAST ONE!  This message paid for by TheRoadToPower.com.[38]

12.     The robocalls reached Ms. Tibbetts's family.  Her father received the robocall and answered the robocall because it displayed a local number.[39]  Family members told reporters that they suffered emotional distress after listening to the calls.[40]  Mollie Tibbetts's stepmother "became physically ill" as a result of the robocalls.[41]

13.     <u>September Idaho Campaign—*Sandpoint Reader.*</u>  Rhodes made hundreds of prerecorded voice message calls to consumers throughout Sandpoint, Idaho, attacking the *Sandpoint Reader*, a local newspaper, and its publisher, Ben Olson.  The paper was one of the first news publications to publicly identify Rhodes as the individual behind Road to Power, the entity that claimed responsibility for the California and Iowa robocalls.[42]  Subsequently, several national media outlets cited the *Sandpoint Reader*'s investigative reporting about Rhodes.[43]  The prerecorded voice message calls that Rhodes made

(Continued from previous page…) ——————————————————

(covering the robocalls); Robin Opsahl and Linh Ta, *White Nationalist in Idaho using Iowa phone number to spread racist message about Mollie Tibbetts' death*, Des Moines Register (Aug. 29, 2018, updated Aug. 30, 2018), https://www.desmoinesregister.com/story/news/politics/2018/08/29/mollie-tibbetts-robocall-brooklyn-iowa-immigration-white-supremacist-white-nationalist-neo-nazi/1134435002/ (providing local news coverage); Pat Rynard, *Neo-Nazi Robocall Hits Iowa on Tibbetts' Murder:  "Kill Them All."*, Iowa Starting Line (Aug. 29, 2018), https://iowastartingline.com/2018/08/29/neo-nazi-robocall-hits-iowa-on-tibbetts-murder-kill-them-all/ (providing first news report on the robocalls).

[37] Appendix.

[38] *Id.*

[39] Luke Nozicka, *'Twisted and grotesque':  Mollie Tibbetts' father says racist robocall singled him out*, Des Moines Register (Sept. 3, 2018), https://www.desmoinesregister.com/story/news/2018/09/03/mollie-tibbetts-missing-found-robocall-racist-white-nationalist-brooklyn-iowa-trump-immigration/1181614002/.

[40] *Id.*

[41] *Id.*

[42] *May Sandpoint Reader Article.*

[43] Blake Montgomery, *A Neo-Nazi Is Using Robocalls To Target A Black Florida Candidate For Governor*, BuzzFeed News (Sept. 1, 2018, updated Sept. 2, 2018), https://www.buzzfeednews.com/article/blakemontgomery/neo-nazis-are-using-robocalls-to-target-florida; Allie Conti, *Now People Are Getting Neo-Nazi Robocalls About Mollie Tibbetts's Death*, Vice (Aug. 31, 2018), https://www.vice.com/en_us/article/3kyggj/neo-nazi-robocall-mollie-tibbetts-death-vgtrn; Kelly Weill, *Neo-Nazi Robocall Impersonates Mollie Tibbetts to Call for Genocide*, Daily Beast (Aug. 30, 2018), https://www.thedailybeast.com/neo-nazi-robocall-impersonates-mollie-tibbetts-to-call-for-genocide.

to residents in Sandpoint included the following statements, with tense keyboard music in the background:

> Ben Olson is a cancer on hopeful North Idaho and cancers must be burned out. Ben Olson is a degenerate bartender with no education or training in reporting. . . . Burn out the cancer, Ben Olson, and send a message to the rest of his tiny leftist cabal that their time is over and it can happen to them too. Burn out the cancer, Ben Olson, or the cancer that he is will spread and kill. Burn it out![44]

Rhodes made 750 calls to Sandpoint residents between September 21, 2018, and September 24, 2018.[45] Rhodes's selected caller ID, a number in the 208-265-xxxx exchange,[46] which was an unassigned number.[47]

      14.     The robocalls were not the only attacks on the *Sandpoint Reader* and Mr. Olson. Concurrent with the robocall campaign, a video surfaced on YouTube using the same audio as the robocall and showing a large portion of the *Sandpoint Reader*'s weekly print edition in flames.[48] Additionally, the *Sandpoint Reader*'s co-owner and advertisers received unsigned letters and emails demanding that they sever ties with Mr. Olson or else "you will be named publicly" and "you will be named privately to the right people."[49] Mr. Olson stated to police that he believed this campaign was a "personal attack" in response to his investigative reporting—reporting that coincided with Rhodes getting evicted from his residence.[50]

      15.     <u>October Florida Campaign—Andrew Gillum.</u> Rhodes targeted Florida gubernatorial candidate Andrew Gillum. The robocalls falsely claimed to be Mr. Gillum and used "a caricature of a black dialect"[51] with jungle background noises as part of a caricature.[52] Between October 20, 2018 and October 23, 2018, Rhodes made 766 robocalls to Florida consumers.[53] The robocalls used a number in the 850-222-xxxx exchange as the caller ID,[54] which was unassigned during Rhodes's calling

---

[44] Appendix. *See also* Keith Kinnaird, *Robocall Targets Local Journalist*, Bonner County Daily Bee (Sept. 22, 2018), https://www.bonnercountydailybee.com/local_news/20180922/robocall_targets_local_journalist (reporting on the robocalls).

[45] Call Detail Records.

[46] 208-265-▮▮▮▮.

[47] ▮▮▮▮ Subpoena Response (Jan. 2, 2020) (on file in EB-TCD-18-00028178).

[48] Jason Wilson, *Neo-Nazi activist behind racist robocalls linked to threats of Idaho newspaper*, The Guardian (Sept. 28, 2018), https://www.theguardian.com/world/2018/sep/28/idaho-robocalls-sandpoint-reader-neo-nazi. The video was removed from YouTube for violating the platform's terms of service. *Id.*

[49] Deputy Report for Incident 18-018901, Sandpoint Police Dept., (at 5 (July 5, 2019) (Sandpoint Police Dept. Records) (on file in EB-TCD-18-00028178). The co-owner told police that he believed this was an implied threat of violence. The letter to the co-owner included a list of the *Sandpoint Reader*'s advertisers and threatened to publicly name them for supporting Mr. Olson. *Id.*

[50] *Id.* at 3. The robocalls claim that Mr. Olson threatened Rhodes's landlord to evict Rhodes, but Mr. Olson says that he simply questioned the landlord about his affiliation with Rhodes off the record as part of his reporting. *Id.*

[51] Eric Brander, *Another racist robocall targets Florida gubernatorial candidate Andrew Gillum*, CNN (Oct. 24, 2018) (CNN Gillum Article), https://www.cnn.com/2018/10/24/politics/andrew-gillum-racist-robocall-florida-governor/index.html.

[52] Appendix.

[53] Call Detail Records.

[54] 850-222-▮▮▮▮.

campaigns.[55]  These robocalls were the second calling campaign by Rhodes against Mr. Gillum and attracted substantial media attention.[56]

16.    November Georgia Campaign—Stacey Abrams.  Following the Andrew Gillum robocalls, Rhodes launched a campaign targeting Georgia gubernatorial candidate Stacey Abrams.  The robocalls roughly mimicked Oprah Winfrey, who was in Georgia campaigning with Ms. Abrams around the time of the robocalls.[57]  Like the Andrew Gillum robocalls, these robocalls garnered significant national reporting.[58]  Between November 2, 2018, and November 3, 2018—three days before the election—Rhodes made 583 robocalls to Georgia consumers.[59]  Rhodes used an unassigned Georgia number in the 770-586-xxxx exchange as the caller ID.[60]

17.    November Charlottesville Campaign—Fields Trial.  In late November 2018, the murder trial of James Fields began.  Mr. Fields was charged with murdering Heather Heyer by driving an automobile into a crowd of protesters in Charlottesville, Virginia.[61]  Rhodes started making robocalls during jury selection, which began on November 26, 2018.[62]  The robocalls relayed false information about the facts of the case and accused the mayor and the police chief of creating anarchy that put a crowd in front of Mr. Fields's car.[63]  The robocalls concluded by saying "try them, convict them, punish them."[64]  The judge questioned the jurors about the robocalls and explicitly instructed the jury pool to ignore the robocalls.[65]

---

[55] ▮▮▮▮▮ Subpoena Response, Dec 7, 2018 (on file in EB-TCD-18-00028178).

[56] See CNN Gillum Article.  Rhodes previously targeted Mr. Gillum between August 30, 2018, and September 1, 2018, with similar prerecorded voice message calls.  Jeff Burlew, *Racist robocalls tied to neo-Nazi group target Andrew Gillum*, Tallahassee Democrat (Aug. 31, 2018), www.tallahassee.com/story/news/2018/08/31/racist-robocalls-tied-neo-nazi-group-targets-andrew-gillum/1157860002/.  The Bureau was able to confirm that Rhodes made several hundred calls to Florida residents during this time frame, but it did not have a recording or transcript of the prerecorded voice message to verify the robocalls.  See Call Detail Records.

[57] Veronica Stracqualursi, *Racist robocall targets Stacey Abrams, Oprah in Georgia governor's race*, CNN (Nov. 5, 2018), https://www.cnn.com/2018/11/03/politics/stacey-abrams-oprah-georgia-racist-robocall/index.html.

[58] Id.

[59] Call Detail Records.

[60] 770-586-▮▮▮.  ▮▮▮▮▮ Subpoena Response (Dec. 27, 2018) (on file in EB-TCD-18-00028178).

[61] Paul Duggan, *James A. Fields Jr. sentenced to life in prison in Charlottesville car attack*, Washington Post (Dec. 11, 2018), https://www.washingtonpost.com/local/public-safety/james-a-fields-jr-sentenced-to-life-in-prison-in-charlottesville-car-attack/2018/12/11/8b205a90-fcc8-11e8-ad40-cdfd0e0dd65a_story.html?utm_term=.16266c266eba.

[62] Staff, *28 picked to weigh Fields case as potential jurors asked about racist robocall*, The Daily Progress (Nov. 28, 2018) (Daily Progress Jury Article), https://www.dailyprogress.com/news/fields_trial/picked-to-weigh-fields-case-as-potential-jurors-asked-about/article_f3a63546-f357-11e8-9481-474483e006ac.html.

