# EXHIBIT B

Submitted to
**Federal Communications Commission**
**Washington DC 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | File No.: EB-TCD-18-00028178 |
| Scott Rhodes | ) | NAL/Acct. No.: 20203217002 |
| | ) | FRN:  0029168846 |
| | ) | |

**REQUEST  OF CANCELLATION  OF PROPOSED FORFEITURE**

**Submitted:  February 25 2020**

**I.      INTRODUCTION**

1. The above-referenced "Notice of Apparent Liability for Forfeiture" ("NAL") proposes a politically motivated gross overreach of FCC authority which if acted upon, risks the FCC losing the Truth in Caller ID Act ("TICIA") as an enforcement tool entirely by having it struck down by the court on grounds of unconstitutionality, as implied by the written statement of FCC Commissioner O'Rielly[1], with the FCC being better to heed that cogent and prescient warning by the Commissioner.

2.. The NAL in this matter is faultily founded upon gross false assertions of material relevance including but not limited to the identity of the person responsible for the calls as alleged in the NAL.[2]

3. The NAL has distorted the clear meaning and intent of the TICIA to apply to speech it was not intended to cover, nor is covered by its actual language, namely political speech., which further, the government is prohibited from abridging by Amendment I of the U.S. Constitution.

4. The NAL relies on  both distortion of and ignoring the specific wording of the qualifying clause of the TICIA "…with the intent to defraud, cause harm, or wrongfully obtain anything of value…"

5. The NAL has used faulty reasoning and omission of relevant facts in its presentation to the Commissioners in order to falsely inflate the number of imagined violations and thus also the penalty amount to $12,910,000.

6. The FCC did not have the authority to issue the NAL, by not first issuing a Citation as required by law, improperly attempting to retroactively apply the recently enacted (December 2019) Pallone-Thune TRACED Act that removed the need to first issue a Citation to a non-regulated entity, giving an opportunity to cure, prior to issuing any NAL.

---

[1] NAL 202032170002, page 27, para. 5 "…at our peril since at some point this individual…likely will find smart representation, probably on a pro bono basis to litigate out some of our questionable decisions, and we may in turn find our authority curtailed." *Ibid.*
[2] See this document "Appendix", Statement of Scott Rhodes

## II.    LEGAL BACKGROUND

7. The NAL asserts that with relation to the Telephone Consumer Protection Act ("TCPA") "spoofing on a large scale is often coupled with illegal robocalling activity"[3]. No "illegal robocalling activity" is alleged by the NAL. That is to say, the very purpose of the NAL is to try to assert that the alleged robocalls violated the TCPA and TICIA, but does not allege any underlying illegal activity such as fraud or theft and other similar crimes for which it admits the TCPA was enacted.

8. Further, the case ruling cited by the NAL of *Mims vs Arrow Financial Services*[4] actually says the intent of the TCPA was related to commercial activities, not political speech, thusly:

> "Congress determined that federal legislation was needed because **telemarketers**, by operating interstate, were escaping state-law prohibitions on intrusive nuisance calls. The Act bans certain invasive **telemarketing** practices..."[5]

No marketing, sales, "telemarketing" or any commercial activity at all is alleged by the NAL.

9. The NAL further argues to presuppose "intent to harm" when caller ID spoofing is done in conjunction with an "unlawful robocalling campaign":

> "The Commission has found that spoofing, when employed in an unlawful robocalling campaign, can indicate an intent to cause harm"[6].

Again, no underlying "unlawfulness" is alleged by the NAL, aside from its purpose in trying to make a case for unlawfulness arising from a claimed violation of TICIA, which cannot itself be used as the "unlawfulness" being referred to since that is circular reasoning.

10. The NAL cites with regard to the claim directly above that "The Commission has found that spoofing, when employed in an unlawful robocalling campaign, can indicate an intent to cause harm" cases that are related to "invasion of privacy" which are not analogous to the activity alleged by the NAL, namely:

> "Similarly, courts have routinely agreed that robocalls are an invasion of privacy, an injury in fact sufficient for Article III jurisdiction. *Mims v. Arrow Financial Services, LLC*, 565 U.S. 368, 372 (2012) (finding that robocalls are an invasion of privacy); *Frisby v. Schultz¸* 487 U.S. 474, 484 (1988) (recognizing that preserving the sanctity of the home is an important value); *LaVigne v. First Community Bancshares, Inc.*, 215 F. Supp. 3d 1138, 1146-47 (D. NM 2016)."

11. In the first of those three cited cases *Mims v. Arrow Financial Services, LLC* relates to calls of a commercial nature (by a debt collection company) rather than political speech, and made repeatedly to the same number, and specifically a cell phone number:

---

[3] NAL 202032170002 page 2, para.5
[4] *Ibid.*
[5] https://supreme.justia.com/cases/federal/us/565/368/
[6] NAL 202032170002 page 2 para 5

"Congress determined that federal legislation was needed because telemarketers, by operating interstate, were escaping state-law prohibitions on intrusive nuisance calls. The Act bans certain invasive telemarketing practices..." and "...alleging that respondent *Arrow*, seeking to collect a debt, violated the TCPA by repeatedly using an automatic telephone dialing system or prerecorded or artificial voice to call Mims's cellular phone without his consent."[7]

12. In the second of those three cited cases "*Frisby v. Schultz* the expectation of privacy being violated was so by the physical picketing of a residence and characterized as follows:

"(d) As is evidenced by its text, the ordinance serves the significant government interest of protecting residential privacy. An important aspect of such privacy is the protection of unwilling listeners within their homes from the intrusion of objectionable or unwanted speech. See, e.g., FCC v. Pacifica Foundation, 438 U. S. 726. Moreover, the ordinance is narrowly tailored to serve that governmental interest, since, although its ban is complete, it targets and eliminates no more than the exact source of the "evil" it seeks to remedy: offensive and disturbing picketing focused on a "captive" home audience. It does not prohibit more generally directed means of public communication that may not be completely banned in residential areas. Pp. 487 U. S. 484-488."

The "privacy" in the decision is of not being held captive to offensive and disturbing picketing[8] since "...unwilling listeners within their homes..." cannot turn off human picketers outside their door.  In contrast, a phone call deemed disagreeable by a recipient can be terminated and he/she is not "captive" or forced to listen to it.

13. The third of the three cited decisions *LaVigne v. First Community Bancshares, Inc* also relates to calls of commercial nature and refers to Article III standing of the lawsuit, with concrete injury not being assumed but needing to be established by trial of fact.[9]

"The TCPA codifies the application of a long-recognized common law tort of invasion of privacy (and the Court would add the tort of nuisance as well) for a particularly intrusive type of unwanted conduct: unauthorized "robocalls." There is no legal rationale for this argument under an Article III analysis: either a plaintiff shows a concrete and particularized harm for Article III standing because of telemarketing calls, or she does not." (Section C, para 3) "Plaintiff claimed the number of calls was between 195 and 265, and that she answered "probably about 70 percent of the calls." (Section C, para 5)

14. In its Introduction, the NAL inverts the actual wording of the TICIA: "..apparently violated the Truth in Caller ID Act by making spoofed robocalls with the apparent intent to cause harm and wrongfully obtain something of value."[10]  The actual wording of the TICIA is:

"No person or entity in the United States, nor any person or entity outside the United States if the recipient is within the United States, shall, with the intent to defraud, cause

---

[7] https://supreme.justia.com/cases/federal/us/565/368/

[8] https://supreme.justia.com/cases/federal/us/487/474/

[9] Janine LAVIGNE, Plaintiff,**v.** FIRST COMMUNITY BANCSHARES, INC. 215 F.Supp.3d 1138 (2016)
https://scholar.google.com/scholar_case?case=14455687982025905534&q=LaVigne+v.+First+Community+Bancshares,+Inc.,+215+F.+Supp.+3d+1138,&hl=en&as_sdt=200006&as_vis=1

[10] NAL 202032170002, page 1, para. 3

harm, or wrongfully obtain anything of value, knowingly cause, directly, or indirectly, any caller identification service to transmit or display misleading or inaccurate caller identification information in connection with any voice service"[11] with that phrase "with the intent to defraud, cause harm, or wrongfully obtain anything of value" modifying "transmit or display misleading or inaccurate caller identification information…"

15. To wit, to violate the TICIA, the transmission of inaccurate caller ID must be the thing that specifically intends "…to defraud, cause harm, or wrongfully obtain anything of value", not merely the intent of the call.[12]   That "…to defraud, cause harm, or wrongfully obtain anything of value" specifically modifies the spoofing of caller ID is repeated in the same document under "SUPPLEMENTARY INFORMATION": "The Truth in Caller ID Act, and the Commission's implementing rules, prohibit any person or entity from knowingly spoofing caller identification information with the intent to defraud, cause harm, or wrongfully obtain anything of value."[13]

16. In fact, so that there can be no mistake about the correct interpretation, the same document states:

> "Based on our reading of the statute, it is not enough that a person or entity intend to defraud, cause harm, or wrongfully obtain anything of value to violate the Truth in Caller ID Act. Rather, the person or entity intending to defraud, cause harm or wrongfully obtain anything of value must facilitate the scheme through the manipulation or alteration of caller identification information"[14]

The use of inaccurate caller ID must be material to creation of the fraud, harm, or wrongfully obtaining anything of value.

17. The NAL later does go on to also allege that intent as being specifically related to the use of inaccurate caller ID and that will be refuted herein separately, but a misleading foundation is created in the NAL Introduction as detailed above in the preceding paragraphs.

18. The NAL cites as its Legal Background "The Truth in Caller ID Act prohibits "caus[ing] any caller identification service" in connection with any telecommunications service or Internet Protocol-enabled service to "knowingly transmit misleading or inaccurate caller identification information with the intent to defraud, cause harm, or wrongfully obtain anything of value"[15] but the NAL fails to establish or even address the necessary "knowingly" element.

