# EXHIBIT C

**Before the**
**Federal Communications Commission**
**Washington, DC 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Scott Rhodes a.k.a. Scott David Rhodes, Scott D. | ) | File No.: EB-TCD-18-00028178 |
| Rhodes, Scott Platek, Scott P. Platek | ) | NAL/Acct. No.: 202032170002 |
| | ) | FRN: 0029168846 |

**FORFEITURE ORDER**

**Adopted: January 13, 2021**                    **Released: January 14, 2021**

By the Commission: Commissioner Rosenworcel concurring.

**TABLE OF CONTENTS**

Heading                                                                    Paragraph #
I.      INTRODUCTION ........................................................................................................ 1
II.     BACKGROUND .......................................................................................................... 4
III.    DISCUSSION ............................................................................................................ 10
        A.    Rhodes Is Responsible for Thousands of Spoofed Robocalls ............................................. 11
        B.    The Commission Used an Appropriate Methodology to Identify the Robocalls ............... 20
        C.    Rhodes Spoofed with the Intent to Cause Harm and Wrongfully Obtain Something of
              Value ........................................................................................................................... 24
              1.    Rhodes Intended to Cause Harm ........................................................................ 27
              2.    Rhodes Intended to Wrongful Obtain Something of Value .................................. 46
        D.    The Commission Provided Sufficient Notice and Due Process ........................................... 52
        E.    We Uphold the Proposed Forfeiture but Find That a Reduction is Necessary to Account for
              the Calls That Were Not Spoofed ...................................................................................... 54
VI.     ORDERING CLAUSES .............................................................................................. 56

**I.      INTRODUCTION**

        1.      Combatting unlawful, unwanted telephone calls—including unlawfully spoofed calls—is
the top consumer protection priority for the Federal Communications Commission (FCC or the
Commission).  Spoofing occurs when caller ID information is manipulated or altered to display anything
other than the originating telephone number.  Spoofing is unlawful under the Truth in Caller ID Act when
it is done with the intent to defraud, cause harm, or wrongfully obtain anything of value.[1]  This Forfeiture
Order advances the Commission's ongoing efforts to crack down on unlawful robocalls by taking action
against a particularly egregious spoofing scheme that targeted various vulnerable individuals and
communities with disruptive and unwanted prerecorded voice message calls.

        2.      Scott Rhodes (Rhodes) made 4,959 unlawful spoofed robocalls between May 2018 and
December 2018.[2]  Rhodes altered his caller ID information to appear as local numbers as part of his
campaign to send provocative prerecorded voice message calls.  The Commission identified several
distinct calling campaigns, each of which targeted voters in districts during political campaigns or
residents in communities that had experienced major news events relating to or involving public
controversies.  For example, Rhodes made hundreds of neighbor-spoofed robocalls to residents of

---

[1] 47 U.S.C. § 227(e); 47 CFR § 64.1604 ("No person or entity in the United States . . . shall, with the intent to
defraud, cause harm, or wrongfully obtain anything of value, knowingly cause, directly, or indirectly, any caller
identification service to transmit or display misleading or inaccurate caller identification information[.]").

[2] A robocall is any call made using an automatic telephone dialing system or an artificial or prerecorded voice.
Certain robocalls are prohibited by section 227(b).  *See* 47 U.S.C. § 227(b).

Brooklyn, Iowa, immediately following the much-publicized murder, by an illegal alien, of a college student who grew up in that small town.  In another campaign, Rhodes harassed and attempted to silence his local newspaper in retaliation for the paper revealing that Rhodes had made controversial robocalls.

3.      The Notice of Apparent Liability for Forfeiture (*Notice* or *Scott Rhodes Notice*) proposed a $12,910,000 penalty for violations of the Truth in Caller ID Act.[3]  In response, Rhodes argued that he did not alter caller ID information and that he did not have the intent to harm or wrongfully obtain something of value.  We find these arguments unpersuasive.  However, Rhodes has persuaded us that he had the right to use one of the caller IDs identified in the *Notice* and thus that number was not spoofed.  We therefore reduce the proposed $12,910,000 forfeiture by $2,992,000 and assess a total forfeiture of $9,918,000.

## II.      BACKGROUND

4.      *Legal Background.*  Congress recognized that consumers have embraced caller ID as a vital part of voice telephone service, depending on it to help them decide whether or not to answer the phone.  Caller ID is only valuable, however, if it is accurate.[4]  Congress codified these policies in the Truth in Caller ID Act of 2009 (Truth in Caller ID Act), as codified in section 227(e) of the Communications Act of 1934, as amended (Act).[5]  The Truth in Caller ID Act prohibits "caus[ing] any caller identification service" in connection with any telecommunications service or Internet Protocol-enabled service to "knowingly transmit misleading or inaccurate caller identification information with the intent to defraud, cause harm, or wrongfully obtain anything of value[.]"[6]  Additionally, the Commission has found that spoofing, when employed in an unlawful robocalling campaign, can indicate an intent to cause harm.[7]

5.      *Factual Background.*  Throughout the summer and fall of 2018, consumers across the country received spoofed robocalls from "The Road to Power."  The robocalls contained prerecorded voice messages targeting political campaigns and were made to phone numbers in communities that had recently experienced major news events relating to or involving public controversies.  The robocalls also directed consumers to a website called "theroadtopower.com" hosted by BitChute.  News organizations

---

[3] *See Scott Rhodes a.k.a. Scott David Rhodes, Scott D. Rhodes, Scott Platek, Scott P. Platek*, Notice of Apparent Liability for Forfeiture, 35 FCC Rcd 882, 883-89, paras. 6-20 (2020) (*Notice* or *Scott Rhodes Notice*).

[4] 156 Cong. Rec. H2522, H2524 (2010) (Remarks of Rep. Engel) ("Now, if you see a caller ID and you see it has a phone number, most people think that it's ironclad that that's the actual phone number that's calling them when in truth it's not."); 155 Cong. Rec. S170-02, S173 (2009) (Remarks of Sen. Nelson) ("Consumers expect caller I.D. to be accurate because it helps them decide whether to answer a phone call and trust the person on the other end of the line.").

[5] 47 U.S.C. § 227(e).

[6] 47 U.S.C. § 227(e)(1); *see also* 47 CFR § 64.1604.  There are exceptions for investigative, protective, or intelligence activities, but those exceptions do not apply here.

[7] *Best Insurance Contracts, Inc., and Philip Roesel, dba Wilmington Insurance Quotes*, Forfeiture Order, 33 FCC Rcd 9204, 9218-19, para. 40 (2018) (*Roesel Forfeiture Order*); *Adrian Abramovich, Marketing Strategy Leaders, Inc., and Marketing Leaders, Inc.*, Notice of Apparent Liability, 32 FCC Rcd 5418, 5423, para. 16 (2017) (*Abramovich Notice of Apparent Liability*).

identified the individual behind the website as Scott Rhodes,[8] who was at that time a resident of Sandpoint, Idaho.[9]

6.      The calls originated from a robocall dialing platform called{[

]}[10] (Dialing Platform).[11]  The Dialing Platform stated that the robocalls originated from an account in Rhodes's name.[12]  The Dialing Platform's service allows customers to dial numbers from a list and play a prerecorded voice message.[13]  The service requires the use of a 10-digit caller ID.[14]  Customers can either provide their own caller ID numbers or request the Dialing Platform to provide the numbers used for caller ID.[15]  According to the Dialing Platform, it did not provide the caller IDs for the robocalls that came from Rhodes's account.[16]  The calling party thus had to have selected the caller IDs.  In many cases, the caller IDs matched the locality of the called parties—a practice known as "neighbor spoofing."[17]

7.      Enforcement Bureau (Bureau) staff identified six distinct calling campaigns involving 6,455 verified spoofed robocalls by matching the call detail records with news coverage of calling campaigns for which the Bureau had recordings or transcripts of the prerecorded voice messages:[18]

---

[8] Rhodes also goes by the name Scott Platek, which is apparently the surname of Rhodes's adopted family. Cameron Rasmusson and Ben Olson, *Rhodes breaks silence amid police investigations*, Sandpoint Reader (Jan. 19, 2018), http://sandpointreader.com/rhodes-breaks-silence-amid-police-investigations/.  A public records search using Westlaw CLEAR shows that Rhodes has used both names.

[9] *See* Ben Olson and Cameron Rasmusson, *Suspected racist CD distributor appears to be responsible for robocalls in California*, Sandpoint Reader (*May Sandpoint Reader Article*) (May 24, 2018), http://sandpointreader.com/suspected-racist-cd-distributor-appears-responsible-robocalls-california/ (identifying the man in the videos as Scott Rhodes).  The Road to Power is only the name of Rhodes's website and his online persona.  It is not a legal entity.

[10] Material set off by double brackets {[  ]} is confidential and is redacted from the public version of this document.

[11] {[                                    ]}, Subpoena Response (Feb. 21, 2019) (on file in EB-TCD-18-00028178) (Call Detail Records).

[12] *Id.*

[13] {[                                    ]}, Narrative Subpoena Response (Feb. 21, 2019) (on file in EB-TCD-18-00028178) (Dialing Platform Response).

[14] *Id.*

[15] *Id.*  The Dialing Platform subscribes to numbers that can be used by its customers.  *Id.*

[16] *Id.*

[17] *See Adrian Abramovich, Marketing Strategy Leaders, Inc., and Marketing Leaders, Inc.*, Forfeiture Order, 33 FCC Rcd 4663, 4668, para. 15 n.37 (2018) (*Abramovich Forfeiture Order*) (stating that neighbor spoofing "requires not only an overt act to change the number that will appear in the called parties caller ID but a conscious decision with respect to selecting the first six digits of the caller ID number to match the called party's first six digits"); *Report on Robocalls:  A Report of the Consumer and Governmental Affairs Bureau Federal Communications Commission*, CG Docket No. 17-59, 2019 WL 945132, para. 20 (2019) (finding that neighbor spoofing is "where a caller spoofs a number that matches the first three or six digits of the called 10-digit number to suggest that a neighbor or local business is calling and thereby entice the consumer to answer the phone"); *Call Blocking Tools Now Substantially Available to Consumers:  Report on Call Blocking*, CG Docket No. 17-59, Report, 2020 WL 3488588, para. 50 (2020) (noting that neighbor spoofing is the practice of "using a spoofed number that appears to be local to the called party").

[18] The recordings or transcripts were obtained from complaints, news reports, or local law enforcement and Bureau staff listened to samples from each campaign.  Rhodes originated 34,277 robocalls using the Dialing Platform in 2018, but the *Notice* was limited to spoofed robocalls verified by Bureau staff.  *See* Call Detail Records.  To ensure that the robocalls were related to the verified campaigns, Bureau staff removed any robocalls made to recipients outside the geographic area targeted by Rhodes in each campaign.

- *May California Campaign—Dianne Feinstein.*  In May 2018, Rhodes used the Dialing Platform to send 1,496 robocalls about the 2018 California U.S. Senate primary, where several challengers attempted to unseat incumbent Senator Dianne Feinstein.[19]

- *August Iowa Campaign—Mollie Tibbetts.*  In late August 2018, Rhodes made 837 prerecorded voice message calls to Iowa residents referring to the apprehension of an illegal alien from Mexico whom prosecutors had charged with the murder of Mollie Tibbetts, a college student from the small town of Brooklyn, Iowa.[20]  One of the robocalls reached Ms. Tibbetts's family.  Her father answered the robocall because it displayed a local number.[21]  Family members told reporters that they suffered emotional distress after listening to the calls.[22]

- *September Idaho Campaign—Sandpoint Reader.*  In September 2018, Rhodes made 750 prerecorded voice message calls to consumers throughout Sandpoint, Idaho, attacking the *Sandpoint Reader*, a local newspaper, and its publisher, Ben Olson.[23]

- *October Florida Campaign—Andrew Gillum.*  In October 2018, Rhodes targeted Florida gubernatorial candidate Andrew Gillum.  The 766 robocalls falsely claimed to be coming from Mr. Gillum.[24]

- *November Georgia Campaign—Stacey Abrams.*  In November 2018, Rhodes launched a campaign targeting Georgia gubernatorial candidate Stacey Abrams.  The 583 robocalls purported to be from Oprah Winfrey, who was in Georgia campaigning with Ms. Abrams around the time of the robocalls.[25]

- *November Charlottesville Campaign—Fields Trial.*  In November 2018, Rhodes made 2,023 robocalls to Charlottesville, Virginia, area residents before and during the jury selection and criminal trial of James Fields.  The defendant was charged with murdering Heather Heyer by driving an automobile into a crowd of protesters in Charlottesville.[26]

---

[19] Greg Price, *California Senate Candidate Endorses Call to 'Rid America of Traitorous Jews Like Dianne Feinstein'*, Newsweek (May 18, 2018), www.newsweek.com/senate-california-traitorous-jews-feinstein-republican-934761.

