IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | CV 21-110-M-DLC-KLD |
| vs. | FINDINGS & RECOMMENDATION |
| SCOTT RHODES, | |
| Defendant. | |

Plaintiff United States of America brings this action under 47 U.S.C. §
504(a) seeking enforcement of a forfeiture order issued by the Federal
Communications Commissioner ("FCC") against Defendant Scott Rhodes in the
amount of $9,918,000. Rhodes, who is proceeding pro se, has filed a motion to
dismiss the Complaint for failure to state a claim upon which relief can be granted
pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons set forth
below, Rhodes' motion to dismiss should be denied.

## I.   __Background__[1]

Between August and November of 2018, Rhodes engaged in five separate
robocall campaigns during which he used a dialing platform's service to display

---

1 Consistent with the standards applicable to a Rule 12(b)(6) motion to dismiss for
failure to state a claim, the following facts are taken from the Complaint and
attached exhibits, the authenticity of which is not disputed.

inaccurate or misleading caller identification information to the thousands of individuals who received his calls. (Doc. 1, at ¶¶ 17-18). Rhodes caused the dialing platform to display caller ID numbers that were not assigned to him, and in a practice known as "neighborhood spoofing," he often selected caller ID information that matched the locality of the call's recipient. (Doc. 1, at ¶¶ 7, 18). The robocalls did not include certain statutorily required disclosures, such as the identity of the business, individual, or entity initiating the call, but did generally end with the statement "paid for by theroadtopower.com," which is a website that Rhodes uses to post a video podcast. (Doc. 1, at ¶ 19).

The first robocall campaign targeted the town of Brooklyn, Iowa between August 28 and 30, 2018. (Doc. 1, at ¶ 20-21). Following the murder of Brooklyn resident Mollie Tibbets by a Mexican immigrant, Rhodes initiated 837 robocalls using a false caller ID matching the area code and central office code for Brooklyn. (Doc. 1, at ¶ 21). The voice message on the calls included derogatory statements aimed at Hispanic individuals and false statements about Tibbetts and her family. (Doc. 1, ¶ 21). The United States alleges that Rhodes intended the robocalls to cause emotional harm to all recipients, including particularly Tibetts' grieving family and their Hispanic neighbors. (Doc. 1, at ¶ 23). The United States further alleges that Rhodes used spoofed caller IDs with the intent of evading law enforcement scrutiny, while raising the profile of his website. (Doc. 1, at ¶ 23).

The second robocall campaign targeted Sandpoint, Idaho between September 21 and 24, 2018. (Doc. 1, at ¶¶ 24-25). Following a local newspaper article about his activities, Rhodes initiated 750 robocalls using a false caller ID that made it appear as if the calls originated from a caller with a Sandpoint telephone number. (Doc. 1, at ¶ 25). The voice message on the calls included derogatory statements about the publisher of the local newspaper, including that he was a "cancer [that] must be burned out." (Doc. 1, at ¶ 25). The United States alleges that Rhodes intended the calls to cause emotional harm to all recipients, including particularly the newspaper's publisher, readers, and employees. (Doc. 1, at ¶ 16). The United States also alleges that Rhodes intended these calls to cause financial and physical harm to the newspaper and its publisher, and that he used spoofed caller IDs with the intent of evading law enforcement scrutiny, while raising the profile of his website. (Doc. 1, at 26).

The third robocall campaign targeted the state of Florida ahead of its 2018 gubernatorial election. (Doc. 1, at ¶ 27). Between October 20 and 23, 2018, Rhodes initiated 766 robocalls to Florida telephone numbers, using a false caller ID that it made it appear as if the calls originated from a Florida caller. (Doc. 1, at ¶ 27). The voice messages on the calls featured an individual claiming to be gubernatorial candidate Andrew Gillum. (Doc. 1, ¶ 27). This individual used a caricatured accent to make outlandish statements about Gillum's intentions that included various

racial stereotypes. (Doc. 1, ¶ 27). The United States alleges that Rhodes intended the calls to cause emotional harm to all recipients, including particularly Black recipients. (Doc. 1, at ¶ 27). The United States further alleges that Rhodes used spoofed caller IDs with the intent of evading law enforcement scrutiny while raising the profile of his website. (Doc. 1, ¶ 28).

