**BRIAN M. BOYNTON**
**Principal Deputy Assistant Attorney General**
**ARUN G. RAO**
**Deputy Assistant Attorney General**
**AMANDA N. LISKAMM**
**Director, Consumer Protection Branch**
**LISA K. HSIAO**
**Assistant Director**
**PATRICK R. RUNKLE**
**Senior Litigation Counsel**
      **450 Fifth Street, NW, Suite 6400S**
      **Washington, D.C. 20001**
      **Telephone: (202) 532-4723**
      **Email: Patrick.R.Runkle@usdoj.gov**
**MICHAEL J. WADDEN**
**Trial Attorney**
      **450 Fifth Street, NW, Suite 6400S**
      **Washington, D.C. 20001**
      **Telephone: (202) 305-7133**
      **Email: Michael.J.Wadden@usdoj.gov**
**SHANNON L. CLARKE**
**Assistant U.S. Attorney**
      **U.S. Attorney's Office,**
      **P.O. Box 8329,**
      **Missoula, MT 59807**
      **Telephone: (406) 542-8851**
      **Email: shannon.clarke@usdoj.gov**
**Attorneys for Plaintiff United States of America**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MONTANA**
**MISSOULA DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **CV 21-110-M-DLC-KLD** |
| **Plaintiff,** | |
| **vs.** | **UNITED STATES OF AMERICA'S BRIEF IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| **SCOTT RHODES,** | |
| **Defendant.** | |

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................1

LEGAL BACKGROUND ......................................................................1

FACTUAL BACKGROUND ..................................................................3

   I.  Rhodes Creates "The Road to Power".........................................3

   II. Rhodes Starts Making "theroadtopower.com" Robocalls.............5

   III.   Rhodes Uses and Loses the j2 Caller ID, Then Starts Spoofing ................7

   IV.   Spoofed Robocall Campaigns ....................................................9

        a.  The August–September 2018 Charlottesville, Virginia campaign .......9

        b.  The August 2018 Iowa campaign........................................10

        c.  The September 2018 Idaho campaign...................................13

        d.  The October 2018 Florida campaign...................................15

        e.  The November 2018 Georgia campaign ..............................17

        f.  The November–December 2018 Charlottesville, Virginia campaign.18

        g.  The 2019 campaigns........................................................19

   V. Effect of the Robocalls on Rhodes' Podcast and Stature .............20

   VI. FCC Proceeding and This Litigation..........................................21

LEGAL STANDARD............................................................................22

ARGUMENT ......................................................................................22

   I.  Rhodes Is Responsible for the Spoofed Calls Identified in the Forfeiture Order ..........................................................................23

   II. Rhodes Spoofed with the Intent to Wrongfully Obtain Things of Value .....24

   III.   Rhodes Spoofed with the Intent to Cause Harm........................27

        a.  Rhodes Intended to Harm the People Who Received His Illegal Robocalls......................................................................27

b.  Rhodes Intended to Harm Ben Olson..................................................29

IV.  The Proposed Injunction is Warranted.......................................................30

CONCLUSION.........................................................................................................31

# TABLE OF AUTHORITIES

PAGE(S)

## Cases

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ...................................................................22

*F.T.C. v. Elec. Payment Sols. of Am. Inc.*,
  Civ. No. 17-02535, 2019 WL 4287298 (D. Ariz. Aug. 28, 2019) ......................30

*F.T.C. v. Think Achievement Corp.*,
  144 F. Supp. 2d 1013 (N.D. Ind. 2000)...............................................31

*Krakauer v. Dish Network LLC*,
  168 F. Supp. 3d 843 (M.D.N.C. 2016), *aff'd*, 925 F.3d 643 (4th Cir. 2019).......27

*Maryland v. Universal Elections, Inc.*,
  729 F.3d 370 (4th Cir. 2013) ..................................................... 24, 29

*SEC v. Fehn*,
  97 F.3d 1276 (9th Cir. 1996)........................................................30

*Smith v. Blue Shield of California Life & Health Ins. Co.*,
  228 F. Supp. 3d 1056 (C.D. Cal. 2017)...............................................27

*United States v. Coss*,
  677 F.3d 278 (6th Cir. 2012)......................................................2, 24

*United States v. Garcia-Camacho*,
  122 F.3d 1265 (9th Cir. 1997).......................................................28

*United States v. Waggy*,
  936 F.3d 1014 (9th Cir. 2019).......................................................29

## Administrative Decisions

*Abramovich Forfeiture Order*
  33 F.C.C.R. 4663 (2018) ............................................................28

*Best Insurance Contracts, Inc., Forfeiture Order*,
  33 F.C.C.R. 9204 (2018) ............................................................28

*In the Matter of Rules & Reguls. Implementing the Truth in Caller Id Act of 2009*,
  26 F.C.C.R. 9114 (2011) ...........................................................1, 2

## Statutes

47 U.S.C. § 227.............................................................. *passim*

47 U.S.C. § 401(a) ........................................................................... 22, 30

47 U.S.C. § 504(a) ...............................................................................22

## Rules

Fed. R. Civ. P. 56(a)...........................................................................22

## Regulations

47 C.F.R § 64.1200 ..................................................................... *passim*

47 C.F.R § 64.1604 ..................................................................... *passim*

## Other Authorities

Black's Law Dictionary (9th ed. 2009) ...................................................2

*Prosecuting the Phone Scammer When Extradition Fails and Concurrent Jurisdiction Exists*, 47 Brook. J. Int'l L. 188 (2021).................................... 28, 29

## INTRODUCTION

In 2018, Defendant Scott Rhodes repeatedly falsified caller identification information in connection with thousands of illegal robocalls. The Federal Communications Commission ("FCC") brought an administrative proceeding and found that Rhodes committed 4,959 violations of the Truth in Caller ID Act, 47 U.S.C. § 227(e)(1), and Truth in Caller ID Rule, 47 C.F.R § 64.1604.

