UNITED STATES DISTRICT COURT
DISTRICT OF MONTANA
MISSOULA DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | **Case No. 21-110-M-DLC-KLD** |
| Plaintiff, | **PRO SE DEFENDANT'S REPLY TO PLAINTIFF'S OPPOSITION TO MOTION FOR EXTENSION OF DEADLINE FOR OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| SCOTT RHODES, | |
| Defendant. | |

## INTRODUCTION

Plaintiff continues a pattern of misrepresentations to the Court in its Opposition to Defendant's Motion for an Extension, (as distinct from making arguments or claims disputed by the Defense), incidentally, for which, Defendant intends to file a Motion for Sanctions against Plaintiff after providing it notice.

Further, the Opposition claims should be recognized as not convincing, and that its citations of cases refer to different circumstances, so are irrelevant.

## BACKGROUND

On October 25, 2023, Defendant made his first-ever motion for an extension of the filing deadline for a motion opposition, reply, or response, specifically to a critical dispositive Plaintiff's Motion for Summary Judgment ("MSJ") that is voluminous, and premature due to the nature of its claims. Motion makes no claim the general category of MSJ is automatically precluded by law during the discovery period, as falsely implied in Plaintiff's Opposition.

October 27, 2023 Plaintiff filed an Opposition cherry-picking a few aspects out of context, presumptively in the hope Plaintiff can induce the judge into forgetting the context and other aspects of Defendant's motion. It further makes mischaracterizations, further still, makes another in a pattern of misrepresentations in its filings to the Court, which Defendant's previous filings pointed out to the Court twice as each occurred, for which the judge has done nothing, not even made comment to the Plaintiff.

Defendant intends to file a Motion for Sanctions against Plaintiff's attorneys for repeated misrepresentations to the Court in violation of FCRP 11(b), including in the very Plaintiff MSJ at issue, (and too, in its Opposition), after first serving that motion to Plaintiff as notice allowing them withdrawal of that version of its MSJ to refile a version that does not violate 11(b).

Rule 56(c)(1) states: "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."

If a party asserts that a fact is undisputed when it is, in fact, obviously in dispute, it would not be in compliance with Rule 56's requirements, and such conduct may be subject to sanctions by the court.

## ARGUMENT

**Plaintiff's Intro.** Starting here, Plaintiff's Opposition (pgs. 1, 3, 5) cleverly makes four (4) repeated descriptions of Defendant's Motion for an Extension as for a "63-day extension" in order to make it sound extreme, when in fact, Defendant's Motion is for the typical 21-day response period merely to begin after the discovery deadline set by this Court, since the ongoing discovery is entirely relevant, and for which the Defendant should be entitled, not the least of which reason is that (as detailed in Defendant's Motion), Plaintiff's MSJ is a dispositive

one that seeks to short-circuit the trial process and remove the Constitutional right of a jury trial, by substituting it with a lawyer-preferred trial-by-paper to be decided by their friendly judge in the equivalent of a bench decision rather than by jury.

**Plaintiff's Background.** From pg. 1 "Court specifically encouraged the parties to file *dispositive* motions early…" (emp. added). **FALSE.** This judge actually said, "substantive motions", in order to "get a ruling out before the final pretrial conference", which implies an assumption there would be such a final pretrial conference. This seems like Plaintiff trying to Jedi mind-trick the judge into believing that when he said it, he was thinking specifically of the principle of a totally dispositive motion before allowable discovery had finished, which is what the Plaintiff is trying via MSJ (which as Defendant's Motion details, is essentially totally dispositive despite being called by Plaintiff "Partial".)

(Pg. 2) Plaintiff's Opposition refers to its offer of a mere two-week extension, still well before the discovery deadline allowed by the Court and thus absolutely insufficient in the circumstances detailed in Defendant's extension motion, regardless of the additional condition Plaintiff attached, (but omitted to share with the Court), that Plaintiff get its own extension to 24 days for its reply[1], with no explanation of why the U.S. Department of Justice with its army of

---

[1] Exhibit A

115,000 employees and budget of over $30 billion, anticipated any need for an extension to reply to a motion response from one inexperienced, pro se defendant.

**Plaintiff's Legal Standard.** Plaintiff (pg. 2) cites *Nat'l Fire & Marine Ins.*, but *Nat'l Fire* does not refer to a filing deadline extension, rather, to a *continuance* of the discovery period, namely "…continuance 'to proffer sufficient facts to show that the evidence sought exists'". The decision quoted in *Nat'l Fire* of *Chance v. Pac-Tel* actually dealt with a movant asking for a *continuance*, after discovery had already closed, because the opposing party added new names to its witness list after the discovery deadline. Likewise (pg. 2) Plaintiff's attempted use of *Margolis v. Ryan*, which also addressed a movant asking a *continuance* of the discovery period beyond the court-set deadline, due to the specific content of opponent's Motion for Summary Judgment filed after the discovery period, just as it was in *Nat'l Fire* and *Chance v. Pac-Tel.*

Defendant's Motion is not one for a continuance of any of the deadlines set by the Court, such as the December 15th deadline for discovery or deadlines for Motions.

**Plaintiff's Argument.** Plaintiff mischaracterizes (pg. 3) Defendant's position using (notice the intended-to-create-prejudice pejorative "complains" to refer to a Motion argument) *"(Defendant) complains that the government's motion 'is premature while discovery [is] ongoing.' That is plainly wrong,"* then cites Rule 56(b) that allows MSJs "at any time." In the context of Defendant's motion,

Defendant stated that Plaintiff's motion is premature in these circumstances, which were then elucidated in the Motion, not that the entire category of MSJs is automatically precluded as a matter of law from being filed prior to end of discovery.

Plaintiff mischaracterizes (pg. 3) Defendant's own anticipated MSJ as one "that the Complaint should be *dismissed*" (emp. added) in order to make it sound invalid. It then ignores the actual disclosure in Defendant's Motion, by falsely implying the ONLY grounds that Defense will be including in its MSJ was the FCC's violation of the law in not first issuing a citation as an opportunity to cease the alleged violation before levying a forfeiture. Defendant's Motion clearly said that is not the only basis and merely the one that he shared with the Court to demonstrate that Defense's intent to file a MSJ was not a frivolous claim.

Plaintiff (pg. 4) deals with Plaintiff's friendly witness, which in an attempt to prejudice the Court (and later a jury), Plaintiff continues to repeat its description of as a "victim". There are no victims in this case, despite the Plaintiff's intent to emotionally manipulate a Court and jury into reacting as if this were a suit for damages when it's not.