[63] The robocalls provide false information about Ms. Heyer's cause of death, claiming that she died of a heart attack rather than blunt force injury to the chest.  Staff, *Heather Heyer's cause of death ruled as blunt force injury*, The Daily Progress (Oct. 16, 2017), https://www.dailyprogress.com/news/local/heather-heyer-s-cause-of-death-ruled-as-blunt-force/article_cf362edc-b2c6-11e7-bfa4-8749ed76aae2.html.  The medical examiner ruled out a heart attack as the cause of death.  Michael Edison Hayden, *Sexist 'Alt-Right' Conspiracy Surrounding Heather Heyer's Death Persists Despite Ruling From Medical Examiner*, Newsweek (Oct. 17, 2017), https://www.newsweek.com/sexist-alt-right-conspiracies-surrounding-heather-heyers-death-keep-swirling-687195.  Contra. Appendix.

[64] Appendix.

[65] Daily Progress Jury Article.

18.      Between November 27, 2018, and December 4, 2018, Rhodes made 2,023 calls to residents (and thus potential jurors) in the Charlottesville area.[66]  Seventeen residents complained to the Charlottesville Police Department about the robocalls.[67]  One resident stated that he only answered the robocall because it displayed a local caller ID.[68]  In November 2018, Rhodes used a number in the 434-972-xxxx exchange as the caller ID,[69] which was a Charlottesville area number assigned to ██████.[70]  On December 4, 2018, he started using a number in the 434-924-xxxx exchange,[71] assigned to the University of Virginia.[72]  Shortly after he started using the University's number, however, the University's carrier, at the behest of the University, complained to its upstream service providers about the spoofed calls.[73]  Upon receiving the complaint, the Dialing Platform terminated Rhodes's service on December 4, 2018.[74]

19.      <u>Rhodes's Pattern of Behavior</u>.  All of Rhodes's prerecorded voice message calls followed the same format.  They used caller IDs matching the locality of his targeted recipients.  None of the caller IDs displayed phone numbers assigned to Rhodes or The Road to Power.  For each campaign, the recipients were a mix of local media organizations and businesses, as well as community residents.  All of the robocalls were illegal.  Each of Rhodes's robocall campaigns violated the TCPA's identification requirements for prerecorded voice message calls and some also violated the restrictions on prerecorded voice message calls to cell phones.[75]  The recordings did not provide any telephone number associated with Rhodes.  The only identifying information was a statement at the end of most of the messages saying, "this message paid for by theroadtopower.com."[76]

20.      The webpage itself (and the videos posted on it) did not provide contact information for Rhodes or identify him.  Rhodes first posted videos on May 30, 2018—fifteen days after he started the May California Campaign.  The early videos only had a few hundred views.[77]  His viewership increased over the course of his calling campaigns as he gained more national exposure.  By his last video on October 20, 2018, he had expanded his number of views tenfold to 7,187 views.[78]

## III.   DISCUSSION

21.      The Bureau's investigation indicates that Rhodes's activities appear to have violated the Truth in Caller ID Act.  He apparently knowingly displayed misleading or inaccurate caller ID

---

[66] Call Detail Records.

[67] Charlottesville Police Department Case Details 2018-00035184, Charlottesville Police Dept. (Nov. 27, 2018) (on file in EB-TCD-18-00028178) (Charlottesville Police Dept. Records).

[68] *Id.*

[69] 434-972-████.

[70] ████████ Subpoena Response (Dec. 8, 2018) (on file in EB-TCD-18-00028178).

[71] 434-924-████.

[72] ████████ Subpoena Response (Dec. 19, 2018) (on file in EB-TCD-18-00028178).

[73] ████████ Subpoena Response (Aug. 9, 2019) (on file in EB-TCD-18-00028178).

[74] E-mail from ████████████, ████████████████ to Daniel Stepanicich, Attorney Advisor, Telecommunications Consumers Division, FCC Enforcement Bureau (Dec. 4, 2018, 15:14 ET).

[75] 47 U.S.C. § 227(b)(1)(A)(iii), (d)(3)(A); 47 CFR § 64.1200(a)(1)(iii), (b).  Rhodes made at least 660 prerecorded voice message calls to wireless numbers.

[76] Appendix.  The *Sandpoint Reader* calls did not include this disclosure—or any identification information.  *Id.*

[77] The first videos posted in May 2018 had around 600 views each. Theroadtopower, *Videos*, https://www.bitchute.com/channel/theroadtopower/https://www.bitchute.com/channel/theroadtopower/ (last visited Dec. 19, 2019).

[78] *Id.*

information.  Evidence shows that Rhodes appears to have intended to cause harm to several individuals, grieving communities, and consumers in general.  By hiding behind a false caller ID, Rhodes also intended to wrongfully obtain something of value.  More specifically, Rhodes used spoofed caller ID in conjunction with an unlawful (i.e., wrongful) robocalling campaign.  In so doing, he sought to avoid law enforcement and private TCPA lawsuits.  Furthermore, his spoofed robocalls resulted in media notoriety and accordingly enabled him to increase publicity for his website and personal brand.  We thus determine that Rhodes is apparently liable for violation of section 227(e) of the Act and section 64.1604 of the Commission's rules.

22.     We propose a forfeiture in the amount of $12,910,000.  We calculate the proposed forfeiture by assessing a base forfeiture of $1,000 per each apparently unlawful call.  Bureau staff analyzed six distinct calling campaigns made by Rhodes.  We apply the base forfeiture to all 6,455 robocalls made across the six campaigns.  We then upwardly adjust the proposed amount to reflect the egregiousness of the specific facts here.

### A.     Rhodes Apparently Knew That He Was Using Inaccurate Caller ID Information.

23.     The Truth in Caller ID Act prohibits a caller from knowingly transmitting misleading or inaccurate caller ID information with the requisite intent.  Rhodes set the caller ID information, and every number he selected was either an unassigned phone number or a phone number that was assigned to unrelated third parties.

24.     In choosing these numbers, Rhodes set the caller ID to display phone numbers that matched the area code—and in some cases the central office code—of the communities that he was targeting.[79]  This practice, called "neighbor spoofing," results in the display of inaccurate caller ID information.[80]  Neighbor spoofing misleads consumers into thinking they are receiving a local call.[81]  The Dialing Platform required users to enter a caller ID number to place a call; Rhodes apparently deliberately selected phone numbers that were not assigned to him and thus were spoofed.

### B.     Rhodes Apparently Falsified Caller ID with the Intent to Harm People.

25.     It is unlawful to display misleading or inaccurate caller ID information when the caller's intent is to defraud, cause harm or wrongfully obtain anything of value.[82]  The Commission has held that the element of "harm" in the Truth in Caller ID Act is broad and "encompasses financial, physical, and emotional harm . . . ."[83]  Moreover, the Commission has stated that an intent to harm under the Truth in Caller ID Act can be demonstrated when the harms are "consequences which are desired" or "substantially certain."[84]  Courts have recognized that direct evidence of specific intent is rarely

---

[79] For example, 641-522-███, the number that he used in his Iowa campaign, matched the area code and central office code for Brooklyn, Iowa, where the Tibbetts family resided.

[80] *See Abramovich Notice of Apparent Liability*, 32 FCC Rcd at 5422, para. 12.

[81] *See id.* para. 13.  Some consumers stated that they only answered the calls because the caller ID appeared as a local number.  *See, e.g.*, Charlottesville Police Dept. Records (containing statements from residents about the robocalls given to police investigators).

[82] 47 U.S.C. § 227(e); 47 CFR § 64.1604.

[83] *Rules and Regulations Implementing the Truth in Caller ID Act of 2009*, Report and Order, 26 FCC Rcd 9114, 9122, para. 22 (2011) (*Truth in Caller ID Order*).

[84] *Affordable Enterprises of Arizona, LLC*, Notice of Apparent Liability for Forfeiture, 33 FCC Rcd 9233, 9242-43, para. 26 & n.70 (2018) (*Affordable Notice of Apparent Liability*) (citing Restatement (Second) of Torts § 8A, comment b, p. 15 ("Intent is not . . . limited to consequences which are desired.  If the actor knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result.")).  *Cf. Burr v. Adam Eidemiller, Inc.*, 386 Pa. 416 (1956) (intentional invasion can occur when the actor knows that it is substantially certain to result from his conduct); *Garratt v. Dailey*, 13 Wash. 2d. 197 (1955) (finding defendant committed an intentional tort when he moved a chair if he knew with "substantial certainty" that the plaintiff was about to sit down).

available.[85]  Therefore, it is reasonable and often necessary to look at a party's actions to determine the party's intent regarding a wrongful action.[86]  In doing so, it may be necessary to look at the content of the robocalls, but we do so only for the narrow purpose of discerning intent.[87]  The merits of the content do not factor into our determination that Rhodes's spoofed robocalls apparently violated the Truth in Caller ID Act.  The Supreme Court has upheld analysis of speech content for such purposes.[88]  We find sufficient evidence that Rhodes apparently intended to cause harm to: (1) the family of Mollie Tibbetts, (2) the *Sandpoint Reader* and its publisher, (3) the Commonwealth of Virginia and the City of Charlottesville, (4) the subscribers of the telephone numbers that Rhodes spoofed, and (5) all consumers who received calls in any of Rhodes' spoofing activities.[89]

### 1.      Rhodes Apparently Intended to Harm the Tibbetts Family.

26.      Rhodes apparently intended to cause emotional harm to the family of Mollie Tibbetts as well as their friends.  The Bureau previously determined that a spoofer intended to cause harm because the caller had reason to know that the calls would cause emotional distress to the recipient.[90]  Here, it was substantially certain that the Tibbetts family or those close to them would receive Rhodes's robocalls and experience emotional distress.

27.      Rhodes specifically targeted the Tibbetts family's hometown and surrounding rural areas of Iowa only days after Ms. Tibbetts's funeral.  He used a caller ID that matched the family's hometown of Brooklyn, Iowa—a city with a population of only 1,468 people[91]—making it more likely that the family would answer the spoofed robocall.[92]  Rhodes blanketed the area with his robocalls, thereby assuring that the robocalls would reach—and be answered by—people with a close relationship with the Tibbetts family.  Indeed, Ms. Tibbetts's father received the robocall and said the only reason he listened

---

[85] *United States v. Dearing*, 504 F.3d 897, 901 (9th Cir. 2007); *United States v. Marabelles*, 724 F.2d 1374, 1379 (9th Cir. 1984); *see also General Cigar Co., Inc. v. CR Carriers, Inc.*, 948 F.Supp. 1030, 1036 (M.D. Ala. 1996) ("Because one cannot know another's subjective intent, circumstantial evidence must be relied upon to indicate intent.  The requirement of specific intent under the mail fraud statute is satisfied by the existence of a scheme which was reasonably calculated to deceive persons of ordinary prudence and comprehension and this intention is shown by examining the scheme itself." (internal citations omitted)).