19. The NAL fails to establish that the individual who made the alleged calls is the same one who caused the display of inaccurate caller ID. The dialing platform cited by the TICIA is not an application for robocalling in the strict sense of that word. The most commonly familiar

---

[11] Truth In Caller ID Act **§ 64.1604** https://www.federalregister.gov/documents/2019/08/30/2019-18229/truth-in-caller-id-rules

[12] https://www.govinfo.gov/content/pkg/FR-2011-07-20/xml/FR-2011-07-20.xml#seqnum43196 FEDERAL COMMUNICATIONS COMMISSION 47 CFR Parts 1 and 64 [WC Docket No. 11-39; FCC 11-100] Implementation of the Truth in Caller ID Act

[13] Implementation of the Truth in Caller ID Act, Supplementary Information www.federalregister.gov/documents/2011/07/20/2011-18165/implementation-of-the-truth-in-caller-id-act

[14] Implementation of the Truth in Caller ID Act, para. 7 www.federalregister.gov/documents/2011/07/20/2011-18165/implementation-of-the-truth-in-caller-id-act

[15] NAL 202032170002 para. 4

third-party robocalling applications employ one single operation that programs the caller ID, the list of numbers to be computer-dialed automatically and the recording to be played and in what circumstances, for the launching of that robocalling application.  In contrast, the Dialing Platform cited by the NAL[16] requires a human operator to curate every call individually (further significance of this to be addressed later in this reply) but does not require the caller ID to be entered or confirmed each time. Rather, the caller ID can be entered by one person, once, any time prior (hours, days, weeks, months or years prior) to a different person engaging in the operation of making each call individually, and that previously entered caller ID is not displayed in the specific application used by the human operator who makes and curates each call.[17]

20. "Knowingly" related to inaccurate caller ID is strictly required for acts to be a violation of the TICIA:

"In the Caller ID Act NPRM, the Commission asked about the placement of the term "knowingly" in the proposed rules. As with the proposed rules, the rules we adopt today provide that in order to violate the rules, the person or entity "knowingly" causing transmission or display of inaccurate or misleading caller identification must be the same person or entity that is acting with intent to defraud, cause harm, or wrongfully obtain anything of value."[18]

21. The NAL does not establish that its target spoofed caller IDs or made the calls, let alone both, as it states vaguely: "The Dialing Platform identifies Scott Rhodes as the originator of the robocalls"[19] without stating the form such alleged "identification" takes so that the degree of certitude and relevance can be considered by the Commissioners or refuted in detail in this written reply.

## III. NAL FALSE STATEMENTS, MATERIAL OMISSIONS, IRRELEVANCIES

22. The NAL author has omitted from his presentation to the Commissioners the actual nature of the Dialing Platform alleged to have been used, upon which the following faulty claim is made:

"Bureau staff identified…a total of 6,455 robocalls…"[20]

An NAL footnote to the statement directly above reads "…this NAL is limited to the verified robocalls"[21]

23. In fact the FCC Enforcement Bureau ("Bureau") has not verified that 6,455 robocalls were made but merely that dials were made in windows of time and geography the Bureau is claiming to be relevant. As touched upon early in this written reply to the NAL, the Dialing Platform cited by the NAL is not a robocalling program in the sense that is commonly taken to mean, i.e. a list of phone numbers is loaded while providing the prerecorded message to be played, with all calls then executed automatically by computer as a one step process.

---

[16] NAL 202032170002 para. 7
[17] Electronic Voice Services https://www.evs7.com/power-dialer-dolphin
[18] Implementation of the Truth in Caller ID Act, para. 5 www.federalregister.gov/documents/2011/07/20/2011-18165/implementation-of-the-truth-in-caller-id-act
[19] NAL 202032170002 para. 7
[20] *Id.* page 3, footnote citation number 3
[21] *Id.* para. 8

24. Rather, with the Dialing Platform cited in the NAL, a human operator must curate each phone call individually by listening to it, even being allowed to dial each number manually, then deciding what action to take once he/she hears the phone call has connected. The relevancy of this which is omitted by the NAL submitted to the Commissioners is that in so doing, the human operator has a choice of six different outcomes upon call connection (aside from immediately hanging up which would be a seventh), namely, he/she can choose to play one of five different prerecorded messages or instead to speak live to whomever or whatever has answered the call on the recipient's end, whether person or voicemail/answering machine.



25. Therefore the NAL author cannot honestly assume that every connected call (as reflected by call logs even with connect times) resulted in **any** recording being played as opposed to a live conversation, and such live conversations do not even meet the required definition of a robocall which specifies **automated** dialing **and/or** the playing of a recording.[23]

26. In the case of dials where a recording is played upon a call connect, because the human operator has a choice among five different recordings, one cannot rightly assume that the recordings alleged via the transcripts presented in the NAL were the ones played to anyone other than a call recipient who both complained and who specified what they heard, and certainly not assumed merely for an entire log of 6,455 connected calls. This also negates the basis for the way in which the NAL has calculated the proposed fine as well as the attempt to claim violations of the TCPA's provisions prohibiting recordings played to cell phones.[24]

27. The NAL, in paragraphs 9 through 18, makes numerous misstatements of fact, the falsities of which have various degrees of relevance to the issue of why the Commissioners should not approve this very faulty NAL. Other than the repeated assertion of Rhodes as the alleged target, which was refuted earlier in this reply, those falsehoods are addressed in order of appearance in the NAL as follows:

---

[22] Electronic Voice Services https://www.evs7.com/power-dialer-dolphin

[23] Telephone Consumer Protection Act 47 U.S.C. § 227 (b)(1)(A)(B) https://www.fcc.gov/sites/default/files/tcpa-rules.pdf

[24] NAL 202032170002 page citation number 75 "…at least 660 prerecorded voice message calls to wireless numbers." *Ibid.*

a. "…a brief female voice—apparently intended to impersonate Ms. Tibbetts and saying, "kill them all." (NAL para. 11)

According to the transcript alleged by the NAL, the recording could not possibly have been "intended to impersonate Ms. Tibbetts" since the recording states Tibbetts is already deceased due to having been murdered by an illegal alien, and that the statement is what she *would* say *if* she could.[25] It can't possibly be characterized as an attempt to "impersonate" the deceased.

b. "…Road to Power, the entity that claimed responsibility for the California and Iowa robocalls." (NAL para. 13)

There is no evidence presented that "Road to Power" ever claimed responsibility for these or any other robocalls.  The newspaper article being cited as a source for this claim actually reads:

"The robocall was paid for by The Road to Power, a group with a website and neo-nazi podcast by the same name, **according to a recording of the call**."

Although poorly written in its separation of two clauses that more properly belong together for clarity, it still shows that it is only accurate to say that the call recordings themselves claimed to be paid for by "The Road to Power", not that any confirmation of that fact was ever received or even attempted by the news media cited by the NAL. Other of the call transcripts included in the NAL have the recording making other claims presumed by the NAL as false, namely that it is Oprah Winfrey or Andrew Gillum speaking, so that the NAL wants to assume statements in the calls as proof of fact when it suits it, and assume other statements in the exact same source, falsehoods when it suits it.

c. The inclusion of the entirety of contents of paragraph 14 is revealingly strange even if not all technically inaccurate and seems designed to defame the NAL target, while not being relevant to the allegations of violations of the TICIA.  There is no indication that the NAL target is responsible for the incidents recited in NAL para. 14, or that the actual robocaller him/herself is either.

d. NAL citation number 50 to paragraph 14 falsely states:

"The robocalls claim that Mr. Olson threatened Rhodes's landlord to evict Rhodes, but Mr. Olson says that he simply questioned the landlord about his affiliation with Rhodes off the record as part of his reporting. "

The alleged transcript in the NAL has no such mention of Rhodes or any landlord of his, further no mention or even allusion to any particular thing ever printed by Olson, merely Olson's lack of qualifications, his "destructive leftist agenda", allegations of unethical behavior by him, and allusions to Olson being detrimental to society.[26] Olson's own previous prewritten admissions attest to his being the object of revilement by others in the community. (See paragraph 49, this document ).

---

[25] NAL 202032170002 para. 11
[26] *Id.* page 23, para. 1

e. Para. 14 falsely states, "…reporting that coincided with Rhodes getting evicted from his residence." Evictions are a matter of public record, well within the resources of the Bureau to look up and confirm. It has not presented any evidence for its false claim because Rhodes was not evicted, nor ever has been.

f. The NAL citation number 48 uses a false and inflammatory slander by a foreign publication in which the article author writes untruthfully that he corresponded with Rhodes, when he never did[27], with the fabricated claim of correspondence from Rhodes supposed to have included a link to a publicly available YouTube video showing copies of Olson's free weekly set on fire, with the clear intention of the article writer being to implicate Rhodes as being responsible (though a non-criminal act), while omitting the fact the YouTube link was reportedly emailed to many local residents[28]. Thus even if the correspondence had occurred as claimed (and it did not), as a local resident Rhodes can just as easily have received the same email of the link as everyone else, such that merely knowing of it is not an indication of any responsibility for it.

g. NAL para. 17 states "The robocalls relayed false information about the facts of the case…" and references footnote citation number 63 where the NAL claims, "The robocalls provide false information about Ms. Heyer's cause of death, claiming that she died of a heart attack rather than blunt force injury to the chest."  In fact, the transcript of the alleged recording presented by the NAL characterizes the call recording text as "…she died of a heart attack **as admitted by her mother**."[29] Mother of Heather Heyer, Susan Bro did make just such an admission on camera[30], thus claiming that the deceased's mother said so is accurate and not "false information" as incorrectly alleged by the NAL.