[20] Linh Ta, Shelby Fleig, & Robin Opsahl, *Mollie Tibbetts search: An undocumented immigrant has been charged with first-degree murder*, Des Moines Register (Aug. 21, 2018), https://www.desmoinesregister.com/story/news/local/2018/08/21/mollie-tibbetts-found-dead-missing-iowa-student-search-brooklyn-update-latest-girl-facebook-reddit/1050165002.

[21] Luke Nozicka, *'Twisted and grotesque':  Mollie Tibbetts' father says racist robocall singled him out*, Des Moines Register (Sept. 3, 2018), https://www.desmoinesregister.com/story/news/2018/09/03/mollie-tibbetts-missing-found-robocall-racist-white-nationalist-brooklyn-iowa-trump-immigration/1181614002/.

[22] *Id.*

[23] Jason Wilson, *Neo-Nazi activist behind racist robocalls linked to threats of Idaho newspaper*, The Guardian (Sept. 28, 2018) (*Guardian Article*), https://www.theguardian.com/world/2018/sep/28/idaho-robocalls-sandpoint-reader-neo-nazi.

[24] Eric Brander*, Another racist robocall targets Florida gubernatorial candidate Andrew Gillum*, CNN (Oct. 24, 2018), https://www.cnn.com/2018/10/24/politics/andrew-gillum-racist-robocall-florida-governor/index.html.

[25] Veronica Stracqualursi, *Racist robocall targets Stacey Abrams, Oprah in Georgia governor's race*, CNN (Nov. 5, 2018), https://www.cnn.com/2018/11/03/politics/stacey-abrams-oprah-georgia-racist-robocall/index.html.

[26] *Commonwealth v. Fields*, Case Nos. CR17000296-01 to 10 (Charlottesville City Cir. Ct. 2018); Staff, *28 picked to weigh Fields case as potential jurors asked about racist robocall*, The Daily Progress (Nov. 28, 2018) (*Daily Progress Jury Article*), https://www.dailyprogress.com/news/fields_trial/picked-to-weigh-fields-case-as-potential-jurors-asked-about/article_f3a63546-f357-11e8-9481-474483e006ac.html.

8.      On January 30, 2020, the Commission issued the *Scott Rhodes Notice* proposing a $12,910,000 forfeiture against Scott Rhodes for his apparent willful and repeated violation of section 227(e) of the Act,[27] and section 64.1604 of the Commission's rules,[28] by spoofing caller ID information with the intent to cause harm and wrongfully obtain something of value.

9.      On February 25, 2020, Rhodes submitted a response to the *Notice*.[29]  Rhodes complained that the *Notice* represents a "politically motivated gross overreach of FCC authority" and evidences the "corruption" of "minority in-groups" within the Commission.[30]  Substantively, Rhodes made several arguments as to why the *Notice* should be cancelled.  *First*, Rhodes argued that the *Notice* failed to establish the identity of the individual who made the calls, and failed to establish that the person whom made the calls was the same person who caused the display of inaccurate caller ID and thus "knowingly" transmitted inaccurate caller ID information.[31]  He filed a signed and notarized affidavit stating that he "did not make the automated phone calls and spoof caller identifications as alleged" in the *Notice*.[32]  *Second*, Rhodes claimed that one of the caller IDs, 415-295-4776, was assigned to him, and that the other numbers used were unassigned or "non-working numbers," which he claimed showed there was no intent to cause harm.[33]  *Third*, Rhodes argued that the spoofing of unassigned and non-working numbers was an expression of political speech and, along with the content of the call, was protected by the First Amendment of the Constitution.[34]  *Fourth*, Rhodes argued that the Commission has not verified that 6,455 robocalls were made because the Dialing Platform requires a human operator to "curate" and listen to each phone call, and the human operator must decide, upon call connection, whether to play one of up to five prerecorded messages on the call or to speak in person, and thus the Commission could not demonstrate that every one of the allegedly verified calls included the particular prerecorded voice message for which Rhodes was being penalized.[35]  *Fifth*, he argued that the *Notice* did not establish the intent to cause harm to the identified persons and entities.[36]  *Sixth*, Rhodes claimed that the *Notice* misapplied the "wrongfully obtain anything of value" factor, which, he claimed, applies only to criminal wrongdoing or telemarketing.[37]  *Seventh*, Rhodes argued that the Commission failed to issue a citation before adopting the *Notice* as required by subsection 503(b)(5) of the Communications Act (Act), and that by so doing, the *Notice* "incorrectly seeks to apply the TRACED Act retroactively" to activity that occurred in 2018 in an effort to deprive Rhodes of an opportunity to cure violations prior to issuance of the *Notice*.[38]

---

[27] 47 U.S.C. § 227(e).

[28] 47 CFR § 64.1604.

[29] *Scott Rhodes*, Response to Notice of Apparent Liability (Feb. 25, 2020) (on file in EB-TCD-18-00028178) (Notice Response).

[30] Notice Response at 1, 28.

[31] *Id.* at 1, 4-5.

[32] *Id.* at 29.

[33] *Id.* at 9-11, 17-18.

[34] *Id.* at 1, 10-11, 13.

[35] *Id*. at 1, 5-6.

[36] *Id.* at 1, 11-20.

[37] *Id.* at 20.

[38] *Id.* at 26-28.

## III.    DISCUSSION

10.    The Commission proposed a forfeiture in accordance with section 503(b) of the Act,[39] section 1.80 of the Commission's rules,[40] and the Commission's *Forfeiture Policy Statement*.[41]  When we assess forfeitures, subsection 503(b)(2)(E) requires that we take into account the "nature, circumstances, extent, and gravity of the violation and, with respect to the violator, the degree of culpability, any history of prior offenses, ability to pay, and such other matters as justice may require."[42]  We have considered Rhodes's response to the *Notice* and, with one exception, find his arguments unpersuasive.  We find that one of the numbers he used as caller ID was not spoofed.  We uphold the forfeiture but reduce the $12,910,000 proposed forfeiture by $2,992,000 to account for the robocalls that Rhodes did not spoof. We therefore assess a total forfeiture of $9,918,000.

### A.    Rhodes Is Responsible for Thousands of Spoofed Robocalls

11.    *Rhodes Is Responsible for Originating the Robocalls*.  The *Notice* identified Scott Rhodes as the apparent originator of the robocalls sent to communities throughout the United States during 2018.[43]  Rhodes submitted a signed and notarized affidavit that he "did not make the automated phone calls and spoof caller identifications as alleged in [the *Notice*]."[44]  Rhodes does not categorically assert that he did not make the calls.  He asserts that he did not make the calls "as alleged."[45]  It is unclear whether Rhodes is suggesting (without supporting evidence) that someone else used Rhodes's account to make the calls, or whether Rhodes is contesting some other, unspecified assertions in the *Notice*.  In any event, we rely on the more probative evidence in the record that supports our determination that Rhodes is responsible for originating the robocalls.  *First*, the Dialing Platform identified Scott Rhodes as the person responsible for the account from which the calls originated.[46]  The Dialing Platform provided documentation showing Scott Rhodes as the account holder, an address that the Bureau confirmed belonged to Rhodes, a phone number, and an e-mail address with Rhodes's name.[47]  *Second*, the Dialing Platform provided monthly billing receipts, which showed the same contact information.[48]  Rhodes even updated his billing information to reflect his new address in November 2018.[49]  The Dialing Platform did not provide any information that showed anyone other than Rhodes accessed the account.

12.    Other than Rhodes's bare assertion that he did not make the calls "as alleged" in the *Notice*, there is no evidence to support the claim that someone other than Rhodes originated the calls or

---

[39] 47 U.S.C. § 503(b).

[40] 47 CFR § 1.80.

[41] *The Commission's Forfeiture Policy Statement and Amendment of Section 1.80 of the Rules to Incorporate the Forfeiture Guidelines*, Report and Order, 12 FCC Rcd 17087 (1997) (*Forfeiture Policy Statement*), *recons. denied*, Memorandum Opinion and Order, 15 FCC Rcd 303 (1999).

[42] 47 U.S.C. § 503(b)(2)(E).

[43] *Scott Rhodes Notice*, 35 FCC Rcd at 884, 890, paras. 7, 23-24.

[44] Notice Response at 29.

[45] *Id.*

[46] Dialing Platform Response at 2; {[                                    ]}, Traceback Subpoena Response (Nov. 27, 2018) (on file in EB-TCD-18-00027696) (Traceback Response).

[47] Dialing Platform Response at 2; Traceback Response.  Rhodes argues that the *Notice* failed to state the form of the identification with such degree of certitude or relevance that he could refute in his response.  Notice Response at 5. The *Notice* precisely cited to the supporting evidence, which was a subpoena response from the Dialing Platform. *See Scott Rhodes Notice*, 35 FCC Rcd at 884, para. 7 & n.17.  Rhodes could have requested and reviewed the evidentiary record used to support the *Notice* to respond but did not do so.

[48] Dialing Platform Response at Document #4 (Scott Rhodes-Automated Billing).

[49] *Id.*

selected the caller ID.[50]  Indeed, Rhodes does not even allege that his account with the Dialing Platform was hacked or otherwise used without his permission.  Thus, we find that Rhodes had control of the Dialing Platform account throughout the period of violations covered by the *Notice* and that he is responsible for the calls at issue.

13.     *Rhodes Knowingly Caused the Display of Inaccurate Caller ID Information*.  The Truth in Caller ID Act outlaws "caus[ing] any caller identification service to knowingly transmit misleading or inaccurate caller identification information with the intent to defraud, cause harm, or wrongfully obtain anything of value."[51]  In the order implementing the Truth in Caller ID Act (*Truth in Caller ID Order*), the Commission determined that the word "knowingly" modifies the action of the person or entity engaged in malicious caller ID spoofing.[52]  Additionally, the person knowingly altering the caller ID must be the same person that is acting with the intent to defraud, cause harm, or wrongfully obtain anything of value.[53]

14.     We find that Rhodes caused the display of inaccurate caller ID within the meaning of the Truth in Caller ID Act.[54]  We considered Rhodes's sworn statement that he did not spoof the calls,[55] but we find the contrary evidence described above to be more probative.  All persons in the causal chain of the spoofed call may be liable so long as (1) they knew that the caller ID information was manipulated, and (2) they intended the caller ID manipulation to defraud, cause harm, or wrongfully obtain anything of value.[56]  The caller ID is derived from either the Dialing Platform or the account holder.  The Dialing Platform did not provide any numbers to Rhodes to use as caller ID.[57]  Thus, the caller ID had to come from the account holder, which was Rhodes.  By entering the false caller ID information into Dialing Platform software interface, Rhodes caused the display of inaccurate caller ID information.

15.     Rhodes knew that, with one exception discussed below, the numbers displayed as caller ID information were not assigned to him, and thus were inaccurate.  Rhodes does not contest that six of the seven numbers included in the *Notice* were spoofed.[58]  He accepts the *Notice*'s findings that the numbers (with one exception) were either unassigned or assigned to persons other than himself.[59]  Rhodes posits a hypothetical argument that the person who set the caller ID information is not necessarily the same person who made the robocalls.  He asserted that "the caller ID can be entered by one person, once, any time prior (hours, days, weeks, months or years prior) to a different person engaging in the operation of making each call individually."[60]  Hypotheticals and conjecture alone do not suffice to contradict the reasonable presumption that, absent actual evidence to the contrary, the person who selected the caller ID

---

[50] Rhodes does not, for example, allege or demonstrate that a third party co-opted his Dialing Platform account without Rhodes's consent, or that another person was authorized to use his Dialing Platform account.

[51] 47 U.S.C. § 227(e)(1).

[52] *Rules and Regulations Implementing the Truth in Caller ID Act of 2009*, Report and Order, 26 FCC Rcd 9114, 9120, para. 17 (2011) (*Truth in Caller ID Order*).

[53] *Id.*

[54] 47 U.S.C. § 227(e).

[55] Notice Response at 29.

[56] *See Truth in Caller ID Order*, 26 FCC Rcd at 9121, para. 21 (discussing liability).