The fourth robocall campaign targeted the state of Georgia ahead of its 2018 gubernatorial election. (Doc. 1, ¶ 29). On November 2 and 3, 2018, Rhodes initiated 583 robocalls to Georgia telephone numbers, again using a false caller ID that made it appear as if the calls originated from a Georgia caller. (Doc. 1, at ¶ 29). The voice messages on the calls featured an individual claiming to be Oprah Winfrey, and making derogatory statements regarding gubernatorial candidate Stacey Abrams. (Doc. 1, at ¶ 29). The United States alleges that Rhodes intended the calls to cause emotional harm to all recipients, including particularly Black recipients. (Doc. 1, at ¶ 30). The United States further alleges that Rhodes used spoofed caller IDs with the intent of evading law enforcement scrutiny while raising the profile of his website. (Doc. 1, at ¶ 30).

The fifth and final robocall campaign targeted Charlottesville, Virginia following the "Unite the Right" rally by members of various extremist groups in May 2017. (Doc. 1, at ¶ 31). During the rally, an attendee drove his car into a crowd of counter-protestors, causing one person's death. The driver was charged

4

with murder, and jury selection began on November 26, 2018. (Doc. 1, at ¶ 31).

Starting on November 27, 2018, Rhodes bombarded the Charlottesville area with

2,023 robocalls. (Doc. 1, at ¶ 32). Rhodes used two false caller IDs matching the

area code and central office code for Charlottesville, which were assigned to the

University of Virginia and Wells Fargo & Company. (Doc. 1, at ¶ 32). The voice

message on the calls included derogatory statements about Charlottesville's mayor

and police chief, and the victim. (Doc. 1, at ¶ 32). The United States alleges

Rhodes intended the calls to cause emotional harm to all recipients, including

particularly Jewish and Black recipients, and those who knew the victim. (Doc. 1,

at ¶ 33). The United States alleges Rhodes also intended to cause harm to the

Commonwealth of Virginia and City of Charlottesville by contaminating the jury

pool for the criminal trial, and to the University of Virginia and Wells Fargo &

Company by causing recipients to believe the messages were coming from

individuals associated with those entities. (Doc. 1, at ¶ 33). Again, the United

States further alleges that Rhodes used spoofed caller IDs with the intent of

evading law enforcement scrutiny while raising the profile of his website. (Doc. 1,

at ¶ 33).

On January 31, 2020, the FCC issued Rhodes a Notice of Apparent Liability in

the amount of $12,910,000 for apparent violations of the Truth in Caller ID Act, 47

U.S.C. § 227(e)(1), and 47 C.F.R. § 64.1604. (Doc. 1, ¶ 35; Doc. 1-1). The Notice

of Apparent Liability charged Rhodes with making 6,455 unlawful spoofed robocalls, and provisionally determined that a $2,000 forfeiture for each unlawfully spoofed robocall was appropriate given the seriousness, duration, and scope, of Rhodes' violations. (Doc. 1, ¶ 35; Doc. 1-1).

Rhodes filed a written response to the Notice of Apparent Liability on February 25, 2020. (Doc. 1, at ¶ 36; Doc. 1-2). Rhodes raised several arguments in his defense, including that he could not be charged for 1,496 of the robocalls because they were not spoofed, meaning that the number appearing in the caller ID for those calls was validly assigned to Rhodes. (Doc. 1, at ¶ 36; Doc. 1-2).   The FCC issued a Forfeiture Order on January 14, 2021. The FCC agreed that the 1,496 calls Rhodes objected to did not violate the Truth in Caller ID Act, but rejected his remaining arguments. (Doc. 1, at ¶ 37; Doc. 1-3).