The evidence leaves no genuine dispute that Rhodes committed those violations, and that there is a reasonable likelihood Rhodes will break the law again unless enjoined from doing so. Accordingly, the United States respectfully requests that the Court grant partial summary judgment as to liability and enter the Proposed Injunction. The only issue remaining in the case at that point will be the entry of the forfeiture penalty, which is an issue for the Court to decide. The government requests that the Court set a two-day bench trial on that issue.

## LEGAL BACKGROUND

The Truth in Caller ID Act and Rule make it unlawful "to cause any caller identification service to knowingly transmit misleading or inaccurate caller identification information with the intent to defraud, cause harm, or wrongfully obtain anything of value." 47 U.S.C. § 227(e)(1). The law prohibits causing such false caller ID displays either directly or indirectly by causing "a third party to cause the transmission or display of inaccurate or misleading caller identification

1

information." *In the Matter of Rules & Reguls. Implementing the Truth in Caller Id Act of 2009*, 26 F.C.C.R. 9114, 9122 (2011).

As this Court has held, the intent to cause harm prohibited by the Truth in Caller ID Act and Rule includes the intent to cause emotional harm to call-recipients through spoofed illegal robocalls. (Doc. 15 at 10–11.) Intent to "wrongfully obtain anything of value" includes intent to obtain "anything of value" in connection with means that are either illegal or otherwise improper or unjust. *United States v. Coss*, 677 F.3d 278, 287–88 (6th Cir. 2012) ("wrongful" conduct includes but is broader than "illegal" conduct); *Black's Law Dictionary* (9th ed. 2009) (defining "wrongful" as "characterized by unfairness or injustice" in addition to "contrary to law"). The term "anything of value" includes both items with a commercial price tag, and things with "non-tangible" value to an individual. (Doc. 15 at 10–11.)

In addition to the Truth in Caller ID Act, some robocall-related statutes are relevant to this case. Under federal law, all artificial or prerecorded voice message calls (robocalls) must, "at the beginning of the message, state clearly the identity of the business, individual, or other entity initiating the call . . . ." 47 U.S.C. § 227(d)(3)(A). Artificial or prerecorded voice message calls must also "state clearly the telephone number" or address of the caller. 47 C.F.R § 64.1200(b)(2).

2

Robocalls also generally cannot be made to cellphones without the express consent of the recipient. 47 U.S.C. § 227(b)(1)(A)(iii).

## FACTUAL BACKGROUND

Rhodes is a self-identified White Nationalist who moved from California to Sandpoint, Idaho around 2015. *See* Statement of Undisputed Facts ("SOF") ¶¶ 1–2. The stage was set for the conduct at issue when, in December 2017 and January 2018, the Sandpoint *Reader*—a local newspaper published by Ben Olson, who later became a target of Rhodes' spoofed robocalls—published two reports identifying Rhodes as "a person of interest" in two police investigations. SOF ¶¶ 3–5. One investigation related to "the distribution of racist propaganda at Sandpoint High School"; the other related to anonymous "threatening phone calls" involving "a recording of Adolf Hitler," which were traced to a phone number associated with Rhodes and his then-employer. SOF ¶¶ 3–5. Rhodes was terminated from his job shortly after the articles were published. SOF ¶ 5.

### I.  Rhodes Creates "The Road to Power"

In March 2018, Rhodes began hosting an online "[v]ideo podcast for White Nationalists" called "The Road to Power." SOF ¶ 6. The podcast starred Rhodes as its host. SOF ¶¶ 8–9. Rhodes purchased the internet domain "theroadtopower.com" and used it for the podcast. SOF ¶ 10. He also used a theroadtopower@protonmail.com email address for the podcast. SOF ¶¶ 12–19.

3

And he promoted the podcast using a "@theroadtopower" account on the social media website Gab. SOF ¶¶ 20–24.

In late February 2018, Rhodes also purchased the telephone number 415-295-4776 from j2 Web Services, Inc. ("j2"). SOF ¶¶ 25–27. During podcast episodes, Rhodes provided that phone number as contact information and told viewers they could leave voicemails for him at that number:



SOF ¶¶ 26–27.

Initially, The Road to Power received very limited attention. By mid-May 2018, Rhodes had posted 10 videos containing nearly as many hours of content to the platform linked to theroadtopower.com. SOF ¶¶ 28–29. But Rhodes had only two subscribers. *Id.*

## II.   <u>**Rhodes Starts Making "theroadtopower.com" Robocalls**</u>

In mid-May 2018, Rhodes started making "theroadtopower.com" robocalls to unsuspecting recipients. SOF ¶¶ 30–45. On May 15, following a one-day trial starting May 14, Rhodes purchased an $89 monthly subscription for "Power Dialer" software from Electronic Voice Services, Inc. ("EVS"). SOF ¶ 30. EVS's Power Dialer software enabled a user to (1) rapidly dial through lists of telephone numbers, (2) display a caller ID of the user's choice, and (3) play prerecorded messages during phone calls. SOF ¶ 33. The subscription enabled Rhodes to download the Power Dialer software to one computer and use the software to make calls from that computer alone. SOF ¶ 35. As a precondition for obtaining EVS's Power Dialer, Rhodes agreed to (1) use the Power Dialer "in full compliance with all laws and regulations"; (2) transmit only "accurate Caller-ID information"; and (3) "mak[e] all mandatory disclosures" to individuals he called. SOF ¶ 36.

On May 14, 2018, the day he gained access to the Power Dialer, Rhodes began using it to make robocalls. SOF ¶¶ 38–45. Call records produced by EVS display thousands of calls Rhodes made using his Power Dialer account. SOF ¶39. The call records show that Rhodes made over 1,000 calls to mostly California telephone numbers between May 14 and 19, 2018. SOF ¶ 39. During those days, Rhodes stated on Gab that he had made thousands of robocalls to Californians and posted links to reports discussing those calls:



SOF ¶ 40.[1]

---

[1] Although the May 14–19 robocalls lacked required disclosures and were thus unlawful, SOF ¶ 41, they were not spoofed with incorrect phone numbers; hence, they are not substantive violations in this case.