Phone call recipients who got a political message they didn't like are not "victims", nor are any of the subjects of those call recordings, the nature of which is political (matters in the public interest), whether it was the elected officials running for higher office, or the call for a boycott of a local semi-public figure

falsely posing as a reporter and publisher of a "newspaper" when furthering his non-newspaper political agenda, and a boycott of the businesses that finance him.

Plaintiff states that Defendant's Motion doesn't "explain what new records he could expect to obtain from Olson…". Yet, Defendant's Motion clearly directed the reader to the Appendix as containing an enumerated list.

Plaintiff goes on to continue in its familiar pattern of dishonestly characterizing a pro se Defendant as villainous and vexatious, in an unfounded claim that the subpoena from this Court, which was <u>defied</u> by Plaintiff's friendly witness, was "to harass", "is massively overbroad" (provably ridiculous such as should rise to the level of to begin to discredit the Plaintiff's attorney in the eyes of the Court), and a "threatening letter to Olson's counsel" which is actually a "threat" of the <u>legal repercussions prescribed by law</u> for witness's willful defiance of the subpoena authorized by the Missoula Federal District Court.

Defendant could have included (but did *not*) a demand for document production on any myriad of topics that would also be allowed to be questioned in a deposition of the Plaintiff's witness, such as financial records relating to the money Olson has solicited by way of donations to his business using his false narrative about the Defendant, and to increase Olson's notoriety calculated to collect such donations, Olson's phone records regarding those he has called related to the Defendant and the events underlying the Complaint, and a plethora of items for the purpose of impeaching Olson's anticipated testimony and impeachment of

relevant written statements Olson has made to the Plaintiff, obtained by Defendant through discovery.

As already reflected in Defendant's Motion's Appendix by way of his letter to witness's lawyer/relative, the enumerated items are the opposite of "overbroad", as they relate to items and topics brought up by Olson himself, in writing, to the Plaintiff[2], as relevant to their Complaint and its legal theory and intended narrative (including Plaintiff's intended litany far removed from the political phone calls alleged).

One exception is quoted in Plaintiff's Opposition "all documents written by others quoting you about (Defendant)", with the understanding that it refers only to those in his possession, and thus easy to disclose, and in the context that Olson made numerous statements about the Defendant and/or underlying events of this case to friendly reporters who then printed them in articles, statements which may contradict his existing claims to the Plaintiff, and especially his sworn Declaration. Such a requirement is far from overbroad or onerous or "harassment".

The Defendant asks the Court to now compare the enumerated items in the subpoena which was included in the Motion Appendix, to this Response's Appendix containing Plaintiff's evidence produced to Defendant during discovery, showing Olson volunteers these topics as relevant, and names items that exist and

---

[2] *See* Appendix, this Reply.

are in his possession (which he willfully defied a subpoena to disclose, arguably because he knows they are exculpatory or will lead to same, and shows he has committed perjury in his Declaration).

Without going through the enumerate items here, Defendant refers to Olson's surreptitious recordings he made of his conversations with or about the Defendant, such as with Defendant's landlord who would have knowledge of Defendant, his activities, living conditions, co-residents, relevant presences or absences of people at times or periods, and landlord's access to Defendant's dwelling during the relevant time period, similarly, conversations Olson sought out with fellow tenants at Defendant's place of business that would have similar knowledge of other individuals at Defendant's place of business, presences and absences at particular periods, statements made to them by Defendant or others in his shared office that are relevant to the underlying events or Plaintiff's intended narrative and theory.

It is reasonable to infer that, like the surreptitious recordings Olson has told Plaintiff he has, Olson likewise has surreptitious recordings of these other conversations too, or at least, written notes of them, with all of the preceding expected to contain exculpatory information or that leads to same, presumably the very reason Olson has willfully defied the Court's subpoena, due to Olson's demonstrable hostility to and obsession with the Defendant, and with having the

United States government do what Olson has no standing to, exact punishment on the Defendant (as the falsely alleged caller) for political speech against him.

Further, Olson has defied the Court's subpoena in improperly burdensome and prejudicial circumstances created by this judge's unnecessary refusal to transfer venue to the jurisdiction to which Olson and other Plaintiff's named witnesses are actually subject to, in which the Defendant lived, and where the alleged activity occurred, and too, additional witnesses not friendly to Plaintiff that the Defense has no standing to ultimately compel.

Penultimately, though this Reply to Opposition does not depend on it, one of Plaintiff's closing statements (pg. 5) to the Court is egregiously false that "there is no factual dispute as to (Defendant's) liability". Plaintiff's attorney states that as if the Defendant's sworn declaration in 2019 that he didn't even make the calls alleged by the FCC[3], and his sworn deposition testimony to the same, taken by Plaintiff in 2023, do not constitute the most fundamental "factual dispute" possible, not overlooking that that alone would not even be enough to be a violation of the anti-fraud/theft statute being misused, because it also requires a particular intent (mental state) on the part of the caller. Further, Defendant disputes the calls fined at $2,000 each even took place. While they might have been dialed using a particular internet platform, the platform does not make robocalls (robodials) as

---

[3] Plaintiff's Complaint, Exhibit B

Plaintiff disingenuously repeatedly calls it, and so their narrative that the caller(s) played the same recording (or any) every time to every number claimed dialed, is obviously disputed[4].

Lastly, Defendant's ability to sufficiently refute Plaintiff's MSJ is obviously affected by its exhibits that Defendant must give time and word count to refute each. Plaintiff's MSJ relies on exhibits that Defendant has, months ago in June, moved to find inadmissible, a motion the Court has so far totally ignored. Defendant requests that the Court either rule on that motion well before Defendant is expected to begin any formal Opposition filing, or that if Court is refusing to rule, that it issue a written statement to the record reflecting that, so Defendant can present that record to the judges of the Appeals Court for their judgment as to the Court's reversible error.

## CONCLUSION

Plaintiff's Opposition document is demonstrably false, and its case citations are not relevant to this Motion. There being no good reason to deny Defendant's sober and rational, good-faith, factually supported Motion for a Deadline Extension, and the multiple reasons for doing so being included in that Motion, it should be granted in full in the interest of a jurisprudence unencumbered by bias.

DATED this 30th day of October, 2023

Respectfully submitted,

---

[4] Exhibit B

SCOTT RHODES
By: */s/Scott Rhodes*
Pro Se Defendant

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1(d)(2)(E), the attached Motion for Continuance of Pretrial Conference is proportionately spaced, has a typeface of 14 points, and contains 2,327 words out of the allowed 3,250, excluding caption and certificates.