[86] *United States v. Davis*, 490 F.3d 541, 549 (6th Cir. 2007); *Tusa v. Omaha Auto Auction Inc.*, 712 F.2d 1248, 1253 (8th Cir. 1983) ("intent to defraud is ordinarily proved by circumstantial evidence"); *see also United States v. Sullivan*, 522 F.3d 967, 974 (9th Cir. 2008) ("the scheme itself may be probative circumstantial evidence of an intent to defraud"); *United States v. Rogers*, 321 F.3d 1226, 1230 (9th Cir. 2003) ("It is settled law that intent to defraud may be established by circumstantial evidence."); *General Analytics Corp. v. CNA Ins. Cos.*, 86 F.3d 51, 54 (4th Cir. 1996) ("[B]ecause it is abstract and private, intent is revealed only by its connection with words and conduct."); *FDIC v. St. Paul Fire & Marine Ins. Co.*, 942 F.2d 1032, 1035 (6th Cir. 1991) ("intent . . . is thought to refer to a subjective phenomenon that takes place inside people's heads . . . .  [The law is concerned only with] the external behavior ordinarily thought to manifest internal mental states . . . .") (citations omitted)).

[87] *See Steven Blumenstock*, Forfeiture Order, 32 FCC Rcd 356, 358, para. 8 (EB 2017) (reviewing the contents of calls to show that Blumenstock intended to inflict emotional harm) (*Blumenstock Forfeiture Order*).

[88] *See Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993) ("The First Amendment, moreover, does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent.").

[89] With regard to the robocalls targeting the Feinstein, Gillum, and Abrams political campaigns, we find that by violating the TCPA the calls harmed the consumers who received them, but we make no determination as to the content of those robocall messages.

[90] *Blumenstock Forfeiture Order*, 32 FCC Rcd at 358, para. 8.

[91] United States Census Bureau, *Brooklyn City* (2010), https://factfinder.census.gov/faces/nav/jsf/pages/community_facts.xhtml.

[92] *See, e.g.*, *Abramovich Notice of Apparent Liability*, 32 FCC Rcd at 5422, para. 13.

to the message was because the caller ID showed a local number.[93]  Rhodes's use of neighbor spoofing and targeted calling made it substantially certain that members of the Tibbetts family and their friends would receive his robocalls.

28.      The nature and timing of the robocalls made it substantially certain the Tibbetts family and their friends would be harmed emotionally, and in fact they did suffer emotional distress from the robocalls.[94]  We therefore find that Rhodes made 837 robocalls with the apparent intent to cause harm to the Tibbetts family and their friends.

### 2.      Rhodes Apparently Intended to Harm His Local, Small-Town Newspaper for Identifying Him as a Robocaller.

29.      Rhodes apparently made 750 spoofed robocalls with the intent to harm the *Sandpoint Reader* and its publisher, Ben Olson.  The *Sandpoint Reader*, which had published previous investigative reporting on Rhodes, was one of the first publications to link Rhodes to the robocalls at issue in this NAL.[95]  When Rhodes gained national attention for his August 2018 Iowa and Florida calling campaigns, several national and international media organizations cited the *Sandpoint Reader*'s reporting, placing greater scrutiny on Rhodes personally.[96]  Mr. Olson contacted Rhodes's landlord for comment about his affiliation with Rhodes and queried whether the landlord was aware of Rhodes's actions.[97]  Rhodes stated in his robocalls[98] that Mr. Olson's reporting resulted in his eviction.[99]  This chain of events indicates that Rhodes sent the prerecorded voice messages in retaliation for the *Sandpoint Reader*'s investigative reporting.

30.      The robocalls were part of an apparent campaign to either shut down the paper or have Mr. Olson fired.  Rhodes made the robocalls to residents throughout Sandpoint, Idaho, a town of 7,365 people,[100] where Mr. Olson lives and circulates the paper.[101]  The robocalls used the same first three or six

---

[93] Luke Nozicka, '*Twisted and grotesque': Mollie Tibbetts' father says racist robocall singled him out*, Des Moines Register (Sept. 3, 2018), https://www.desmoinesregister.com/story/news/2018/09/03/mollie-tibbetts-missing-found-robocall-racist-white-nationalist-brooklyn-iowa-trump-immigration/1181614002/.

[94] *Id.*

[95] Ben Olson and Cameron Rasmusson, *Suspected racist CD distributor appears to be responsible for robocalls in California*, Sandpoint Reader (May 24, 2018), http://sandpointreader.com/suspected-racist-cd-distributor-appears-responsible-robocalls-california/.

[96] Blake Montgomery, *A Neo-Nazi Is Using Robocalls To Target A Black Florida Candidate for Governor*, BuzzFeed News (Sept. 1, 2018), https://www.buzzfeednews.com/article/blakemontgomery/neo-nazis-are-using-robocalls-to-target-florida; Allie Conti, *Now People Are Getting Neo-Nazi Robocalls About Mollie Tibbetts's Death*, Vice (Aug. 31, 2018), https://www.vice.com/en_us/article/3kyggj/neo-nazi-robocall-mollie-tibbetts-death-vgtrn; Kelly Weill, *Neo-Nazi Robocall Impersonates Mollie Tibbetts to Call for Genocide*, Daily Beast (Aug. 30, 2018), https://www.thedailybeast.com/neo-nazi-robocall-impersonates-mollie-tibbetts-to-call-for-genocide.

[97] Sandpoint Police Dept. Records at 3.  *See also* Ben Olson and Cameron Rasmusson, *Racist robocalls across nation again linked to Sandpoint man*, Sandpoint Reader (Sept. 6, 2018), http://sandpointreader.com/racist-robocalls-across-nation-again-linked-to-sandpoint-man/ (seeking comment from Rhodes's landlord).

[98] The robocalls said, "Ben Olson blackmailed one of our local business owners, threatened to write about him to harm his business, if he didn't evict one of his residential tenants."  Appendix.  Mr. Olson told police investigators that he did attempt to get a comment from Rhodes's landlord for a story but denied any nefarious purpose or methods.  Sandpoint Reader Police Dept. Records at 3.

[99] Sandpoint Police Dept. Records at 3.  Rhodes moved out of Sandpoint sometime in early 2019.  Chad Sokol, *Racist robocaller now living in Montana, but harassment in Sandpoint continues*, The Spokesman-Review (Feb. 13, 2019), https://www.spokesman.com/stories/2019/feb/07/racist-robocaller-now-living-quietly-in-montana-bu/.

[100] United States Census Bureau, *Sandpoint City* (2010), https://factfinder.census.gov/faces/nav/jsf/pages/community_facts.xhtml.

[101] Call Detail Records.

digits as the called parties' telephone numbers, which made it more likely that local residents would answer their telephones believing that they were receiving a local call.[102]  The robocalls called for "burning out" Mr. Olson and instigating an advertiser boycott:

> Punish his advertisers for feeding the cancer on our town.  Burn out the cancer Ben Olson and send a message to the rest of his tiny leftist cabal that their time is over and it can happen to them too. Burn out the cancer, Ben Olson, or the cancer that he is will spread and kill.  Burn it out![103]

Additionally, the robocall audio accompanied a YouTube video showing a stack of the *Sandpoint* Reader in flames.  Mr. Olson told police that this stack was most, if not all, of the paper's weekly circulation.[104]  Rhodes's spoofed robocalls were apparently part of an effort to harm the *Sandpoint Reader* and Mr. Olson.  Thus, Rhodes apparently had the intent to harm the *Sandpoint Reader* and Mr. Olson.  We therefore find that Rhodes made 750 robocalls with the apparent intent to cause harm to the *Sandpoint Reader* and Mr. Olson.

> **3.     Rhodes Apparently Intended to Harm the Commonwealth of Virginia and the City of Charlottesville by Interfering with the Judicial Process Through the Use of Spoofed Robocalls.**

31.     Rhodes made 2,023 robocalls during the 2018 Virginia trial of James Fields for the murder of Heather Heyer.  The Commonwealth of Virginia and the City of Charlottesville have a fundamental interest in a judicial process that protects trials from outside influence.[105]  Rhodes's robocalls coincided with the latter part of jury selection in the Fields trial, and he continued to make calls during the trial.[106]  By targeting the Charlottesville area, it was substantially certain that his robocalls would reach potential jurors.[107]  The robocalls contained false information about the facts surrounding the case.[108]  In fact, the robocalls were sufficiently numerous and sufficiently prejudicial that the judge in the case felt

---

[102] Contemporaneously with the robocalls, a YouTube video circulated that showed a large stack of the *Sandpoint Reader* being set on fire while playing the robocall's audio.  Sandpoint Police Dept. Records at 3-4; Jason Wilson, *Neo-Nazi activist linked racist robocalls linked to threats of Idaho newspaper*, The Guardian (Sept. 28, 2018), https://www.theguardian.com/world/2018/sep/28/idaho-robocalls-sandpoint-reader-neo-nazi.  When *The Guardian* contacted Rhodes about the robocalls, Rhodes sent the reporter a link to the YouTube video.  *Id.*

[103] Appendix.

[104] Sandpoint Police Dept. Records at 3-4.  Additionally, the paper's co-owner and advertisers received anonymous correspondence that threatened to publicly shame them and name them to "the right people" if they did not dismiss Mr. Olson.  Sandpoint Police Dept. Records at 5-6.  Although police were unable to conclusively determine the source of the letters, they began arriving after Mr. Rhodes's robocalling and online campaigns and contained similar grievances against Mr. Olson.  *Id.*

[105] *See Sheppard v. Maxwell*, 384 U.S. 333, 362 (1966) ("[d]ue process requires that the accused receive a trial by an impartial jury free from outside influences"); *Pennekamp v. Florida*, 328 U.S. 331, 366 (1946) (Frankfurter, J. concurring) ("[I]n a particular controversy pending before a court and awaiting judgment, human beings, however strong, should not be torn from their moorings of impartiality by the undertow of extraneous influence.  In securing freedom of speech, the Constitution hardly meant to create the right to influence judges or juries.").

[106] Call Detail Records.  *See also* Sara Sidner, Kevin Conlon & Nicole Chavez, *James Fields convicted in Charlottesville death*, CNN (Dec. 7, 2018), https://www.cnn.com/2018/12/07/us/charlottesville-james-fields-trial/index.html (reporting on the trial).