h. NAL para. 17 seeks to mislead the Commissioners to believe that jurors in the trial of James Fields received the alleged robocalls where it states "The judge questioned the jurors about  the robocalls and explicitly instructed the jury pool to ignore the robocalls" while omitting in its presentation to the Commissioners that the article cited in NAL footnote number 62 actually said:

"**None of the potential jurors reported receiving the call.** Judge Richard E. Moore instructed them to ignore the call and hang up **if** they receive it."[31] There is no indication any received it after that instruction either.

i. NAL para. 17 suspiciously omits the number of robocalls alleged as all similar paragraphs in this NAL section include, presumably so as to bolster the false impression that the alleged robocalls sought to influence potential jurors (which even if true is not a crime, unlike actual tampering with sitting jurors), but the NAL

---

[27] See this document "Appendix – Statement of Scott Rhodes Regarding The Guardian"
[28] KHQ-TV https://www.khq.com/news/video-stack-of-sandpoint-newspapers-lit-on-fire-in-latest/article_5a29e3f1-d967-5051-9032-b81d5944aa74.html
[29] NAL 202032170002 page 24, para. 7
[30] https://www.youtube.com/watch?v=9t1X6eOOrAE Susan Bro: "She died of a heart attack right away at the scene." *Ibid.*
[31] The Daily Progress (Nov. 28, 2018)  https://www.dailyprogress.com/news/fieldstrial/picked-to-weigh-fields-case-as-potential-jurors-asked-about/article_f3a63546-f357-11e8-9481-474483e006ac.html

elsewhere states the number of alleged calls to be 2,023[32]. Charlottesville VA is a city of over 48,000[33]

28.  NAL para. 20 alleges "The webpage itself and the videos posted on it did not provide contact information for Rhodes or identify him." First, there is no reason the website would provide contact information specifically for Rhodes if he is not responsible for the videos. But if one generously interprets the imprecise wording of the NAL language to mean that the website address named in the call recordings "…and the videos posted on it…" did not have contact information, that is provably false.  As of the date of the NAL there were 16 videos total. A review of each video shows that all 16 of them both verbally relate and textually display an email address[34]. All of the first 11 of the 16 videos both verbally relate and textually display a phone number.[35]   More significantly, the main landing page of the website to which theroadtopower.com resolves displays text of an email address and a link to an account on Gab, (a Twitter analogue)[36], without the need to view even a single video found there in order to obtain contact information.

## IV. CALLER IDs

29. The language of the TICIA makes clear that for an action to rise to the level of a violation, that the "…intent to defraud, cause harm, or wrongfully obtain anything of value" must relate directly to the knowing use of inaccurate caller ID, and not merely to the intent of a call itself that happens to use inaccurate caller ID for another reason or no reason.[37] The attempt by the NAL to conform to that requirement by distorting the obvious meaning of that clause will be deferred until the section of this written reply directly following this one.

30. First, that attempt by the NAL is necessarily predicated on a claim that the caller IDs were inaccurate, i.e., not in the possession of the caller at the time.  The following numbers are all of the caller IDs alleged by the NAL in order of appearance:

a)  415-295-4776[38]
The NAL says of this caller ID that it was, "…a number that was assigned to an individual who does not have any association with Rhodes"[39] when that is irrelevant. This is the second instance of this same imprecise language by the NAL. What is probably meant (since it is what is actually relevant) is if that number was in the possession of an individual consenting to its use as caller ID for the alleged phone calls.   The NAL alleges a call transcript for those call recordings which reads, "This call paid for by TheRoadtoPower.com"[40] while also saying that URL resolves at a site of video podcasts.[41] A review of the videos found there show 415-295-4776 was being used by that video channel

---

[32] NAL 202032170002 para. 18
[33] https://www.census.gov/quickfacts/charlottesvillecityvirginiacounty
[34] https://www.bitchute.com/channel/theroadtopower/
[35] https://www.bitchute.com/channel/theroadtopower/
[36] https://www.bitchute.com/channel/theroadtopower/ "About" tab,
[37] See this document, para. 15 & 16
[38] NAL 202032170002 para. 9
[39] *Ibid.*
[40] *Id.*  page 22
[41] *Id.* para. 6

from March 2018 through to and including May 19 of 2018[42], with a subsequent video dated June 10 2018 saying that some time since the previous video episode of May 19 2018 that Jews got that phone number "shut down".[43] The NAL alleges the calls using that number as caller ID were made between May 14 and May 18 2018[44] thus the calls were made during a time the number was in possession of the entity claimed to have sponsored them, presumably being canceled not by the holder but by the number provider due to pressure from the interest group criticized in the call recording.

b) 641-522-1488 Claimed by the NAL to be unassigned [45]

c) 208-265-0802 Claimed by the NAL to be unassigned [46]

d) 850-222-1488 Claimed by the NAL to be unassigned [47]

e) 770-586-1488 Claimed by the NAL to be unassigned [48]

f) 434-972-1488 Claimed by the NAL to be assigned to Wells Fargo [49]

g) 434-924-0420 Claimed by the NAL to be assigned to the University of Virginia [50]

31. Note the NAL nowhere alleges that the final two numbers above at f) and g) were working numbers, nor that either of the two entities named by the NAL got any return calls so it is therefore suggested that the reason is because, like the four phone numbers directly preceding them (b through e) they were also non-working numbers.  The relevance of that will be addressed in the next section dealing with the attempt by the NAL to claim "intent to harm" those entities by use of those two numbers at f) and g) above.

32. There is only one FCC complaint among all the numbers above b) through g) [51] and it reflects the lack of first-hand evidence to be relied upon as to the alleged details of the phone calls.

33. The preeminence of protection of free speech, and the foundational prohibition of the government to abridge it, will be dealt with more substantively later in this reply.  In the meantime it is noted here that four of the caller ID numbers above end with the digits "1488" which is well established to be a political slogan, including use as the last four digits of the

---

[42] https://www.bitchute.com/video/V9TIwlUQaIHH/   time stamp approx. 50:41,
https://www.bitchute.com/video/IL0dGIzITq6H/ time stamp approx. 54:30,
[43] https://www.bitchute.com/video/B9BztL5jIq8s/ time stamp approx. 1:26
[44] NAL 202032170002 para. 9
[45] *Id.* para. 10
[46] *Id.* para. 13
[47] *Id.* para. 15
[48] *Id.* para. 16
[49] *Id.* para. 18
[50] *Ibid.*
[51] FCC Open Data, CGB-Consumer Complaints Data https://opendata.fcc.gov/Consumer/CGB-Consumer-Complaints-Data/3xyp-aqkj/data

phone number of far-right Hungarian party Jobbik[52] and which references the slogan, "We must secure the existence of our people and a future for White children."[53]

34. The phone number in g) above (para. 30) ends in the digits 0420, with 420 recognized as associated with marijuana use or with Adolf Hitler[54] (born April 20). Considering the recognized meaning of the 1488 ending of the numbers above, it is presumable that the 0420 in this number relates to the latter rather than the former. Thus use of all five phone numbers can be said to be itself a deliberate expression of political speech, acknowledged by the NAL as nonworking numbers for three of those five and contended by this reply the remaining two were also likewise nonworking despite the NAL claim they were "assigned".

## V. BURDEN NOT MET FOR "…INTENT TO DEFRAUD, CAUSE HARM, OR WRONGFULLY OBTAIN ANYTHING OF VALUE

35. As cited earlier in this reply, an action only rises to the level of a violation of the TICIA if inaccurate caller ID is used with "…the intent to defraud, cause harm, or wrongfully obtain anything of value…" and it is not sufficient that merely the call itself have been intended so (see this document, para. 15 & 16). The inaccurate caller ID must be an element material to the intent to defraud, cause harm, or wrongfully obtain anything of value.

*36. Intent to defraud*: The NAL does not allege any attempt to defraud, and there are no allegations that the alleged calls described sought any money or material goods, had any commercial nature, or any nature beyond political speech, with political speech being given wide protection from abridgement by the First Amendment of the United States Constitution.

*37. Intent to…cause harm*: The NAL falsely asserts in para 21: "Evidence shows that Rhodes appears to have intended to cause harm to several individuals, grieving communities, and consumers in general"[55] yet does not the offer a single piece of evidence of such intent. Rather, it relates incidents and then claims to infer "intent to cause harm" without any evidence that the caller had such intent.

38. The family of Mollie Tibbets: The NAL alleges "Rhodes apparently intended to cause emotional harm to the family of Mollie Tibbetts as well as their friends"[56] yet does not allege any evidence of specific knowledge of, let alone animus on the part of the caller for either Tibbetts or her family, including where or who they were. Because the NAL does not possess such, it seeks to rely on: "The Bureau previously determined that a spoofer intended to cause harm because the caller had reason to know that the calls would cause emotional distress to the recipient[57] but in fact the FCC Forfeiture order cited of Blumentock Forfeiture Order, para. 8 reads:

> *"The Commission determined that harm does not only include physical or financial harm but also emotional harm such as **stalking and harassment**. Mr. Blumenstock's extensive calling campaign and the spoofed numbers he selected were specifically*

---

[52] https://rationalwiki.org/wiki/Fourteen_Words
[53] https://rationalwiki.org/wiki/Fourteen_Words
[54] https://www.adl.org/sites/default/files/documents/mobilehatesymbols/number-11.html
[55] NAL 202032170002 para. 21
[56] *Id.* para. 26
[57] *Ibid.*

*designed to induce Ms. Braver to answer the calls for the purpose of **intimidating, harassing, and threatening her.** On numerous instances Mr. Blumenstock spoofed the numbers of prisons…with messages such as "we are waiting for you"….Mr. Blumentock also spoofed numbers with a **special, personal meaning to Ms. Braver**, such as her child's school district and her parent' home. The calls often referenced very personal information."*[58]

39. The NAL alleges no such personal connection between the caller and the recipients, any desire to specifically harass or stalk such recipients, or any motivation to do so. The call recording transcript provided by the NAL shows the call to be critical of the murder of 20 year-old Mollie Tibbetts and blames "an invader from Mexico" who was a "savage" and on claimed violent behavior patterns of "mestizos"[59], clearly making the call political as it advocated for the consideration of race in public and social policy, specifically the deportation of mestizos and the institution of a "white only" standard for the United States.