[57] Dialing Platform Response at 2-3.  The dialer could not make outbound calls without the user entering a number to be used as caller ID.  According to the Dialing Platform, "[dialing software] has a box in the software for the user to type in his or her 10-digit Caller ID.  It will not call unless a number is there."  *Id.*

[58] Notice Response at 9-11.  The spoofed numbers are 641-522-{[      ]}, 208-265-{[      ]}, 850-222-{[      ]}, 770-586-{      ]}, 434-972-{      ]}, and 434-924-{[      ]}.

[59] Notice Response at 10-11.

[60] *Id.* at 4-5.

and the person who originated the calls were either the same or were working collaboratively.  In any event, even if we accepted Rhodes's hypothetical scenario, it would not release him from liability.  Any person who knowingly *caused* the transmission or display of inaccurate caller ID information is liable if they acted with wrongful intent.[61]  This includes the person who selected the inaccurate caller ID, as well as the person who decided to transmit a call displaying the inaccurate caller ID.  Moreover, the Dialing Platform system is designed so that the person making the calls will see the caller ID that is transmitted with the calls.[62]  Thus, even if the calls were made long after the caller ID had been selected, the person originating the call could see whether the caller ID was spoofed.

16.     Additional evidence supports our finding that Rhodes knowingly selected inaccurate caller ID to be displayed.  First, the calls displayed numbers that appeared to be local.[63]  Many of the calls were spoofed with the first three or six digits of the caller ID matching the dialed number.  In addition, Rhodes contended that the last four digits of five of the caller IDs were selected because they conveyed a particular message.[64]  These facts support our finding that Rhodes selected the caller ID himself—he chose numbers that reflected the locality of the called parties or that otherwise appealed to him.[65]  Moreover, the relationship between the caller ID and the messages indicates that the person who selected the caller ID was the same person, or was coordinating with the person, who made the calls.

17.     Rhodes distinguished one number, 415-295-4776, and presented evidence that he had the right to use that number at the time the calls were made.  The *Notice* asserted that Rhodes used 415-295-4776 to make 1,496 robocalls to California residents between May 14 and May 18, 2018.[66]  Rhodes cites videos posted on his Road to Power website that displayed 415-295-4776 as a contact number.[67]  One video published on May 30, 2018, directs viewers at the end of the video to leave a voicemail at 415-295-4776.[68]  Although this evidence did not by itself demonstrate that Rhodes had a right to use that number, we requested and received confirmation from the service provider that Rhodes was the subscriber of record for that number at the time the calls were made.[69]  Consequently, we find that Rhodes did not spoof 415-295-4776.  However, we uphold the *Notice*'s finding that he knowingly spoofed the other six numbers (641-522-{[     ]}, 208-265-{[     ]}, 850-222-{[     ]}, 770-586-{[     ]}, 434-972-{[     ]}, and 434-924-{[     ]}) to make 4,959 spoofed robocalls.

18.     *Rhodes's Chosen Caller IDs are Not Protected Speech.*  We find that the caller IDs do not constitute protected speech and they are not immune from enforcement under the Truth in Caller ID Act.  The Truth in Caller ID Act regulates conduct, not speech.[70]  It prohibits a person from knowingly transmitting misleading or inaccurate caller ID information with the intent to defraud, cause harm, or wrongfully obtain anything of value.  Rhodes argues that the selected caller IDs conveyed a political

[61] *Truth in Caller ID Order*, 26 FCC Rcd at 9121, para. 21.

[62] The dialer displays the caller ID field every time a user opens the application to make calls.  E-mail from {[                    ]}, President {[                              ]}, to Daniel Stepanicich, Attorney Advisor, Telecommunications Consumers Division, FCC Enforcement Bureau (Oct. 9, 2020, 18:21 ET).

[63] *See supra* note 17.

[64] Notice Response at 11.

[65] The relationship between the caller ID and the calls further weakens the assertion that the calls might not have been made by the person who selected the caller ID.

[66] *Scott Rhodes Notice*, 35 FCC Rcd at 885, para. 9.  The messages disparaged Senator Diane Feinstein.  *Id.*

[67] Notice Response at 9.

[68] *The Road to Power 20180506* (May 30, 2018), https://www.bitchute.com/video/V9TIwlUQaIHH/ (time stamp approximately 50:40).

[69] {[                    ]} Subpoena Response (Sept. 10, 2020) (on file in EB-TCD-18-00028178).

[70] 47 U.S.C. § 227(e).

message and therefore were protected by the First Amendment.[71]  The last four digits of his selected caller IDs were either "1488" or "0420," which Rhodes alleges are neo-Nazi symbols.[72]  The Supreme Court in *Spence v. Washington* determined that conduct only becomes expressive and deserving of First Amendment protection when the actor intended to communicate a particular message by his actions *and* the message was understood by the audience.[73]  The caller IDs do not satisfy the standard in *Spence. First*, because Rhodes denies that he was involved in selecting the caller ID numbers, he makes no claims about his intent in selecting the numbers; instead, he merely asserts that the meanings of those numbers were "well established" and "recognized."[74]  *Second*, even if we assume that Rhodes intended the caller IDs to communicate a political message, there is no evidence in the record that the called parties understood that message.

19.     The fact that particular numbers may be intended to convey a political message does not afford a caller the right to use the numbers in violation of the Truth in Caller ID Act.  The Truth in Caller ID Act bars the knowing transmission of inaccurate or misleading caller ID information with the intent to defraud, cause harm, or wrongfully obtain anything of value.[75]  If Rhodes wanted to use telephone numbers to try to convey a message, he would have needed to obtain the right to use the numbers.  Moreover, Rhodes's contention regarding the last four digits of the caller ID numbers does not alter the fact that he chose the first three digits—and in many cases the first six digits—to appear to be a local number, in order to:  (1) hide his identity and (2) make it more likely that a called party would answer the phone thinking that it was a local caller.  In any event, we find that there was no message in the spoofing here that was comprehensible to called parties; instead, the spoofing was non-expressive conduct and thus can be regulated.[76]

**B.     The Commission Used an Appropriate Methodology to Identify the Robocalls**

20.     Each calling campaign targeted a discrete geographic area and used a distinct caller ID—often matching the first three or six digits of the called parties.  The Commission evaluated the calls in each of Rhodes's six robocalling campaigns.  This is the same methodology that the Commission has used in prior spoofing enforcement actions.  Between May 2018 and December 2018, Rhodes made 34,277 calls using the Dialing Platform.[77]  We analyzed 6,455 calls to verify that they were all spoofed and, for each campaign, reviewed at least one full recording or transcript of a call, and one or more additional partial recordings, to determine that the calls were robocalls, that the recordings included identical statements, and that there was wrongful intent, consistent with the approach taken in *Abramovich* and *Roesel*.[78]  Commission staff was able to identify and distinguish the calling campaigns by matching the call detail records with news coverage of calling campaigns for which the Commission had recordings or transcripts of the prerecorded voice messages.  We also reviewed complaints filed with the Commission and local law enforcement to corroborate the call detail records and news reports.  Each

---

[71] Notice Response at 10.

[72] The number "1488" is an amalgamation of the "14 Words," a white supremacist slogan, and "88," which stands for "Heil Hitler."  *14/88*, Anti-Defamation League, https://www.adl.org/education/references/hate-symbols/1488 (last visited May 21, 2020).  Rhodes claimed that "0420" is a reference to Adolf Hitler, who was born on April 20.  Notice Response at 11.  However, a Google search of "0420" does not generate a reference to Hitler or related matters.

[73] *See Spence v. Washington*, 418 U.S. 405, 410-11, 415 (1974) (finding that defendant's alteration of the flag was intended to communicate a message that would have been likely understood by those who viewed it).

[74] Notice Response at 10-11.

[75] 47 U.S.C. § 227(e).

[76] *See, e.g.*, *United States v. O'Brien*, 391 U.S. 367, 376 (1968) (distinguishing speech and conduct).

[77] Call Detail Records.

[78] *Roesel Forfeiture Order*, 33 FCC Rcd at 9225-26, paras. 56-57; *Abramovich Forfeiture Order*, 33 FCC Rcd at 4674, para. 33.

news report and complaint described the same message, for the applicable calling campaign, that we heard. And we found no evidence beyond Rhodes' own assertion that even one of the 6,455 calls at issue was not a robocall.

21.    Rhodes contends that the Commission's verification methodology was improper because it assumed that every call included a harmful prerecorded voice message rather than a live conversation or some other message.[79] Rhodes argues in effect that Commission staff was required to listen to every single call. We disagree: The process used to analyze Rhodes' calls was a reasonable and fair approach consistent with Commission precedent.[80] Spoofing campaigns frequently involve thousands or even millions of calls. It is reasonable, and necessary, for the Commission to review only a subset of calls to identify the content and scope of the calls and to rely on other available evidence to reach its conclusions.

22.    Rhodes also asserts that the messages in the spoofed call *might* have varied, and that some of the calls *might* have been live rather than prerecorded. *First*, it is irrelevant for purposes of a Truth in Caller ID Act violation whether the call was live or prerecorded so long as the caller ID was spoofed with wrongful intent. Moreover, in instances where we find that Rhodes intended to cause harm by making prohibited prerecorded voice message calls, we also find additional harms for each violation. No single violation in this forfeiture relies on whether the call was a robocall. *Second*, Rhodes does not allege that any of the calls deviated from the ones that the Bureau reviewed.[81] He simply asserts that they *could* have differed. That hypothetical assertion, without more, is not persuasive in light of the countervailing evidence: In addition to reviewing calls ourselves—including full and partial recordings or transcripts for each campaign, which all indicated use of an identical message in more than one call in each campaign, each of which involved hundreds or thousands of calls—each complaint, police report, and news article that we reviewed confirmed the content for each calling campaign; there is no credible evidence that the messages varied. *Third*, Rhodes sought out and purchased the services of a robocall dialing platform. The Dialing Platform enabled Rhodes to upload, store, and transmit prerecorded messages.[82] Rhodes presumably would not have needed to purchase the Dialing Platform's services if he were not making robocalls, and nothing in the record suggests an alternative explanation.

23.    We thus find that the preponderance of the evidence shows that all of the calls in these campaigns were robocalls, and Rhodes has provided no documentary evidence to the contrary. Indeed, other than calls made using one caller ID number, Rhodes did not dispute that each call was spoofed. And though he claims in his response that that some of the calls could have been live calls,[83] we did not find any evidence that supports this assertion. In short, the weight of the evidence supports our finding that all these calls were robocalls.

### C.    Rhodes Spoofed Robocalls with the Intent to Cause Harm and Wrongfully Obtain Something of Value

24.    We find that Rhodes made thousands of spoofed robocalls with the intent to cause harm and wrongfully obtain something of value. Specifically, we find that Rhodes intended to cause harm to several individuals and communities, and he intended to wrongfully obtain something of value in the

---

[79] Notice Response at 5-6.

[80] *Roesel Forfeiture Order*, 33 FCC Rcd at 9225-26, paras. 56-57; *Abramovich Forfeiture Order*, 33 FCC Rcd at 4674, para. 33.

[81] Rhodes had the opportunity to show that the sample the Commission used in this case was flawed. In other instances, the Commission has reduced a proposed forfeiture following convincing evidence that a portion of the calls should not have been included. *See Dialing Services, LLC*, Forfeiture Order, 32 FCC Rcd 6192, 6200, para. 23; *see also Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Declaratory Ruling, 23 FCC Rcd 559, 565, para. 10 (2008) (concluding that "[s]hould a question arise as to whether express consent was provided, the burden will be on [the caller] to show it obtained the necessary prior express consent").

[82] Dialing Platform Response at 2.