The FCC issued a Forfeiture Order on January 14, 2021. (Doc. 1, at ¶37; Doc. 1-3). The FCC agreed with Rhodes that those 1,496 robocalls did not violate that the Truth in Caller ID Act, but rejected his remaining arguments. The FCC determined that Rhodes repeatedly violated 47 U.S.C. § 227(e)(1) and 47 C.F.R. § 64.1604 by making 4,959 unlawful spoofed robocalls from August to December 2018, and that he made those calls with the intent to defraud, cause harm, or wrongfully obtain something of value. (Doc. 1, at ¶ 42). The FCC imposed a forfeiture penalty in the amount of $9,918,000 against Rhodes for the 4,959

unlawful spoofed robocalls. (Doc. 1, at ¶ 37; Doc. 1-3). The Forfeiture Order directed Rhodes to pay the forfeiture penalty within thirty days, and advised him that if he did not do so, the matter could be referred to the Department of Justice for enforcement. (Doc. 1, at ¶ 37; Doc. 1-3, at 26).

Rhodes did not pay the forfeiture penalty, and the FCC subsequently referred the matter to the Department of Justice for enforcement. (Doc.1, at ¶¶ 38-39). On September 27, 2021, the United States filed this action seeking to enforce the Forfeiture Order pursuant to 47 U.S.C. § 504(a). (Doc. 1). The United States also seeks injunctive relief compelling Rhode to comply with the provisions of the Truth in Caller ID Act in the future. (Doc. 1, at 16-17). Rhodes moves to dismiss the Complaint for failure to state a claim under Rule 12(b)(6).

## II.   <u>Legal Standards</u>

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of a complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). The Court's standard of review under Rule 12(b)(6) is informed by the provision of Fed. R. Civ. P. 8(a)(2) which requires that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009) (quoting Rule 8). Although Rule 8(a)(2) does not require "detailed factual allegations," a plaintiff must set forth more than bare allegations that the defendant unlawfully harmed the plaintiff. *Iqbal*, 556 U.S. at 677-78.

To survive a Rule 12(b)(6) motion, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678-79 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A complaint will survive a motion to dismiss if it alleges facts that allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. But if the complaint "lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory," then dismissal under Rule 12(b)(6) is appropriate. *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008).

As a general rule, the court may not consider any materials outside the pleadings on a Rule 12(b)(6) motion. *Lee v. City Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001). The court may, however, consider documents attached to the complaint, matters that are subject to judicial notice, and documents necessarily relied on by the complaint and whose authenticity no party questions. See *Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007); *Lee*, 250 F.3d at 688-89 (9th Cir. 2001). "[R]ecords and reports of administrative bodies" are subject to judicial notice, and may be considered by the court without converting a Rule 12(b)(6) motion to a motion for summary judgment. *Mack v. South Bay Beer Distribs.*, 798 F.2d 1278, 1282 (9th Cir. 1986).

The FCC's Notice of Apparent Liability, Rhodes' written response, and the

FCC's Forfeiture Order are attached as exhibits to the Complaint. (Docs. 1-1; 1-2; 1-3). Consistent with the legal standard set forth above, the Court may consider these material in determining whether the Complaint states a claim for relief.

Because Rhodes is proceeding pro se, the Court construes his filings liberally and affords him the benefit of any doubt. See *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Hebbe v. Pliler*, 627 F.3d 228, 342 (9th Cir. 2010).

## III.   <u>Discussion</u>

### A.   **Statutory Framework**

The general rule for review of FCC action is found in 47 U.S.C. § 401(a), which states that "[a]ny proceeding to enjoin, set aside, annul, or suspend any order of the Commission under this chapter … shall be brought as provided by and in the manner prescribed in chapter 158 of Title 28." 47 U.S.C. § 402(a). Chapter 158 includes § 2342, which provides that "[t]he court of appeals … has exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of – (1) all final orders of the Federal Communication Commissioner made reviewable by section 402(a) of title 27." 28 U.S.C. § 2342. These statutes make "clear that Congress intended any attack on a final order of the [FCC] to be heard in the court of appeals." *United States v. TravelCenters of America*, 597 F.Supp.2d 1222, 1225 (D. Or. 2007).

Importantly, however, Congress carved out an exception to this general rule for forfeiture cases. 47 U.S.C. § 504(a). Under § 504(a),

> [t]he forfeitures provided for in this chapter shall be payable into the Treasury of the United States, and shall be recoverable, …, in a civil suit in the name of the United States brought in the district where the person or carrier has its principal operating office …. *Provided*: That any suit for the recovery of a forfeiture imposed pursuant to the provisions of this chapter shall be a trial de novo….