The robocalls quickly garnered Rhodes extensive media attention as well as positive feedback on Gab, including offers of donations. SOF ¶¶ 44. Proud of his newfound notoriety, Rhodes promised on Gab:



SOF ¶¶ 45.

### III.   Rhodes Uses and Loses the j2 Caller ID, Then Starts Spoofing

At first, Rhodes' robocalls displayed an accurate caller ID. Throughout the May 14–19 robocall campaign, Rhodes caused the Power Dialer to display his registered 415-295-4776 caller ID. SOF ¶ 46. During subsequent campaigns throughout May, June, and July 2018, Rhodes continued to display that caller ID. SOF ¶ 47. During that period, numerous recipients of calls reflected in the EVS call records submitted sworn complaints to FCC about robocalls received from 415-295-4776. SOF ¶¶ 48–55.

On or about June 1, in response to complaints, j2 deactivated Rhodes' account, stripping him of the 415-295-4776 phone number. SOF ¶ 56. Rhodes knew he had lost use of that number, and complained in a June 10, 2018 podcast episode that "Jews got that phone number 'shut down[.]'" SOF ¶ 57.

Rhodes subsequently continued robocalling but began causing the Power Dialer to display inaccurate caller IDs. SOF ¶¶ 58–59. Through mid-July 2018, Rhodes continued to cause the Power Dialer to display the number 415-295-4776 with his robocalls, even though he knew he no longer had rightful use of that number. *Id*. Then in late July 2018, he began "neighbor-spoofing" his robocalls, by causing EVS's software to display caller ID's associated with the areas he was calling. *Id*.[2]

Rhodes paired the adoption of neighbor-spoofing with a new practice of pretending he might not be the person responsible for the "theroadtopower.com" robocalls. SOF ¶¶ 60–63. Rhodes included the attribution "paid for by theroadtopower.com" at the end of his post-July 2018 robocalls. SOF ¶¶ 77, 94, 164, 176, 208, 227, 232. He also continued to highlight the illegal robocalls in Gab posts and devoted lengthy podcast segments to them. SOF ¶¶ 60–63. But he stopped unambiguously claiming credit for the illegal robocalls and instead took to promoting the calls without acknowledging responsibility. SOF ¶¶ 62–63. A September Gab post highlighting publicity about a robocall campaign targeting Florida illustrates this new strategy:

---

[2] This practice is also known as "neighborhood spoofing."



theroadtopower.com @theroadtopower
Sep 2, 2018 · ⛃

This morning on MSNBC, Joy "Congoid" Reid repeated the accusation that our video podcast is responsible for robocalls mocking negro Andrew Gillum who be running for gubbanoor o' Flo'ida. If Reid knew that we made her N.O.W. in episode 20180429 maybe she would have been nicer about our podcast on her show this morning?

*Id*.

This new practice of spoofing and ambiguously declining credit for his illegal robocalls allowed Rhodes to continue using the Power Dialer to make illegal robocalls, while making it much more difficult for parties without access to EVS's records to prove him responsible. However, EVS's records obliterate the shield of deniability that spoofing provided Rhodes.

## IV.  Spoofed Robocall Campaigns

### a.  The August–September 2018 Charlottesville, Virginia campaign

Starting in mid-August 2018, Rhodes targeted Charlottesville, Virginia for an illegal spoofed robocall campaign. Using the spoofed caller ID 434-972-1488, which reflected the local area code 434, Rhodes made hundreds of calls to recipients with Charlottesville-area numbers. SOF ¶¶ 65–66.

Many recipients of Rhodes' spoofed robocalls were upset by the calls and filed reports with Charlottesville police. SOF ¶¶ 67–74. One recipient, Laura Galgano, retained a copy of the robocall left in her voicemail. SOF ¶¶ 75–77. The recording contains virulent racist language, including that "Negroes are not human" and that the United States should "expel all Negroes to Africa." It ends

9

with the attribution, "this message paid for by theroadtopower.com." SOF ¶ 77. It does not include the disclosures required by 47 U.S.C. § 227(d)(3)(A) and 47 C.F.R § 64.1200(b). *Id.*

In addition to causing such distress that recipients filed police reports, the campaign generated media reports featuring distraught recipients. SOF ¶¶ 78–81. Rhodes tracked this reporting and publicly reveled in it. *Id.* On the @theroadtopower Gab account, Rhodes linked a report about an 82-year-old who wept when recalling the spoofed robocall, and ridiculed him:



theroadtopower.com @theroadtopower
Sep 2, 2018 ·

82 y.o. White man cries, has to reach for tissues when recalling racist robocall saying "negroes are not humans", which is being blamed on our video podcast. Maybe we can all chip in and buy him some more tissues? Has he ever shed any tears for the disproportionately high number of Whites who r victims to negro crime?
bit.ly/2NMycwA

SOF ¶ 78. And in his September 2018 podcast, Rhodes mocked a news report in which a Charlottesville-area woman described how the spoofed robocall "put a pit in [her] stomach." SOF ¶ 80. In the same September podcast, Rhodes quipped that he had caused so many tears that he would need a water tower to contain them all. SOF ¶ 82.

### b.  The August 2018 Iowa campaign

In late August 2018, Rhodes targeted the Brooklyn, Iowa-area for an illegal spoofed robocall campaign. That small Iowa town had become the focus of

national attention following the murder of resident Mollie Tibbetts by a Mexican national. SOF ¶ 83. Mollie's father, Robert Tibbetts, became concerned that his daughter's death was leading to backlash against Hispanics, so at his daughter's memorial service on August 26, 2018, Mr. Tibbetts specifically thanked the local Hispanic community and made statements in their support. SOF ¶ 84. Mr. Tibbetts' comments were widely publicized. SOF ¶ 85.