DATED this 30th day of October, 2023

By: */s/Scott Rhodes*
Pro Se Defendant

**CERTIFICATE OF SERVICE**

I hereby certify that on the 30th day of October, 2023, I electronically filed the

forgoing document with the Clerk of Court using the CM/ECF system which will

send notification of the filing to the Plaintiff.


*/s/ Scott Rhodes*
Pro Se Defendant

# EXHIBIT A

Original Message

On Tuesday, October 24th, 2023 at 10:17 AM, Wadden, Michael J.
<Michael.J.Wadden@usdoj.gov> wrote:

> We're willing to agree to a reasonable extension and would just want an equivalent
> extension for our reply deadline. Would you agree to a schedule where you get an
> additional 10 days (31 total) for your opposition (due Nov. 13), and we get 24 days for
> our reply (due Dec. 7)?

# EXHIBIT B



**ELECTRONIC VOICE SERVICES, INC.**
8111 LBJ Freeway   Suite 1045
Dallas, TX  75251
Tel: 972-713-6622   Fax: 972-713-8364
Email: richard@evs7.com
Federal ID: 75-2459943

November 29, 2018

United States of America
Federal Communications Commission
445 12th Street, SW
Washington, DC  20554

Re: File No. EB-TCD-18-00027696

Attn: Daniel Stepanicich and Parul P. Desai

software and VoIP phone service, but our Dolphin is not a robodialer thus cannot make robocalls. It only calls one number at a time and each call has to be initiated by a human. It appears to us from the recording he had on his account that he may have

USA_00004454

# APPENDIX

# Timeline of Scott Rhodes investigation and incidents

By Ben Olson
Prepared March 3, 2020
Subsequently augmented with notes from Chris Bessler

**Jan. 2015** – I launched the *Sandpoint Reader* weekly newspaper in January, 2015 after it had been out of publication for 2.5 years. My business partner is Chris Bessler, who owns Keokee in Sandpoint.

**Oct. 6, 2015 – (USB Drive "SandpointUnitedAgainstShelby-Oct2015-RoboCall.mp3")** I was forwarded an email from one of our readers who reported that she had received a robocall from a group called "Sandpoint United Against Shelby" containing racist, sexist material. It should be noted Shelby Rognstad was currently running for mayor at the time this call was placed. The *Sandpoint Reader* reported on the robocall in the Oct. 8, 2017 issue.

**Oct. 29, 2015** – We report in the *Reader* that the Idaho Secretary of State's office received documents declaring expenses for the group "Sandpoint United Against Shelby" with the name "Dan Grost" attached to the documents. One of the addresses included in the document is the location of Shelby Rognstad's former business Common Knowledge in Sandpoint. Expenses claimed on the reports were "$6,250.07."

**Nov 3, 2015 – (USB Drive "OrdinaryCitizensAgainstShelby-Nov2015-RoboCall.m4a")**. Another robocall against Shelby, concluding with "this message from Ordinary Citizens of Sandpoint, not a political candidate."

**Feb. 18, 2016** – We report in the *Reader* that the Sandpoint PD announced all leads had led to dead ends concerning the robocall targeting Shelby Rognstad.

**March, 2017** – Numerous residents of South Sandpoint reported awakening on March 18, 2017 to find racist flyers had been thrown on their yard. (**USB drive folder marked "Racist Flyers" / 1-March 2017**) One resident reported the flyer was packaged in a plastic sleeve and included a 2" x 2" tile which presumably made it easier to be thrown from a vehicle. Sandpoint Police Chief Corey Coon reported around 30 copies turned into authorities.

**April, 2017** – Another report came to our Facebook messages that more racist, anti-Semitic flyers had been distributed onto people's yards and driveways along Cedar Street west of Fifth Avenue. The flyers appear to be the same ones distributed in March, 2017. At the bottom of the flyer reads: "Come visit our new regional offices in Sandpoint, opening soon!" below the dailystormer.com logo.

*\*There may have been one or two other distributions in spring/summer 2017. I can't recall or find information confirming this, though.*

**August 14, 2017** – Another round of racist flyers were reported, this time some placed inside mailboxes. Also, a meme depicting Shelby in a gas chamber was sent to area businesses. The file name was "sandpoint_dream-2.jpg" (**USB drive folder marked "Racist Flyers" / 2015-shelbymeme**) and showed Shelby Rognstad inside a gas chamber with makeup added to his face, with the racist green frog character dressed in a Nazi helmet reading dailystormer.com and a swastika says "feels good man" as he pushes a button marked "gas."

Contains PII

**August 22, 2017** – a mass email was reported to the *Reader* with the subject line: "Fwd: report these two to Sandpoint police if you see them" and contains the copy: "Please print and post the attached jpeg prominently at your place of business to keep Sandpoint safe, or distribute to your neighbors homes as other residents have already been doing." The email contained an attachment (**USB drive folder marked "August 2017 flyer"**) The flyer shows photographs of two Sandpoint residents, one Stan Norman, the other Lynn Bridges. The flyer includes "last known residence" and prints Stan Norman's home address. The top of the flyer reads: "Wanted: For crimes including stupidity, gullibility, promoting a dangerous cult, spreading lies, attempting destruction of North Idaho & western civilization"

*\*Note, Stan Norman is a local pastor and Lynn Bridges is the president of the Bonner County Human Rights Task Force. The emails were sent to dozens of local businesses. The return address listed is from "sandpoint crimealert – sandpointcrimealert@mail2idaho.com"*

**Sept. 6, 2017** – The Bonner County Human Rights Task Force holds a press conference on Sept. 6, 2017 addressing the ongoing distribution of racist flyers attacking local residents of Sandpoint. The *Reader* reports on the meeting in the Sept. 7, 2017 issue. I spoke with Bill Morlin at this press conference, a former reporter for the *Spokesman-Review* and currently working for the Southern Poverty Law Center. We agreed to share any information should more of these flyers be released, or if a suspect was identified.