[107] No jurors, however, reported receiving the calls.  Staff, *28 picked to weigh Fields case as potential jurors asked about racist robocall*, The Daily Progress (Nov. 28, 2018) (Daily Progress Jury Article), https://www.dailyprogress.com/news/fields_trial/picked-to-weigh-fields-case-as-potential-jurors-asked-about/article_f3a63546-f357-11e8-9481-474483e006ac.html.

[108] We do not opine on the content of the calls, or their merit; our interest is solely on whether they violated the Truth in Caller ID Act.

compelled to find out whether the calls had tainted jury selection, and instructed the jury pool to ignore the robocalls.[109]

32.       This evidence indicates that Rhodes apparently intended to influence the judicial process with false information, thereby interfering with the public's interest in a fair trial.  We therefore find that Rhodes made 2,203 robocalls with the apparent intent to cause harm to the Commonwealth of Virginia and Charlottesville.

### 4.       Rhodes Apparently Intended to Harm the People to Whom the Phone Numbers Were Assigned.

33.       The Commission has found that spoofing is particularly harmful to the innocent third parties who are assigned the spoofed numbers.[110]  In *Abramovich*, the Commission recognized that people frequently redial a spoofed number to determine who called or to express outrage.[111]  In *Affordable*, the Commission said:

> [A] person whose number is spoofed by a [robocaller] and used to make large numbers of illegal calls often finds herself inundated with callbacks and angry messages from the [spoofer's] other, and often irate, victims.  In short, by spoofing numbers assigned to legitimate users, Affordable shifted the risk of harm—large numbers of disturbing calls from angry consumers—on to innocent third parties.[112]

It is substantially certain that such harm will occur when a spoofer knowingly uses a number that does not belong to him and instead uses a number assigned to someone else; thus, the intent to cause harm may be imputed to the spoofer.[113]

34.       Rhodes spoofed numbers that belonged to innocent third parties.  He made 3,519 robocalls using three numbers assigned to an individual unaffiliated with Rhodes (415-295-███), ███████ (434-972-███), and the University of Virginia (434-924-███).[114]  In December 2018, he started using the University of Virginia number, but the Dialing Platform immediately shut him down after the University complained.[115]  This spoofing was harmful enough to the University of Virginia that it quickly acted to protect itself.  Rhodes knew that those numbers were not assigned to him, and it was substantially certain that spoofing those numbers would harm innocent third parties like ████████ and the University of Virginia.  We therefore find that Rhodes made 3,519 robocalls with the apparent intent to cause harm to the individuals whose numbers he spoofed.

---

[109] Daily Progress Jury Article.

[110] *Affordable Notice of Apparent Liability*, 33 FCC Rcd at 9243, para. 28; *Best Insurance Contracts, Inc. and Philip Roesel, DBA Wilmington Insurance Quotes*, Notice of Apparent Liability, 32 FCC Rcd 6403, 6411, para. 23 (2017) (*Roesel Notice of Apparent Liability*); *Abramovich Notice of Apparent Liability*, 32 FCC Rcd at 5424, para. 18.

[111] *See Abramovich Notice of Apparent Liability*, 32 FCC Rcd at 5424, para. 18 (implying that even one callback from an angry consumer is a harm).

[112] *Affordable Notice of Apparent Liability*, 33 FCC Rcd at 9243, para. 28.

[113] *See id.* at 9242-43, paras. 25-26 (discussing that intent can be inferred if the action is "substantially certain" to cause harm).

[114] Call Detail Records.  In addition to those calls, Rhodes made 2,936 robocalls spoofing unassigned numbers. Spoofing unassigned numbers is also a harmful practice.  *Roesel Forfeiture Order*, 33 FCC Rcd at 9216; *Roesel Notice of Apparent Liability*, 32 FCC Rcd at 6411, para. 23.

[115] ████████ Subpoena Response (Aug. 9, 2019) (on file in EB-TCD-18-00028178).

     5.     **Rhodes Apparently Intended to Harm Consumers by Subjecting Them to Illegal Robocalls.**

35.     Rhodes apparently intended to harm consumers because he made spoofed robocalls that violated the TCPA. In *Roesel*, the Commission stated that "when spoofing is done in conjunction with an illegal robocalling campaign (itself a harmful practice), it indicates an intent to cause harm."[116] The Commission reasoned that harm is a broad concept that includes violations of civil statutes such as the TCPA.[117] Specifically, "the placement of illegal robocalls causes consumers significant harm, including that such calls are a nuisance and [an] invasion of privacy."[118]

36.     The TCPA prohibits prerecorded voice message calls that do not contain specific identification disclosures. Section 227(d)(3)(A) of the Act and section 64.1200(b) of the Commission's rules require that all artificial or prerecorded voice message calls meet certain standards. First, all prerecorded voice message calls must, "at the beginning of the message, state clearly the identity of the business, individual, or other entity initiating the call . . . ."[119] Second, the prerecorded voice message calls must, "during or after the message, state clearly the telephone number or address of [the] business, other entity, or individual . . . ."[120] The Bureau has repeatedly warned that it will enforce these identification rules against all robocallers, including political callers.[121] As our precedent states, spoofing activity in furtherance of such an illegal robocalling campaign indicates an intent to cause harm.[122]

37.     Rhodes unlawfully failed to include these identification requirements in his prerecorded voice message calls in violation of the TCPA. The identification requirements of the TCPA are vital consumer protection measures because they give consumers agency to control their privacy—to screen calls and know where to direct grievances.[123] In each prerecorded voice message examined by Bureau staff, Rhodes failed to identify himself at the beginning of the robocall.[124] None of his messages included a phone number that consumers could use to reach him. Rhodes called some consumers multiple times.[125]

---

[116] *Roesel Forfeiture Order*, 33 FCC Rcd at 9218-19, para. 40. *See also Abramovich Notice of Apparent Liability*, 32 FCC Rcd. at 5423, para. 16.

[117] *See Roesel Forfeiture Order*, 33 FCC Rcd at 9217-18, paras. 38-39 (rejecting claim that the Truth in Caller ID Act only applies to criminal or malicious conduct).

[118] *Id.* at 9218, para. 40.

[119] 47 U.S.C. § 227(d)(3)(A); 47 CFR § 64.1200(b)(1). The Commission's rules further require that businesses must use the name under which the entity is registered to conduct business. 47 CFR § 64.1200(b)(1).

[120] 47 U.S.C. § 227(d)(3)(A). *See also* 47 CFR § 64.1200(b)(2).

[121] *See Biennial Reminder for Political Campaigns About Robocall and Text Abuse, Enforcement Advisory*, Public Notice, 31 FCC Rcd 1940, 1941 (Mar. 14, 2016) ("All prerecorded voice messages, campaign-related and otherwise, that are permissible under Section 227 of the Communications Act of 1934, as amended, and the Commission's rules must include certain information to identify the party responsible for the message."). *See also Warning Political Campaigns and Promoters Against Robocall Abuse, Enforcement Advisory*, Public Notice, 29 FCC Rcd 12657 (Oct. 21, 2014); *Political Campaigns and Promoters are Reminded of Restrictions on Autodialed and Prerecorded Calls*, Public Notice, 27 FCC Rcd 11017 (Sept. 11, 2012).

[122] *Roesel Forfeiture Order*, 33 FCC Rcd at 9218-20, paras. 40-41; *Roesel Notice of Apparent Liability*, 32 FCC Rcd at 6408, para. 16.

[123] *See 2003 TCPA Order*, 18 FCC Rcd at 14100-01, paras. 143-44 ("adequate identification information is vital so that consumers can determine the purpose of the call, possibly make a do-not-call request, and monitor compliance with the TCPA rules"); *see also Maryland v. Universal Elections, Inc.*, 729 F.3d 370, 376-77 (4th Cir. 2013) (holding that the identification rules help consumers stop future calls, provide information to consumers to better screen and evaluate calls, and promote effective law enforcement).

[124] Appendix. The only identification in his messages was a reference to his website, which was stated at the end of the message. *Id.*

[125] Call Detail Records.

Had Rhodes provided a call-back number, they could have told Rhodes to not call them again. Additionally, Rhodes's use of neighbor spoofing made it more likely that consumers would answer the telephone and be subjected to his illegal prerecorded messages.  Further, consumers were confused about the source of the calls because of the spoofing, and many complained to local law enforcement.[126] Rhodes's intentional disregard of the TCPA and the Commission's rules for all 6,455 robocalls across the six campaigns verified by Bureau staff indicates that he was substantially certain that consumers would be harmed.  We therefore find that Rhodes made 6,455 robocalls with the apparent intent to cause harm to consumers.

### C.    Rhodes Apparently Intended to Wrongfully Obtain a Shield from TCPA Liability and Publicity for His Website.

38.    The Truth in Caller ID Act and the Commission's rules prohibit knowingly displaying misleading or inaccurate caller ID information with the intent to wrongfully obtain anything of value.[127] We find that Rhodes apparently made thousands of robocalls in violation of the TCPA's identification requirements for prerecorded voice message calls and prohibition on prerecorded voice message calls to wireless numbers.[128]  Rhodes apparently spoofed those unlawful—and thus wrongful—calls with the intent to obtain something of value.  Courts have held that "anything of value" is not limited to tangible assets.[129]  In this case, the spoofed robocalls apparently helped Rhodes in two ways.  First, by using spoofed caller ID, Rhodes was able, for a time, to evade law enforcement as well as private civil lawsuits for violations of the TCPA.  Second, the increased publicity that resulted from the provocative spoofed calls helped Rhodes build his website and "personal brand."

### 1.    Rhodes Apparently Used Spoofing to Obtain a Valuable Shield Against Culpability and Lawsuits.

39.    The Commission has found that "avoidance of culpability is a benefit that qualifies as a thing of value."[130]  Rhodes's attempt to evade personal TCPA liability has an ascertainable dollar value. In this case, avoidance of culpability has a specific, ascertainable dollar value—namely, up to $20,134 per

---

[126] The Charlottesville Police Department received numerous complaints about the calls.  *See* Charlottesville Police Dept. Records.

[127] 47 U.S.C. § 227(e); 47 CFR § 64.1604.