40. The NAL alleges, "…specifically targeted the Tibbetts family's hometown and surrounding rural areas of Iowa"[60] and it specifies "Brooklyn, Iowa"[61]. There is no evidence that the caller knew anything of the Tibbetts family, who they were, or where they lived. Rather, Brooklyn, Iowa is the location of the widely publicized murder of Mollie Tibbetts by an illegal from Mexico, and her body was found in the same area.[62] That alone is sufficient explanation for why one could believe support for the policy advocated by the recording could be most forthcoming from the residents of that area. However it is further noted that the NAL does not offer proof or even allege that the call recording was not received in other areas also which would belie the use by the NAL of the word "targeted".

41. While the two paragraphs directly preceding this one show there is zero evidence of "…intent to harm…" due to the NALs unsubstantiated claim the caller specifically had the Tibbetts family in mind as recipients, even that (emotional) harm is not established since it uses as its support, the citation of an article in the Des Moines Register.[63] Elsewhere in that article it states of the recording listened to by a Tibbetts relative, "In it, a white nationalist called Mollie's family members traitors to their race." The transcript of the call recordings on the topic of the murder of Mollie Tibbetts provided by the NAL contain no such statement nor even language like "traitor" or "race", nor even any such implication of that sentiment. So if the source article is accurate in that, then it was a different call recording and thus even caller, than the one alleged by the NAL. If the source article is not accurate, then it has been impeached as a reliable source upon which to base the claim of emotional harm of the call recipient.

42. The NAL alleges, "…use of neighbor spoofing and targeted calling made it substantially certain that members of the Tibbetts family and their friends would receive his robocalls."[64] This is a faulty premise which improperly combines two distinct concepts, one of

---

[58] Blumenstock Forfeiture Order, 32 FCC Rcd at 358, para.8
[59] NAL 202032170002 page 22, para. 8
[60] *Id.* para. 27
[61] *Ibid.*
[62] https://www.cnn.com/2018/08/21/us/mollie-tibbetts-missing-iowa-student/index.html
[63] NAL 202032170002 page 11, footnoted citation number 93
https://www.desmoinesregister.com/story/news/2018/09/03/mollie-tibbetts-missing-found-robocall-racist-white-nationalist-brooklyn-iowa-trump-immigration/1181614002/
[64] NAL 202032170002 para.27

which, so-called "targeted calling", was already dealt with in the paragraph directly preceding this one.

43. The other of the two concepts, "neighbor spoofing…made it substantially certain that members of the…family and their friends would receive…robocalls."  The premise is false because the caller ID used made no material difference to the outcome of the call. The NAL admits of the call recordings that "…recipients listened to the robocalls live while others listened to the robocalls from voicemail."[65]  Therefore, whether or not a call recipient is more likely to answer a phone call due to a spoofed caller ID appearing to be local to him/her is immaterial. The NAL tries to rely on this particular false premise several times after and so this written reply will later cite such instances.

44. Additionally, in a landmark case, Westboro Baptist Church demonstrated at the funeral of a dead soldier, which it is reasonable to assume would be attended by grieving relatives. The demonstrators used a placard reading "Thank God for Dead Soldiers"[66]. The call alleged by the NAL doesn't even rise to that level as the transcript condemns the murder of Mollie Tibbetts and neither stated nor implied her death was a good thing[67], nor is there any evidence that an assumption could be made that call recipients would include any relatives, unlike a demonstration at a funeral. Yet, about the attempt to sue the Westboro Baptist church for emotional distress, the Supreme Clear made very clear in Snyder v. Phelps, 562 U.S.443 (2011):

> The Free Speech Clause of the First Amendment can serve as a defense in state tort suits, including suits for intentional infliction of emotional distress. *Hustler Magazine, Inc.* v. *Falwell*, <u>485 U. S. 46</u>, 50-51. Whether the First Amendment prohibits holding Westboro liable for its speech in this case turns largely on whether that speech is of public or private concern, as determined by all the circumstances of the case. "[S]peech on public issues occupies the ' "highest rung of the hierarchy of First Amendment values" ' and is entitled to special protection." *Connick* v. *Myers*, <u>461 U. S. 138</u>, 145. Although the boundaries of what constitutes speech on matters of public concern are not well defined, this Court has said that speech is of public concern when it can "be fairly considered as relating to any matter of political, social, or other concern to the community," *id.,* at 146, or when it "is a subject of general interest and of value and concern to the public," *San Diego* v. *Roe*, <u>543 U. S. 77</u>, 83–84. A statement's arguably "inappropriate or controversial character … is irrelevant to the question whether it deals with a matter of public concern." *Rankin* v. *McPherson*, <u>483 U. S. 378</u>, 387. Pp. 5–7.

45. <u>Small town newspaper:</u> The entire basis of the claim by the NAL of this particular intent to harm is a "chain of events"[68] that are incorrect as to fact that will be taken here in order of appearance in the NAL. "When Rhodes gained national attention for his August 2018 Iowa and Florida calling…several national and international media organizations cited the Sandpoint

---

[65] NAL 202032170002 page 3, footnote citation 18
[66] Snyder v. Phelps, 562 U.S.443 (2011)
[67] NAL 202032170002 "Appendix – Transcripts of Robocalls", page 22
[68] *Id.* para. 29

Reader's reporting, placing greater scrutiny on Rhodes personally."[69]  There is no evidence presented of "greater scrutiny", while in fact the three articles cited by the NAL in para. 29 have no more, and actually less, focus or detail on the individual being blamed for the calls.[70]

46. If the NAL is construing the mere existence of these three articles as undesired by Rhodes, that is contradicted by: a) the later claim by the NAL that publicity for "personal brand" was an intended "wrongfully obtained something of value"[71] b) the common sense observation that the article by The Reader of May 2018[72] which the NAL wants to construe Rhodes as blaming for different articles by the three other publications cited in NAL footnote number 96, is refuted by the fact the three subsequent articles were neither reprints of nor even based on The Reader article, but rather about totally different events which the NAL is alleging that Rhodes initiated three months after the article in The Reader. The Reader had nothing to do with those three articles and the fact that three months earlier it had merely published a subsequently quoted claim that Rhodes was responsible for theroadtopower.com, the entity clearly named in different call recordings sent three months later, and reported on then by other publications, would likely have been known about by Rhodes well prior to allegedly initiating subsequent robocalls three months later.  In other words, if Rhodes was genuinely so undesirous of having his name associated with the robocalls made and reported on in August and September 2018, he either would not have made them, or would not have included "theroadtopower.com" in the recording, thus subsequent articles naming him as allegedly associated with "theroadtopower.com" cannot possibly have been motivation for "intent to harm" regarding the much earlier "small-town newspaper"[73] article of March 2018.

47. The NAL here states, "Rhodes stated in his robocalls that Mr. Olson's reporting resulted in his eviction".  This was already refuted in this reply on page 7. To repeat what is found on page 7 of this reply:

> *A review of the alleged transcript in the NAL shows no mention of Rhodes or any landlord of his, further no mention or even allusion to any particular thing ever printed by Olson, merely Olson's lack of qualifications, his "destructive leftist agenda", allegations of unethical behavior by him, and allusions to Olson being detrimental to society.[74]*
>
> *NAL Para. 14 falsely states, "…reporting that coincided with Rhodes getting evicted from his residence." Evictions are a matter of public record, well within the resources of the Bureau to look up and confirm. It has not presented any evidence to this false claim because Rhodes was not evicted, nor ever has been.*

---

[69] NAL 202032170002 para. 29  Also, the NAL repeatedly refers to "The Sandpoint Reader" which is incorrect. It's "The Reader"

[70] *Id.* footnote citation 96 https://www.buzzfeednews.com/article/blakemontgomery/neo-nazis-are-using-robocalls-to-target-florida

[71] *Id.* para. 41

[72] *Id.* page 11, footnote citation 95

[73] *Id.* page 11. Heading number 2

[74] *Id.* page 23, para. 1

48. The NAL states that the "robocall audio accompanied a YouTube video showing a stack of the Sandpoint Reader *(sic)*[75] in flames." First, the lack of clarity by the NAL should be pointed out. It is referring to an event alleged to have taken place after the robocalls being alleged by the NAL,[76] i.e., it claims a robocall was made to 750 recipients then days later an audio recording which ostensibly is then possessed by a great number of people was uploaded to YouTube. The NAL makes no claim, and offers no evidence that even suggests that the YouTube video had anything to do with the target of the NAL but desires to make a reader incorrectly infer such.