[83] Notice Response at 6.

form of evading liability for the robocalls and garnering publicity for his personal brand—all of which were furthered by his spoofing.  We examine the display of caller IDs as well as the context of the caller's actions to determine intent.  Courts have recognized that direct evidence of specific intent is rarely available.[84]  Therefore, it is reasonable and often necessary to look at a party's actions to determine the party's intent regarding a wrongful action.[85]  In doing so, it may be necessary to look at the content of the robocalls, but we do so only for the narrow purpose of discerning intent.[86]

       25.     The spoofing must be done in conjunction with an intent to defraud, cause harm, or wrongfully obtain something of value in order to violate the Truth in Caller ID Act.  But the text of the law does not support Rhodes's contention that the fraud, harm, or wrongful conduct must result from the spoofing of the caller ID itself, rather than from the content of the call.[87]  Rhodes's assertion lacks any foundation in the text of the statute and his interpretation would unduly narrow the intended scope of the Truth in Caller ID Act.  In passing that statute, members of Congress were concerned, among other things, about hoaxes that were facilitated through caller ID spoofing.[88]  Congress was concerned that the spoofing enabled the spoofers to hide from law enforcement.  Congress did not say or suggest that the spoofed caller ID had to be responsible for the harm.  In *Abramovich*, the Commission found that Adrian Abramovich intended to cause harm to well-known travel companies because he mentioned the companies in his robocalls.[89]  His selected caller IDs had no connection to the mentioned companies; instead, the Commission determined that Abramovich's use of neighbor spoofing made it more likely that recipients would answer their phones and listen to the robocalls' harmful message.[90]  Likewise, in *Roesel*, Philip Roesel's selection of caller IDs did not facially establish the intent to cause harm; rather the intent to cause harm was gleaned from the messages.[91]

---

[84] *United States v. Dearing*, 504 F.3d 897, 901 (9th Cir. 2007); *United States v. Marabelles*, 724 F.2d 1374, 1379 (9th Cir. 1984); *see also General Cigar Co., Inc. v. CR Carriers, Inc.*, 948 F. Supp. 1030, 1036 (M.D. Ala. 1996) ("Because one cannot know another's subjective intent, circumstantial evidence must be relied upon to indicate intent.  The requirement of specific intent under the mail fraud statute is satisfied by the existence of a scheme which was reasonably calculated to deceive persons of ordinary prudence and comprehension and this intention is shown by examining the scheme itself." (internal citations omitted)).

[85] *United States v. Davis*, 490 F.3d 541, 549 (6th Cir. 2007); *Tusa v. Omaha Auto Auction Inc.*, 712 F.2d 1248, 1253 (8th Cir. 1983) ("intent to defraud is ordinarily proved by circumstantial evidence"); *see also United States v. Sullivan*, 522 F.3d 967, 974 (9th Cir. 2008) ("the scheme itself may be probative circumstantial evidence of an intent to defraud"); *United States v. Rogers*, 321 F.3d 1226, 1230 (9th Cir. 2003) ("It is settled law that intent to defraud may be established by circumstantial evidence."); *General Analytics Corp. v. CNA Ins. Cos.*, 86 F.3d 51, 54 (4th Cir. 1996) ("[B]ecause it is abstract and private, intent is revealed only by its connection with words and conduct."); *FDIC v. St. Paul Fire & Marine Ins. Co.*, 942 F.2d 1032, 1035 (6th Cir. 1991) ("intent . . . is thought to refer to a subjective phenomenon that takes place inside people's heads . . . .  [The law is concerned only with] the external behavior ordinarily thought to manifest internal mental states . . . .") (citations omitted)).

[86] *See Abramovich Forfeiture Order*, 33 FCC Rcd at 4668, paras. 15-16 (determining that the fraudulent use of company names in the content of the robocall messages caused harm); *Steven Blumenstock*, Forfeiture Order, 32 FCC Rcd 356, 358, para. 8 (EB 2017) (reviewing the contents of calls to show that Blumenstock intended to inflict emotional harm) (*Blumenstock Forfeiture Order*).

[87] Notice Response at 3-4.

[88] 156 Cong. Rec. H8376, H8380 (2010); 156 Cong. Rec. H2522, H2523 (2010).  *See also* 156 Cong. Rec. H8376, H8379 (2010) (discussing an incident where law enforcement personnel wasted their Christmas Day investigating a hoax claim that a woman shot her baby).

[89] *Abramovich Forfeiture Order*, 33 FCC Rcd at 4668, para. 16.

[90] *Id.* at 4668, paras. 15-16.

[91] *Best Insurance Contracts, Inc., and Philip Roesel, dba Wilmington Insurance Quotes*, Forfeiture Order, 33 FCC Rcd 9204, 9220, para. 42 (2018) (*Roesel Forfeiture Order*).

26.     We find that Rhodes used spoofed caller IDs to further his intent to harm and to wrongfully obtain something of value. He chose caller IDs that would appear as local numbers (i.e., neighbor spoofing) so that it was more likely that people would answer their phones and listen to his messages.[92] Furthermore, spoofing enabled him to avoid detection and liability—things of value. The fact that the harm and wrongful conduct did not arise specifically from the caller ID he selected is not legally relevant.

### 1.     Rhodes Intended to Cause Harm

27.     The Commission has stated that intent to harm under the Truth in Caller ID Act can be demonstrated when the harms are "consequences which are desired" or "substantially certain."[93] The Commission has also determined that harm under the Truth in Caller ID Act includes emotional, physical, and financial harm.[94] Rhodes does not contest these determinations. Instead, he argues that he did not intend to harm and that the calls were not harmful. We reject these arguments and find that Rhodes intended to cause harm.

28.     *Intent to Cause Harm to the Mollie Tibbets Family.* Rhodes made 837 robocalls to the small town of Brooklyn, Iowa, and surrounding areas, using a spoofed caller ID that made the calls appear to be local. We find that he did so with the intent to cause harm to area residents, including the Tibbets family and their friends. Rhodes blanketed the area with his robocalls, making it substantially certain that the robocalls would reach—and be answered—by people with a close relationship to the Tibbets family.[95] Brooklyn is a community of only 1,549 people.[96] Not only was it substantially certain that the calls would reach Ms. Tibbetts's family and friends, but neighbor spoofing made it more likely that the called parties would answer the phone and listen to Rhodes's message. Rhodes acknowledges that the robocalls likely targeted the Brooklyn area because the media reported that Ms. Tibbetts was murdered there, and he believed residents there would be receptive to the content of the message.[97] He argues, however, that the Commission failed to show that the caller knew that the Tibbetts family resided in Brooklyn.[98] Yet the same media reports Rhodes cites also report that the Tibbets family lived in the

---

[92] The Commission has observed in past cases that neighbor spoofing made it more likely that consumers would answer their phones. *See Abramovich Forfeiture Order*, 33 FCC Rcd at 4668, para. 15; *Abramovich Notice of Apparent Liability*, 32 FCC Rcd at 5424, para. 17 ("Consumers reported frustration at being tricked into answering the calls . . . ."). Rhodes claims that this observation is false, but he offers no evidence to question our past precedent investigating robocalling schemes. Notice Response at 13. Furthermore, just because some robocalls went to voicemail or were unanswered does not make the spoofing less material to the scheme. The Truth in Caller ID Act only requires intent to defraud, cause harm, or wrongfully obtain something of value—it does not require the scheme to be successful.

[93] *Affordable Enterprises of Arizona, LLC*, Notice of Apparent Liability for Forfeiture, 33 FCC Rcd 9233, 9242-43, para. 26 & n.70 (2018) (*Affordable Notice of Apparent Liability*) (citing Restatement (Second) of Torts § 8A, comment b, p. 15 ("Intent is not . . . limited to consequences which are desired. If the actor knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result.")). *Cf. Burr v. Adam Eidemiller, Inc.*, 386 Pa. 416 (1956) (intentional invasion can occur when the actor knows that it is substantially certain to result from his conduct); *Garratt v. Dailey*, 13 Wash. 2d. 197 (1955) (finding defendant committed an intentional tort when he moved a chair if he knew with "substantial certainty" that the plaintiff was about to sit down).

[94] *Truth in Caller ID Order*, 26 FCC Rcd at 9122, para. 22.

[95] The fact that areas surrounding Brooklyn received the robocalls does not belie our argument that Rhodes targeted the Brooklyn area. *See* Notice Response at 12. Rhodes deliberately picked the NPA/NXX numbers for Brooklyn, Iowa, and called numbers in those exchanges; thus, he targeted Brooklyn, Iowa.

[96] United States Census Bureau, *Brooklyn City, Iowa*, https://data.census.gov/cedsci/profile?g=1600000US1908695 (last visited Sept. 1, 2020).

[97] Notice Response at 12.

[98] *Id.*

Brooklyn area.[99]  Thus, we conclude that Rhodes knew it would be substantially certain that his robocalls would reach Ms. Tibbetts's family or friends.

29.     The Truth in Caller ID Act does not require a personal nexus to the called parties in order to demonstrate an intent to cause emotional harm, and the Commission has never imposed such a requirement.[100]  Nor does the purpose of the statute or its legislative history describing the problem of spoofing mandate such a requirement.[101]  In fact, the Commission has found an intent to harm when the spoofed calls targeted people with whom the spoofer had no personal relationship.[102]  Rhodes claims that because the caller did not have any nexus with or animosity toward any members of the Tibbetts family, he could not have intended to cause them harm.  In support, Rhodes relies on the *Blumenstock Forfeiture Order*.[103]  *Blumenstock* involved a man who spoofed caller ID while making harassing calls to a friend's ex-wife.[104]  The fact that Mr. Blumenstock had a personal connection to the victim helped demonstrate an intent to harm in that case, but a personal relationship is not required to show intent to harm.  In other cases, we have found an intent to harm without finding that there was a personal relationship between the spoofer and the called parties.[105]

30.     We find that Rhodes made prerecorded voice message calls partially spoken in a feminine voice meant to represent Ms. Tibbetts,[106] and he sent these robocalls immediately after her murder—actions that could be extremely disturbing to those close to Ms. Tibbetts and, in fact, caused emotional distress.[107]  Therefore, we find that Rhodes intended to cause emotional harm.

*31.*     We also find that our enforcement action is consistent with the First Amendment.  Rhodes contended that his calls were protected speech because they involved a matter of public concern.[108]  In *Snyder v. Phelps*, which Rhodes cites in support, the Supreme Court held that speech on an issue of public concern made in a *public place* is entitled to "special protection" under the First

---

[99] *See* Notice Response at 12 n.62 (citing Eric Levenson, Samira Said, and Steve Almasy, *Man leads police to body, faces murder charge in Mollie Tibbetts case*, CNN (Aug. 22, 2018) ("Before she went missing, Tibbetts' brother dropped her off at her boyfriend's house so she could dog-sit, HLN reported.  Her family reported her missing after she did not show up for work the next day.")).

[100] The *Blumenstock Forfeiture Order* provides an example where the content of the call may be used to demonstrate an intent to harm; the calls were designed to inflict harm on a targeted audience.  Although the specifics are different in this case, we find that Rhodes similarly selected his audience in a manner that demonstrates an intent to harm.

[101] *See Truth in Caller ID Order*, 26 FCC Rcd at 9122, para. 22.  Members of Congress considered many schemes, some including where the caller had a relationship with the victim, but there is no evidence that Congress required a nexus.  *See* 156 Cong. Rec. H8376, H8376-80 (2010); 155 Cong. Rec. S170-02, S173-74 (2009) (Remarks of Sen. Nelson).

[102] *Roesel Forfeiture Order*, 33 FCC Rcd at 9217-20, paras. 37-42; *Abramovich Forfeiture Order*, 33 FCC Rcd at 4667-69, paras. 12-20.

[103] Notice Response at 11-12.

[104] *Blumenstock Forfeiture Order*, 32 FCC Rcd at 357, para. 3.

[105] *Roesel Forfeiture Order*, 33 FCC Rcd at 9217-20, paras. 37-42; *Abramovich Forfeiture Order*, 33 FCC Rcd at 4667-69, paras. 12-20.

[106] *Scott Rhodes Notice*, 35 FCC Rcd at 886, para. 11 ("If after her life has now been brutally stolen from her, she could be brought back to life for just one moment and asked, "What do you think now?"  Mollie Tibbetts would say, "Kill them ALL.").  "Kill them all" was spoken in a feminine voice.  *Id.*

[107] Rhodes does not contest that the Tibbetts family experienced emotional distress other than to attack the credibility of the newspaper article cited by the *Notice*.  Notice Response at 12.  Rhodes argues that there were discrepancies between the article's description of the robocalls' message and the recording cited by the *Notice*, which showed that either the Tibbetts family received a different robocall from someone other than Rhodes or that the newspaper falsified its story.  *Id.*  We find no evidence of either theory.

[108] Notice Response at 13.