47 U.S.C. § 504(a). As interpreted by the Ninth Circuit, the "trial de novo" provision in § 504(a) vests exclusive jurisdiction in the district court to hear suits by the government to enforce FCC forfeiture orders, and suits by private individuals seeking to avoid enforcement. *Dougan v. F.C.C.*, 21 F.3d 1488, 1491 (9th Cir. 1994).

### B.    Constitutional Challenges

Rhodes raises two constitutional arguments in support of dismissal. First, he contends that the statute and FCC regulation upon which the Complaint is based, 47 U.S.C. § 227(e)(1) and 47 C.F.R. § 64.1604, are facially overbroad in violation of the First Amendment to the United States Constitution because they do not make an exception for political speech. (Doc. 5, at 9). Second, Rhodes maintains the $9.918 million dollar penalty imposed in the FCC's Forfeiture Order violates the excessive fines clause of the Eighth Amendment to the United States Constitution. (Doc. 5, at 9).

In response, the United States argues that the Court lacks subject matter jurisdiction to address these constitutional challenges to the extent they seek to invalidate the FCC's rules or regulations. (Doc. 10, at 6). To the extent the Court may have jurisdiction, the United States maintains that both of Rhodes' constitutional challenges fail on the merits. (Doc. 10, at 11-15).

As the United States acknowledges, there is divergent caselaw on the scope of a district court's jurisdiction under § 504(a) to consider constitutional and other legal challenges to the enforcement of FCC forfeiture orders. See *Radar Solutions, Ltd. v. F.C.C.*, 368 Fed. Appx. 480 (5th Cir. 2010) (recognizing that circuits are split on the issue of whether a district court has jurisdiction under § 504(a) to hear defenses that challenge the validity of the governing agency regulations); *United States v. TravelCenters of America*, 597 F.Supp.2d 1222, 1226-1228 (D. Or. 2007). The Sixth Circuit has held that district courts do have jurisdiction to consider constitutional challenges to FCC regulations in a forfeiture enforcement action. *United States v. Any and All Radio Station Transmission Equipment*, 204 F.3d 658, 667 (6th Cir. 2000) ("*Radio Station I*").

The Eighth Circuit, in contrast, has held that district courts lack jurisdiction under § 504(a) to consider defenses to the enforcement of a forfeiture order that challenge the validity of FCC regulations. *United States v. Any and All Radio Station Transmission Equipment*, 207 F.3d 458, 463 (8th Cir. 2000) ("*Radio Station*

*II*"). Citing *Radio Station II*, the Fifth Circuit has similarly held that "[p]ersons aggrieved by a final FCC forfeiture order must raise legal challenges to the validity of the order in a timely petition for review in the appropriate court of appeals." *United States v. Stevens*, 691 F.3d 620, 623 (5th Cir. 2012). See also *Radar Solutions, Ltd. v. FCC*, 368 Fed. Appx. 480, 485 (5th Cir. 2010) (unpublished) ("The district court can hear a factual dispute as to whether a defendant has violated the [FCC]'s rules.").

While the Ninth Circuit has not definitively resolved the extent to which district courts may have jurisdiction under § 504(a) to consider constitutional and other legal challenges to an FCC forfeiture order, its decisions in *Dougan v. F.C.C.*, 21 F.3d 1488 (9th Cir. 1994) and *United States v. Dunifer,* 219 F.3d 1004 (9th Cir. 2000) are instructive. In *Dougan*, a radio station operator sought appellate court review of an FCC forfeiture order. *Dougan*, 21 F.3d at 1489. The radio station operator challenged the jurisdiction of the FCC over his intrastate broadcasts and the constitutionality of the agency's licensing regulations. *Dougan*, 21 F.3d at 1489. The Ninth Circuit concluded that the specific jurisdictional provisions in § 504(a) trumped the general rule in § 402(a), and held that the district court had exclusive jurisdiction to hear the radio station operator's suit seeking to avoid enforcement of the forfeiture order, including, presumably, the constitutional challenges to the FCC's regulations. *Dougan*, 21 F.3d at 1491. While

12

*Dougan* effectively held that the district court had jurisdiction over the constitutional challenges raised in the radio station operator's suit, those constitutional challenges were immaterial to the analysis. The Ninth Circuit's discussion instead centered on whether the jurisdictional grant found in § 504(a) extends beyond enforcement suits by the government to also include suits by private individuals seeking to avoid enforcement, and held that it does. *Dougan*, 21 F.3d at 1490-91.