In apparent response to these statements, from August 28 to 30, 2018, Rhodes made hundreds of spoofed robocalls to Brooklyn and the surrounding area, using the spoofed local caller ID 641-522-1488. SOF ¶¶ 86–89. As reflected by the spoofed robocall left in the voicemail of Sean Bagniewski, the robocall contains racial invective and, referring to the widely publicized statements of Mr. Tibbetts, states that "relatives of Mollie Tibbetts" were falsely denying that she would want to kill all "Aztec hybrids." SOF ¶¶ 91–94. The robocall message ends with "this message paid for by theroadtopower.com." SOF ¶ 94. It does not include the disclosures required by 47 U.S.C. § 227(d)(3)(A) and 47 C.F.R § 64.1200(b). *Id.*

The spoofed illegal robocalls were deeply disturbing to people who received them. Liz Ramey received the spoofed robocall, and she submitted a sworn complaint to FCC minutes after, describing it as the most "disturbing and unwanted phone call I've ever received." SOF ¶¶ 95–96. Susan Thoma Garvin

11

received the spoofed robocall too, and she found it "horribly disturbing" and "frightening." SOF ¶¶ 97–99.

Rhodes specifically targeted members of Mollie Tibbetts family, including her grieving father, for the spoofed robocall. SOF ¶¶ 100–07. At that time, Mr. Tibbetts lived in California, and he had a California phone number that could be found online. SOF ¶¶ 101–02. Rhodes placed a spoofed call to it. SOF ¶ 100. Tibbets saw a voicemail from a Brooklyn number and assumed it originated from a member of the Brooklyn community. SOF ¶ 107. For that reason, he played Rhodes' robocall voicemail. *Id*. He found it extremely disturbing and upsetting. *Id.* His wife was so upset by the spoofed robocall that she became "physically sick[.]" *Id.*

Rhodes again tracked reporting about this spoofed robocall campaign. On Gab, he posted:



SOF ¶ 108. During the same September 2018 podcast episode in which he mocked the woman upset by the August Charlottesville robocall, Rhodes displayed images of multiple reports describing the distress the Iowa calls caused. SOF ¶¶ 109–11.

### c.  The September 2018 Idaho campaign

In between illegal spoofed robocall campaigns targeting strangers, Rhodes conducted a campaign of a more personal nature. After the Sandpoint *Reader*'s initial reporting that precipitated Rhodes' firing, the newspaper continued publishing articles about Rhodes, including his robocalling. SOF ¶ 112. Around September 2018, Ben Olson, the *Reader*'s publisher, contacted the owner of Rhodes' home in Sandpoint seeking comment about the robocalls. SOF ¶ 113. After speaking with Olson, the property owner informed Rhodes he would be terminating Rhodes' lease, and according to Rhodes, stated he was doing so because of Ben Olson. SOF ¶ 114.

In his September 23, 2018 podcast, Rhodes ranted about how media members who expose White Nationalists to mistreatment are "literally terrorists who use the power of the organization and of the ad dollars to not merely lie but to intimidate people and punish them with persecution[.]" He concluded, "those individuals need to be named; they need to be targeted; they need to be punished; they need to be dealt with by the means available to us now." SOF ¶ 115.

In mid-September, Olson received reports from friends and acquaintances that they had received a robocall calling Olson a "cancer" and saying he needed to be "burned out." SOF ¶ 116. Lenny Hess, a *Reader* advertiser, emailed Olson a copy of the message left in his voicemail. SOF ¶¶ 117–18. The robocall message

13

calls Olson a "cancer" and says he needs to be "burned out"; it calls for his

advertisers to be "punish[ed] for feeding the cancer on our town"; and it says:

Olson "blackmail[ed] one of our local business owners, threatened to write about

him to harm his business if he didn't evict his residential tenant[.]" SOF ¶ 119.

Unlike Rhodes' other illegal robocalls, this robocall does not include any

attribution. SOF ¶ 119.

EVS's call records list hundreds of calls apparently made from the spoofed

Sandpoint caller ID 208-265-0802 to mostly Sandpoint-area phone numbers from

September 21–24. SOF ¶¶ 120–21. Regina Danielsson received one of those calls,

and shortly after, she emailed Olson: "Ben, you don't know me but I got a crazy

message on my home phone regarding you. The number registered 208-265-0802,

referring to you as a cancer which needs to be burned out. . . ." SOF ¶¶ 125–27.

Cynthia Thomas also received the spoofed robocall and was very disturbed. SOF

¶¶ 129–30.

Local restaurant Forty-One South, whose owner Cassandra Cayson

advertised with the *Reader*, was also targeted for the spoofed robocall. SOF ¶¶

131–33. In addition, Cayson received an anonymous email message threatening

Cayson if she kept advertising with *Reader*. SOF ¶ 134. Cayson forwarded the

email to the *Reader* with the message: "We've been getting a few automated calls

bashing the Reader and Ben and then I got his email today threatening me

14

personally for advertising with you guys. What the heck is going on? . . ." SOF ¶ 135. Other *Reader* advertisers whose numbers also appear in the EVS call records forwarded similar messages. SOF ¶¶ 136–39.

### d.  The October 2018 Florida campaign

In October 2018, Rhodes targeted Florida for an illegal spoofed robocall campaign. At the time, Florida was in the midst of a governor's race that involved gubernatorial candidate Andrew Gillum. SOF ¶ 139. As discussed above, Rhodes had already targeted Florida for a spoofed robocall campaign relating to Gillum in August and September. SOF ¶¶ 140–48. He had posted about that campaign on Gab, and in the September 2018 podcast episode, he discussed and featured reports describing the distress the campaign caused. *Id.*

Rhodes initiated another spoofed robocall campaign targeting Florida from October 20–23, 2018. SOF ¶¶ 149. Using the spoofed Florida caller ID 850-222-1488, Rhodes made hundreds of calls to mostly Florida numbers. SOF ¶¶ 149–52.