**Oct. 2017** – Another racist flyer is distributed via email, (**USB drive - "Racist Flyers" / 3-October-2017** folder) this one depicting several people photos:
   •One was Mayor Shelby Rognstad with a doctor's photo that read "I'm Mayor" on a nameplate;
   •another of Lynn Bridges;
   •another of *Bonner County Daily Bee* reporter Keith Kinnaird with the following written underneath: "Keith Kinnaird, Sandpoint – One of the many groupies at the lying propaganda outfit called The Daily Bee – 300 Church St., Sandpoint;
   •and finally one of Ben Olson (myself) with the following written underneath: "Ben Olson, Sandpoint – Degenerate publisher of the leftist rag called The Sandpoint Reader – 119 Cedar St. #9"
      *\*Note, our actual office address is 111 Cedar St. #9*
   This flyer proposed to be from "www.redice.tv" and claims to be "Paraphrased from a 2015 speech by Professor Kai Murros" and urges on the back page: "You must utterly destroy everything that is foul, deformed, corrupt, and degenerate. You must attack those responsible for the debasement of your culture. You must bring them down on their knees and you must destroy everything they have ever created. Let the world know just how much you hate and despise these pseudo-intellectual vermin. All of the wars and violent conflicts the nation has faced so far will pale in comparison with what is coming. Soon history will be made again in this land. Your undying love for this land and its people gives you the strength to do terrible deeds. You WILL commit extreme acts in order to save your people and you will commit those acts without remorse because too much is at stake. Whatever you do, the people will eventually understand you and support you because they will come to know that you act out of love."
      *\*Note, this hate it the first time I was included in these hate flyers.*

**Nov. 30, 2017** – We receive information from a former *Reader* intern named McCalee Cain who was then a senior at Sandpoint High School that about 56 CDs containing racist propaganda had been placed beneath the wipers of dozens of students' vehicles in the Sandpoint High School parking lot. The CDs were titled "What They Are Hiding From You" and contained dozens of files, mostly long racist tracts and some racist and anti-Semitic fliers.

**Dec. 1, 2017** – The City of Sandpoint announced that a person of interest had been trespassed from school property. Video surveillance had been obtained from Sandpoint High School that identified a person of interest and "contact was made." The person of interest was trespassed from Lake Pend Oreille School Distict on Friday, Dec. 1, 2017 for a period of one year. (DVDs containing surveillance video and contact made by Sandpoint PD to trespass person of interest are included in my folder).
           *Both myself and *Reader* editor Cameron Rasmusson began working on this story immediately. We filed a public records request to obtain the video of the Sandpoint PD making contact with the "person of interest" as well as copies of the police reports. The records request contained a police report identifying the person as "Scott D. Rhodes," with DOB and address redacted. This was the first time we learned of the name of the "person of interest."

**Dec. 7, 2017** – The *Reader* publishes the first story identifying Scott Rhodes by name (https://sandpointreader.com/racist-propaganda-spread-shs-campus-person-interest-identified/) stating in the police report that "officers identified a man named Scott Rhodes as a person of interest in the incident."
           *I believe it's an important point to note that the *Reader* was the first media outlet to identify him by name, which I think led to his particular hatred of our paper and me personally. Other regional newspapers reported on the incident in the following days, but Rhodes seems to have a more intense hatred toward the *Reader* and myself.

**Dec. 15, 2017** – (**see \*Dec. 15, 2017 in file folder**) After examination of the <mark>video obtained via public records request</mark> showing Sandpoint PD trespassing Scott Rhodes from LPOSD properties, Cameron Rasmusson and I were able to identify the office building Rhodes was occupying at the time. The office was located in a business complex called Syringa Creek located on Division St. and Ponderosa Drive. From the video, we determined Rhodes had been in office #2. We were able to identify the office by examining the mountains in the background, as well as the buildings seen while one of the officers walked outside.
           *Back story – Also included in our earlier public records request was another police report reading: "On [date redacted] this department received the following teletype from Alexandria PD (VA): 'PLEASE HAVE UNITS RESPOND TO [**REDACTED**] TO ATTEMPT TO LOCATE AND INTERVIEW SUBJECT SCOTT RHODES, [**REDACTED**] SUBJECT HAS BEEN POSSIBLY MAKING THREATENING PHONE CALLS TO LOCAL POLITICIANS IN THE CITY OF ALEXANDRIA. CALLS WERE MADE FROM [**REDACTED**] A NUMBER WHICH IS REGISTERED TO MR RHODES. PLEASE HAVE THE RESPONDING OFFICERS CONTACT SGT SALAS ON HIS CELL [**REDACTED**] IF THEY HAVE ANY QUESTIONS AND EMAIL ANY RESULTS TO [**REDACTED**] THANK YOU FOR YOUR ASSISTANCE.'
     I attempted to make contact with Scott Rhodes on Dec. 15, 2017 to ask for comment on the follow-up story Cameron Rasmusson and I were working on that linked Rhodes to threatening calls received in Alexandria, VA, as well as reported harassment of an African-American man living in Sandpoint named Lee Hardin. (The police report also identified Rhodes as a "person of interest in the recent hate flyers being distributed throughout the town, as well as the emails being distributed to members of the community.")
<mark>I knocked on the door of Scott Rhodes' office</mark> and he came slowly to the door. There was one computer in the front office and through an open door I saw a corner office where Rhodes was located. When he opened the door, I handed him my card identifying me as a reporter for the *Sandpoint Reader* and asked if he had any comment regarding his recently being trespassed from LPOSD for suspicion of distributing the racist CDs. He said he had no comment. I asked him again if he had anything to say for himself, if he had anything to do with it and he said, "No" and slammed the door in my face, locking it.

Around this same time, in the course of my investigation, I contacted numerous people, including the mayor of Alexandria, VA and Lee Hardin (who was allegedly harassed by Rhodes). I showed Lee Hardin a photo of Rhodes obtained from the police video and he identified him as the person who yelled "Nigger" out of a red Jeep while Hardin was exiting a restaurant on First Avenue.

**Dec. 18, 2017** – (**see \*Dec 18, 2017 in file folder**) I checked the mail at the *Sandpoint Reader* office around noon and noticed an odd envelope. I opened it and it contained a card stamped multiple times with the words "Dear Ben May the Lord bless and keep you in your courageous battle against ovarian cancer" with no other identifying marks. ==I immediately believed this to be a troll move sent to me just three days after my attempt to receive comment from Rhodes.== I reported the incident and turned the card over to Sandpoint PD (Police report included in file).

**Jan. 4, 2018** – The *Reader* runs a follow up story about Rhodes: *https://sandpointreader.com/person-interest-racist-cd-distribution-shs-also-investigated-virginia-similar-actions/*

This story details the information above about Rhodes' involvement with threatening phone calls received in Alexandria, VA that were linked back to Rhodes' phone number in Sandpoint and eventually led to him being a "person of interest" for the racist CDs and flyers distribution in Sandpoint.

\*Around this time I was contacted by Bill Morlin with the SPLC, who congratulated us on our reporting and said he was planning on covering this as a story for the SPLC. I shared all of our information with Morlin and he subsequently shared a Nexus Lexus report with the *Reader* providing us with a wealth of public records information about Rhodes, including past addresses, names of family and associates, as well as the fact that he apparently went by another name, Scott Platek.