[128] Although this NAL pertains only to apparent violations of the Truth in Caller ID Act, we take into account the fact that Rhodes violated the TCPA and thus acted wrongfully.  With the recent passage of the TRACED Act, we may issue NALs for violations of the TCPA without first issuing a citation, and we will do so. Pallone-Thune Telephone Robocall Abuse Criminal Enforcement and Deterrence Act, S. 151, 116th Cong. (2019).

[129] *United States v. Nilsen*, 967 F.2d 539, 542-43 (11th Cir. 1992) ("Congress' frequent use of 'thing of value' in various criminal statutes has evolved the phrase into a term of art which the courts generally construe to envelope both tangibles and intangibles. This broad interpretation is based upon a recognition that monetary worth is not the sole measure of value."); *United States v. Girard*, 601 F.2d 69, 71 (2d Cir. 1979) ("[T]he phrase ['thing of value'] is generally construed to cover intangibles as well as tangibles."); *see also United States v. Picquet*, 963 F.2d 54, 55-56 (5th Cir. 1992) (holding that sales taxes constitute "a thing of value" for the purposes of 18 U.S.C. § 1029(a)(2)'s prohibition of using unauthorized access devices to obtain "anything of value"); *United States v. Singleton*, 144 F.3d 1343, 1349-50 (10th Cir. 1998), rev'd on other grounds, 165 F.3d 1297 (10th Cir. 1999) (agreeing with Picquet); *United States v. Draves*, 103 F.3d 1328, 1332 (7th Cir. 1997) (agreeing with and applying 5th Circuit's expansive interpretation of phrase "anything of value" in Picquet); *United States v. Schwartz*, 785 F.2d 673, 680 (9th Cir. 1986) (noting broad range of intangibles that have been found to be "things of value" by prior courts); *United States v. Williams*, 705 F.2d 603, 622-23 (2nd Cir. 1983) (holding that the district court properly construed the meaning of the term "anything of value" to "focus on the value that the defendants subjectively attached to the items received"); *United States v. Sheker*, 618 F.2d 607, 609-10 (9th Cir. 1980) (holding that "value" includes anything recognized or appreciated by others).

[130] *Roesel Notice of Apparent Liability*, 32 FCC Rcd at 6413, para. 27; *see also Roesel Forfeiture Order*, 33 FCC Rcd at 9212, para. 22.

unlawful call in a forfeiture action brought by the FCC.[131]  Additionally, in a private action, that potential liability is up to $1,500 per illegal robocall.[132]  Although Rhodes included his website in his prerecorded voice message calls, he did not provide his personal name or other contact information in the message or on his website.[133]  Rhodes spoofed the caller ID, and omitted his personal contact information, with the apparent intent to evade legal liability.  While Rhodes sought publicity for the Road to Power, he always kept his personal identity hidden, indicating that he wanted to avoid personal responsibility for the robocalls.[134]  Aggrieved consumers could not determine whom to sue under the TCPA.  Therefore, we find that Rhodes apparently knowingly spoofed numbers to wrongfully obtain something of value—namely, to avoid facing personal legal liability and financial consequences for his actions.

### 2.     Rhodes Apparently Used Spoofing to Obtain Publicity and Increase the Value of His Personal Brand.

40.     Courts recognize that there is value in publicity.[135]  By creating a right to publicity, the courts acknowledged that a person's likeness was valuable and deserved legal protection.[136]  The digital marketing industry refers to one's digital likeness as a "personal brand."[137]  This personal brand can be valuable, as evidenced by the numerous articles dedicated to building and enhancing a personal brand.[138]  Thus, publicity or personal brand can be a "thing of value" for purposes of the Truth in Caller ID Act.

41.     Rhodes apparently made 6,455 robocalls with the intent to send traffic to his website and earn publicity for "The Road to Power"—Rhodes's personal brand.  The Road to Power operates primarily as an online video podcast; Rhodes's robocalling campaigns increased its visibility and notoriety.  When Rhodes began his calling campaigns in May 2018, the Road to Power received about 500 visitors per uploaded video.[139]  He targeted some of his robocalls to local news organizations, which reported about the robocalls.  National news organizations then picked up the local news coverage and ran

---

[131] *See* 47 CFR § 1.80.

[132] 47 U.S.C. § 227(b)(3).

[133] Theroadtopower, *Videos*, https://www.bitchute.com/channel/theroadtopower/ (last visited Dec. 18, 2019).

[134] *See* Theroadtopower, *Videos*, https://www.bitchute.com/channel/theroadtopower/ (last visited Dec. 18, 2019) (providing no personal contact information).

[135] *See Zacchini v. Scripps-Howard Broadcasting Co.*, 433 U.S. 562, 576 (1977) (discussing the right of publicity to profit from one's fame); *Haelan Laboratories, Inc. v. Topps Chewing Gum, Inc.*, 202 F.2d 866, 868 (2d Cir. 1953) (discussing the right of prominent persons to control and use their likeness and profit off it); Restatement (Second) of Torts, § 652C (describing the right to publicity).  Similarly, the Lanham Act protects personal names where the name has acquired distinctiveness.  *Schlafly v. Saint Louis Brewery, LLC*, 909 F.3d 420, 425 (Fed. Cir. 2018).

[136] *Zacchini*, 433 U.S. at 576; *Schlafly*, 909 F.3d at 425; *Haelan Laboratories*, 202 F.2d at 868.

[137] Tom Peters, *The Brand Called You*, Fast Company (Aug. 31, 1997), https://www.fastcompany.com/28905/brand-called-you.  *See also* Jessica Todd Swift, *How to Build A Personal Brand With Podcasts And Webinars*, CEO World (Aug. 10, 2017), https://ceoworld.biz/2017/08/10/how-to-build-a-personal-brand-with-podcasts-and-webinars-28905/ (describing how to build personal brand via the Internet).

[138] *See, e.g.*, Michael Brenner, *Personal Branding—Why Now is the Time to Build Your Personal Brand*, Marketing Insider Group (July 11, 2019), https://marketinginsidergroup.com/social-media/personal-branding-why-now-is-the-time-to-build-your-personal-brand/; Shelcy V. Joseph, *5 Ways to Build a Powerful Personal brand*, Forbes (Apr. 30, 2018), https://www.forbes.com/sites/shelcyvjoseph/2018/04/30/5-ways-to-build-a-powerful-personal-brand/#3d486735549e; Nicolas Cole, *How to Build a Personal brand in 5 Steps (and Why Everyone Messes Up on Number 1)*, Inc. (July 27, 2016), https://www.inc.com/nicolas-cole/how-to-build-a-personal-brand-in-5-steps-and-why-everyone-messes-up-on-number-1 html.

[139] Theroadtopower, *Videos*, https://www.bitchute.com/channel/theroadtopower/ (last visited Dec. 18, 2019).

stories mentioning his website and furthering its exposure.[140]  By October 2018, he had increased viewership of his website ten-fold.[141]

42.    Rhodes gained this publicity, and increased attention to and the value of his personal brand, The Road to Power, through apparently wrongful means. His robocalls were illegal as they failed to include the appropriate identification disclosures as required by the TCPA.  The spoofing of what appeared to be local phone numbers in caller ID increased the likelihood that consumers would answer the calls, thereby increasing publicity for The Road to Power.  Rhodes obtained a thing of value— publicity and enhancement of his personal brand—through apparently unlawful spoofed robocalls.

43.    In sum, we find that between May 14, 2018, and December 4, 2018, Rhodes made 6,455 apparently unlawful spoofed robocalls.  We conclude that each robocall was apparently unlawfully spoofed using an unassigned number or a number that was assigned to a third party unconnected to Rhodes, and that Rhodes apparently made 6,455 spoofed robocalls with the intent to cause harm or wrongfully obtain something of value—each robocall an apparent violation of the Truth in Caller ID Act and section 64.1604 of the Commission's rules.

### D.    Proposed Forfeiture

44.    Section 227(e) of the Act and section 1.80 of the Commission's rules authorize the Commission to impose a forfeiture against any person that engages in unlawful spoofing.[142]  Specifically, the Act and the Commission's rules authorize a forfeiture of up to $11,766 for each spoofing violation, or three times that amount for each day of a continuing violation, up to a statutory maximum of $1,156,242 for any single act or failure to act.[143]  In exercising our forfeiture authority, we must consider the "nature, circumstances, extent, and gravity of the violation and, with respect to the violator, the degree of culpability, any history of prior offenses, ability to pay, and such other matters as justice may require."[144]  In addition, the Commission has established forfeiture guidelines; they establish base penalties for certain violations and identify criteria that we consider when determining the appropriate penalty in any given case.[145]  Under these guidelines, we may adjust a forfeiture upward for violations that are egregious, intentional, or repeated, or that cause substantial harm or generate substantial economic gain for the violator.[146]

---

[140] This reporting expanded the exposure of his personal brand but also unintentionally contributed to his personal identification by and feud with the *Sandpoint Reader*.

[141] Theroadtopower, *Videos*, https://www.bitchute.com/channel/theroadtopower/ (last visited Dec. 18, 2019).

[142] 47 U.S.C. § 227(e)(5); 47 CFR § 1.80(b)(4).  The Truth in Caller ID Act and the Commission's rules contain a two-year statute of limitations on proposing forfeitures for unlawful spoofing.  47 U.S.C. § 227(e)(5)(A)(iv); 47 CFR § 1.80(c)(3).  Unlike forfeitures assessed under section 503(b) of the Act, "the Truth in Caller ID Act does not require 'willful' or 'repeated' violations to justify imposition of a penalty."  *Truth in Caller ID Order*, 26 FCC Rcd at 9133, para. 48.  Thus, the Commission is not required to demonstrate the "conscious and deliberate commission or omission of such act" or that such act happened more than once or for more than one day to propose a forfeiture for apparently unlawful spoofing.  47 U.S.C. § 312(f)(1)-(2).  We nevertheless find that Rhodes apparently willfully and repeatedly spoofed caller ID information with the intent to harm and to wrongfully obtain something of value.

[143] 47 U.S.C. § 227(e)(5)(A); 47 CFR § 1.80(b)(4); *Amendment of Section 1.80(b) of the Commission's Rules, Adjustment of Civil Monetary Penalties to Reflect Inflation*, Order, DA-19-1325 (EB 2019).  In the alternative and in lieu of the Act's general criminal fine provision in section 501 of the Act, the Truth in Caller ID Act also provides for criminal fines up to $10,000 for each violation, or three times that amount for each day of a continuing violation. 47 U.S.C. § 227(e)(5)(B).

[144] 47 U.S.C. § 503(b)(2)(E).