49. Only because the NAL is seeking to rely on such tenuous "chain of events" in order to ascribe an "intent" to the single individual it has targeted, by implying that incidents of public revilement of The Reader and its co-owner Olson must likewise be ascribed to that same individual despite no such evidence, it must here be pointed out that Olson is reviled by many in the community according to social media and Olson's own admissions:

"I agree to moderate a candidates' forum …only to have a husband and wife tell me: "You are a disgrace and should be ashamed to show your face in this town"[77]

"On Christmas Day, we woke up to find a pair of posts on our *Reader* Facebook page that went beyond the typical "fake news" straw man and "liberal, biased rag/I light my morning fire with this paper" nonsense from people who can't cite specifics to back up their beef. This local Facebook user, whom we blocked, hid and won't name, contended that, "We the people" possess "a list of all these hate filled liberal traitors" **at the Reader** and other local media, and when "civil war" comes to this nation, "these liberal traitors will be rounded up and made to pay for their crimes against this country." [78]

"I had to constantly defend the Reader from multiple unfounded attacks stating we were biased, that we were one-sided, that we were somehow part of a multi-state liberal conspiracy…"[79]

"We received our very first threatening phone call….the caller began shouting profanities at me…He told me to 'shut the f--- up,' threatening to 'come down there' and show me just how angry he was. After a quick call to the Sandpoint Police…"[80]

"I receive anywhere from 50-100 emails a day…some threatening me."[81]

---

[75] NAL 202032170002 page 12, para. 30

[76] https://www.inlander.com/spokane/sandpoint-reader-targeted-by-anonymous-right-wing-propaganda/Content?oid=13007824

[77] The Reader, January 3 2019, page 22 https://sandpointreader.com/love-your-neighbor-in-2019/

[78] The Reader, January 3 2020 https://sandpointreader.com/a-history-of-violence/

[79] The Reader, November 5 2015, page 8,
https://issuu.com/keokee/docs/reader_november5_2015?e=1515675/31156844

[80] The Reader, January 14 2016, page 3,
https://issuu.com/keokee/docs/reader_january14_2016?e=1515675/32765705,

[81] The Reader, March 24 2016, page 3
https://issuu.com/keokee/docs/reader_march24_2016?e=1515675/34396582

"I've also received threatening phone calls on more than one occasion."[82]

50. None of the actions cited by the NAL regarding this particular robocall rise to the level of a violation of the TICIA for the same reason as the other incidents, namely that the spoofing of caller ID was immaterial to the argued "…intent to cause harm…" but it's even less so in this particular case since where the NAL states, "The robocalls used the same first three or six digits as the called parties' telephone numbers, which made it more likely that local residents would answer their telephones believing that they were receiving a local call"[83], it has also alleged Rhodes as a resident of Sandpoint, Idaho[84] and thus any call made by him with a **non**-spoofed caller ID would equally appear to recipients in Sandpoint, ID as a "local call"…because it would be.

51. City of Charlottesville: The NAL states, "…City of Charlottesville (has) a fundamental interest in a judicial process that protects trials from outside influence.[85] Both cases cited in support in NAL footnote number 104 refer to "jury" and "juries", not the community from which potential jurors come nor can that possibly have been the intention of that case law. There is no evidence presented of any attempt to target jurors or otherwise commit the crime of jury tampering. To repeat what is written earlier in this reply on page 8:

> *NAL para. 17 seeks to create the false impression that jurors in the trial of James Fields received the alleged robocalls where it states "The judge questioned the jurors about  the robocalls and explicitly instructed the jury pool to ignore the robocalls" while omitting in its presentation to the Commissioners that the article cited in NAL footnote number 62 actually said:*
>
> *"**None of the potential jurors reported receiving the call.** Judge Richard E. Moore instructed them to ignore the call and hang up **if** they receive it."[86]*
>
> *NAL para. 17 suspiciously omits the number of robocalls alleged as all similar paragraphs in this section include, presumably so as to bolster the false impression that the alleged robocalls sought to influence potential jurors (which even if true is not a crime, unlike actual tampering with sitting jurors), but the NAL elsewhere states the number of alleged calls to be 2,023[87]. Charlottesville VA is a city of over 48,000*

52. The NAL states, "This evidence indicates that Rhodes apparently intended to influence the judicial process with false information, thereby interfering with the public's interest in a fair trial.[88]   It does not here state what that "false information" is alleged to be, but a similar allegation by the NAL was answered earlier in this reply on page 7 thusly:

> *NAL para. 17 states "The robocalls relayed false information about the facts of the case…" and references footnote citation number 63 where the NAL claims, "The*

---

[82] The Reader, September 15 2016, page 3
https://issuu.com/keokee/docs/reader_september15_2016?e=1515675/38826673
[83] NAL 202032170002 page 12, para. 30
[84] *Id.* para. 6
[85] *Id.* para. 31
[86] The Daily Progress (Nov. 28, 2018)  https://www.dailyprogress.com/news/fieldstrial/picked-to-weigh-fields-case-as-potential-jurors-asked-about/article_f3a63546-f357-11e8-9481-474483e006ac.html
[87] NAL 202032170002 para. 18
[88] *Id.* para. 32

*robocalls provide false information about Ms. Heyer's cause of death, claiming that she died of a heart attack rather than blunt force injury to the chest." In fact, the transcript of the alleged recording presented by the NAL characterizes the call recording text as "…she died of a heart attack **as admitted by her mother**."[89] Mother of Heather Heyer, Susan Bro did make just such an admission on camera[90], thus claiming that the deceased's mother said so is accurate and not "false information" as incorrectly alleged by the NAL.*

53. According to the transcript provided by the NAL of this alleged call recording[91], the focus of the call was not the trial of James Fields, with neither the trial nor Fields' name ever mentioned. Rather, it claimed the violence and chaos of the Charlottesville rally where Heather Heyer died was the fault of the city Mayor and the Police Chief deliberately allowing violent confrontations between the permit-holding ralliers and the non-permitted protestors in order to provide the excuse to shut down the event, and so of the Mayor and Police Chief to "Try them. Convict them. Punish them."[92] To characterize speech criticizing city officials and calling for the legal system to be applied, as an "intent to harm" the city is grossly offensive to anyone with an understanding of the foundational principles of the United States and the claimant should be considered to have revealed him/herself as un-American.

54. <u>People to whom the phone numbers were assigned</u>: The NAL states "…the Commission recognized that people frequently redial *(sic)* a spoofed number to determine who called or to express outrage."[93] Of the seven caller IDs alleged used by the NAL, it admits that four of those were unassigned (see pages 9,10 of this document), and thus non-working numbers. Of the remaining three, the NAL again repeats the falsehood that one was a spoofed caller ID, namely 415-295-4776.[94] That was already refuted in this written reply on page 9, which is repeated here:

*The NAL says of this caller ID that it was, "…a number that was assigned to an individual who does not have any association with Rhodes"[95] when that is irrelevant. This is the second instance of this same imprecise language by the NAL. What is probably meant (since it is what is actually relevant) is if that number was in the possession of an individual consenting to its use as caller ID for the alleged phone calls. The NAL alleges a call transcript for those call recordings which reads, "This call paid for by TheRoadtoPower.com"[96] while also saying that URL resolves at a site of video podcasts.[97] A review of the videos found there show that phone number was being used by that video channel from March 2018 through to and including May 19 of 2018[98], with a subsequent video dated June 10 2018 saying that some time since the previous video episode of May 19 2018 that Jews got that phone number*

---

[89] NAL 202032170002 page 24, para. 7
[90] https://www.youtube.com/watch?v=9t1X6eOOrAE Susan Bro: "She died of a heart attack right away at the scene." *Ibid.*
[91] NAL 202032170002 pages 23, 24
[92] *Ibid.*
[93] *Id.* para. 33
[94] *Id.* para. 34
[95] *Id.* para. 9
[96] *Id.* page 22
[97] *Id.* para. 6
[98] https://www.bitchute.com/video/V9TIwlUQaIHH/ time stamp approx. 50:41,
https://www.bitchute.com/video/lL0dGIzITq6H/ time stamp approx. 54:30,

17

*"shut down".[99] The NAL alleges the calls using that number as caller ID were made between May 14 and May 18 2018[100] thus the calls were made during a time the number was in possession of the entity claimed to have sponsored them, presumably being canceled not by the holder but by the number provider due to pressure from the interest group criticized in the call recording.*

55. Of the two caller IDs claimed to be assigned to Wells Fargo and the University of Virginia[101], it has been contended earlier in this reply that neither number was a working number and thus could not have been dialed to "see who called" or "express outrage" as a foreseeable harm to be presumed as intent, and the NAL tellingly makes no claim of any such calls to either entity and no claim that the numbers were in fact working.  When one takes into account that the five other phone numbers claimed not to have affiliation to "theroadtopower.com" were all admitted by the NAL to be non-working, plus the fact that five of those numbers seem chosen because their very digits imparted a political message and these two numbers are among those five (see para. 33 of this document), it is certainly more likely that the numbers alleged to belong to Wells Fargo and the University of Virginia were chosen because of their digits, not to whom they belonged, and probably with no knowledge they even had owners as non-working numbers.

56. The worst possible thing that could even be contended about the caller would be negligence, certainly not intent to harm, since the NAL shows no evidence of connection to, bias against, or even knowledge of Wells Fargo and the University of Virginia by either Rhodes or the caller, nor does the call content in each case have anything to do with either entity even remotely, with that call recording alleged to be claiming guilt of the Mayor and Police Chief of Charlottesville VA for the situation that led to the death of Heather Heyer.[102]

57. <u>Intent to harm assumed due to allegation of TCPA violation</u>: The NAL attempts to seek the Commission to reason thusly: The alleged calls violated the TCPA, thus making them "illegal". Such an illegality is prima facie "harm" that has to have been presumed by the caller. Thus intentionally violating the TCPA meets the TICIA standard for "intent to harm".[103]

58. First, that reasoning fails for the same reason addressed earlier in this reply, namely that the "intent to harm" must be related specifically to the spoofing of caller ID, not merely to the intent of the call itself (para. 15 & 16 of this document) which is the only intent that can be ascribed (if it should be at all) by the TCPA violation argument.