Amendment.[109]  But the Court noted that "'[e]ven protected speech is not equally permissible in all places and at all times.'"[110]  Rhodes's prerecorded voice message calls may have involved an issue of public concern, but they were not made in a public place.  Instead, the robocalls were transmitted directly into peoples' homes via telephone.  One's home is a private space that the government may protect from unwanted intrusion, as the Court noted in *Snyder*.[111]  The Court similarly reached this conclusion in *Frisby v. Shultz*:

> [A] special benefit of the privacy all citizens enjoy within their own walls, which the State may legislate to protect, is an ability to avoid intrusions.  Thus, we have repeatedly held that individuals are not required to welcome unwanted speech into their own homes and that the government may protect this freedom.[112]

Rhodes attempts to distinguish an unwanted phone call from the picketing at issue in *Frisby* by arguing that the recipient of a robocall can simply terminate the call.[113]  The Court rejected this distinction in *FCC v. Pacifica Foundation*, noting that "[o]ne may hang up on an indecent phone call, but that option does not give the caller a constitutional immunity or avoid a harm that has already taken place."[114]

32.     Our enforcement action relates to Rhodes's use of spoofed caller ID.  The content of the messages is relevant only to the extent that it demonstrates an intent to harm.  The Supreme Court has long recognized that the government may introduce "the evidentiary use of speech to establish the elements of a crime or to prove motive or intent."[115]  We find that the nature and timing of the robocalls made it substantially certain that the Tibbetts family or their friends would be harmed emotionally.  Thus, we conclude that Rhodes used spoofed caller ID with the intent to cause harm to the Tibbetts family and others.[116]

33.     *Intent to Cause Harm to Ben Olson and the Sandpoint Reader*.  We find that Rhodes made 750 spoofed robocalls with the intent to harm the *Sandpoint Reader* and its publisher, Ben Olson.  The robocalls contained a message declaring Mr. Olson "a cancer" that should be "burn[ed] out" and calling for an advertiser boycott:

> Ben Olson is a cancer on hopeful North Idaho and cancers must be burned out.  Ben Olson is a degenerate bartender with no education or training in reporting.  His co-conspirator [unintelligible] has a bankrupt arts and entertainment paper, The Sandpoint Reader, which he now uses to push his destructive leftist agenda on our people.  Burn out

---

[109] *Snyder v. Phelps*, 562 U.S. 443, 458 (2011).

[110] *Id*. at 456 (quoting *Frisby v. Schultz*, 487 U.S. 474, 479 (1988)).

[111] *Id.* at 459-60 (noting the Court has recognized a "captive audience doctrine" to "protect unwilling listeners from protected speech" and citing two examples where the doctrine has been applied to protect residents in their homes) (citing *Frisby*, 487 U.S. at 484-85 and *Rowan v. U.S. Post Office Dept.*, 397 U.S. 728, 736-38 (1970)).  *See also FCC v. Pacifica Foundation*, 438 U.S. 726, 748-49 (1978) (stating that "in the privacy of the home . . . the individual's right to be left alone plainly outweighs the First Amendment rights of an intruder"); *Kovacs v. Cooper*, 336 U.S. 77, 86-87 (1949).

[112] *Frisby*, 487 U.S. at 484-85.

[113] Notice Response at 3.

[114] *Pacifica Foundation*, 438 U.S. at 749.

[115] *Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993); *see also Street v. New York*, 394 U.S. 576, 594 (1969) (noting that nothing would render a conviction impermissible "merely because an element of the crime was proved by the defendant's words rather than in some other way").

[116] We make no representations about whether calls that do not use spoofed caller ID would be lawful.  We find only that such calls would not violate the Truth in Caller ID Act.  In fact, to the extent that we found that Rhodes makes a showing that some of his calls were not spoofed, we concluded that those calls did not violate the Truth in Caller ID Act.  *See supra* para. 17.

the cancer.  Ben Olson blackmailed one of our local business owners.  He threatened to write about him to [unintelligible] Business if he didn't evict his residential tenants—some whose politics Ben Olson doesn't like.  Doesn't sound like a real paper.  It's not—it's a cancer.  And cancers must be burned out.  Punish his advertisers for feeding the cancer on our town.  Burn out the cancer Ben Olson and send a message to the rest of his tiny leftist cabal that their time is over and it can happen to them too.  Burn out the cancer, Ben Olson, or the cancer that he is will spread and kill.  Burn it out![117]

The message advocated harm both to the newspaper and Mr. Olson.  If acted upon, it would have caused financial and, potentially, physical harm.

34.      Rhodes does not refute that the robocalls advocated harm to Mr. Olson or the paper.  In fact, his response expressed continued animosity toward the paper and Mr. Olson.[118]  He argues, however, that the *Notice* incorrectly relied on a "tenuous 'chain of events'" to prove intent to harm.[119]  The *Notice* cited unwanted attention placed on Rhodes from national news organizations that referenced and included a live web link to the *Sandpoint Reader*.  The unwanted attention included an apparent eviction proceeding alleged in the Sandpoint Police Department investigative record related to the robocalls, and contemporaneous actions attributed to Rhodes to show Rhodes's motive.[120]  Rhodes argues that the attention from national news organizations was neither undesirous nor causally linked to the *Sandpoint Reader*'s reporting, there was never an eviction proceeding, and the contemporaneous actions, such as burning copies of the newspaper, cannot be definitively linked to him.[121]  We determine, however, that the robocall message itself is enough to find that Rhodes intended to harm Mr. Olson and the *Sandpoint Reader*.  The message indicates, and police records corroborate, that Rhodes believed that Mr. Olson tried to get him evicted.[122]  We find that Rhodes used the spoofed caller ID to advocate harm to Mr. Olson and the *Sandpoint Reader*.  Therefore, we conclude that Rhodes made the robocalls with the intent to cause harm.

35.      *Intent to Cause Harm to the Commonwealth of Virginia and the City of Charlottesville.*  We find that Rhodes made 2,023 spoofed robocalls with the intent to interfere with the judicial process of the 2018 trial of James Fields for the murder of Heather Heyer.  The Commonwealth of Virginia and the City of Charlottesville have a fundamental interest in a judicial process that protects trials from outside influence.[123]  Rhodes's illegally spoofed robocalls coincided with the trial of Mr. Fields.  Jury selection

---

[117] Deputy Report for Incident 18-018901, Sandpoint Police Dept. (July 5, 2019) (Sandpoint Police Dept. Records) (on file in EB-TCD-18-00028178).

[118] Notice Response at 14 (alleging that Olson is "reviled" by many in the community).

[119] *Id.* at 14-15.

[120] *See Scott Rhodes Notice*, 35 FCC Rcd at 892-93, paras. 29-30.

[121] Notice Response at 7-8, 14-15.  Rhodes faults the *Notice* for relying on reporting by the *Guardian*.  He claims that the *Guardian* article cited in the *Notice* included fabricated claims of correspondence between Rhodes and the reporter.  *Id.*  Rhodes offers a notarized and signed affidavit that he never corresponded with the *Guardian*.  The *Guardian* article says that, "[w]hen Rhodes was asked about the call by the Guardian via email, he sent a link to a YouTube video that reproduced the robocall audio, and featured video of a large stack of copies of the Sandpoint Reader being set on fire."  *See Guardian Article*.  The Commission relied primarily on police reports and the messages, which are consistent with the newspaper reports.

[122] *See* Sandpoint Police Dept. Records.

[123] *See Sheppard v. Maxwell*, 384 U.S. 333, 362 (1966) ("[d]ue process requires that the accused receive a trial by an impartial jury free from outside influences"); *Pennekamp v. Florida*, 328 U.S. 331, 366 (1946) (Frankfurter, J. concurring) ("[I]n a particular controversy pending before a court and awaiting judgment, human beings, however strong, should not be torn from their moorings of impartiality by the undertow of extraneous influence.  In securing freedom of speech, the Constitution hardly meant to create the right to influence judges or juries.").

began on November 26, 2017, and Rhodes started making his robocalls on November 27, 2017.[124]  The trial continued for a week, during which Rhodes continued to make robocalls until the Dialing Platform terminated his account.[125]  The calls targeted geographic areas that were likely to comprise the jury pool. The calls were sufficiently numerous and prejudicial that the judge in the case felt compelled to find out whether the calls had tainted jury selection, and he instructed the jury pool to ignore the robocalls:  "If you get one of those [robocalls], ignore it, hang up immediately and give it no attention."[126]

36.       In particular, the robocalls contained false information about the death of Ms. Heyer by claiming that she died of a heart attack rather than blunt force trauma from the impact of the car.[127] Rhodes argues that his robocalls were truthful because they referenced a statement by Ms. Heyer's mother.[128]  Rhodes offers a YouTube video that appears to be a cropped clip of an NBC News broadcast showing a press interview with Ms. Heyer's mother shortly after her daughter's death stating that Ms. Heyer died of a heart attack.[129]  Upon reviewing the unedited NBC News video and comparing the submitted edited version, we find that Rhodes took Ms. Heyer's mother's statement out of context.  She was not providing a statement on Ms. Heyer's cause of death but rather drawing comfort that her daughter appeared to not suffer after being struck by the car.[130]  Further, even if Rhodes believed that his calls contained truthful information, making the calls in the midst of jury selection, to a geographic area from which the jurors would be selected, evinces an intent to disrupt the judicial process.[131]

37.       Rhodes asserts that speech criticizing city officials and advocating for changes to the legal system is consistent with "foundational principles of the United States" and he contends that such advocacy cannot reasonably be deemed an intent to harm.[132]  We only examine Rhodes's speech for the limited and permissible purpose of discerning intent.[133]  Our determination that Rhodes intended to cause harm is tied inextricably to his use of spoofed caller ID, along with the fact that the calls were calculated to interfere with the judicial process.[134]  Rhodes also argued that there was no harm because none of the

---

[124] See Daily Progress Jury Article.

[125] Sara Sidner, Kevin Conlon & Nicole Chavez, James Fields convicted in Charlottesville death, CNN (Dec. 7, 2018), https://www.cnn.com/2018/12/07/us/charlottesville-james-fields-trial/index.html; Call Detail Records; E-mail from {[                    ]}, President {[                              ]}, to Daniel Stepanicich, Attorney Advisor, Telecommunications Consumers Division, FCC Enforcement Bureau (Dec. 4, 2018, 15:14 ET).

[126] Trial Transcript at 1317, Commonwealth v. Fields, Case Nos. CR17000296-01 to 10 (Charlottesville City Cir. Ct. 2018).

[127] The robocalls said, "[a]n unhealthy, morbidly obese smoker, never struck by any car was knocked down by the crowd and she died of a heart attack as admitted by her mother."  Charlottesville Police Dept. Records.  In contrast, the autopsy report said, "Cause of Death:  Blunt Force Injury to Torso; Manner of Death:  Homicide."  Jennifer Bowers, Assistant Chief Medical Examiner, Office of the Chief Medical Examiner, Report of Investigation, C2017-64645 (Oct. 30, 2017).

[128] Scott Rhodes Notice, 35 FCC Rcd at 893, para. 31.

[129] Notice Response at 8 (citing American Freedom Party, "Heather Heyer's mom said in an NBC interview she died of a heart attack," YouTube (Sept. 9, 2017), https://www.youtube.com/watch?v=9t1X6eOOrAE).

[130] Heather Heyer's mom delivers message about karma to white nationalists, NBC News (Aug. 19, 2017), https://www.nbcnews.com/video/heather-heyer-s-mom-delivers-message-about-karma-to-white-nationalists-1028340803735.

[131] See Sheppard, 384 U.S. at 362 (noting that the defendant had a right to a fair trial free from outside interference).

[132] Notice Response at 17.

[133] See Mitchell, 508 U.S. at 489 (the First Amendment does not prohibit evidentiary use of speech to prove intent or motive); Street, 394 U.S. at 594.

[134] See Mitchell, 508 U.S. at 489 (recognizing that speech content can be used to prove intent or motive); United States v. O'Brien, 391 U.S. at 376 (distinguishing speech and conduct).  See also Sheppard, 384 U.S. at 362 ("Due (continued….)

jurors reported receiving the robocalls.[135]  Whether any member of the jury pool received the robocalls is irrelevant because the Truth in Caller ID Act only requires intent to harm, not actual harm.  The judge believed that the robocalls were sufficiently harmful to the judicial process to instruct the jury pool about the robocalls.[136]  The evidence supports our finding of an intent to harm.

38.     *Intent to Cause Harm to Consumers.*  Rhodes made thousands of robocalls that harmed consumers by failing to include identification information.  The inclusion of identification information in prerecorded voice message calls is vital to protect consumer privacy,[137] otherwise called parties have no means to register do-not-call requests or evaluate the veracity of the message.[138]  Congress deemed these consumer privacy interests important enough to codify them in the TCPA.[139]  Rhodes intentionally harmed consumers by failing to include identifying information, and this intentional action violated the TCPA.