In *Dunifer*, the government brought suit against a private individual in district court seeking declaratory and injunctive relief under § 301 of the Communications Act, which prohibits the operation of a radio station without an FCC license. *Dunifer*, 219 F.3d at 1005. The defendant did not challenge the constitutionality of the statutory licensing requirement of § 301, but argued the FCC's implementing regulations were unconstitutional. *Dunifer*, 219 F.3d at 1006. The district court found that "it had subject matter jurisdiction under the applicable statutory scheme to hear [the defendant's] arguments concerning the unconstitutionality of the regulations," but rejected those arguments on the merits and granted summary judgment in favor of the government. *Dunifer*, 219 F.3d at 1006.

On appeal, the Ninth Circuit held that the district court lacked jurisdiction to adjudicate the defendant's affirmative defenses challenging the constitutionality of

the FCC's implementing regulations. *Dunifer*, 219 F.3d at 1007-1009. In doing so, the Ninth Circuit found the Sixth Circuit's decision in *Radio Station I* unpersuasive, and instead relied heavily on the Eighth Circuit's decision in *Radio Station II. Dunifer*, 219 F.3d at 1007-08. The Ninth Circuit agreed that, as noted in *Radio Station II*, "the Supreme Court has already determined that 'the exclusive jurisdiction of the Court of Appeals over rulemaking by the FCC may not be evaded by seeking to enjoin a final order of the FCC in the district court.'" *Dunifer*, 219 F.3d at 1008 (quoting *Radio II*, 207 F.3d at 463, citing *FCC v. ITT World Communications, Inc.*, 466 U.S. 463, 468 (1984)). To allow the defendant to contest the validity of FCC's implementing regulations, the Ninth Circuit reasoned, would create just such an evasion. *Dunifer*, 219 F.3d at 1008 (citing *Radio II*, 207 F.3d at 463).

While *Dunifer* distinguished *Dougan* on the ground that *Dougan* was a forfeiture action under § 504(a) rather than an injunctive action, *Dunifer* expressly called the *Dougan* court's reasoning into question. *Dunifer*, 219 F.3d at 1008. In particular, *Dunifer* indicated that "with respect to regulatory challenges, *Dougan* relied too broadly on *Pleasant Broadcasting*, [a District of Columbia Circuit Court case] in which the parties did not challenge the underlying regulations, but merely asserted standard defenses to the validity of the FCC orders." *Dunifer*, 219 F.3d at

14

1008 n. 8 (citing *Pleasant Broadcasting v. F.C.C.*, 564 F.2d 496, 499-500 (D.C. Cir. 1977)).

In a 2007 case out of the District of Oregon, the district court applied *Dunifer* in the context of an FCC enforcement action and held that it did not have jurisdiction under § 504(a) to consider constitutional defenses to the extent they challenged the validity of the FCC's rules or regulations. *TravelCenters,* 597 F.Supp.2d at 1226-28. The court recognized that § 402(a) and § 504(a) "create somewhat of a quandary" with regard to jurisdiction, and observed that [t]he courts seem to have resolved the question by finding that actions which raise issues with regard to the facts underlying a forfeiture order, such as whether the conduct at issue violated the [Communications] Act or its regulations, or which require the court to construe the regulations supporting a forfeiture order, are governed by 47 U.S.C. § 504 and are properly resolved by the district court." *TravelCenters*, 597 F.Supp.2d at 1226. But "actions which attack the legality of the [Communications] Act or its regulations are properly characterized as proceeding to enjoin, set aside, annul or suspect any order of the [FCC …] and must be addressed by the appellate courts." *TravelCenters*, 597 F.Supp.2d at 1226.