Cynthia Chestnut was one of Rhodes' targets. SOF ¶¶ 153–56. Shortly after receiving the spoofed robocall, she posted on social media:

> I just received a very insulting robocall with a person "speaking in what they considered a Negro dialect" impersonating Andrew Gillum, promising all the chicken feet we wanted. the number that showed up on my phone was: 850-222-14888. . . . The call came from a group called, Road to Power.

SOF ¶ 156.

In the Road to Power episode posted in March 2020, Rhodes hosted an extended segment on the Florida spoofed robocalls, in which he played an October 24, 2018 CNN report regarding the October robocalls, noted he had been credited with making the spoofed robocalls, and asserted that "Florida owes the racists behind those robocalls a thank you." SOF ¶ 160. At the end of the episode, Rhodes also played the full audio of the two Florida robocalls. SOF ¶ 161.

The second robocall matches Chestnut's description of the message she received and the October 24, 2018 CNN report. SOF ¶¶ 163–64. It involves an individual claiming to be "the Negro Andrew Gillum" and using a caricatured accent making outlandish and racially-charged claims. The speaker also claims that Jews are conspiring to subjugate whites. The robocall ends with, "this message paid for by theroadtopower.com." *Id.* It does not include the disclosures required by 47 U.S.C. § 227(d)(3)(A) and 47 C.F.R § 64.1200(b). *Id.*

The EVS call records reflect that Rhodes targeted this spoofed illegal robocall at recipients whom he anticipated would be particularly upset by it. SOF ¶ 165. For example, Rhodes targeted numerous Jewish institutions. *Id*. Rhodes knew that Jewish recipients could find receiving anonymous spoofed robocalls with anti-Jewish content particularly disturbing. In his August 2018 podcast, Rhodes played several minutes of footage of a news report in which a Jewish individual discussed

16

his distress at receiving one of Rhodes' earlier anti-Jewish robocalls. Rhodes said: "That's good, Jew. Be shocked. Being shocked is at least a good start." SOF ¶ 166.

### e.  The November 2018 Georgia campaign

In November 2018, Rhodes targeted Georgia for an illegal spoofed robocall campaign. Like Florida, the 2018 Georgia gubernatorial race involved a Black candidate, Stacey Abrams. SOF ¶ 167. From November 2–3, 2018, Rhodes made hundreds of spoofed calls to mostly Georgia phone numbers using the spoofed Georgia caller ID 770-586-1488. SOF ¶¶ 168–72. Ivory Watts received this "heartbreaking" spoofed robocall. SOF ¶¶ 173–75. It involved an individual claiming to be "the magical Negro, Oprah Winfrey" making racist statements about Winfrey and Abrams. SOF ¶ 176. The message ends with "this message paid for by theroadtopower.com." *Id.* It does not include the disclosures required by 47 U.S.C. § 227(d)(3)(A) and 47 C.F.R § 64.1200(b). *Id.*

Melissa Clink, Gary Day, and Lisa Ring all received the spoofed robocall. SOF ¶¶ 177–87. All of them were upset and disturbed by it. *Id.* Clink and Day both believed that they were being targeted by someone local, and the spoofed robocall caused them to fear for their physical safety. *Id.* Again, Rhodes targeted individuals he knew would be particularly upset and concerned by the spoofed robocall, including individuals associated with institutions like the NAACP. SOF ¶ 188.

17

### f. The November–December 2018 Charlottesville, Virginia campaign

Starting in late November 2018, Rhodes targeted Charlottesville Virginia for another illegal spoofed robocall campaign. SOF ¶¶ 189–93. This one coincided with jury selection in the trial of James Fields for the killing of Heather Heyer following the "Unite the Right" rally in Charlottesville, an event involving violent clashes between White Nationalists and counter-protestors. SOF ¶ 194. Using the spoofed caller IDs 434-972-1488 and 434-924-0420, Rhodes made thousands of calls to recipients with mostly Charlottesville-area numbers. SOF ¶¶ 189–93.

Rhodes called many of the same numbers that he had during his August–September campaign. SOF ¶ 195. Again, many people who received the spoofed robocall were so disturbed by it that they filed reports with the police. SOF ¶ 196–217. Rosa Ayres was one such recipient; she saved a copy of the robocall in her voicemail, the record of which reflects her receipt of the voice-message from 434-972-1488. SOF ¶¶ 206–09. The voicemail recording opens: "Who killed Heather Heyer in Charlottesville? The Jew Mayor. Who killed Heather Heyer in Charlottesville? His pet Negro Police Chief." It continues with racial invective and insulting assertions about Heyer and her death, before concluding, "this message paid for by theroadtopower.com." SOF ¶ 208. It does not include the disclosures required by 47 U.S.C. § 227(d)(3)(A) and 47 C.F.R § 64.1200(b). *Id.*

18

Barbara Heritage also reported the spoofed robocall to the police. SOF ¶¶ 210–14. She felt "threatened and intimidated" by the idea that someone in the local community was behind it. SOF ¶ 212. Kathryn Wilkerson reported the spoofed robocall to police too. SOF ¶¶ 215–17. It made her feel "sick and scared[.]" *Id*.

The calls were traced back to EVS, which found a copy of the robocall message stored in Rhodes' account. SOF ¶¶ 218–221. EVS terminated Rhodes' service on December 4, 2018. *Id*. By that point, Rhodes had used the Power Dialer to make over 30,000 spoofed calls. SOF ¶¶ 222–23.