\*Also around this time, I obtained Scott Rhodes' residential address through the above-mentioned report and contacted the Bonner County Tax Assessor and sent a letter to the registered owner of the property as part of my investigatory details. I was interested in see if Rhodes rented or owned the property, and if it was the former, I was interested in getting some information about Rhodes' activities, when he moved here, what he did for work, etc. I received a call from a man who I will name if compelled to, but I promised him everything was off the record, so I prefer not to share much information on this. ==But he identified himself as the property owner and that he had received my letter.== I asked him if he was aware a "person of interest" for racist propaganda distribution was living in his home and he declined to comment about anything and hung up. He wasn't rude, but wasn't interested in speaking with me, claiming that he preferred to "stay out of" his tenants' business.

**Jan. 16, 2018** – (see Jan. 16, 2018) Both Cameron and myself receive an email reportedly from "Tina Kotula" (~~[redacted]~~) with the following text: "Dear Ben Olson and Cameron Rasmusson, Yesterday we became aware of your article on Scott Rhodes. The story is very shocking and the behavior described violates our company policy. We have terminated Mr. Rhodes. Also, it should be noted that Mr. Rhodes is not and has never been an owner in any form of American Discovery Publishing, LLC. Also, the company is a California LLC not an Idaho LLC. Thank you, Tina Kotula, Manager, American Discovery Publishing LLC."

\*We both found this email odd. "Tina Kotula" never responded to multiple attempts at getting a follow up comment. Plus, we found it suspicious that she would explain to us that Rhodes had been fired. My first inclination was that it seemed like an attempt to establish monetary loss to sue my newspaper for defamation of character. We believed "Tina Kotula" was either an associate of Rhodes, or maybe Rhodes himself. It should be noted that The Idaho Secretary of State listed American Discoveries Publishing, LLC on May 20, 2016 on a "Foreign Registration Statement" identifying Scott Rhodes as the registered agent in Idaho with the following address: "819 US RTE 2,

STE 207, Sandpoint, ID 83864" and Tina Kotula as "at least one governor" and the following address: "131 A Stony Circle, STE 500, Santa Rosa, CA 95401."

   *Shortly after (I'm not certain of the date, but it was around when our Jan. 4 story published) I was contacted during my morning paper delivery duties on a Thursday morning by Brent (?) Featherstone, who claimed he was an attorney hired by Scott Rhodes. Mr. Featherstone asked me several questions about our reporting, asked whether I had attempted to make contact with Rhodes, and when I told him all the information we published was obtained via public records requests, he claimed that that wouldn't protect us from a defamation suit. I asked him what this was about and he said he was investigating a potential defamation case and that I should "be ready" for the next step, that he would be in touch again. Thereafter, I directed all of my failed attempts to obtain comment from Rhodes via his varied email addresses to Featherstone Law Firm. I never heard from anyone at Featherstone Law Firm again.

   *Note, at some point in spring, 2018, after the fourth or fifth attempt to speak with the attorney supposedly representing Scott Rhodes, I was put on hold for a few minutes, then the receptionist returned to the line and said Featherstone was "no longer representing that client."

**Feb – March, 2018** – More reports of racist flyers being spread around town via email and in physical form are reported to the *Reader* office. Some depict me on them, others are more racist materials. I returned to Rhodes' office once more (not certain of the date, but it was between these months) and saw a large man exiting Rhodes' office as I climbed the stairs to the second floor. I walked to Rhodes' door and the man, who must've been 6'5" and weighed at least 300 pounds and had shoulder-length curly hair and a mean disposition stood there blocking the door. I asked him if I could get past him and he said, "You want to go in here?" and I nodded, and he then slowly stepped out of the way and went down the hall to the bathroom, looking over his shoulder at me. I felt a threatening vibe from him. I knocked on the door and Rhodes came halfway into his outer office, (I saw him through the glass doorway) and stopped halfway to the door and said, "Get out of here, I have nothing to say to you." I urged him to tell me his side of the story, that I was interested in giving him any attempt to speak on the record to defend himself. He walked back into his office and disappeared around the corner. I reported the sighting of the second individual to Detective Michael Aerni, who has become my point person regarding the Rhodes incidents from then on.

**March 15, 2018** – I have an encounter with Scott Rhodes in front of Monarch Mountain Coffee on Fourth Street in Sandpoint. I had noticed Rhodes' red Jeep parked in front of the coffee shop several times and once saw him sitting inside typing into a laptop. This day, I was riding my bike on Fourth Street during paper deliveries and saw him exiting the coffee shop. I had the following interaction with him:

| | |
|---|---|
| ME: | Hi Scott |
| SCOTT: | Get lost |
| ME: | Get lost? |
| SCOTT: | Get lost |
| ME: | This is a public street. I have every right to be here. |
| SCOTT: | Just get lost |
| ME: | Care to comment on that latest batch of racist flyers that went out? |
| SCOTT: | I have nothing to say to you, you're a fake journalist. Fake. |
| ME: | I'm just doing my job, Scott. Care to make a comment? |
| SCOTT: | You're a fake journalist (he starts walking away toward the post office) Why don't you go write another screenplay. |

| ME: | I'm sorry? You're writing a screenplay? |
|---|---|
| SCOTT: | Why don't YOU write another screenplay. |
| ME: | Oh. Uh, okay. |

*context – I had recently written and produced an original play on the Panida Theater, our local playhouse. He no doubt read about it in the* Reader.

*Later that day, I talked to Sherry, the manager at Monarch Mountain Coffee, and asked her if Rhodes came in often. She said he does sporadically, usually keeps to himself and works on his computer. I asked her to call me if she saw him in her place of business again so I could again ask him questions regarding follow up stories. To date, he had never responded to any of our attempts at getting comment via email and in person.*

**mid-April, 2018 –** During another visit to Rhodes' office suite to obtain comment for a follow-up story we had written, I noticed the offices he had occupied were empty. It appears he had moved out. I confirmed with the medical business downstairs from his office that he moved out in early April.