[145] 47 CFR § 1.80(b)(8), Note to paragraph (b)(8).

[146] *Id*.

45.     The Commission has proposed a base forfeiture of $1,000 per unlawful spoofed call in past mass-spoofing actions.  We came to the $1,000 figure because we determined that the aggregate forfeiture would serve the dual goals of punishment and deterrence, and that higher amounts would be unlikely to achieve a more effective result.[147]  We thus propose a base forfeiture amount of $1,000 per violation.[148]

46.     As with past Commission actions addressing violations of section 227(e), we do not apply the base forfeiture to all the unlawfully spoofed calls that Rhodes potentially made; rather, we apply the base forfeiture to a subset of the apparently unlawful spoofed calls analyzed by Bureau staff.  The reasons for doing so, rather than proposing a forfeiture based on the total number of apparently spoofed calls, are pragmatic.  First, in some cases, depending on the specific spoofing scheme, it can be time-consuming to analyze every apparently spoofed call.  Second, in large spoofing schemes, we have found that applying a fraction of the statutory maximum per-call penalty to a fraction of the total calls resulted in a proposed forfeiture that was sufficient to achieve the dual goals of penalizing wrongful conduct and preventing it from recurring.[149]  Each case is unique, and we must use our discretion in proposing an appropriate penalty to meet the specific circumstances.[150]  In this case, the Bureau focused on six distinct calling campaigns and was able to verify that 6,455 robocalls were spoofed.  Applying the base forfeiture to these analyzed violations yields a total base forfeiture of $6,455,000.

47.     We find that, in applying the statutory factors in section 503 of the Act and section 1.80 of the Commission's rules,[151] the totality of the circumstances in this case merit a significant upward adjustment to the base penalty.

48.     Rhodes appears to have designed his spoofed calling campaigns to be as disruptive as possible.  Most notably, Rhodes blanketed a small Iowa community with his spoofed robocalls, which resulted in emotional distress to the family and friends of Mollie Tibbetts.  The murder of Ms. Tibbetts shocked the tight-knit community of Brooklyn, Iowa, where Ms. Tibbetts grew up and attended high school.  One local sheriff commented that "I don't think it is something that this community will ever completely recover from.  Brooklyn is a tight-knit community where everyone knows everyone.  And to have something like that happen here, it's shocking."[152]  Just two days after an emotional funeral at Ms. Tibbetts's high school that received national media attention,[153] Rhodes flooded the grieving community with spoofed robocalls that mentioned comments made by members of the Tibbetts family.[154]

---

[147] In unlawful spoofing campaigns of millions of calls, a higher per-violation amount would quickly reach astronomical levels.  For example, if we were to assess a base forfeiture amount close to the statutory maximum (e.g., $10,000 per call) upon 75 million unlawful spoofed calls, the forfeiture would be $750,000,000,000, *i.e.,* three quarters of a trillion dollars.

[148] We have discretion, however, to propose a higher amount up to the statutory maximum of $11,766, and a strong congressional directive to take action necessary to pursue and punish perpetrators of unlawful spoofing.

[149] *Affordable Notice of Apparent Liability*, 33 FCC Rcd at 9245-46, paras. 34-35; *Roesel Forfeiture Order*, 33 FCC Rcd at 9225, paras. 57-58; *Roesel Notice of Apparent Liability*, 32 FCC Rcd at 6414, paras. 32-33

[150] *See RKO General, Inc. v. FCC*, 670 F. 2d 215, 237, (D.C. Cir. 1981), *cert. denied*, 456 U.S. 927 (1982) (*citing Leflore Broadcasting Co. v. FCC*, 636 F.2d 454, 463 (D.C. Cir. 1980) ("We have made it clear in earlier cases that 'the choice of remedies and sanctions is a matter wherein the Commission has broad discretion.'")).

[151] 47 U.S.C. § 503(b)(2)(E); 47 CFR § 1.80; *Truth in Caller ID Order*, 26 FCC Rcd at 9132, para. 46.

[152] Kat Russell, *A year after Mollie Tibbetts tragedy, a community changes*, The Gazette (July 18, 2019), https://www.thegazette.com/subject/news/public-safety/mollie-tibbetts-murder-brooklyn-iowa-one-year-later-20190718.

[153] Jennifer Calfas, *'The Hispanic Community Are Iowans' Mollie Tibbetts' Dad Rebukes the Politicization of her Death*, Time (Aug. 28, 2018), https://time.com/5380053/mollie-tibbetts-dad-funeral-iowa/.

[154] Luke Nozicka and Kevin Hardy, *'Today, we need to turn the page. We're at the end of a long ordeal,' Rob Tibbetts tells crowd at daughter's funeral*, Des Moines Register (Aug. 26, 2018),

49.     Similarly, in Idaho, Rhodes deliberately targeted consumers in Sandpoint to harass the local newspaper, which had published critical reporting on Rhodes.  The spoofed robocalls seem to have been one part of a campaign designed to force the closing of the paper or the firing of its publisher.

50.     Finally, Rhodes made spoofed robocalls to Charlottesville area residents in an apparent attempt to influence the James Fields trial jury.  These robocalls contained false information, and Rhodes deliberately made the robocalls during both jury selection and the trial.   This interfered with Commonwealth of Virginia's and City of Charlottesville's interest in a fair trial—a cornerstone of the judicial system.

51.     In all, we find that Rhodes is highly culpable and unlikely to be deterred absent a substantial penalty.  We therefore propose a 100% upward adjustment to the base penalty yielding a total forfeiture of $12,910,000.

## IV.    ORDERING CLAUSES

52.     Accordingly, **IT IS ORDERED** that, pursuant to section 503(b) of the Act[155] and section 1.80 of the Commission's rules,[156] Scott Rhodes a.k.a. Scott David Rhodes, Scott D. Rhodes, Scott Platek, Scott P. Platek is hereby **NOTIFIED** of this **APPARENT LIABILITY FOR A FORFEITURE** in the amount of twelve million, nine hundred, ten thousand dollars ($12,910,000) for willful and repeated violations of section 227(e) of the Act;[157] section 64.1604 of the Commission's rules,[158] and the *Rules and Regulations Implementing the Truth in Caller ID Act of 2009* and associated rules.[159]

53.     **IT IS FURTHER ORDERED** that, pursuant to section 1.80 of the Commission's rules,[160] within thirty (30) calendar days of the release date of this Notice of Apparent Liability for Forfeiture, Scott Rhodes a.k.a. Scott David Rhodes, Scott D. Rhodes, Scott Platek, Scott P. Platek **SHALL PAY** the full amount of the proposed forfeiture or **SHALL FILE** a written statement seeking reduction or cancellation of the proposed forfeiture, consistent with paragraphs 54-57 below.

54.     Scott Rhodes a.k.a. Scott David Rhodes, Scott D. Rhodes, Scott Platek, Scott P. Platek shall send electronic notification of payment to Telecommunications Consumers Division, Enforcement Bureau, Federal Communications Commission, at TCD@fcc.gov on the date said payment is made. Payment of the forfeiture must be made by credit card, ACH (Automated Clearing House) debit from a bank account using the Commission's Fee Filer (the Commission's online payment system),[161] or by wire transfer.  The Commission no longer accepts forfeiture payments by check or money order.  Below are instructions that payors should follow based on the form of payment selected:[162]

- Payment by wire transfer must be made to ABA Number 021030004, receiving bank TREAS/NYC, and Account Number 27000001.  A completed Form 159 must be faxed to the Federal Communications Commission at 202-418-2843 or e-mailed to

(Continued from previous page…) ───────────────
www.desmoinesregister.com/story/news/crime-and-courts/2018/08/26/mollie-tibbetts-funeral-missing-iowa-body-found-family-update-death-brooklyn-murder-cristhian-rivera/1103580002.  The message of the robocalls specifically included comments made by members of the Tibbetts family.  Appendix.

[155] 47 U.S.C. § 503(b).

[156] 47 CFR § 1.80.

[157] 47 U.S.C. § 227(e).

[158] 47 CFR § 64.1604.

[159] *Truth in Caller ID Order*, 26 FCC Rcd 9114.

[160] 47 CFR § 1.80.

[161] Payments made using the Commission's Fee Filer system do not require the submission of an FCC Form 159.

[162] For questions regarding payment procedures, please contact the Financial Operations Group Help Desk by phone at 1-877-480-3201 (option #6), or by e-mail at ARINQUIRIES@fcc.gov.

RROGWireFaxes@fcc.gov on the same business day the wire transfer is initiated.  Failure to provide all required information in Form 159 may result in payment not being recognized as having been received.  When completing FCC Form 159, enter the Account Number in block number 23A (call sign/other ID), enter the letters "FORF" in block number 24A (payment type code), and enter in block number 11 the FRN(s) captioned above (Payor FRN).[163]  For additional detail and wire transfer instructions, go to https://www.fcc.gov/licensing-databases/fees/wire-transferhttps://www.fcc.gov/licensing-databases/fees/wire-transfer.

- Payment by credit card must be made by using the Commission's Fee Filer website at https://apps.fcc.gov/FeeFiler/login.cfm.  To pay by credit card, log-in using the FRN captioned above.  If payment must be split across FRNs, complete this process for each FRN.  Next, select "Pay bills" on the Fee Filer Menu, and select the bill number associated with the NAL Account – the bill number is the NAL Account number with the first two digits excluded – and then choose the "Pay by Credit Card" option.  Please note that there is a $24,999.99 limit on credit card transactions.

- Payment by ACH must be made by using the Commission's Fee Filer website at https://apps.fcc.gov/FeeFiler/login.cfm.  To pay by ACH, log in using the FRN captioned above.  If payment must be split across FRNs, complete this process for each FRN.  Next, select "Pay bills" on the Fee Filer Menu and then select the bill number associated to the NAL Account – the bill number is the NAL Account number with the first two digits excluded – and choose the "Pay from Bank Account" option.  Please contact the appropriate financial institution to confirm the correct Routing Number and the correct account number from which payment will be made and verify with that financial institution that the designated account has authorization to accept ACH transactions.

55.    Any request for making full payment over time under an installment plan should be sent to:  Chief Financial Officer—Financial Operations, Federal Communications Commission, 445 12th Street, SW, Room 1-A625, Washington, DC 20554.[164]  Questions regarding payment procedures should be directed to the Financial Operations Group Help Desk by phone, 1-877-480-3201, or by e-mail, ARINQUIRIES@fcc.gov.