59. Second, both FCC forfeitures cited by the NAL in footnote citation 116 to support the contention, namely "*Roesel Forfeiture Order*", and *"Abramovich Notice of Apparent Liability"* came only after each party first received a Citation informing them of violations such that "intent" could afterwards be presumed of both parties. See "Adrian Abramovich Citation And Order" issued June 22 2017 signed by Lisa Gelb[104] with forfeiture following almost a full year

---

[99] https://www.bitchute.com/video/B9BztL5jIq8s/ time stamp approx. 1:26
[100] NAL 202032170002 para. 9
[101] *Id.* para. 34
[102] *Id.* pages 23, 24
[103] *Id.* para. 35
[104] Abramovich Citation and Order https://docs.fcc.gov/public/attachments/DA-17-593A1.pdf

later in May 2018[105], and "Roesel Citation and Order" issued August 4 2017, signed by Lisa Gelb[106] with forfeiture following over one year later on September 26 2018[107].

60. Furthermore, the accused caller is a non-regulated entity who cannot be presumed to know the TCPA requirements the way a regulated entity can be, coupled with the suspicious decision of the FCC to not first send the accused individual a Citation as legally required, thus giving no opportunity to cure (something to be addressed in more detail later in this reply). While it is commonly held that ignorance of the law is not immunity from it, such immunity is not at issue here, rather the attempt of the NAL to claim the caller's "intent" to commit illegality via knowing violation of the TCPA.

61. Third, violation of the TCPA has not been sufficiently established. The NAL admits that the presumed call contents were taken from outside parties including news media.[108] There is no cited instance of any cited sources warranting that it has provided to its viewers, readers, or listeners the call recording in full, as opposed to the most relevant (or most sensational) parts. In fact at least one transcript seems clearly to have had the beginning truncated since what is printed does not make sense.[109]

62. Therefore the NAL has not established the first of two claimed TCPA violations, an alleged failure to "…at the beginning of the message, state clearly the identity of the business, individual, or other entity initiating the call…"[110]

63. As to the second of two claimed TCPA violations, a failure to "…during or after the message, state clearly the telephone number or address of [the] business, other entity, or individual…"[111], that condition was met according to call transcripts alleged by the NAL.[112]  All but one of the transcripts in the NAL end with "This message paid for by theroadtopower.com"[113] and theroadtopower.com is an address, namely a web address and so meets the criteria required by the TCPA which requires only a "…telephone number OR address…"[114] It not only meets the address requirement literally in that it is a web address, but also meets it by intent of the regulation, namely that call recipients can contact the caller, including for the purpose of the regulation cited by the NAL, to "…know where to direct grievances."[115]

64. In fact a web address provides faster and cheaper means of said contact than does a street address since the former provides instant and free means of contact while the latter requires the cost of postage and the delay of physical mail delivery. Case law has held that a web address satisfies requirements which stipulate merely an "address":

---

[105] Abramovich Forfeiture Order https://docs.fcc.gov/public/attachments/FCC-18-58A1.pdf
[106] Roesel Citation and Order  https://docs.fcc.gov/public/attachments/DA-17-662A1.pdf
[107] Roesel Forfeiture Order https://docs.fcc.gov/public/attachments/FCC-18-134A1.pdf
[108] NAL 202032170002 Appendix pages 22,23,24 footnote citations 1-6
[109] *Id.*  Appendix page 23 "November Charlottesville Campaign"
[110] *Id.* para. 36
[111] *Ibid.*
[112] *Id.* "Appendix – Transcripts of Robocalls"
[113] *Ibid.*
[114] Telephone Consumer Protection Act 47 U.S.C. § 227  (3)(A) https://www.fcc.gov/sites/default/files/tcpa-rules.pdf
[115] NAL 202032170002 para. 37

"The word "address" is defined as both "The place where someone lives or an organization is situated," and "A string of characters which identifies a destination for email messages or the location of a website." (Oxford Dictionaries Online [as of Sept. 8, 2014]. See Wasatch Property Management v. Degrate (2005) 35 Cal.4th 1111, 1121–1122, 29 Cal.Rptr.3d 262, 112 P.3d 647["[w]hen attempting to ascertain the ordinary, usual meaning of a word, courts appropriately refer to the dictionary definition of that word"].) [116]

65. As detailed earlier in para. 28 of this written reply the web address cited in the call recordings had multiple means of contact provided, repeated here:

*More significantly, the main landing page of the website to which theroadtopower.com resolves displays text of an email address and a link to an account on Gab, (a Twitter analogue)[117], without the need to view even a single video found there in order to obtain contact information.*

66. *Intent to…wrongfully obtain anything of value*: This argument by the NAL author is perhaps the most tortured, most distorted, and most offensive to common sense among the stretching attempt to satisfy the necessary TICIA clause requirement of "…with the intent to defraud, cause harm, or wrongfully obtain anything of value…"

67. The TICIA was clearly enacted to punish criminals using spoofed caller IDs to steal, cheat or otherwise defraud victims of their money through either outright theft or at very least via sales or other commercial transactions somehow materially enhanced by a misleading caller ID. The NAL alleges none of these.  A review of the website URL given in the call recordings, and the content there, both text and video, shows no solicitation or sales of any kind, no advertising or video monetization, and  not even a mechanism for donations, as of the date of this written reply.

68. Instead, the NAL tries to reach to satisfy the "anything of value" of the clause by arguing the following as said value: "shield from TCPA liability", "shield against culpability and lawsuits", "publicity", "increased value of personal brand".[118]  The fact that some of these are contradictory is obvious and will be addressed here.

69. But first, the NAL acknowledges the problem that there is no monetary angle it can pursue in its attempt to argue satisfaction of the "anything of value" clause of TICIA by asking the Commissioners to buy the premise that the items aforementioned in the paragraph directly preceding this one are equitable to the monetary value intended by TICIA.   First it cites United States v. Nilson.[119]  That decision actually reads:

"We conclude that the statutory language of § 876 encompasses the extortion of intangible objectives such as the prevention of a witness from testifying in a criminal trial, and therefore affirm the judgment and sentence of the district court."[120]

[116] Foster v. Williams (III) (I) https://caselaw.findlaw.com/ca-superior-court/1677688.html
[117] https://www.bitchute.com/channel/theroadtopower/ "About" tab,
[118] NAL 202032170002 pages 15, 16
[119] *Id.* page 15, footnote citation number 129
[120] U.S. vs Nilsen, "PER CURIAM" https://casetext.com/case/us-v-nilsen-2

70. The above is not a ruling merely that "intangible objectives" constitute value according to § 876 but that "…the **extortion** of intangible objectives…" does.  No extortion is alleged by the NAL.

71. The NAL also cites United States v. Girard.[121] That decision actually reads:

> *"We do not embrace the government's sweeping position that 18 U.S.C. § 912 extends to anything that has value to the defendant. Such a broad reading of "value" negates any limitation the word could imply. By the same token, we cannot accept Sheker's suggestion that 18 U.S.C. § 912 covers only things having commercial value. Information can be a thing of value."[122]*

In the above case, the defendant posed as an IRS agent in order to obtain information on the whereabouts of a person.

72. In none of the cases cited by the NAL in footnote citation number 129 page 15 in order  to try and bolster its claim that its allegations constitute "wrongfully obtain something of value" is the value the same as that which it goes on to allege, rather it tries to lure the Commissioners to rely on a concept that the decision of United States v. Sheker explicitly rejects: a "sweeping position" that "thing of value…extends to anything that has value to the defendant."

73. Also significant is that of  the items the NAL attempts to establish as "wrongfully obtain(ed) a thing of value", which again, are: "shield from TCPA liability", "shield against culpability and lawsuits", "publicity", "increased value of personal brand"[123], not a single one are obtainable *from the call recipient.*

74. <u>Shield from TCPA liability</u>: NAL states, "We find that Rhodes apparently made thousands of robocalls in violation of the TCPA's identification requirements…"[124]  This has been refuted earlier in this written reply, namely that due to the Dialing Platform claimed by the NAL, it cannot assume "thousands of robocalls" for the following reason repeated here from para. 24 of this document:

> *"…with the Dialing Platform cited in the NAL, a human operator must curate each phone call individually by listening to it, even being allowed to dial each number manually, then deciding what action to take once he/she hears the phone call has connected. The relevancy of this which is omitted by the NAL submitted to the Commissioners is that in so doing, the human operator has a choice of SIX different outcomes upon call connection (aside from immediately hanging up which would be a seventh), namely, he/she can choose to play one of five different prerecorded messages or instead to speak live to whomever or whatever has answered the call on the recipient's end, whether person or voicemail/answering machine."[125]*

---

[121] NAL 202032170002 page 15, footnote citation number 129
[122] United States v. Sheker, 618 F.2d 607, 609-10 (9th Cir. 1980)
[123] NAL 202032170002 pages 15, 16
[124] *Id.* para. 38
[125] Electronic Voice Services https://www.evs7.com/power-dialer-dolphin

> Therefore the NAL author cannot honestly assume that every connected call (as reflected by call logs even with connect times) resulted in **any** recording being played as opposed to a live conversation, and such live conversations do not even meet the required definition of a robocall which specifies automated dialing and/or the playing of a recording.[126]

> In the case of dials where a recording is played upon a call connect, because the human operator has a choice among five different recordings, one cannot rightly assume that the recordings alleged via the transcripts presented in the NAL were the ones played to anyone other than a call recipient who both complained and who specified what they heard, and certainly not assumed merely for an entire log of 6,455 connected calls.  This also negates the basis for the way in which the NAL has calculated the proposed fine as well as the attempt to claim violations of the TCPA's provisions prohibiting recordings played to cell phones.[127]