39.     Section 227(d)(3)(A) of the Act and section 64.1200(b) of the Commission's rules require that all artificial or prerecorded voice message calls include specific information.  *First*, section 227(d)(3)(A) states that the Commission's technical standards shall require that all artificial or prerecorded voice message calls must, "at the beginning of the message, state clearly the identity of the business, individual, or other entity initiating the call . . . ."[140]  *Second*, section 227(d)(3)(A) further requires the Commission's technical standards to require that artificial or prerecorded voice message calls must, "during or after the message, state clearly the telephone number or address of [the] business, other entity, or individual . . . ."[141]  With regard to the latter requirement, the Commission's rules require that all artificial or prerecorded messages must "state clearly the telephone number" of the calling party (but the rule does not require inclusion of an address).[142]  The Commission recognized that "adequate identification information is vital so that consumers can determine the purpose of the call, possibly make a do-not-call request, and monitor compliance with the TCPA rules."[143]  The Bureau has repeatedly warned that it will enforce these identification rules against all robocallers, including political callers.[144]

---

process requires that the accused receive a trial by an impartial jury free from outside influences."); *Pennekamp*, 328 U.S. at 366 (Frankfurter, J. concurring) ("[I]n a particular controversy pending before a court and awaiting judgment, human beings, however strong, should not be torn from their moorings of impartiality by the undertow of extraneous influence.  In securing freedom of speech, the Constitution hardly meant to create the right to influence judges or juries.").  Rhodes misreads these cases in arguing that they are irrelevant.  Notice Response at 17.  The *Notice* properly cited to them for the proposition that the government has a fundamental interest in protecting the integrity of the judicial process.  *Scott Rhodes Notice*, 35 FCC Rcd at 893-94, para. 31.

[135] Notice Response at 8.

[136] *See Daily Progress Jury Article.*

[137] *Maryland v. Universal Elections, Inc.*, 729 F.2d 370, 376 (4th Cir. 2013) ("There are at least three important government interests furthered by the TCPA's identity disclosure provisions:  protecting residential privacy; promoting disclosure to avoid misleading recipients of recorded calls; and promoting effective law enforcement.").

[138] *2003 TCPA Order*, 18 FCC Rcd at 14099, para. 144; *Maryland*, 729 F.2d at 376-77.

[139] 47 U.S.C. § 227(d)(3)(A).  *See also* 47 CFR § 64.1200(b).

[140] 47 U.S.C. § 227(d)(3)(A); *see also* 47 CFR § 64.1200(b)(1).  The Commission's rules further require that businesses must use the name under which the entity is registered to conduct business.  47 CFR § 64.1200(b)(1).

[141] 47 U.S.C. § 227(d)(3)(A).  *See also* 47 CFR § 64.1200(b)(2).

[142] 47 CFR § 64.1200(b)(2).

[143] *See 2003 TCPA Order*, 18 FCC Rcd at 14099, para. 144.

[144] *See Biennial Reminder for Political Campaigns About Robocall and Text Abuse, Enforcement Advisory*, Public Notice, 31 FCC Rcd 1940, 1941 (EB 2016) ("All prerecorded voice messages, campaign-related and otherwise, that are permissible under Section 227 of the Communications Act of 1934, as amended, and the Commission's rules must include certain information to identify the party responsible for the message.").  *See also Warning Political* (continued….)

40.     Rhodes's prerecorded voice messages failed to meet either requirement.  Based on our sampling of the calls, we find that the robocalls did not provide the name of the caller at the beginning of the message.  Rhodes argues that the *Notice* relied on recordings from news organizations that had an incentive to sensationalize the robocalls and cut out portions of the recordings, as part of an apparent conspiracy against him.[145]  But he does not submit any evidence that the calls identified Rhodes at the beginning of the message.  The Commission relied on police reports of the messages; we did not rely only on news reports.[146]  In addition, the Bureau listened to the entire recording from each of the robocalling campaigns, and it did not identify Rhodes at the outset of the message.[147]

41.     The robocalls also failed to provide the telephone number of the caller at any point in the recording.  The purpose of requiring a telephone number is "so that consumers can determine the purpose of the call, possibly make a do-not-call request, and monitor compliance with the TCPA rules."[148]  Rhodes argues that the robocalls provided a web address, and that satisfied both the literal requirement and its underlying purpose by allowing call recipients to contact the caller.[149]  We find that providing a web address—particularly one that did not identify the name of the caller—does not satisfy the explicit requirement to include a telephone number.  In support of his position, Rhodes cites *Foster v. Williams*.[150]  But that decision holds no sway; it is a state court decision interpreting the term "address" in a state statute concerning real property, not a federal regulation requiring disclosure of a telephone number.  The two regulatory regimes were designed to serve completely different purposes; the California law functions to protect tenants by requiring notices from landlords before eviction, while the Commission's rule focus upon enforcement of consumer rights to screen unwanted voice calls.[151]

42.     As the Commission has found in previous cases, there is an intent to harm when illegal robocalls are combined with spoofing.[152]  Rhodes claims in his Notice Response that the harm must result from criminal or fraudulent activity or at the very least be commercial in nature.[153]  He also argues that the TCPA was only intended to cover commercial activities.[154]  The Commission already has rejected the

---

*Campaigns and Promoters Against Robocall Abuse, Enforcement Advisory*, Public Notice, 29 FCC Rcd 12657 (EB 2014); *Political Campaigns and Promoters are Reminded of Restrictions on Autodialed and Prerecorded Calls, Enforcement Advisory*, Public Notice, 27 FCC Rcd 11017 (EB 2012).

[145] Notice Response at 19.

[146] *Scott Rhodes Notice*, 35 FCC Rcd at 889, para. 18.

[147] Rhodes argued that one recording must have been truncated because the transcript does not make any sense.  Notice Response at 19.  Our review of the full recording shows that it still fails to meet the TCPA's identification requirements.

[148] *2003 TCPA Order*, 18 FCC Rcd at 14099, para. 144.

[149] *See* Notice Response at 19-20.

[150] *See id.* at 20 (citing *Foster v. Williams*, 229 Cal. App. 4th Supp. 9, 15, 177 Cal. Rptr. 3d 371, 376 (Cal. App. Div. Super. Ct. 2014)).

[151] *See 2003 TCPA Order*, 18 FCC Rcd at 14100-01, paras. 142-44 ("adequate identification information is vital so that consumers can determine the purpose of the call, possibly make a do-not-call request, and monitor compliance with the TCPA rules").  In any event, the California state court ultimately determined that an "address" did not include URLs because a website could not accomplish the purpose of the state statute at issue in that case.  *See* Cal. Civ. Proc. Code § 1161(2).

[152] *Roesel Forfeiture Order*, 33 FCC Rcd at 9217-19, paras. 38-40.  *See also Abramovich Notice of Apparent Liability*, 32 FCC Rcd at 5423, para. 16.

[153] Notice Response at 2.

[154] *Id.*

contention that the Truth in Caller ID Act applies only to criminal or malicious conduct.[155]  We also reject the assertion that the TCPA applies only to commercial activities; such a constrained reading is unsupported by the statutory language.  The TCPA's identification requirements for artificial or prerecorded voice message calls apply to "all" such calls.[156]  Although Congress authorized the Commission to adopt exemptions from the prohibition on robocalls to residential lines in section 227(b)(1)(B), it granted the Commission no such authority with respect to the identification requirements in section 227(d)(3)(A), indicating that Congress fully intended the identification requirements to apply to all artificial or prerecorded voice message calls.[157]  To accept Rhodes's argument would require us to ignore statutory language and violate the "cardinal principal of statutory construction" to "give effect . . . to every clause and word of a statute.[158]  We reaffirm our decision that harm is a broad concept that includes violations of civil statutes such as the TCPA.[159]  Specifically, "the placement of illegal robocalls causes consumers significant harm, including that such calls are a nuisance and [an] invasion of privacy."[160]  Illegal robocalls are harmful to consumers whether they seek to advance fraudulent schemes, commercial activities, or social or political positions.

43.     We find that Rhodes's intentional failure to include identifying information in his robocalls shows an intent to harm consumers.  His use of neighbor spoofing made it more likely that consumers would answer the telephone and be subjected to his harmful prerecorded messages.  We therefore conclude that Rhodes made thousands of robocalls with the intent to cause harm to consumers.

44.     *Intent to Cause Harm to Numbering Resources.*  We find that Rhodes intended to harm numbering resources by spoofing phone numbers that were not assigned to him.  Rhodes contends that he did not intend harm because the spoofed numbers that he used were either "non-working" numbers or unassigned.[161]  The Commission has rejected this argument before and we do so again.[162]  This harm is distinct from the harm to consumers who receive the unwanted, unlawful calls.  For example, called parties will typically redial the spoofed number to determine who called or to express outrage.  *Second,* telephone numbers are a limited resource and the Commission has held that spoofing numbers is harmful, even if the numbers are not currently assigned to a particular customer.[163]  For example, spoofing can cause caller identification services to flag the number as untrustworthy.  Any service provider that allocates the previously unassigned phone number to a subscriber in the future risks saddling that subscriber with a toxic phone number.[164]  Companies are developing "black lists" of numbers that are

---

[155] *See Roesel Forfeiture Order*, 33 FCC Rcd at 9217-18, para. 39 (rejecting claim that the Truth in Caller ID Act only applies to criminal or malicious conduct).

[156] 47 U.S.C. § 227(d)(3)(A).

[157] 47 U.S.C. § 227(b)(2)(B); (d)(3(A).

[158] *Duncan v. Walker*, 533 U.S. 167, 174 (2001).

[159] *See Roesel Forfeiture Order*, 33 FCC Rcd at 9217-18, paras. 38-39.

[160] *Id.* at 9218, para. 40.  *See also* Pub. L. No. 102-243 (1991); *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Report and Order, 7 FCC Rcd 8752 (1992).

[161] Notice Response at 17-18.  Presumably, "non-working" means a number that has been assigned but not in use by the subscriber.

[162] *See Best Insurance Contracts, Inc., and Philip Roesel, dba Wilmington Insurance Quotes*, Forfeiture Order, 33 FCC Rcd 9204, 9216-17, paras. 33, 37 (2018) (*Roesel Forfeiture Order*); *Best Insurance Contracts, Inc. and Philip Roesel, DBA Wilmington Insurance Quotes*, Notice of Apparent Liability, 32 FCC Rcd 6403, 6411, para. 23 (2017) (*Roesel Notice of Apparent Liability*).  Prior to the time that Rhodes made his calls, the Commission had already explained that using unassigned numbers in spoofed robocalls caused significant harm.  *Roesel Notice of Apparent Liability*, 32 FCC Rcd at 6411, para. 23.

[163] *Roesel Notice of Apparent Liability*, 32 FCC Rcd at 6411, para. 23.

[164] *Id.*

associated with unwanted robocalls.[165]  As blacklist-based call blocking tools develop and grow in the market, consumers who obtain toxic numbers may find themselves unable to contact end users who have blocked the number.  Misuse of unassigned numbers causes harm by potentially blocking phone numbers that have in the past been misappropriated by spoofers.  The Truth in Caller ID Act does not distinguish between spoofing "working" and "non-working" numbers,[166] and spoofing unassigned numbers can cause harm.[167]  Thus, we conclude that it was substantially certain that spoofing numbers that Rhodes was not authorized to use would cause harm to the actual and potential subscribers of the numbers.

45.        *Intent to Harm Subscribers of the Spoofed Numbers*.  It was substantially certain that Rhodes's spoofing of numbers not assigned to him would harm the innocent subscribers of those numbers.   Rhodes spoofed numbers assigned to the University of Virginia and Wells Fargo.[168]  The University of Virginia demonstrated that it was harmed by Rhodes's spoofed robocalls by complaining to its carrier, which promptly got the Dialing Platform to terminate Rhodes's account.[169]  Rhodes did not dispute these assertions.[170]  Instead, he argues that the caller did not have the intent to harm those subscribers because the caller did not have any "bias" against the subscribers or knowledge that he was using numbers assigned to either the University of Virginia or Wells Fargo.  Rhodes's argument is inconsistent with our past precedent.  The Commission has held that it is substantially certain that harm will occur when a spoofer knowingly uses a number that does not belong to him; thus, the intent to cause harm may be imputed to the spoofer.[171]  Spoofing a number that is assigned to another customer causes harm.[172]  For example, called parties will typically redial the spoofed number to, among other things, determine who called or to express outrage.  Thus, we conclude that Rhodes intended to cause harm subscribers of the numbers that he spoofed.