Based in large part on the guidance provided in *Dunifer*, the *TravelCenters* court said it seemed clear "that the law in the Ninth Circuit is that questions related to the enforcement of a forfeiture order are to be resolved by the district court,"

while "questions relating to the validity of [FCC] rules or regulations under the [Communications] Act must be determined by a court of appeals." *TravelCenters*, 597 F.Supp.2d at 1227. Applying those principles to the case before it, the court found the defendant's argument that the underlying FCC regulation was not properly enacted and was therefore unenforceable constituted an attack on an FCC action over which the court of appeals had exclusive jurisdiction. *TravelCenters*, 597 F.Supp.2d at 1227. But the court concluded it did have jurisdiction under § 504(a) to consider the defendant's remaining argument that the radios at issue did not fall within the definition of convertible transceivers, because the argument was based solely on how the agency's regulation applied to the defendant's conduct. *TravelCenters*, 597 F.Supp.2d at 1227.

The Court finds the *TravelCenters* court's reasoning persuasive, and agrees with the United States that under Ninth Circuit caselaw and *Radio Station II*, the Court does not have jurisdiction under § 504(a) to consider Rhodes' argument that 47 U.S.C. § 227(e)(1) and 47 C.F.R. § 64.1604, are facially overbroad in violation of the First Amendment to the United States Constitution because they do not make an exception for political speech. This argument raises a defense to enforcement that directly challenges the validity of § 227(e) and the FCC's regulation, and constitutes an attempt to set aside or annul the Forfeiture Order over which the Ninth Circuit has exclusive jurisdiction.

Rhodes also maintains that the $9.918 million dollar penalty imposed in the Forfeiture Order violates the excessive fines clause of the Eighth Amendment to the United States Constitution. Section 227(e) and the FCC's operative rules authorize the imposition of forfeiture up to $10,000 for each violation. See 47 U.S.C. § 227(e)(5)(A)(i); 47 C.F.R. § 1.80(b); Annual Adjustment of Civil Monetary Penalties To Reflect Inflation, 85 Fed. Reg. 2318-01 (Jan. 15, 2020). To the extent Rhodes means to challenge the facial validity of § 227(e) and the FCC's implementing regulations on constitutional grounds, this Court is without jurisdiction for the reasons stated above. To the extent the Rhodes argues the $9.918 million dollar penalty is unconstitutionally excessive because it is not supported by the FCC's factual findings, however, he raises a factual defense that is within the Court's jurisdiction under § 402(a). As the United States convincingly argues, however, this argument is not ripe for adjudication because it has not yet proven its case, and the final forfeiture amount has not yet been determined. See e.g. *j2 Global Communications, Inc. v. Protus IP Solutions,* 2008 WL 11335051, at *9 (C.D. Cal. Jan. 14, 2008) (finding in a lawsuit alleging violations of 47 U.S.C. § 227 "that the question of excessive damages will be ripe for adjudication after issuance of a verdict"). Accordingly, Rhodes' Eight Amendment arguments do not provide a basis for dismissal for failure to state a claim for relief.

## C.     Sufficiency of Factual Allegations

Rhodes argues the United States has not alleged sufficient facts

demonstrating that he violated 47 U.S.C. § 227(e)(1) and 47 C.F.R. § 64.1604 as

determined by the FCC in the Forfeiture Order that the United States is now

seeking to enforce. He maintains the United States has made only "naked

assertions" and "conclusory statements," and has not offered any evidence

demonstrating that he violated § 227(e)(1) and § 64.1604. (See Doc. 5, at 6, 10, 17-

32).

Section 227(e)(1) of the Truth in Caller ID Act provides in relevant part as

follows:

> It shall be unlawful for any person within the United States, or any person
> outside the United States if the recipient is within the United States, in
> connection with any voice service or text messaging service, to cause any
> caller identification service to knowingly transmit misleading or inaccurate
> caller identification information with the intent to defraud, cause harm, or
> wrongfully obtain anything of value….

47 U.S.C. § 227(e)(1). FCC implementing regulation 47 C.F.R. § 64.1604 similarly

provides that no such person "shall, with the intent to defraud, cause harm, or

wrongfully obtain anything of value, knowingly cause, directly, or indirectly, any

caller identification service to transmit or display misleading or inaccurate caller

identification information in connection with any voice service or text messaging

service." 47 C.F.R. § 64.1604(a).