### g. The 2019 campaigns

Even losing access to the Power Dialer did not stop Rhodes from making spoofed "theroadtopower.com" robocalls. In 2019, residents of Georgia received another spoofed robocall ending with an attribution to theroadtopower.com, this one from the spoofed caller ID 770-716-1488. SOF ¶¶ 224–30. Rhodes targeted some of the same people whom he had targeted with the November 2018 robocall, including Lisa Ring, who saved the robocall message she received. SOF ¶¶ 224–26. Among other things, the message states: "Negros aren't Americans. They aren't even fully human. Time to send them all to Africa . . ." SOF ¶ 227. Bradley Sanders also received the spoofed robocall and found it so outrageous that he reported it to FCC and a local news outlet. SOF ¶¶ 228–30.

Around December 25, 2019, hundreds of people associated with Barnard College and Columbia University received another "theroadtopower.com" spoofed robocall, this one displaying the caller ID 212-796-5706. SOF ¶¶ 231–32. That message discussed the recent, high-profile murder of Barnard student Tessa Majors. *Id*. The message states that Majors was stabbed to death by "three negroid animals," blames Majors' parents for her death, and calls for the deportation of Blacks to Africa. It ends with "this message paid for by theroadtopower.com." *Id*.

## V.   Effect of the Robocalls on Rhodes' Podcast and Stature

As Rhodes focused on robocalling, he produced fewer Road to Power podcast episodes. Where Rhodes had hosted a podcast episode every week in March and April 2018, he made only one episode during each month of June, July, August, and September 2018, and made none from October 2018 to January 2020. SOF ¶¶ 233. During those months, he spent hundreds of hours making spoofed calls using the Power Dialer. SOF ¶ 234.

This focus on robocalling paid off for Rhodes. Where he had just two subscribers in May 2018, by early 2020, Rhodes could claim some 29,000 subscribers, and boast that The Road to Power was "undisputably the country's most famous racial video podcast." SOF ¶¶ 29, 235–37.

20

## VI.   __FCC Proceeding and This Litigation__

On January 31, 2020, FCC issued a Notice of Apparent Liability ("NAL")

for Forfeiture against Rhodes for apparent violations of the Truth in Caller ID Act

and Rule. (Doc. 1-1.) Based on an analysis of the EVS records, FCC provisionally

found that Rhodes had committed at least 6,455 violations in connection with the

five robocall campaigns described above in Section IV.b–f, plus the May 14–19,

2018 California campaign. (*Id.*)

Rhodes responded on February 25, 2020. (Doc. 1-2.) Rhodes' response

showed that 415-295-4776 was his phone number in May 2018, and thus that the

first 1,496 calls identified by FCC from the California campaign were not spoofed.

(*Id.*)

On January 14, 2021, the FCC issued a Forfeiture Order ("FCC Order")

imposing a forfeiture penalty of $9,918,000 on Rhodes. (Doc. 1-3.) FCC found that

Rhodes had shown the May 14–19, 2018 California robocalls did not violate the

Truth in Caller ID Act and Rule. (*Id.* ¶ 17.) But FCC concluded that Rhodes had

committed 4,959 violations in connection with the other five campaigns: 837 in the

August Iowa campaign, 750 in the September Idaho campaign, 766 in the October

Florida campaign, 583 in the November Georgia campaign, and 2,023 in the

November-December Charlottesville, Virginia campaign. SOF ¶¶ 90, 123, 151,

171, 192. Each of the violations identified by FCC is reflected in the EVS records.

21

*See id.* What is more, FCC's highly conservative analysis did not count as violations some of the spoofed calls made during the identified campaigns, and FCC found no violations in connection with the tens of thousands of other spoofed calls Rhodes placed outside those campaigns. *See id*.

Rhodes did not pay the penalty or contest the FCC Order, so the government filed its Complaint seeking to enforce the Order pursuant to 47 U.S.C. § 504(a) and requesting injunctive relief pursuant to 47 U.S.C. § 401(a). (Doc. 1.)

## LEGAL STANDARD

A party is entitled to summary judgment if it can demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party, and a dispute is "material" only if it could affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

## ARGUMENT

Rhodes knowingly caused the Power Dialer to display false caller IDs in connection with each of the 4,959 calls identified by FCC. In doing so, Rhodes acted with the intent to wrongfully obtain things of value and the intent to cause

harm. Rhodes should be found liable, and the Proposed Injunction should be entered.

## I.   Rhodes Is Responsible for the Spoofed Calls Identified in the Forfeiture Order

Rhodes knowingly caused the Power Dialer to transmit inaccurate caller identifications in connection with each of the telephone calls identified by FCC and reflected in EVS's call records. EVS's records unambiguously establish that Rhodes purchased the EVS account used to make the calls reflected in those call records. SOF ¶¶ 30–38. Rhodes has admitted as much. SOF ¶ 30. All calls made from Rhodes' account were made from just one computer containing the sole copy of EVS's software bought by Rhodes. SOF ¶ 35. Rhodes used his own phone number for the first several thousand calls made with the Power Dialer. *Supra* at 5– 8. He unambiguously claimed responsibility for many of those calls in social media posts bragging about his robocalling. *Id*.

Rhodes publicly promoted many other calls reflected in EVS's records in his podcast and online. The prerecorded messages played in these calls attributed them to "theroadtopower.com," a website Rhodes owns, which links to a podcast he hosted and on which only he ever appeared. Rhodes played copies of those prerecorded messages on that podcast, *supra* at 16, and posted them to his Soundcloud account. SOF ¶¶ 42–43, 111. The evidence leaves no genuine dispute that Rhodes knowingly caused the Power Dialer to transmit inaccurate caller

identifications in connection with each of the calls identified by FCC and reflected in the call records.