**May, 2018 –** I notice a news item regarding racist robocalls being sent in California attacking U.S. Senator Dianne Feinstein and promoting neo-Nazi Patrick Little's candidacy for the U.S. Senate. The robocalls claimed at the end that they were "paid for by theroadtopower.com." I investigated this site and clicked on a video blog and noticed right away that the man speaking in the blog was none other than Scott Rhodes. Cameron and I both found this incredible that the man we had identified and that was living in Sandpoint was also placing robocalls in other places in the country, and that he was now operating a video blog site where he shared his racist views. In one video he explained how to distribute flyers, urging people to buy "clear plastic sleeves" and "put something inside to give it weight so you can easily toss it, that also prevents it from blowing away." (the very same technique was used on multiple flyers distributed in Sandpoint). He also called for the mass deportation of Jews and African-Americans among other vile statements.
*We wrote about this link to the California robocall in the* Sandpoint Reader *on May 24, 2018:* *https://sandpointreader.com/suspected-racist-cd-distributor-appears-responsible-robocalls-california/* *Again, Rhodes didn't respond to attempts to obtain comment.*

**May 15, 2018 – (USB drive - "Robocall-AlamedaCalif-May2018.mp3")** A racist robocall is reported to have been sent to multiple phone numbers in Alameda, California. The robocall urges people to "relocate now to North Idaho, where there's almost no nig nogs, Jews or ching-chongs. North Idaho, one of the freest places left in the United States specifically because it's one of the whitest places left. Relocate to North Idaho. Paid for by theroadtopower.com."
*I spoke with a few different people in the Alameda area and confirmed that they had received the call.*

**August, 2018 –** Robocalls are reported to have been received in Iowa regarding the murder of a college student named Mollie Tibbetts. The Tibbetts family reportedly received the calls as well.

**Sept. 6, 2018 –** The *Reader* publishes another follow up story on Rhodes (https://sandpointreader.com/racist-robocalls-across-nation-again-linked-to-sandpoint-man/) this time linking him with robocalls received in Florida marked with the name of his video blog. One was regarding African-American gubernatorial candidate for Florida Andrew Gillum. The story was picked up by national media, listing Rhodes' name and information based on our reporting. We also reported on the Iowa robocall. In this story is included the line: "A *Reader* reporter reached out to the property owner who rents to Rhodes, but the landlord declined to comment on the record." This refers to another

attempt I made to call the property owner to inquire whether he was aware that Rhodes was now responsible for a nationwide hate campaign. The landlord wasn't aware of the national news that his tenant had been making. (I have this call recorded, but again it was off the record. I will only share it if it's necessary, otherwise I prefer to maintain my pledge to keep this information off the record).

**Sept. 20, 2018** – (**USB drive - "1-Sept20-robocall-spt.m4a"**) Approximately 750 "spoofed robocalls" (number later obtained by the FCC report issues 1/30/20) were received by residents of Sandpoint personally attacking me and the *Reader*, claiming that I am a "cancer" and calling on residents to "burn out the cancer Ben Olson." Local law enforcement was notified but said they couldn't act because it didn't meet the qualifications for a threat. The most important part of this call, in my opinion, is the fact that the narrator claims that "Ben Olson blackmailed one of our local business owners, threatened to write about him to harm his business if he didn't evict his residential tenant. Someone whose politics Ben Olson doesn't like." At the time of this call, nobody, including Cameron, knew about my conversation with Rhodes' landlord. A follow up conversation with the landlord a week later confirmed that he hadn't shared the information with anyone, so the only person that could possibly know that Rhodes was being evicted was Rhodes himself. Why he believed I was attempting to "blackmail" him is beyond me – just more alternate reality. I have both of my phone calls with the landlord recorded, and they both clearly show I made no threats whatsoever, nor did I ever say anything about the landlord's business – that is pure fantasy invented by Rhodes. (side note: I believe the voice on the robocall is none other than Patrick Little, which lines up because Little supposedly visited Rhodes earlier that month, but I can't confirm this).

     *I began carrying a firearm while doing my normal duties for the Reader after this robocall, fearing for my life, either from an attack by Rhodes himself, or because he could have inspired someone with a weak mind. I have never really been at ease since.

     On the morning of Sept. 20, several people reported they were unable to find any *Readers* at the grocery stores. Upon investigating the situation, I found that all the *Readers* had been removed from Super 1, Safeway and Yokes – which would have amounted for about 1,200 copies of the paper.

     After the robocall was released (perhaps the next day?), a reporter from *The Guardian* named Jason Wilson, who I had been in contact with regarding Rhodes before, said he emailed Rhodes for comment for a story he was also working on. Rhodes sent back a link to a video. The video contained the audio of the first robocall and showed a stack of *Readers* that reached approximately 6 feet high. They were doused with a liquid and lit on fire, burning throughout the rest of the video.

     *I attempted to get surveillance video to show who may have taken all the Readers, but was unsuccessful. Also, since we are a free weekly, there was no charge of theft that local law enforcement could pursue. I estimate the cost of the loss around $400.*

**Sept. 24, 2018** – (**USB drive – "ThreatLetter-ChrisBessler-20180924.pdf"**) Chris Bessler receives a letter by postal mail postmarked Sept. 22, reading as follows:

     "Your partner at the Reader, Ben Olson, recently used the role there that you bought for him to threaten a decades-long resident, family man, businessman ... threaten to write about him unless he evicted a residential tenant of his whose politics Olson doesn't like.
     "As a direct result of that irresponsibility and that unethical act, Olson is and will continue to be named publicly, and privately to the right people.
     "If you do not dismiss Olson, you are next.
     "You will be named publicly.
     "You will be named privately to the right people.
     "Due to your relationship with Olson and his behavior.
     "Then, your advertisers will get the same treatment.

"Not just their company name, the owners personally by name, not just those in the Reader but those in your magazine, and they will be told that it is happening to them as due to their support of Chris Bessler.

"As a reminder of who some of those biggest advertisers of yours are, a list is included here.

"If Olson is still at the Reader or working for you in any capacity on Friday 28th that will happen.

"You have the opportunity to avoid that by doing the right thing, which will also give you some legal protection should Olson's stunt result in legal action. Showing that you dismissed him upon learning of what he did will go a long way to mitigate the legal responsibility you bear as owner of the Reader."

The second sheet of the letter included a list of 55 businesses who had advertised recently in Sandpoint Magazine. Chris provided the original of the letter to Det. Michael Aerni.

**Sept. 25, 2018** – (**USB drive - "2-Sept25-robocall-spt.mp3"**) A second robocall was sent to Sandpoint residents, this time featuring a gravel-voiced man and a woman talking. They attacked the "leftist propaganda" and "mind poison" of the *Reader*, and urged people when they "see the *Reader*, take the stack and throw it in the trash). The man's voice is similar to the male voice used in the May, 2018 robocall received in Alameda, Calif.

**Sept. 26, 2018** – Chris Bessler, in followup to the threat letter he received in the mail, calls Rhodes' landlord to inquire if he had been threatened by Olson as claimed in the anonymous letter. The landlord quickly says "we are just innocent people in this," he's gotten calls from media all over, he's been threatened with lawsuits, he and his family have been physically threatened and he just wants it to go away. And he immediately hangs up.