56.    The written statement seeking reduction or cancellation of the proposed forfeiture, if any, must include a detailed factual statement supported by appropriate documentation and affidavits pursuant to sections 1.16 and 1.80(f)(3) of the Commission's rules.[165]  The written statement must be mailed to the Office of the Secretary, Federal Communications Commission, 445 12th Street, SW, Washington, DC 20554, ATTN:  Enforcement Bureau – Telecommunications Consumers Division, and must include the NAL/Account Number referenced in the caption.  The statement must also be e-mailed to TCD@fcc.gov.

57.    The Commission will not consider reducing or canceling a forfeiture in response to a claim of inability to pay unless the petitioner submits:  (1) federal tax returns for the most recent three-year period; (2) financial statements prepared according to generally accepted accounting practices; and (3) some other reliable and objective documentation that accurately reflects the petitioner's current financial status.  Any claim of inability to pay must specifically identify the basis for the claim by reference to the financial documentation.

---

[163] Instructions for completing the form may be obtained at http://www.fcc.gov/Forms/Form159/159.pdf.

[164] *See* 47 CFR § 1.1914.

[165] 47 CFR §§ 1.16, 1.80(f)(3).

**Federal Communications Commission**                                      **FCC 20-9**

58.    **IT IS FURTHER ORDERED** that a copy of this Notice of Apparent Liability for
Forfeiture, together with the Reviewed Call Detail Records, shall be sent by first class mail and certified
mail, return receipt requested, to Scott Rhodes a.k.a. Scott David Rhodes, Scott D. Rhodes, Scott Platek,
Scott P. Platek, ██████████████████████████.

FEDERAL COMMUNICATIONS COMMISSION

Marlene H. Dortch
Secretary

**APPENDIX**

**Transcripts of Robocalls**

May California Campaign-Dianne Feinstein

[Man's Voice]: Dianne Feinstein isn't just a Jew, she's an Israeli citizen.

[Woman's Voice]: Wait, that can't be legal, right?  I mean she's a citizen of Israel but gets to vote as a U.S. Senator from California to send billions of our dollars every year to her real country, Israel?

[Man's Voice]: It used to be illegal but the Jews in our country got rid of that law.

[Woman's Voice]: Not only that, but she gets to vote America into Middle East wars based on lies so that Israel can eventually expand its borders like it always planned.

[Man's Voice]: To rid America of the traitorous Jews like Dianne Feinstein, vote for Patrick Little for U.S. senator from California by mail by May 29 or at polls on June 5th.  He's a patriot, a veteran of the U.S. Marine Corps, and he's vowed to end Jewish control over America, starting with Dianne Feinstein, an Israeli citizen pretending to be an American while she takes our money for her real country, Israel, and kills our children for it too.  Vote for Patrick Little for U.S. Senator from California by mail by May 29 or at polls on June 5th.  He's going to get rid of all the nation-wrecking Jews from our country starting with Israeli citizen, Dianne Feinstein.

[Sound of children screaming, audio taken from the film Schindler's List]: "Goodbye Jews!  Goodbye Jews!  Goodbye Jews!"

[Man's Voice]: This message paid for by TheRoadtoPower.com.[1]

August Iowa Campaign-Tibbetts

[Male Voice] The body of 20-year-old Mollie Tibbetts was found in a corn field after she was stabbed to death by an invader from Mexico. A biological hybrid of white and savage Aztec ancestors, who also killed with knives during their mass human sacrifices on top of pyramids they didn't build.  Some relatives of Mollie Tibbetts are implying that despite having been murdered by a non-white, savage intruder, she would still support the invasion of America by a brown horde currently at a staggering 58 million. But you know in your heart they are wrong.  If after her life has now been brutally stolen from her, she could be brought back to life for just one moment and asked, "What do you think now?" Mollie Tibbetts would say, [Female Voice] "Kill them ALL."  [Male Voice Continues] We don't have to kill them all, but we do have to deport them all.  The Aztec hybrids, known as Mestizos, are low-IQ, bottom-feeding savages, and is why the country they infest are crime-ridden failures.  That's now America's fate too unless we re-found America as whites-only and get rid of them now!  EVERY LAST ONE!  This message paid for by TheRoadToPower.com.[2]

---

[1] Oren Segal, *Anti-Semitic Robocalls Supporting Patrick Little Proliferate in California*, Anti-Defamation League (May 18, 2018), https://www.adl.org/blog/anti-semitic-robocalls-supporting-patrick-little-proliferate-in-california/.

[2] Pat Rynard, *Neo-Nazi Robocall Hits Iowa on Tibbetts' Murder:  "Kill them All."*, Iowa Starting Line (Aug. 29, 2018), https://iowastartingline.com/2018/08/29/neo-nazi-robocall-hits-iowa-on-tibbetts-murder-kill-them-all/.

September Idaho Campaign-*Sandpoint Reader*

Ben Olson is a cancer on hopeful North Idaho and cancers must be burned out.  Ben Olson is a degenerate bartender with no education or training in reporting.  His co-conspirator [unintelligible] has a bankrupt arts and entertainment paper, The Sandpoint Reader, which he now uses to push his destructive leftist agenda on our people.  Burn out the cancer.  Ben Olson blackmailed one of our local business owners. He threatened to write about him to [unintelligible] Business if he didn't evict his residential tenants— some whose politics Ben Olson doesn't like.  Doesn't sound like a real paper.  It's not—it's a cancer. And cancers must be burned out. Punish his advertisers for feeding the cancer on our town.  Burn out the cancer Ben Olson and send a message to the rest of his tiny leftist cabal that their time is over and it can happen to them too. Burn out the cancer, Ben Olson, or the cancer that he is will spread and kill. Burn it out![3]

October Florida Campaign-Andrew Gillum

"Well, hello there! I is the negro Andrew Gillum, and I be asking you to make me governor of this here state of Florida.  My esteemed opponent, who done called me a monkey, [monkey screech] is doin' a lot of hollerin' about how 'spensive my plans for healthcare be, but he be thinkin' of the white man's medicine, which is very 'spensive 'cause it uses science and what-not. But the medicine of my African race be very 'ffordable.  For instance, puttin' the chicken feets under your pillow during the full moon don't cost hardly nothing at all.  So, I's promise that you make me, Andrew Gillum, the governor, every peoples what be ailin' will get all the chicken feets they need.  As to the claim by my esteemed opponent that I don't like the Jews, nothing be further from the truth.  It was the Jews who owned the slave trade what done brought us negroes to America to 'gin with, and they the ones that been puttin' negroes in charge over da white folk, just like they done after the Civil War.  All the Jews gon' vote me, Andrew Gillum [monkey screech] governor of this here state of Florida."

This message paid for by theroadtopower.com.[4]

November Georgia Campaign-Stacey Abrams

This is the magical negro, Oprah Winfrey, asking you to make my fellow negress, Stacey Abrams, the governor of Georgia.  Years ago, the Jews who own the American media saw something in me – the ability to trick dumb white women into thinking I was like them, and to do, read and think what I told them to.  I see that same potential in Stacey Abrams.  Where others see a poor-man's Aunt Jemima, I see someone white women can be tricked into voting for, especially the fat ones.  And so I promise that every single person who votes for Stacey Abrams, you're going to get a new car!  So YOU get a car!  And YOU get a car!  And YOU get a car! And YOU get a car!  EVERYBODY GETS A CAR!  And as far as the [unintelligible] whites who are in the way, don't worry about them, like I said in that famous interview in 2013, white racists just have to DIE.

This message is paid for by theroadtopower.com.[5]

November Charlottesville Campaign-Fields Trial

[Speaker 1]: Mayor in Charlottesville.

---

[3] Sandpoint Police Dept. Records.

[4] HuffPost Politics, *Racist Robocall Against Andrew Gillum Sent By Neo-Nazi Group*, SoundCloud (Oct. 23, 2018), https://soundcloud.com/huffpost-dc-politics/racist-robocall-against-andrew-gillum-sent-by-neo-nazi-group.

[5] Anti-Defamation League Complaint (June 20, 2019) (on file in EB-TCD-1800028178).

[Speaker 2]: The Jew Mayor.

[Speaker 1]: Who killed Heather in Charlottesville?

[Speaker 2]: His pet Negro police Chief.

[Speaker 3]: Together, they colluded to create mayhem in order to shut down speech they didn't like by agreeing [unintelligible] a permit.  They conspired to allow physical assaults [unintelligible] against the permitted and group as an excuse to declare a public emergency, then.

[Speaker 4]: Shut it down.

[Speaker 2]: Due to the anarchy created by the Negro police Chief, on direct order of his Jew Mayor boss, a young man drove his car into a crowd walking the streets.

[Speaker 3]: An unhealthy, morbidly obese smoker, never struck by any car was knocked down by the crowd and she died of a heart attack as admitted by her mother.

[Speaker 2]: So fake news used a plotting narrative to manipulate you into allowing the persecution of men brave enough to speak out against the Jewish agenda for the displacement of whites in America.

[Speaker 3]: Which includes disparaging our monuments and history.

[Speaker 2]: Who really belongs on trial for the heart attack of morbidly obese Heather [unintelligible] A Jew Mayor, a Negro police Chief.

[Speaker 1]: Try them, convict them, punish them.

[Speaker 2]: And surely, we're no longer going to tolerate a Jewish lying press, and Jew corruption of an American legal system.

[Speaker 4]: This message paid for by theroadtopower.com.[6]

---

[6] Charlottesville Police Dept. Records.

## STATEMENT OF
## CHAIRMAN AJIT PAI

**Re:**     *Scott Rhodes a.k.a. Scott David Rhodes, Scott D. Rhodes, Scott Platek, Scott P. Platek*, EB-
TCD-18-00028178.

In this Notice of Apparent Liability, we propose a forfeiture of $12,910,000 against Scott Rhodes for his apparent widespread violations of the Truth in Caller ID Act.  Those apparent violations started in Brooklyn.  Brooklyn, Iowa.

If you were to drive a stretch of U.S. Route 6 from Iowa City to Des Moines, you might miss the city of Brooklyn, Iowa (population: 1401).  Brooklyn touts itself as the "Community of Flags" and the boyhood home of John Wayne.

Brooklyn was also the hometown of Mollie Tibbetts.  Mollie was a rising sophomore at the University of Iowa who was murdered while out jogging one evening on July 18, 2018.  Her body was recovered in a nearby corn field nearly a month after she had been declared missing.  An illegal alien from Mexico was charged with her murder.