75. The NAL then states that a violation of the TCPA satisfies the required TICIA condition of "wrongfully" thusly:

> "Although this NAL pertains only to apparent violations of the Truth in Caller ID Act, we take into account the fact that Rhodes violated the TCPA and thus acted wrongfully."[128]

76. As previously cited in this written reply,"wrongfully" in the TICIA must relate specifically to the use of spoofed caller ID. It is not sufficient to allege it merely of the call itself. The following is copied from para. 15 & 16 of this written reply:

> "…to violate the TICIA, the transmission of inaccurate caller ID must be the thing that specifically intends "…to defraud, cause harm, or wrongfully obtain anything of value", not merely the intent of the call.[129]  That "…to defraud, cause harm, or wrongfully obtain anything of value" specifically modifies the spoofing of caller ID is repeated in the same document under "SUPPLEMENTARY INFORMATION": "The Truth in Caller ID Act, and the Commission's implementing rules, prohibit any person or entity from knowingly spoofing caller identification information with the intent to defraud, cause harm, or wrongfully obtain anything of value."[130]

> In fact, so that there can be no mistake about the correct interpretation, the same document states:

---

[126] Telephone Consumer Protection Act 47 U.S.C. § 227 (b)(1)(A)(B) https://www.fcc.gov/sites/default/files/tcpa-rules.pdf

[127] NAL 202032170002 page citation number 75 "Rhodes made at least 660 prerecorded voice message calls to wireless numbers."  *Ibid.*

[128] *Id.* page 15, footnote citation number 128

[129] https://www.govinfo.gov/content/pkg/FR-2011-07-20/xml/FR-2011-07-20.xml#seqnum43196 FEDERAL COMMUNICATIONS COMMISSION 47 CFR Parts 1 and 64 [WC Docket No. 11-39; FCC 11-100] Implementation of the Truth in Caller ID Act

[130] Implementation of the Truth in Caller ID Act, Supplementary Information www.federalregister.gov/documents/2011/07/20/2011-18165/implementation-of-the-truth-in-caller-id-act

*"Based on our reading of the statute, it is not enough that a person or entity intend to defraud, cause harm, or wrongfully obtain anything of value to violate the Truth in Caller ID Act. Rather, the person or entity intending to defraud, cause harm or wrongfully obtain anything of value must facilitate the scheme through the manipulation or alteration of caller identification information"[131] so that the inaccurate caller ID must be material to creation of the fraud, harm, or wrongfully obtaining anything of value.*

77. For the calls alleged by the NAL, spoofed caller ID was irrelevant to the claimed violations of the TCPA, thus the NAL claim that such a TCPA violation satisfies the condition of the "wrongfully" required by the TICIA fails.

78. <u>Shield against culpability and lawsuits</u>: The NAL claims "The Commission has found that "avoidance of culpability is a benefit that qualifies as a thing of value."  However, the cited action Roesel Notice of Apparent Liability paragraph 27 actually says:

"In addition, the evidence shows that Philip Roesel knew his robocall campaigns were illegal."[132]

79. As previously stated in this written reply,  for the calls alleged by this NAL there is no such evidence of "(knowing) his robocall campaigns were illegal" and in fact the FCC explicitly chose not to first issue a Citation that could then have constituted proof that the recipient knew the FCC was alleging a violation of the TCPA.

80. As also previously noted in this written reply, ignorance of the TCPA is not immunity from it, but immunity is not the issue here, rather the NAL tries to claim and needs to prove such knowledge of a TCPA violation in order to show "intent" required by the TICIA.

81. The NAL here in paragraph 39 repeats the false claim that the website URL given in the call recordings "…did not provide his personal name or other contact information…"[133]. That is false. The following is repeated here from para. 28 of this written reply:

*NAL para. 20 alleges "The webpage itself and the videos posted on it did not provide contact information for Rhodes or identify him." First, there is no reason the website would provide contact information specifically for Rhodes if he is not responsible for the videos. But if one generously interprets the imprecise wording of the NAL language to mean that the website address named in the call recordings "…and the videos posted on it…" did not have contact information, that is provably false.  As of the date of the NAL there were 16 videos total. A review of each video shows that all 16 of them both verbally relate and textually display an email address.[134].All of the first 11 of the 16 videos both verbally relate and textually display a phone number.[135]   More significantly, the main landing page of the website to which theroadtopower.com resolves displays text of an*

---

[131] Implementation of the Truth in Caller ID Act, para. 7 www.federalregister.gov/documents/2011/07/20/2011-18165/implementation-of-the-truth-in-caller-id-act

[132] Roesel Notice of Apparent Liability para, 27

[133] NAL 202032170002 para.39

[134] https://www.bitchute.com/channel/theroadtopower/

[135] *Ibid.*

> *email address and a link to an account on Gab, (a Twitter analogue)[136], without the need to view even a single video found there in order to obtain contact information.*

82. <u>Publicity</u>:  The NAL seeks to construe publicity[137] as rising to the TICIA requirement for "…intend…to wrongfully obtain something of value."  Again, as stated earlier in this reply, the very attempt has a flawed premise since the spoofing of caller ID as alleged would be immaterial to the hypothetical "…wrongfully obtain something of value…" as is required by the TICIA (See Para. 15 & 16 this document).

That being noted, we then consider the case law citations attempted as a foundation of that claim.

84. The cited case of Haelan Laboratories, Inc. v. Topps Chewing Gum, Inc. issued a decision as to the "**right** of publicity", namely the right of a ballplayer to assert a monetary value to commercial use of his image.  This decision did not at all confer a blanket "value" to "publicity", merely that if there were a value, one had a right to insist on renumeration for the commercial use of it by others:

> "We think that…a man has a right in the publicity value of his photograph, *i. e.*, the right to grant the exclusive privilege of publishing his picture, and that such a grant may validly be made "in gross," *i. e.*, without an accompanying transfer of a business or of anything else. Whether it be labelled a "property" right is immaterial; for here, as often elsewhere, the tag "property" simply symbolizes the fact that courts enforce a claim which has pecuniary worth.
>
> This right might be called a "right of publicity." For it is common knowledge that many prominent persons (especially actors and ball-players)…would feel sorely deprived if they no longer received money for authorizing advertisements, popularizing their countenances, displayed in newspapers, magazines, busses, trains and subways. This right of publicity would usually yield them no money unless it could be made the subject of an exclusive grant which barred any other advertiser from using their pictures."[138]

The NAL made no showing of any indications of any attempt, successful or not, by the NAL target to assert a right of financial compensation for commercial use of his/her likeness. There is not an automatically assumed commercial value to "publicity" established in the decision of Haelan Laboratories, Inc. v. Topps Chewing Gum, Inc., rather one must make a claim and showing that such exists, with the cited case decision being upon merely the right to do so.

85. The cited decision of Zaccini v. Scripps-Howard Broadcasting similar to the case directly above of Haelan, was only about the **right** to assert a value to publicity, being about a paid performer claiming financial loss from having his performance shown by television news because it is something he otherwise charges people to see, in other words his exclusive right to the property of viewing the performance:

---

[136] https://www.bitchute.com/channel/theroadtopower/ "About" tab,
[137] NAL 202032170002 para. 40
[138] Haelan Laboratories Inc v. Topps Chewing Gum, Inc., 202 jF.2d 866, 868 (2d Cir. 1953)

> "The Ohio Supreme Court, while recognizing that petitioner had a cause of action under state law on his **right** to the publicity value of his performance"[139]

So just as in Haelan, the case did not confer a blanket finding of value to publicity, merely the right to try and claim a value. As noted above, the NAL made no showing of any indications of any attempt, successful or not, by the NAL target to assert a right of financial compensation for commercial use of his/her likeness.

86. The cited case of Schlafly v. Saint Louis Brewery merely decided that due to the use of the name Schlafly for its products, it had a acquired a distinctiveness in the public mind that prohibited those with the surname of Schlafly from opposing the brewery's trademark attempt on the name. So just like the two previously cited cases of Haelan and Zaccini, it too deals with the right to assert (show) a commercial value which the petitioner for the trademark did in the process for applying for it. As a matter of fact, the decision denied the claim of the Plaintiffs that they had an intrinsic and assumed value to their surnames of Schlafly that would allow them to prohibit it from being trademarked by another party, despite the fame (**publicity**) of Plaintiff, the famous activist Phyllis Schlafly.

> "The TTAB ruled in favor of SLB and accordingly entitled the SCHLAFLY mark to registration on the Principal Register. The allowance was on the basis of acquired distinctiveness under Section 2(f), the Board found that the mark had acquired secondary meaning. The Board explained that it need not decide whether the mark was primarily a surname, because the mark had acquired distinctiveness. The Board relied on the long continuous use of the mark, the geographic scope of use of the mark, the variety of products with the mark in commerce, the prominent placement of the mark on SLB's products, the large sales volume of SCHLAFLY beer, the marketing types and expenditures of SLB, the total revenue for SCHLAFLY marked products, SLB's significant ranking among craft brewers in the United States, the awards won by SCHLAFLY beer, and media and other reports on SCHLAFLY beer products."[140]

The NAL cites no similar research proving that any names of the alleged caller(s) or affiliated entities have, as above, "acquired distinctiveness under Section 2(f)"

88. <u>Personal Brand</u>: The NAL says, "Rhodes apparently made 6,455 robocalls with the intent to send traffic to his website and earn publicity for "The Road to Power"—Rhodes's *(sic)* personal brand."[141]  First, the NAL presents no evidence, that "The Road to Power" is Rhodes' "personal brand" or that there is even any affiliation between the two.  Next, "…with the intent to send traffic…" is unfounded. No call transcript provided by the NAL includes any exhortation by the recipient to ***visit*** theroadtopower.com, merely a statement at the end of the calls saying "This message paid for by…"[142] which can be nothing more than intent to comply with the legal requirement that the end of the message include an address allowing for contact by the call recipient if desired.