### 2.        Rhodes Intended to Wrongfully Obtain Something of Value

46.        We find that Rhodes also spoofed his robocalls with the intent to wrongfully obtain a shield from TCPA liability and publicity for his website.[173]  *First*, as noted above, Rhodes intentionally failed to provide identifying information, which violated the TCPA.  *Second*, Rhodes acted wrongfully by violating the terms of his user agreement with the Dialing Platform.  The contract prohibited the use of

---

[165] *Id.*  Whitelist-based call blocking allows consumers to tell their service provider to accept calls only from specified numbers.  *Advanced Methods to Target and Eliminate Unlawful Robocalls*, CG Docket No. 17-59, Declaratory Ruling and Third Further Notice of Proposed Rulemaking, 34 FCC Rcd 4876, 4890, para. 43 (2019).  In contrast, blacklist-based call blocking allows service providers or call blocking applications to block incoming suspect calls based on analytics.  *Id.* at 4887, para. 34.

[166] 47 U.S.C. § 227(e).

[167] *John C. Spiller; Jakob A. Mears; Rising Eagle Capital Group LLC; JSquared Telecom LLC; Only Web Leads LLC; Rising Phoenix Group; Rising Phoenix Holdings; RPG Leads; and Rising Eagle Capital Group – Cayman*, Notice of Apparent Liability, 35 FCC Rcd 5948, 5959-60, para. 28 (2020) (forfeiture pending).

[168] {[                    ]} Subpoena Response (Dec. 19, 2018) (on file in EB-TCD-18-00028178); {[                    ]} Subpoena Response (Dec. 8, 2018) (on file in EB-TCD-18-00028178).

[169] *Scott Rhodes Notice*, 35 FCC Rcd at 894, para. 34.

[170] Notice Response at 18.

[171] *See Affordable Enterprises of Arizona, LLC*, Forfeiture Order, FCC 20-149, para. 52 (2020) (*Affordable Forfeiture Order*) (finding intent to harm the innocent subscribers of the spoofed numbers); *Affordable Notice of Apparent Liability*, 33 FCC Rcd at 9242-43, paras. 25-26, 28 (determining that it was substantially certain that subscribers of the spoofed numbers would be harmed).

[172] The Commission has concluded in other cases that the spoofer intended to harm the consumers to whom the phone numbers were assigned.  *See Affordable Forfeiture Order*, FCC 20-149 at para. 52; *Affordable Notice of Apparent Liability*, 33 FCC Rcd at 9243, para. 28; *Roesel Notice of Apparent Liability*, 32 FCC Rcd at 6411, para. 23; *Abramovich Notice of Apparent Liability*, 32 FCC Rcd at 5424, para. 18.

[173] *Scott Rhodes Notice*, 35 FCC Rcd at 895-96, para. 37.

inaccurate caller ID information: "[Y]ou agree to comply with other behavioral rules, including without limitation: (1) transmitting ('pushing out') accurate Caller ID information . . . ."[174] Thus, we conclude that he knew that he was acting wrongfully.

47.    The Commission has found that the phrase "anything of value" is not limited to tangible assets.[175] Rhodes argued that the cases cited by the *Notice* do not support the *Notice*'s reasoning.[176] He argues that *United States v. Nilsen* was limited to extortion cases[177] and that *United States v. Sheker* was limited to information pertaining to a person's location.[178] Rhodes offers no explanation for why those cases should be so limited to their facts. Although the court in *Sheker* did not adopt the government's interpretation regarding what constituted a "thing of value" in that case, *Sheker* also rejected the contention that only things of commercial value can be a "thing of value."[179] The cases that the Commission cited in the *Notice* support that courts have interpreted the phrase "thing of value" to include intangibles.[180] Finally, the "thing of value" does not have to be obtainable from the called party.[181] The Commission rejected this same argument in *Roesel*: "Nothing in the Truth in Caller ID Act requires that the intent must be directed to any particular person or class of persons, let alone to the exclusion of all others."[182] We see no reason—and Rhodes has not offered any—to depart from Commission precedent.

48.    *Liability Shield*. We find that Rhodes's spoofing enabled him to avoid liability for his robocalls. The Commission has found that "[a]voidance of culpability is a benefit that qualifies as a 'thing of value.'"[183] Rhodes's attempt to evade personal TCPA liability has an ascertainable dollar value. In this case, avoidance of culpability has a specific, ascertainable dollar value—namely, up to $20,248 per unlawful call in a forfeiture action brought by the FCC.[184] Additionally, a violator evades private actions

---

[174] Dialing Platform Response at Document #5 (Scott Rhodes-Dialer Services Agreement).

[175] *Roesel Forfeiture Order*, 33 FCC Rcd at 9212, para. 22. The *Notice* cited several cases where courts have determined that "a thing of value" can include intangible objections. *See Scott Rhodes Notice*, 35 FCC Rcd at 896, para. 38 n.129 (citing *United States v. Nilsen*, 967 F.2d 539, 542-43 (11th Cir. 1992) ("Congress' frequent use of 'thing of value' in various criminal statutes has evolved the phrase into a term of art which the courts generally construe to envelope both tangibles and intangibles. This broad interpretation is based upon a recognition that monetary worth is not the sole measure of value."); *United States v. Girard*, 601 F.2d 69, 71 (2d Cir. 1979) ("[T]he phrase ['thing of value'] is generally construed to cover intangibles as well as tangibles."); *see also United States v. Picquet*, 963 F.2d 54, 55-56 (5th Cir. 1992) (holding that sales taxes constitute "a thing of value" for the purposes of 18 U.S.C. § 1029(a)(2)'s prohibition of using unauthorized access devices to obtain "anything of value"); *United States v. Singleton*, 144 F.3d 1343, 1349-50 (10th Cir. 1998), *rev'd on other grounds*, 165 F.3d 1297 (10th Cir. 1999) (agreeing with *Picquet*); *United States v. Draves*, 103 F.3d 1328, 1332 (7th Cir. 1997) (agreeing with and applying 5th Circuit's expansive interpretation of phrase "anything of value" in Picquet); *United States v. Schwartz*, 785 F.2d 673, 680 (9th Cir. 1986) (noting broad range of intangibles that have been found to be "things of value" by prior courts); *United States v. Williams*, 705 F.2d 603, 622-23 (2nd Cir. 1983) (holding that the district court properly construed the meaning of the term "anything of value" to "focus on the value that the defendants subjectively attached to the items received"); *United States v. Sheker*, 618 F.2d 607, 609-10 (9th Cir. 1980) (holding that "value" includes anything recognized or appreciated by others)).

[176] Notice Response at 20-21.

[177] *Id.* at 20.

[178] *Id.* at 21.

[179] *Sheker*, 618 F.2d at 609-10.

[180] *See Scott Rhodes Notice*, 35 FCC Rcd at 895-96, para. 37.

[181] *See* Notice Response at 21.

[182] *Roesel Forfeiture Order*, 33 FCC Rcd at 9217, para. 35.

[183] *Roesel Notice of Apparent Liability*, 32 FCC Rcd at 6413, para. 27; *see also Roesel Forfeiture Order*, 33 FCC Rcd at 9212, para. 22.

[184] *See* 47 CFR § 1.80.

with potential liability up to $1,500 per illegal robocall.[185]  Spoofing prevents consumers from using the caller ID information to identify the caller.  Rhodes's prerecorded voice messages offered no name or telephone number for consumers to file grievances or lawsuits in violation of the TCPA.  Rhodes did provide the name of his website, but the website did not provide any contact information and did not identify Rhodes.  We therefore conclude that Rhodes spoofed with the intent to avoid liability for his robocalls.

49.     *Publicity and Personal Brand*.  We find that Rhodes also used spoofed caller ID to obtain publicity and increase the value of his personal brand.[186]  Rhodes used his unlawful robocalls to increase exposure for his website and personal brand, "The Road to Power."[187]  During the course of his robocalling campaigns, traffic to his website and viewership of his videos increased ten-fold.[188]  *First*, by using spoofed caller ID, Rhodes induced people to answer the phone and listen to his message when they would have been less likely to do so if the caller ID had been accurate.  *Second*, because the caller ID was spoofed, consumers had to visit the website to determine the originator of the robocalls.[189]  The record also indicates that Rhodes targeted news organizations with some of his robocalls.[190]  This would further increase his publicity and personal brand.  This increased website traffic is valuable as it can be monetarized in the future or used to increase social influence.[191]  Although Rhodes claims that he did not target media outlets, he did not contest that he received increased visibility and notoriety from his robocalling campaigns.[192]

50.     Courts have recognized that there is value in a person's likeness in various contexts.[193]  Rhodes argued that the cases cited in the *Notice* only recognized a "right" to claim a cause of action rather than any inherent value in publicity or likeness.[194]  However, the recognition of a cause of action to protect one's publicity or likeness indicates that the courts believe that publicity is a thing of value deserving legal protection.[195]

---

[185] 47 U.S.C. § 227(b)(3).

[186] *Scott Rhodes Notice*, 35 FCC Rcd at 897, para. 40.

[187] *Id.* at 897-98, para. 41.

[188] *Id.*

[189] Rhodes argues that he did not tell people to *visit* his website; rather, he merely included the name of the website at the end of the message to comply with the TCPA requirements.  Notice Response at 25.  Including the URL of his website in his prerecorded voice message calls, however, would induce at least some consumers to visit the website to determine who made the robocalls, especially since the caller ID was inaccurate.  And it is especially disingenuous to claim the URL was included to satisfy the TCPA (rather than to boost Rhodes's website's traffic) when a visitor to the website could not opt-out of calls or actually reach Rhodes.

[190] *Scott Rhodes Notice*, 35 FCC Rcd at 897-98, para. 41.

[191] James Parsons, *10 Reasons Why High Traffic Makes a Website Valuable*, growtraffic (Jan. 2, 2015), https://growtraffic.com/blog/2015/01/10-reasons-high-traffic-makes-website-valuable.

[192] Notice Response at 25.

[193] *See Scott Rhodes Notice*, 35 FCC Rcd at 897, para. 40 & n.135 (citing *Zacchini v. Scripps-Howard Broadcasting Co.*, 433 U.S. 562, 576 (1977) (discussing the right of publicity to profit from one's fame); *Haelan Laboratories, Inc. v. Topps Chewing Gum, Inc.*, 202 F.2d 866, 868 (2d Cir. 1953) (discussing the right of prominent persons to control and use their likeness and profit off it); Restatement (Second) of Torts, § 652C (describing the right to publicity).  Similarly, the Lanham Act protects personal names where the name has acquired distinctiveness.  *Schlafly v. Saint Louis Brewery, LLC*, 909 F.3d 420, 425 (Fed. Cir. 2018)).

[194] Notice Response at 24-25.

[195] *See Zacchini*, 433 U.S. at 576 ("The rationale for (protecting the right of publicity) is the straightforward one of preventing unjust enrichment by the theft of good will."); *McFarland v. Miller*, 14 F.3d 912, 919 (3d Cir. 1994) ([N]ames and likenesses 'are things of value.[']").

51.     In addition, the concept of a "personal brand" is increasingly accepted as a thing of value.[196]  Rhodes further argued that publicity or personal brand cannot be things of value, and that, in any event, a "personal brand" only applies to commercial enterprises.[197]  Rhodes references an article cited in the *Notice*, but reads it to mean that branding only applies to companies.[198]  We find that the article in fact supports the proposition that one may market, and obtain value from, a personal brand, even if there is no direct or immediate commercial product for sale.[199]  Personal brand can be used to build one's career, but it can also be used to establish oneself as a person of influence.[200]  Thus, we reject Rhodes's arguments.  We find that a personal brand can be valuable and conclude that Rhodes intended his wrongful robocalls to enhance his publicity and personal brand.[201]

**D.     The Commission Followed the Procedural Requirements of the Truth in Caller ID Act and Its Own Rules**

52.     Rhodes contends that the Commission should have served him with only a non-monetary warning before issuing the Notice with its proposed forfeiture, but he has misread the relevant statutory provisions.[202]  The Commission followed the procedures set out in the Truth in Caller ID Act and in its own rules, neither of which require the issuance of a citation prior to the issuance of a notice of apparent liability for spoofing violations.  The Commission provided Rhodes with notice of the forfeiture in accordance with subsection 227(e)(5)(A)(iii), which allows such notice to be provided either in accordance with subsection 503(b)(3) (*i.e.*, notice and opportunity for a hearing before the Commission or an administrative law judge) or subsection 503(b)(4) of the Act (*i.e.*, a notice of apparent liability).[203]  As the Commission has long recognized, the Truth in Caller ID Act empowers the Commission "to proceed expeditiously to stop and . . . assess a forfeiture penalty against, any person or entity engaged in *prohibited caller ID spoofing* without first issuing a citation" against the violator.[204]  The Commission

---

[196] *Scott Rhodes Notice*, 35 FCC Rcd at 897, para. 40 & n.138.