Thus, to state a plausible claim that Rhodes violated § 227(e)(1) and § 64.1604(a), the United States must allege facts demonstrating that Rhodes (1) in connection with a voice or text service (2) caused a caller identification service to knowingly transmit misleading or inaccurate caller identification information (3) with the intent to defraud, cause harm, or wrongfully obtain anything of value. 47 U.S.C. § 227( e)(1); 47 C.F.R. § 64.1604. Taking the allegations in the Complaint as true, the United States has pled sufficient facts to establish each of these elements.

As set forth in detail above, the United States alleges that Rhodes made thousands of robocalls playing a prerecorded voice message, and did so using a dialing platform's service to display caller ID numbers that were not assigned to him. (Doc. 1, at ¶ 17). The United States further claims that for many of the robocalls, Rhodes selected caller IDs that matched the area code of the call's recipient rather than his own. (Doc. 1, at ¶ 18). The United States has thus alleged facts demonstrating that Rhodes knowingly caused a caller identification service to transmit misleading or inaccurate caller ID information in connection with a voice service.

Focusing on the third requirement for liability under § 227(e)(1) and § 64.1604(a), Rhodes argues the United States has not pled facts showing that he used misleading or inaccurate caller ID information with the intent to cause harm.

In his opening brief, Rhodes seems to take the position that the United States has not adequately pled "intent to cause harm" because the term "harm" as used in § 227(e)(1) and § 64.1604 does not include emotional harm. (Doc. 5, at 10). In his reply brief, however, Rhodes makes clear that he is not making this argument. (Doc. 11, at 3). As Rhodes explains it, his argument is that the United States must allege facts showing that his use of misleading or inaccurate caller ID information was "material to the intent to cause harm." (Doc. 11, at 5). In other words, Rhodes maintains it is not enough for the United States to show that he made robocalls with the intent to cause harm, and that those calls happened to contain misleading or inaccurate caller ID information. Rather, Rhodes argues the United States must allege facts demonstrating that he intended the misleading and inaccurate caller ID information itself to cause harm. (Doc. 5, at 10; Doc. 11, at 5). Rhodes concedes that that Complaint makes such an assertion, but argues "it is an insufficiently naked assertion" and is a "silly claim that humans experience distress merely by thinking a call's origin is within their state and then learning it is not, or that [Rhodes] believed in the existence of such a dynamic." (Doc. 11, at 5).

This argument is unavailing. For one thing, it is based on an overly restrictive reading of the statutory and regulatory language, which does not specify that the person must intend for the caller ID information itself to cause harm. The Complaint alleges that Rhodes made the 4,959 calls at issue using misleading or

inaccurate caller ID information with the intent to cause emotional harm to all recipients, who were led to believe they were receiving a call from a neighbor but instead received a disturbing prerecorded voice message about members of their community. (Doc. 1, at ¶¶ 23, 26, 28, 30, 33). The United States further alleges that Rhodes intended to cause the most emotional harm to black, Hispanic, and Jewish recipients of prerecorded messages with racist and anti-Semitic content, and to the families and friends of the individuals disparaged in the prerecorded messages. (Doc. 1, at ¶¶ 20-23, 25-26, 27-28, 29-30, 31-34). Taken as true, these allegations are sufficient to demonstrate that Rhodes transmitted misleading or inaccurate caller ID information with the intent to cause harm, as prohibited by § 227(e)(1) and § 64.1604.

Rhodes additionally argues the United States has not alleged facts demonstrating that Rhodes used misleading or inaccurate caller ID information with the intent to wrongfully obtain "anything of value" within the meaning of § 227(e)(1) and § 64.1604. In his opening brief, Rhodes seemingly argues the phrase "anything of value" requires the intent to obtain something of monetary value, and would not include the publicity and protection from the liability the United States alleged he intended to obtain by using misleading or inaccurate caller ID information.