## II.   Rhodes Spoofed with the Intent to Wrongfully Obtain Things of Value

The evidence also leaves no genuine dispute that Rhodes acted with the intent to wrongfully obtain things of value. The spoofed calls at issue here were "wrongful" for at least three reasons: (1) Spoofed robocalls violated Rhodes' contract with EVS, which was intended to ensure compliance with the law and prohibited both spoofing and illegal robocalling; (2) Rhodes spoofed in furtherance of a scheme to make illegal robocalls that violated 47 U.S.C. § 227(d)(3)(A) and 47 C.F.R § 64.1200(b); and (3) Rhodes' neighbor-spoofing was designed to thwart § 227's important goals of "protecting residential privacy; promoting disclosure to avoid misleading recipients of recorded calls; and promoting effective law enforcement," *Maryland v. Universal Elections, Inc.*, 729 F.3d 370, 376 (4th Cir. 2013); *see also Coss*, 677 F.3d at 287–88 ("wrongful" conduct includes but is broader than "illegal" conduct).

Through the lens of these wrongful calls, Rhodes spoofed to obtain at least three things of value:

***First***, Rhodes spoofed so that he could continue using EVS's Power Dialer, which is a thing of value that was particularly valuable to Rhodes. As noted, for his first several thousand robocalls, Rhodes caused the Power Dialer to accurately

display his then-valid caller ID 415-295-4776. It was only after complaints about his robocalling caused j2 to strip Rhodes of the 415-295-4776 number that Rhodes started spoofing. The Power Dialer did not allow fully anonymous calls that did not transmit a caller ID number, SOF ¶ 34; after Rhodes lost access to the 415-295-4776 number, he had to input a phone number for the software to display to call recipients. His spoofing of numbers he did not own allowed him to use the software that he had purchased.

Use of the Power Dialer had a market value of $89 per month, which Rhodes paid. SOF ¶¶ 30, 37. The ability to use the Power Dialer to make illegal robocalls also had an enormous non-monetary value to Rhodes. With the robocalls covered nationally by major news organizations, spoofing brought Rhodes the notoriety he craved and that his podcasting had failed to garner.

**Second**, and relatedly, spoofing allowed Rhodes to save money (and thereby obtain something of value) by not having to pay a communications company like j2 for phone numbers—phone numbers that would inevitably get shut off once the communications company realized what Rhodes was doing. As discussed immediately above, the Power Dialer did not place anonymous calls and required the user to input a caller ID number that the software transmitted over the phone lines. Had Rhodes not spoofed, he would have had to pay for all of the phone numbers he used to call the victims who received his robocalls, just like he had

25

paid j2 for the phone number j2 shut down shortly after Rhodes initial, non-spoofed robocalls.

*Third*, Rhodes spoofed with the intent to avoid the known negative consequences of his illegal robocalls, including legal liability, protection from which has value. Rhodes had lost his job due to reporting that he made harassing phone calls, and then he lost his apartment due to reporting on his illegal robocalls. Rhodes' podcast and social media show he was aware that White Nationalists have been sued and prosecuted for various forms of electronic harassment. SOF ¶¶ 238–44. Indeed, Rhodes knew that a prominent White Nationalist had been sued in this Court for allegedly harassing online conduct, and Rhodes closely followed that case. SOF ¶¶ 238–39. Rhodes' podcast and social media also show his specific awareness of the laws governing telephone harassment. SOF ¶¶ 245–49. What is more, on his podcast, Rhodes discussed and displayed an image of at least one news report that specifically noted Rhodes' robocalls violated 47 C.F.R § 64.1200 and corresponding state law. SOF ¶ 249. In sum, Rhodes' illegal robocalling exposed him to very costly consequences, and he knew it. By spoofing and disclaiming responsibility for his illegal robocalls, for a time, Rhodes created enough doubt to avoid the more serious consequences that he knew might happen. This wrongful liability shield had significant monetary value. *See, e.g.*, 47 U.S.C. §

227(b)(3) (recipients of illegal robocalls may sue and obtain a $1,500 per-violation penalty).

In sum, spoofing was valuable to Rhodes for a variety of reasons, and it was "wrongful" under the statute. No reasonable fact finder could fail to find that Rhodes acted with the intent to wrongfully obtain things of value.

## III.   <u>Rhodes Spoofed with the Intent to Cause Harm</u>

Rhodes also acted with the intent to cause harm. Rhodes intended all of the illegal robocalls addressed in the Forfeiture Order to cause harm to their recipients. He also intended the Idaho campaign to harm Ben Olson.

### a. Rhodes intended to harm the people who received his illegal robocalls

Even illegal robocalls that are meant to be innocuous represent a "disruptive and annoying invasion of privacy[.]" *Krakauer v. Dish Network LLC*, 168 F. Supp. 3d 843, 845 (M.D.N.C. 2016), *aff'd*, 925 F.3d 643 (4th Cir. 2019); *see also Smith v. Blue Shield of California Life & Health Ins. Co.,* 228 F. Supp. 3d 1056, 1063 (C.D. Cal. 2017) (unwanted illegal robocalls cause harm by invading recipients' privacy). As such, spoofing during an illegal robocall campaign establishes a caller's unlawful intent to cause harm as a matter of law. *See Best Insurance Contracts, Inc., Forfeiture Order*, 33 F.C.C.R. 9204, 9218–19 (2018) (spoofing in furtherance of illegal robocalls establishes intent to cause harm because unwanted

robocalls are "a nuisance and invasion of privacy"); *Adrian Abramovich Forfeiture Order*, 33 F.C.C.R. 4663, 4667–69 (2018) (similar).

Rhodes spoofed to facilitate thousands of illegal robocalls to unsuspecting recipients. What is more, Rhodes neighbor-spoofed, so that his illegal robocalls would appear to come from the recipient's local area. These facts standing alone would be enough to establish that Rhodes spoofed with the intent to cause harm. *See United States v. Garcia-Camacho,* 122 F.3d 1265, 1268 (9th Cir. 1997) ("[T]he law will presume that a person intended the natural and probable consequences of his voluntary acts.").