Chris Bessler also emails Scott Rhodes via the website theroadtopower.com, asking for further information or to talk by phone. There's no response.

**October 4, 2018** – I received a call from a fellow Sandpoint business owner named Rich who owns Home Sweet Home Consignment. Home Sweet Home advertised with us sporadically, the last one in an August, 2018 issue. Rich said he got a call from a man with a deep, gravely voice who claimed to be a private detective who was "investigating Ben Olson as being a dealer of child pornography." Rich said he hung up immediately, but the man called back and said he would visit "next week." Rich then called me to inform me of the call. I walked down to his shop and asked him if he had caller ID, but he didn't. In previous emails sent to Chris Bessler, the attacker said they would go after people who advertised with the *Reader*, so I thought this must be the next step – calling our advertisers and attempting to spread false information about me. I was quite shaken by this development and reported this call to Sandpoint PD Detective Aerni.

   Shortly after the call received by Rich, Chris Bessler and I decided it was time to consult with an attorney to investigate pursuing legal action against Rhodes. We met with Stephen Snedden, who worked for a local law firm called Berg & McLaughlin. Snedden heard our case and informed us that a defamation case would be extremely hard to prove, and even if we were successful, there's no guarantee we'd ever receive any of the money awarded us in court. We also asked about restraint of trade and any other charges, but that didn't change the matter. Now knowing that we faced at least $10,000 and more likely $30,000 in legal fees, we both realized it would be futile to pursue this since it would bleed us completely dry and put the *Reader* out of business – the very action that Rhodes seems to desire. He also seems to benefit from media attention.

Contains PII

**Oct. 12, 2018** – I received a call from a person named Daryl Sobczak, 970-443-9184, who claimed he went to school with a Scott Platek from third (or possibly 6th) to 12th grade and was best friends with him. This was at Berlin High School in Berlin, Connecticut. Daryl said he Googled Platek's name out of the blue the other day and "saw all this stuff and said 'Oh my god, that's him.'" I was wary of this call, as it seemed a bit too convenient that this man had simply Googled Scott's name out of the blue and not seen it in a news report from the various national outlets covering his story. But, after speaking with him over the next 30 minutes, I was convinced he was who he said he was. I took notes of the conversation, which you can read in the file marked "**Oct. 12, 2018**" in the file folder. I didn't receive much by way of useful information from this call, but I did collect some names of past friends and other information that I thought could be useful to law enforcement should he ever receive charges for his ongoing harassment. I also learned that the surname Platek that had been attributed to Rhodes was from his adoptive parents, according to Sobczak. Sobczak said the last time he saw Platek/Rhodes was when he left town at 18 years old hitchhiking west. Sobczak said he also believed that Rhodes had had some trouble with the law either in New York or Connecticut, but wasn't certain what for. He did claim Rhodes may have done a short stint in jail.

**Late October, 2018** – After speaking with Rhodes' landlord a final time, I discover that Rhodes had been issued a 30-day eviction notice at the end of September. I confirmed with the landlord that Rhodes had moved out of his rental home on Pine Street in late October. A reporter named Chad Sokol, who

child pornography" and shows a picture of me, Chris Bessler and Lenny Hess, who regularly advertises on our back page, with lines connected us all. The flyer was accompanied by a single page of text, which claimed that an investigator is "looking into the allegations of child porn being shared by him (Ben Olson) to some of his advertisers" and that "If as has been alleged, Olson is blackmailing some advertisers that they can't stop sending him money because they accepted child porn images from him and now fear legal penalties if exposed, then know that such an advertiser probably isn't liable for any and so should come clean. That is because while normal people agree that child pornography is repugnant, it's often not illegal when the images were mocked-up in Photoshop and children did not actually perform the acts being shown" (see digital file for full text).

**August 8, 2019** – Several of our advertisers reported receiving an email from "schweitzerneights@countermail.com" containing the subject line: "ongoing investigation into Ben Olson of The Reader, Sandpoint ID" and several links to websites such as veoh.com and dailymotion.com. Upon clicking one of the links, a 5:51 video titled "ongoing investigation into Ben Olson of the *Reader*, Sandpoint ID" showed a man with a darkened out face and a disguised voice claiming that he'd been an advertiser of the Reader and wanted to "back out of the contract" (we never have contracts, so there's nothing to "back out of") but was told he couldn't because of the emails sent to him containing photographs of underage boys. The man on the video also claimed that he'd witness me and Chris Bessler "making out" in a parked car behind a bar in Sandpoint. Every time I reported the video to the webhost and they removed it, more emails came containing more links to the same video. To date, I believe I've been successful removing every one of the links except for BitChute, which also hosts Rhodes' racist video blog site theroadtopower.com. They have continually refused to return contact me with, even after contacting their legal department. The link is still valid: (https://www.bitchute.com/video/j5PljeMYAcH9/)  I also have the video recorded on my phone.

**December 25, 2019 – USB Drive "Robocall-TessaMajors_12-25-2019.mp3")**. A robocall goes out to faculty at Barnard College at Columbia University in New York City, where Tessa Majors was a student before she was fatally stabbed in an attack in a city park. The robocall begins:

> "On December 11, an 18-year-old white college student named Tessa Majors died in a Manhattan park from stabbings by three negroid animals, ages 13 and 14 But who really killed Tessa Majors? Her parents. Because they never taught her that negroes aren't fully human and are dangerous animals to be avoided. .."

The recording goes on for 1 minute, 45 seconds, concluding with:

> "Time to get rid of them all. ... until we do, the blame for every future Tessa Majors killed by the negro subhuman is on all of our heads. And remember, to teach your children, around blacks never relax. This message paid for by theroadtopower.com."

For reference, stories on these calls were carried in various media nationally, including these two:

https://www.nytimes.com/2019/12/27/nyregion/racist-robocall-barnard.html
https://www.columbiaspectator.com/news/2019/12/28/racist-robocalls-about-tessa-majors-sent-to-columbia-barnard-professors/

**January 2, 2020** – While I was away on a monthlong vacation sailing in the Caribbean with my

girlfriend Cadie, another round of threatening emails were sent to local businesses that advertise with the *Reader* from an email called "justicesword@runbox.com" with the subject line "DANGER Sandpoint!" See file marked "**Sent Jan. 2, 2020**" in file folder for full text.