As if this tragedy were not enough, just two days after her funeral, Mollie's family, friends, and the close-knit community of Brooklyn began to receive a barrage of spoofed robocalls.  Preying on the tragedy, the calls contained inflammatory prerecorded messages and a woman's voice apparently intended to impersonate Mollie Tibbetts saying "kill them all"—the "them" referring to illegal aliens from Mexico.

The man apparently behind these robocalls was Scott Rhodes.  Between August 28 and August 30, 2018, he apparently made 837 of these robocalls to Iowa consumers.  Rhodes apparently used spoofed caller IDs that matched the area code and central office code for Brooklyn to mislead consumers into thinking that they were receiving a local call.  Sadly, that is exactly what Mollie's father thought when he answered Rhodes's robocall.  Family members said that listening to the robocalls caused them to suffer emotional distress and caused Mollie's stepmother to become physically ill.

Unfortunately, that's not all.  Our Enforcement Bureau staff has identified five other distinct illegal robocalling campaigns apparently attributable to Rhodes that are also part of today's Notice of Apparent Liability.

For instance, between May 14 and May 18, 2018, Rhodes apparently made 1,496 spoofed robocalls to Californians in an apparent effort to unseat incumbent Senator Dianne Feinstein in the 2018 U.S. Senate primary.  Among other things, the robocalls made disparaging comments about the senator's Jewish heritage.  Rhodes apparently used a phone number assigned not to him, but to someone with no connection at all with him.

And between September 21 and September 24, 2018, Rhodes apparently made 750 spoofed robocalls to Sandpoint, Idaho residents.  He again apparently used a false caller ID to attack the local newspaper and claim that its publisher was "a cancer" and "a degenerate bartender," urging listeners to "burn out the cancer."

Between October 20 and October 23, 2018, Rhodes apparently made 766 spoofed robocalls to Floridians, targeting Florida gubernatorial candidate Andrew Gillum.  Rhodes apparently used an inaccurate caller ID to relay messages falsely claiming to be from Mr. Gillum, using what the Enforcement Bureau characterized as "a caricature of a black dialect," with jungle noises in the background.

Between November 2 and November 3, 2018, Rhodes apparently made 583 spoofed robocalls to Georgians, targeting Georgia gubernatorial candidate Stacey Abrams.  Yet again with an apparently

unassigned number, Rhodes relayed a message mimicking Oprah Winfrey, who was in Georgia campaigning with Ms. Abrams around the time of the robocalls.

And between November 27 and December 4, 2018, Rhodes apparently made 2,023 spoofed robocalls to residents of Charlottesville, Virginia regarding the trial of James Field, who was charged with murdering Heather Heyer by driving an automobile into a crowd of protesters. Rhodes apparently used false caller IDs associated with the University of Virginia and another entity unrelated to Rhodes to convey a message alleging that the mayor and the police chief were at fault for Heyer's death, and urging listeners to "try them, convict them, punish them."

Considered together, between May 14, 2018, and December 2018, Rhodes apparently conducted six campaigns using unlawful spoofed robocalls. Each bore the same signature: the apparent use of a spoofed caller ID unconnected to Rhodes; the apparent use of caller IDs that matched the area codes of targeted communities; and the apparent use of falsified caller IDs with the intent to cause harm and to shield Rhodes from liability while earning publicity for his personal brand and his website "The Road to Power."

Today, we begin to hold Rhodes accountable for his apparent violations of the law. Our Notice of Apparent Liability will not undo the harm caused by these spoofed robocalls, particularly to the grieving family of Mollie Tibbetts and the community of Brooklyn. But it once again makes clear this Commission's determination to go after those who are unlawfully bombarding the American people with spoofed robocalls.

Speaking of determination, I want to thank Chairmen Thune and Pallone, Chairmen Wicker and Doyle, Ranking Members Walden and Latta, and Senator Markey and the President for enacting the Telephone Robocall Abuse Criminal Enforcement and Deterrence (TRACED) Act. The additional tools provided by the TRACED Act will help us continue our fight against illegal robocalls and to provide relief to the American people.

And to the team of teams, I want to thank Lisa Gelb, Rosemary Harold, Shannon Lipp, Daniel Stepanicich, Kristi Thompson, and Shana Yates of the Enforcement Bureau, and Valerie Hill, Richard Mallen, and Bill Richardson of the Office of General Counsel for their vigilance in once again bringing in another apparent illegal robocaller to justice.

# STATEMENT OF
# COMMISSIONER MICHAEL O'RIELLY

**Re:**     ***Scott Rhodes a.k.a. Scott David Rhodes, Scott D. Rhodes, Scott Platek, Scott P. Platek,* File No.:
EB-TCD-18-00028178.**

At the outset, let me be clear that the individual subject to this NAL engaged in vile discourse that should have no acceptance in American civil society.

Be that as it may, my responsibility as a Commissioner is to apply the law as written.  I have previously taken a slightly different approach from my colleagues when it comes to interpreting the Truth in Caller ID Act's anti-spoofing provisions.  In my opinion, the text specifically requires evidence of subjective intent to cause harm.  In other words, a negligence standard does not cut it, when Congress specifically indicated that there must be "intent."  And, given the "intent to harm" prong being sandwiched in between two types of harm that are economic in nature, psychological harm is not exactly the type of injury contemplated by the statute.

In the past, the Commission has brought enforcement actions under the "intent to harm" prong against individuals engaging in telemarketing and other various schemes to make money.  Those actions seemed to twist the meaning of the statute to reach an intended result, and I would have approached matters differently.  The inclination to strain our legal analysis may certainly indicate a problem with the underlying statute, but I believe the better and more accountable solution is to instead focus on changing the law.

The Commission's forced analysis is yet again on display here.  While the item claims that Mr. Rhodes intended to harm those affected by his robocalls, from what I can tell, his motive was rather to spread his hateful ideas, and I doubt that his mere indifference to harming others can truly satisfy the statutory standard.  In one eyebrow-raising example, the draft claims that since spoofing is known to harm the party assigned to the spoofed number, Rhodes intended to harm those whose numbers he spoofed. Applying that theory to its logical conclusion, every spoofed call would show an intent to harm, and every spoofed call would therefore violate the statute.  That line of argument doesn't seem to make much sense, as it would render the "intent to harm" qualifier in the statute completely meaningless.

While distorting statutory text is always questionable, I would also point out that we need to be especially careful not to play fast and loose with the statute when speech intended to persuade others or influence public opinion—in other words, *political* speech—is involved.  Putting aside my disagreement as to Rhodes' motive, the item at least appears to apply the statute in a content- or viewpoint-based manner.  Inflammatory political speech, which is entitled to the highest order of legal protection,[172] is *by nature* psychologically distressing.  If we're going to prohibit all spoofing that is likely to cause others emotional harm, by logical extension, all vitriolic political speech involving spoofing would be prohibited.  Since that cannot possibly be the law, the draft seems to imply that Rhodes is being targeted based on the evil content of his ideas—something that we are constitutionally prohibited from doing under the First Amendment.  And, we imply as such at our peril, since at some point, this individual or another accused party likely will find smart representation, probably on a pro bono basis, to litigate out some of our questionable decisions, and we may in turn find our "authority" curtailed.

To counter the impression that the item is not content-neutral, we also likely could have done without some of the item's more sensationalist factual sections, as well as references to the "falsity" of the information Mr. Rhodes was peddling, which I consider irrelevant to the item's legal analysis.

---

[172] *See* Snyder v. Phelps, 562 U.S. 443 (2011).

**Federal Communications Commission**                                      **FCC 20-9**

In the end, while I am not 100 percent on board with all of conclusions drawn, I do thank the Chairman for agreeing to remove certain language that might be construed as content-based.  Those changes were very much appreciated and gave me more comfort to approve our action at this stage of the process.

In supporting this NAL, I also humbly recognize my role in this rather unique structure is to serve as a judge and not a prosecutor.  I will therefore allow the enforcement process to unfold and look forward to revisiting the question of Mr. Rhodes' liability at a future point, once he has been given a full opportunity to make his case, should a forfeiture action be forthcoming.

**STATEMENT OF
COMMISSIONER JESSICA ROSENWORCEL,
DISSENTING**

**Re:**    *Scott Rhodes a.k.a. Scott David Rhodes, Scott D. Rhodes, Scott Platek, Scott P. Platek*,
        **File No.: EB-TCD-18-00028178.**

We're all sick of robocalls.  But if you're like me you especially despise those calls that roll in with a number designed to look familiar so you pick up the call.  These spoofed calls are fraud.  We should throw the book at the scam artists behind them.  We should fine them to the hills.  We can't be shy about taking strong action to stop this nuisance.

Yet the fine in this enforcement action is nowhere near as high as it should be given that the individual behind this mass of robocalls was responsible for no less than six separate spoofing campaigns.  In fact, it falls far short of the maximum fine the agency could have levied.  There has been an exponential increase in these nuisance calls.  Everyone with a phone knows that.  It's time for this agency to respond in kind by stepping up our own fines.  There is nothing in the law that stops us from doing so.  In fact, in the report accompanying the just-passed bipartisan TRACED Act, Congress made abundantly clear that "to combat robocalls, stronger penalties are needed."

Given the repeated nature of the calls in this case, the Federal Communications Commission should have sent the strongest possible signal to get robocallers to stop, send scammers away, and provide consumers with some peace.  Because we fail to do so, I dissent.

**STATEMENT OF
COMMISSIONER GEOFFREY STARKS**

**Re:**   *Scott Rhodes a.k.a. Scott David Rhodes, Scott D. Rhodes, Scott Platek, Scott P. Platek,* **File No.:  EB-TCD-18-00028178.**

This is yet another case of illegal robocalling with egregious facts, this time including commentary full of racial animosity and anti-Semitic overtones aimed at disrupting our democratic processes.  The harm inflicted upon those who were targeted in the calls and those who received the calls is likely far beyond what we can measure, so the large penalty in this case is clearly justified.  I thank the Enforcement Bureau for their hard work in chasing down every lead to uncover the full extent of these harmful messages from multiple robocalling campaigns, and I strongly support this item.

I am further encouraged that now, with last month's enactment of the Pallone-Thune TRACED Act, we have more tools at our disposal to combat the ever-growing problem of unwanted robocalls.  With a longer statute of limitations and elimination of the need to warn unlawful robocallers before proposing a penalty, we can be more effective enforcers of the Truth In Caller ID Act and our implementing regulations.