---

[139] Zacchini v. Scripps-Howard Broadcasting Co., 433 U.S. 562 (1977)

[140] Schlafly v. Saint Louis Brewery, LLC, 909 F.3d 420, 425 (Fed. Cir. 2018)
[141] NAL 202032170002 para.41
[142] *Id.* "Appendix – Transcripts of Robocalls"

89. The NAL then states, "This personal brand can be valuable, as evidenced by…numerous articles…"   First note the words "…**can be**…", not "is assumed to be". The dubious source cited by the NAL (a mere magazine) as supposed proof actually reads:

> "Regardless of age, regardless of position, regardless of the business we happen to be in, all of us need to understand the importance of branding. We are CEOs of our own **companies**: Me Inc. To be in **business** today, our most important job is to be head marketer for the brand called You."[143]

As stated earlier in this written reply, there is no evidence  of any "company" or "business" or any kind of commercial enterprise associated with the alleged calls, merely calls of political speech and advocating for the public good, from the caller's perspective.[144]

90. In NAL para. 9 it stated, "Although Rhodes included his website in his prerecorded voice message calls, he did not provide his personal name…in the message or on his website"[145] and so the NAL itself completely negated its own claim later in para. 41 of obtaining value in a "personal brand."[146]

91. The NAL states "He targeted some of his robocalls to local news organizations, which reported about the robocalls"[147]  yet provides no substantiation of this claim; not that news organizations received the calls directly nor that they had been "targeted". The NAL earlier alleged "For each campaign, the recipients were a mix of local media organizations and businesses, as well as community residents."[148]   In fact, "local media organizations" *are* "businesses" and so the fact that some "media organization" received a robocall purportedly sent widely to "businesses as well as …residents" contradicts any claim that such a media organization was "targeted".


## VI. INVALID NAL DUE TO FAILURE TO FIRST ISSUE A CITATION AS REQUIRED BY LAW, AND UNALLOWED ATTEMPT TO RETROACTIVELY APPLY TRACED ACT

92. Section 503(b)(5) of the Communications Act prevents the FCC from issuing a forfeiture liability to a non-regulated entity unless the following conditions have been met:

> "No forfeiture liability shall be determined under this subsection against any person, if such person does not hold a license, permit, certificate, or other authorization issued by the Commission, and if such person is not an applicant for a license, permit, certificate, or other authorization issued by the Commission, unless, prior to the notice required by paragraph (3) of this subsection or the notice of apparent liability required by paragraph (4) of this subsection, such person (A) is sent a citation of the violation charged; (B) is given a reasonable opportunity for a personal interview with an official of the Commission, at the field office of the Commission which is nearest to

---

[143] https://www.fastcompany.com/28905/brand-called-you
[144] NAL 202032170002 Appendix – Transcripts of Robocalls
[145] NAL 202032170002 para. 9
[146] *Id.* para. 41
[147] *Ibid.*
[148] *Id.* para. 19

such person's place of residence; and (C) subsequently engages in conduct of the type described in such citation."[149]

93. Or in the interpretation of FCC Commissioner O'Rielly:

"Section 503(b)(5) of the Communications Act provides that no forfeiture liability shall be determined against any person who does not hold a license, permit, certificate, or other authorization issued by the Commission unless, prior to issuance of any Notice of Apparent Liability, such person is "(A) sent a citation of the violation charged; (B) is given a reasonable opportunity for a personal interview with an official of the Commission at the field office of the Commission which is nearest to such person's place of residence; and (C) subsequently engages in conduct of the type described in such citation."[150]

94. The NAL was issued improperly in violation of the above requirement, something tacitly acknowledged in the NAL thusly:

"With the recent passage of the TRACED Act, we may issue NALs for violations of the TCPA without first issuing a citation, and we will do so. Pallone-Thune Telephone Robocall Abuse Criminal Enforcement and Deterrence Act, S. 151, 116th Cong. (2019)."[151]

95. However, the TRACED Act only became law in December 2019. The activity alleged by the NAL is purported to have taken place "…between May 2018 and December 2018."[152] The NAL incorrectly seeks to apply the TRACED Act retroactively, with retroactive application being explicitly prohibited because such retroactivity was not explicitly intended by Congress in the language of the TRACED Act.[153]

96. On December 13, 2017, the U.S. Court of Appeals for the Ninth Circuit ruled that a 2012 amendment to the TCPA would not be given retroactive applicability. In *Silver v. Pennsylvania Higher Education Assistance Agency*, No. 16-15664, 2017 WL 6349153 (9th Cir. Dec. 13, 2017), the plaintiff, Neil Silver ("Silver"), appealed the district court's order granting summary judgment in favor of the Pennsylvania Higher Education Assistance Agency for alleged TCPA violations. Silver argued that the district court erred in retroactively applying the amendment, which was silent as to Congress's intent on retroactivity, and the Ninth Circuit agreed.

97. In its brief memorandum opinion, the Ninth Circuit specifically disagreed with the district court's finding that giving the amendment retroactive affect would not impair rights a party possessed when he acted, or **increase a party's liability for past conduct**.

98. The Ninth Circuit's decision is consistent with previous case law considering the retroactive applicability of amendments to the FCC's governing regulations. *See e.g.*, *Siding & Insulation Co. v. Alco Vending, Inc.*, 822 F.3d 886 (6th Cir. 2016) (amended version of the FCC's TCPA regulation governing the definition of a "sender" would not be applied

---

[149] 47 U.S. Code § 503(b)(5)
[150] https://www.fcc.gov/news-events/blog/2016/01/05/regulation-citation
[151] NAL 202032170002 page 15, footnote citation number 128
[152] *Id.* para. 2
[153] Pallone-Thune TRACED Act https://www.congress.gov/bill/116th-congress/senate-bill/151/text

retroactively); *Kesselman v. GC Servs. Ltd. P'ship*, 2016 WL 9185399, at *3 (C.D. Cal. Nov. 17, 2016) (noting that "the Supreme Court has held that congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires the result," and, accordingly, the 2016 FCC Order would likely not apply retroactively) (internal citations omitted); *Workman v. Navient Sols., Inc.*, 2016 WL 4088716, at *3 (S.D. Ind. July 27, 2016) (noting that the "FCC's Notice of Proposed Rulemaking does not say or imply that the anticipated rules will be retroactive").

99. It is exceptionally troubling that the NAL alleges activity to have taken place between May 2018 and December 2018, yet the FCC waited, not issuing the NAL until January 2020 just after the TRACED Act became law on December 31 2019.  It is reasonable to conclude that parties internal to the FCC and/or related organizations or forces who were the impetus behind this NAL intentionally sought an outcome they thought would allow them to avoid first sending a Citation with its opportunity to cure, as required by law, because they feared a cure could and would be made, something they sought to avoid because it would deny them the financial and social punishment they sought to inflict as revenge for political speech they perceived to be against their minority interest.

100. If said parties within the FCC truly were motivated solely and properly by the mission of the FCC to protect the public from infractions of the TCPA or TICIA, then they would have issued a Citation at the earliest opportunity in order to curb such infractions immediately. The fact that they did not, but instead clearly waited a year until the (mistakenly perceived) opportunity to issue a $12.9M forfeiture against an individual, non-regulated entity engaged in non-commercial protected First Amendment speech, makes clear the personal motivations of said parties.

101. Therefore, in addition to this reply representing a formal "Request of Cancellation of Forfeiture" let it also serve as a formal request that an internal investigation into the parties behind this NAL be undertaken now, in order to root out their corruption of the FCC.

102. Corruption is not merely when an individual or group misuses the power of government for monetary gain. It is also constituted when such individuals or groups pervert the processes of government and its administrative processes in order to achieve their own ends including the interest of minority in-groups to which they feel affiliation.  It is in the best interest of the FCC to investigate and punish such individuals and/or organizations behind the process that led to this improper NAL since the ability of the FCC to function properly depends on the public perception that it does so with integrity. An awareness among the public of corruption and abuse of power by certain entities manipulating and using the FCC for their own ends would greatly damage the FCC and those among its staff who are honest.


SUBMITTED


Scott Rhodes
*Pro se*

28

**APPENDIX**

**Statement of Scott Rhodes**

I, Scott Rhodes, did not make the automated phone calls and spoof caller identifications as alleged in FCC Notice of Apparent Liability For Forfeiture 2020032170002

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 25 2020.

Scott Rhodes

State of Idaho) ss
County of Boundary
On this 25 day of February , in the year 2020
20 before me Tracie Isaac, personally appeared
Scott Rhodes personally known
to me/proved to me on the basis of satisfactory evidence to be
the person whose name is subscribed to this instrument and
acknowledged he/she executed it.

WITNESS my hand and official seal
Tracie Isaac
Notary Public
My Commission Expires: 11-16-2017 11-16-2023



29

## Statement of Scott Rhodes Regarding The Guardian

I, Scott Rhodes, did not have the correspondence falsely claimed by Jason Wilson of The Guardian as he wrote in the article published there dated September 28 2018.

Nor have I ever had correspondence with anyone at The Guardian other than a complaint to the Editor of The Guardian specifically about the lie told by their employee Jason Wilson, referred to above, which I sent within days of its appearance.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 25 2020.

Scott Rhodes

State of Idaho) ss
County of Boundary
On this 25 day of February , in the year
2020 before me Tracie Isaac, personally appeared
Scott Rhodes personally known
to me/proved to me on the basis of satisfactory evidence to be
the person whose name is subscribed to this instrument and
acknowledged he/she executed it.

WITNESS my hand and official seal
Notary Public
My  Commission Expires: 11-16-2017  11-16-2023