[197] Notice Response at 25-26.  Rhodes further argues that "Road to Power" cannot be a personal brand because it does not include his personal name.  *Id.*  Some of the most recognized personal brands are not personal names.  *See* The Rock, *Home*, YouTube, https://www.youtube.com/user/therock (last visited Aug. 20, 2020).

[198] Notice Response at 26.

[199] *See, e.g.,* Tom Peters, *The Brand Called You*, Fast Company (Aug. 31, 1997), https://www.fastcompany.com/28905/brand-called-you.

[200] *See* Shama Hyder, *7 Things You Can Do To Build An Awesome Personal Brand*, Forbes (Aug. 18, 2014), https://www.forbes.com/sites/shamahyder/2014/08/18/7-things-you-can-do-to-build-an-awesome-personal-brand/#15180ed93c3a ("Is there a certain subject matter in which you want to be perceived as an expert or are there general qualities you want linked to your brand?").

[201] This conclusion is not at odds with our finding that Rhodes made the robocalls to evade liability despite Rhodes's objection.  Notice Response at 26.  A person can want publicity or notoriety for their actions but also seek to escape legal responsibility—and large fines or penalties—associated with the actions.  *See Online trolls hiding behind a keyboard*, BBC (Nov. 9, 2018), https://www.bbc.co.uk/newsround/46157694 ("These people don't show their real names or pictures and write cruel things and can avoid getting in trouble because nobody knows who they really are.").

[202] Notice Response at 26-27.  Rhodes argues we should have issued a citation like the Bureau did in *Abramovich* and *Roesel*.  Notice Response at 18-19.  Neither the *Abramovich* spoofing forfeiture nor the *Roesel* spoofing forfeiture relied on the Bureau citations.  The Bureau issued those citations for other, non-spoofing violations for which such initial warnings were once required by subsection 503(b)(5).  Section 3(a)(1) of the TRACED Act removed the citation requirement for TCPA violations.  Pallone-Thune Telephone Robocall Abuse Criminal Enforcement and Deterrence Act, Pub. L. No. 116-105, § 3(a)(1), 133 Stat. 3274, 3274-75 (2019) (TRACED Act).

[203] 47 U.S.C. § 227(e)(5)(A)(iii).

[204] *Truth in Caller ID Report and Order*, 26 FCC Rcd at 9132, para. 47 (emphasis added).

also followed the procedures in section 1.80 of its rules.[205]  Although subsection 1.80(d) states a general requirement to issue a citation if the target of a forfeiture proceeding "does not hold a license, permit, certificate, or other authorization issued by the Commission" or is not an applicant for same, it expressly provides an exception to that citation requirement "for a forfeiture imposed under subsection 227(e)(5) of the Act," as is the case here.[206]  Additionally, Rhodes argues that we should have issued a citation for violations of the TCPA, as the Commission did in *Abramovich* and *Roesel*.[207]  But we are proposing a monetary forfeiture exclusively for Rhodes's Truth in Caller ID Act violations.  The fact that we chose not to issue a citation or otherwise pursue action for TCPA violations has no bearing on our authority to take action under the Truth in Caller ID Act.  The Commission therefore adhered to its rules by initiating this forfeiture proceeding by issuing a notice of apparent liability.[208]

53.     Rhodes also argues that we improperly applied the TRACED Act retroactively in the *Notice*.[209]  The *Notice* found Rhodes apparently liable for violations made in 2018 before the TRACED Act took effect.  However, the *Notice* did not rely on any of the amendments to section 227 of the Act that were enacted in the TRACED Act.  Much of the changes in the TRACED Act apply to the TCPA, and the Notice did not find Rhodes apparently liable for any TCPA violations.  Instead, the *Notice* proposed a forfeiture for violations of the Truth in Caller ID Act (i.e., unlawful spoofing) that occurred at the time of Rhodes's calls.[210]  Moreover, while the TRACED Act amended subsection 227(e)(5)(A)(ii) to explicitly state that the citation requirement in subsection 503(b)(5) does not apply to spoofing forfeitures,[211] that amendment merely confirmed the Commission's existing interpretation that subsection 227(e)(5)(A) does not, and never did, require a citation prior to issuance of a notice of apparent liability.[212]  Therefore, the passage of the TRACED Act has no bearing on this forfeiture action.

### E.     We Uphold the Proposed Forfeiture but Find That a Reduction is Necessary to Account for the Calls That Were Not Spoofed

54.     After considering the relevant statutory factors and the Commission's *Forfeiture Policy Statement*, we find that Rhodes is liable for a total forfeiture of $9,918,000.[213]  As explained in the *Notice*, the Commission used a base forfeiture amount of $1,000 and multiplied that by the total number of violations reviewed by the Bureau.[214]  The Bureau verified 6,455 robocalls for a total proposed base forfeiture of $6,455,000.[215]  We then determined that a 100% upward adjustment was necessary to reflect the egregiousness of Rhodes's conduct, yielding a proposed forfeiture of $12,910,000.[216]  Rhodes does

---

[205] 47 CFR § 1.80.

[206] 47 CFR § 1.80(d).

[207] Notice Response at 18-19.

[208] *Id*. § 1.80(e)-(f).

[209] Notice Response at 27.

[210] *See Scott Rhodes Notice*, 35 FCC Rcd at 898-900, paras. 44-51.

[211] *See* TRACED Act § 3(a)(2)(A), 133 Stat. at 3275 (amending 47 U.S.C. § 227(e)(5)(A)(ii) by adding a sentence stating, "Paragraph (5) of section 503(b) shall not apply in the case of a violation of this subsection.").

[212] *See Truth in Caller ID Report and Order*, 26 FCC Rcd at 9132-33, para. 47; *Roesel Notice of Apparent Liability*, 32 FCC Rcd at 6413-14, para. 29 n.74; *Abramovich Notice of Apparent Liability*, 32 FCC Rcd at 5425, para. 22 n.51; 47 CFR § 1.80(d).

[213] Any entity that is a "Small Business Concern" as defined in the Small Business Act (Pub. L. 85-536, as amended) may avail itself of rights set forth in that Act, including rights set forth in 15 U.S.C. § 657, "Oversight of Regulatory Enforcement," in addition to other rights set forth herein.

[214] *Scott Rhodes Notice*, 35 FCC Rcd at 899, paras. 45-46.

[215] *Id.* at 899, para. 46.

[216] *Id.* at 899-900, paras. 47-51.

not argue that we improperly calculated the base forfeiture or the upward adjustment.  He does not argue that we failed to appropriately consider the section 503(b)(2)(E) factors, nor does he assert an inability to pay the proposed forfeiture.

55.     Rhodes does argue, however, that he did not spoof the 1,496 robocalls made in the California Dianne Feinstein calling campaign because the number appearing in the caller ID was validly assigned to him at the time.[217]  The Bureau confirmed with the service provider that this statement was true.  We therefore find that Rhodes made only 4,959 violations of the Truth in Caller ID Act and our rules.  Multiplied by the $1,000 base forfeiture and applying the 100% upward adjustment, this yields a total forfeiture of $9,918,000.  Weighing the relevant statutory factors and our own forfeiture guidelines, we conclude, based upon the evidence before us, that the proposed forfeiture of $9,918,000 properly reflects the seriousness, duration, and scope of Rhodes's violations.

## F.     ORDERING CLAUSES

56.     Accordingly, **IT IS ORDERED** that, pursuant to section 503(b) of the Act,[218] and section 1.80 of the Commission's rules,[219] Scott Rhodes a.k.a Scott David Rhodes, Scott D. Rhodes, Scott Platek, and/or Scott P. Platek **IS LIABLE FOR A MONETARY FORFEITURE** in the amount of nine million, nine hundred eighteen thousand dollars ($9,918,000) for willfully and repeatedly violating section 227(e) of the Act[220] and section 64.1604 of the Commission's rules.[221]

57.     Payment of the forfeiture shall be made in the manner provided for in section 1.80 of the Commission's rules within thirty (30) calendar days after the release of this Forfeiture Order.[222]  Scott Rhodes shall send electronic notification of payment to Telecommunications Consumers Division, Enforcement Bureau, Federal Communications Commission, at TCD@fcc.gov on the date said payment is made.  If the forfeiture is not paid within the period specified, the case may be referred to the U.S. Department of Justice for enforcement of the forfeiture pursuant to section 504(a) of the Act.[223]

58.     Payment of the forfeiture must be made by credit card, ACH (Automated Clearing House) debit from a bank account using the Commission's Fee Filer (the Commission's online payment system),[224] or by wire transfer.  The Commission no longer accepts forfeiture payments by check or money order.  Below are instructions that payors should follow based on the form of payment selected:[225]

- Payment by wire transfer must be made to ABA Number 021030004, receiving bank TREAS/NYC, and Account Number 27000001.  A completed Form 159 must be faxed to the Federal Communications Commission at 202-418-2843 or e-mailed to RROGWireFaxes@fcc.gov on the same business day the wire transfer is initiated.  Failure to provide all required information in Form 159 may result in payment not being recognized as having been received.  When completing FCC Form 159, enter the Account Number in block number 23A (call sign/other ID), enter the letters "FORF" in block number 24A (payment

---

[217] Notice Response at 9-10.  To the extent that Rhodes challenges the other calls, those arguments hinge on arguments that we rejected above.

[218] 47 U.S.C. § 503(b).

[219] 47 CFR § 1.80.

[220] 47 U.S.C. § 227(e).

[221] 47 CFR § 64.1604.

[222] *Id.*

[223] 47 U.S.C. § 504(a).

[224] Payments made using the Commission's Fee Filer system do not require the submission of an FCC Form 159.

[225] For questions regarding payment procedures, please contact the Financial Operations Group Help Desk by phone at 1-877-480-3201 (option #6), or by e-mail at ARINQUIRIES@fcc.gov.

type code), and enter in block number 11 the FRN(s) captioned above (Payor FRN).   For additional detail and wire transfer instructions, go to https://www.fcc.gov/licensing-databases/fees/wire-transfer.

- Payment by credit card must be made by using the Commission's Fee Filer website at https://apps.fcc.gov/FeeFiler/login.cfm.  To pay by credit card, log-in using the FRN captioned above.  If payment must be split across FRNs, complete this process for each FRN.  Next, select "Pay bills" on the Fee Filer Menu, and select the bill number associated with the NAL Account – the bill number is the NAL Account number with the first two digits excluded – and then choose the "Pay by Credit Card" option.  Please note that there is a $24,999.99 limit on credit card transactions.

- Payment by ACH must be made by using the Commission's Fee Filer website at https://apps.fcc.gov/FeeFiler/login.cfm.  To pay by ACH, log in using the FRN captioned above.  If payment must be split across FRNs, complete this process for each FRN.  Next, select "Pay bills" on the Fee Filer Menu and then select the bill number associated with the NAL Account – the bill number is the NAL Account number with the first two digits excluded – and choose the "Pay from Bank Account" option.  Please contact the appropriate financial institution to confirm the correct Routing Number and the correct account number from which payment will be made and verify with that financial institution that the designated account has authorization to accept ACH transactions.

59.    Any request for making full payment over time under an installment plan should be sent to:  Chief Financial Officer – Financial Operations, Federal Communications Commission, 45 L Street, NE, Washington, DC 20554.[226]  Questions regarding payment procedures should be directed to the Financial Operations Group Help Desk by telephone, 1-877-480-3201, or by e-mail, ARINQUIRIES@fcc.gov.

60.    **IT IS FURTHER ORDERED** that a copy of this Forfeiture Order, together with the Reviewed Call Detail Records, shall be sent by first class mail and certified mail, return receipt requested, to Scott Rhodes a.k.a. Scott David Rhodes, Scott D. Rhodes, Scott Platek, Scott P. Platek, {[                ]}.

FEDERAL COMMUNICATIONS COMMISSION

Marlene H. Dortch
Secretary

---

[226] *See* 47 CFR § 1.1914.