Unlike Rhodes' First Amendment challenge to the validity of § 227(e) and § 64.1604(a), this argument effectively challenges the FCC's interpretation of the statute and its implementing regulation. *TravelCenters* suggested that defenses to enforcement that require the court to construe the regulations supporting a forfeiture order are governed by § 504 and are properly resolved by the district court. *TravelCenters*, 597 F.Supp.2d at 1226. In *Radar Solutions*, however, the Fifth Circuit stated more broadly that under the "complicated review process" created by the Communications Act, "a judicial attack on the [FCC's] regulations (or interpretations thereof) usually has to originate in a circuit court". *Radar Solutions*, 368 Fed. Appx. 480, 485 (5th Cir. 2010)

Again, the Court finds *TravelCenters* persuasive and concludes under Ninth Circuit caselaw that it has jurisdiction under § 504(a) to consider Rhodes' argument that the FCC interpreted the phrase "anything with value" too broadly in finding that he repeatedly violated § 227(e)(1) and § 64.1604(a) during the five robocall campaigns at issue. However, the Court agrees with the United States that Rhodes' argument fails on the merits.

As the United States correctly points out, Congress could easily have specified in § 227(a) that the phrase "anything of value" was limited to some type of valuable tangible item or money, but did not do so. A number of courts, including the Ninth Circuit, have held in different but comparable statutory

contexts that a "thing of value" is not limited to tangible assets. See e.g. *United States v. Schwartz*, 785 F.2d 673, 680 (9th Cir. 1986) (the meaning of the statutory phrase "a thing of value" is not limited "to tangible things with an identifiable commercial price tag"); *United States v. Nilsen*, 967 F.2d 539, 542-43 (11th Cir. 1992). Under the plain language of § 227(e)(1), the United States need only allege facts demonstrating that Rhodes intended to obtain "anything of value," not necessarily something of monetary value.[2]

In its Complaint, the United States alleges that the calls Rhodes made did not include certain statutorily required disclosures, such as the identity of the business, entity, or individual initiating the call, and instead ended with the statement "paid for by theroadtopower.com," which is a website that Rhodes uses to post a video podcast. (Doc. 1, at ¶ 19). For each of the five robocall campaigns, the United States asserts that Rhodes used inaccurate or misleading caller ID information "with the intent of evading law enforcement scrutiny, while raising the profile of his website." (Doc. 1, at ¶¶ 23, 26, 28, 30, 33). Taking these allegations as true, the United States has alleged facts from which the Court can reasonably

---

2 Even if the phrase "anything of value" can be considered ambiguous, the FCC's interpretation is entitled to deference. See 47 U.S.C. ¶ 227(e)(3) (vesting the FCC with authority to prescribe regulations to implement this subsection); *Chevron, U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984); *Gomez v. Campbell-Ewald Co.*, 768 F.3d 871, 878 (9th Cir. 2014).

infer that Rhodes acted with the intent to wrongfully obtain "anything of value," namely, valuable publicity and protection from liability.

To the extent Rhodes argues the United States has not offered any evidence proving the facts alleged in the Complaint, such evidence is not required to survive a Rule 12(b)(6) motion to dismiss for failure to state a claim. Whether the United States will ultimately be able to demonstrate that Rhodes used misleading or inaccurate caller ID information with the intent to cause harm or wrongfully obtain anything of value remains to be seen. For present purposes, it is enough that the Complaint contains factual allegations demonstrating that Rhodes violated § 227(e)(1) and § 64.1604, as alleged by the United States in support of its claims to enforce the Forfeiture Order under § 504(a) and for injunctive relief pursuant to § 401(a).

## IV.   <u>Conclusion</u>

For the reasons explained above,

IT IS RECOMMENDED that Rhodes' motion to dismiss for failure to state a claim for relief pursuant to Rule 12(b)(6) be DENIED.

NOW, THEREFORE, IT IS ORDERED that the Clerk shall serve a copy of the Findings and Recommendation of the United States Magistrate Judge upon the parties. The parties are advised that pursuant to 28 U.S.C. § 636, any objections to the findings and recommendations must be filed with the Clerk of Court and copies

served on opposing counsel within fourteen (14) days after entry hereof, or

objection is waived.

DATED this 1st day of April, 2021.

Kathleen L. DeSoto
United States Magistrate Judge