But they do not stand alone. The record is replete with evidence that Rhodes wanted his spoofed robocalls to upset, shock, and offend recipients. Rhodes enjoyed that his illegal robocalls made unsuspecting 82-year-olds cry; that they left Jews, Blacks, and "Mestizos" in shock; that they "put a pit in [recipients'] stomach[s.]" SOF ¶¶ 78, 80, 166. He specifically targeted his illegal spoofed robocalls at individuals most likely to be badly shaken by them, including Mollie Tibbetts' grieving family. Rhodes knew that spoofing and obscuring his identity left his recipients feeling unable to protect themselves from further illegal robocalls, and Rhodes intentionally rendered the calls all the more effective and disturbing by neighbor-spoofing. *See* Michelle Lepkofker, *Prosecuting the Phone Scammer When Extradition Fails and Concurrent Jurisdiction Exists*, 47 Brook. J.

28

Int'l L. 188, 194–95 (2021) (Neighbor-spoofing is believed to increase the likelihood that a call will be answered.).

Rhodes has a First Amendment right to take to the public square and express unpopular opinions. But the First Amendment does not protect the act of making an illegal robocall. *See Universal Elections*, 729 F.3d at 376–77. Nor does it protect the conduct of spoofing with the intent to shock and disturb recipients. *See United States v. Waggy*, 936 F.3d 1014, 1019 (9th Cir. 2019) (prohibition on making phone call with specific wrongful intent "does not implicate First Amendment concerns"). Rhodes' illegal acts took him far outside the protections of the First Amendment, and no reasonable fact finder could fail to find that Rhodes acted with the intent to cause emotional harm to call recipients.

### b. Rhodes intended to harm Ben Olson

With the 750 calls targeting Ben Olson, Rhodes also spoofed with the intent to harm Olson. Olson's reporting had precipitated Rhodes' firing from his job, then caused Rhodes' landlord to end Rhodes' lease. Rhodes evidently wanted to retaliate against Olson, and in September 2018, illegal spoofed robocalls were Rhodes' go-to weapon.

The anonymous spoofed robocalls were evidently intended to terrorize Olson, and they did just that. No reasonable fact finder could fail to find that Rhodes acted with the intent to cause harm to Olson.

29

## IV.     <u>The Proposed Injunction Is Warranted</u>

In addition to finding Rhodes liable for the 4,959 violations identified by

FCC, the Court should also enter the Proposed Injunction. 47 U.S.C. § 401(a)

authorizes the Court to issue an injunction commanding any person who has

"fail[ed] to comply with or [violated] any of the provisions" of the

Communications Act or its regulations "to comply[.]" 47 U.S.C. § 401(a). To

prove its entitlement to a statutory injunction, the government need only show a

past violation accompanied by some reasonable likelihood of future violations.

*SEC v. Fehn*, 97 F.3d 1276, 1295–96 (9th Cir. 1996).

The evidence leaves no genuine dispute that Rhodes repeatedly violated the

Communications Act, including not just 47 U.S.C. § 227(e), but also 47 U.S.C. §

227(b) & (d)'s prohibitions related to illegal robocalling. And it leaves no genuine

dispute that, absent an injunction, there is a reasonable likelihood of future

violations. "To determine whether past conduct is likely to recur, courts consider

the totality of the circumstances surrounding the defendant's conduct including the

degree of scienter involved; the isolated or recurrent nature of the infraction; the

defendant's recognition of the wrongful nature of his conduct; . . . and the sincerity

of his assurances against future violations." *FTC v. Elec. Payment Sols. of Am.*

*Inc.*, Civ. No. 17-02535, 2019 WL 4287298, at *10 (D. Ariz. Aug. 28, 2019)

(citations omitted). Rhodes knowingly committed thousands of violations of

multiple parts of Section 227. Far from recognizing the wrongfulness his conduct and assuring against future violations, he has been completely unrepentant, accusing the government employees tasked with pursuing this action of involvement in a conspiracy against him. (Doc. 16.) The Proposed Injunction is manifestly warranted. *See FTC v. Think Achievement Corp.*, 144 F. Supp. 2d 1013, 1016–18 (N.D. Ind. 2000) (collecting cases on appropriateness of injunctive provisions in government enforcement action).

## CONCLUSION

This Court should enter partial summary judgment in the government's favor as to liability and enter the proposed injunction. The only remaining issue is setting the forfeiture amount. The government respectfully requests that this Court set a two-day bench trial on that matter.

**DATED** this 13th day of October, 2023

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney
General

ARUN G. RAO
Deputy Assistant Attorney General

AMANDA LISKAMM
Director, Consumer Protection Branch

LISA K. HSIAO
Assistant Director

SHANNON L. CLARKE
Assistant U.S. Attorney

/s/ Michael J. Wadden
PATRICK R. RUNKLE
Senior Litigation Counsel
MICHAEL J. WADDEN
Trial Attorney
Consumer Protection Branch
United States Department of Justice
Attorneys for Plaintiff United States

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Local Rule 7.1(d)(2)(E), the attached brief is proportionately spaced, has a typeface of 14 points and contains 6,490 words, excluding the caption, signature block, and certificates of service and compliance.

**DATED** this 13th day of October, 2023

<u>**/s/ Michael J. Wadden**</u>
**Michael. J. Wadden**
**Trial Attorney**
**Attorney for Plaintiff**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 13th day of October 2023, a copy of the foregoing document was served on the following person by the following means.

 <u>1,2</u>  CM/ECF
<u>    </u>  Hand Delivery
<u>    </u>  U.S. Mail
<u>    </u>  Overnight Delivery Service
<u>    </u>  Fax
<u>    </u>  E-Mail

1. Clerk of Court

2. Scott Rhodes
1104 Louisiana Avenue,
Libby, MT 59923

**/s/  Michael J. Wadden_____**
**Michael J. Wadden**
**Trial Attorney**
**Attorney for Plaintiff**