The email warns people about a "coming campaign to harass local conservatives by the cabal of leftist media in Sandpoint," and named several people, including Mayor Shelby Rognstad, myself, Chris Bessler, as well as some of our advertisers, including Lenny Hess of 7BTV (calling him an "alleged boy lover"), Jeff Nizzoli of Eichardt's, Greg Taylor of Taylor & Sons Chevrolet and Dawn Mehra of North Idaho Animal Hospital. The email claims the campaign (led by Ben Olson, Chris Bessler and Mayor Shelby Rognstad) is to be a "PURGE by the leftist activists Ben Olson & Chris Bessler and is set to begin in about 8 weeks. So prepare yourselves, think about your vulnerabilities, heighten your physical security, because there's nothing you can do now to stop them." The email also claims that Olson & Bessler will begin disclosing embarassing details about local conservatives, including details about their relatives, ending with: "Again, there isn't much time left before they will begin, so do what you need to now to protect yourself while you can."

**Jan. 16, 2020** – (I was still out of the country, so this is information gleaned after the fact) A threatening email was sent to the Deschutes Brewery containing the following text:

*Fwd: Word is that employees of your brewery are hosting an event tonight at a small bar called Eichardt's in Sandpoint Idaho. If so, TELL THEM TO BE ARMED AND ON HIGH ALERT!*

*There's word that an angry group is planning on taking advantage of the possible crowd to show up armed and do something nasty because that bar owner Jeff Nizoli has been said to financially support the town pedophile. There's no reason why your staff should have to pay the price for that. So tell them to come armed for self-defense since there's no telling who will be impacted.*

*It should be noted that Eichardt's published an ad on the back page of the *Reader* advertising a tap takeover event where the Deschutes wooden bar trailer parks in the alley by the pub and serves drinks in promotion of their beer. This event has been happening at Eichardt's for ten years. As a result of this threatening email, Deschutes was forced to cancel the event out of safety and liability reasons for their staff. Not only did we have to refund the back page advertisement (a loss of $500), Eichardt's had to go through with the event without Deschutes, casting a damper on the usually fun event.

**January 23, 2020** – I return from my vacation and learn about the latest attacks on the *Reader*.

**January 24, 2020** – One of the *Reader* advertisers Brett Taylor of Taylor and Sons Chevrolet reported receiving an email sent to their form on the website with the subject line: "Greg [Brett's father and founder of the business], you wont get away with it (Taylor & Sons Chevrolet)" and contained this text: "Have read about your funding Bessler and Ben Olson's plans to smear/intimidate local conservatives in the reader. If you think we're going to just lie down and allow you to do this you're dead wrong. … And you can tell that to your pedophile buddy at The Reader who you finance."

**Jan. 30, 2020** – (see **\*Jan 30, 2020 in file folder**) Another email makes the rounds of my advertisers email addresses. This one from "bonnercounty@mailhouse.biz" with the subject line "lawsuit with you against Sandpoint bar. In this email, the writer claims to be seeking residents who attended Eichardt's Pub on Thursday, Jan. 16, urging them they "may be entitled to compensatory damages for the

negligence of owner Jeff Nizzoli which put you and all customers at undue risk and the infliction of severe emotional distress upon your learning after the fact that known to him was a threat of gun violence against you as a customer that evening. On the morning of January 16 2020 a company named Deschutes Brewery received notice of a threat of gun violence against all customers of Eichardt's Pub later that same day, by an armed group angry at Jeff Nizzoli's 'financial support of the town pedophile.' Nizzoli has since admitted that was a reference to his advertising with The Reader."

**Jan. 30, 2020** – Ironically, just moments after learning about the email mentioned directly above, while I was delivering newspapers on my bike (again, the attack came on a Thursday, as they usually did), I received a call from my staff writer Lyndsie Kiebert saying the FCC called and wanted to speak with me. While I was returning to the office, I received a Google alert about Scott Rhodes and learned that the FCC was proposing a $13 million fine against Rhodes for six different instances where he used call spoofing and robocalls around the country, including the Sept. robocall in Sandpoint against me (the FCC only lists the one call, but there were two – the second came a week later on Sept. 25, 2020). The Reader published a web-story about the fine, and followed it up with a story in the print edition in the Feb. 6, 2020 issue.

**Jan. 31, 2020** – After a hiatus since Oct. 20, 2018, Rhodes posted a new video on his video blog site (theroadtopower.com) titled "IMPORTANT ANNOUNCEMENT!" The video is a highlight reel of his past videos, ending with a section titled "New videos coming soon in February 2020."
    *It is worth noting that Rhodes apparently leans into any negative publicity he receives, as it possibly helps him gain followers. When I was following his video blog regularly in 2018, he had a couple thousand subscribers and each video rarely got more than 2,000 views. As of today, he has over 26,000 subscribers and the latest video has over 24,300 views, which means his brand-building has been successful.

**March 3, 2020** – Olson and Bessler meet with Sandpoint Police Detective Michael Aerni and FBI agent Mack Zahaczewsky at Sandpoint City Hall council chambers. Discussion goes over various ways Rhodes has harrassed/threatened the Reader, Olson and Bessler.

**Jan. 14, 2021** – Press release from FCC:

> From: FCC Office of Media Relations <FCCOfficeofMediaRelations@fcc.gov>
> Sent: Thursday, January 14, 2021 2:03 PM
> Subject: RELEASE: FCC Fines Robocaller Nearly $10 Million for Malicious Spoofing
>
> **Media Contact:**
> Will Wiquist, (202) 418-0509
> will.wiquist@fcc.gov
>
> **For Immediate Release**
>
> ## FCC FINES MALICIOUS ROBOCALLER NEARLY $10 MILLION FOR SPOOFING WITH THE INTENT TO CAUSE HARM
> ### '*Neighbor Spoofing' Campaigns Threatened a Reporter, Sought to Influence a Jury, and Targeted a Grieving Community*

Text of initial release does not name Scott Rhodes, refers just to "Robocaller" but later releases do.

**Jan. 27, 2021** - Email received via contact form at SandpointReader.com.

From: dontbothermepervert@usmunitions.com <dontbothermepervert@usmunitions.com>
Date: Wed, Jan 27, 2021 at 5:27 AM
Subject: Sandpoint Reader Contact Us form submission
To: <ben@sandpointreader.com>, <zach@sandpointreader.com>

**Name**

Donald Pendleton

**Email**

dontbothermepervert@usmunitions.com

**Phone**

(208) 123-4567

**Message**

YOU GOT A LOT OF NERVE MAILING ME THIS PERVERT CRAP, OLSON. YOU KNOW MY KIDS ALMOST SAW THIS? WHAT THE HELL IS WRONG WITH YOU? WHAT IS WRONG WITH ALL OF YOU PERVERTS THERE?