IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CV 21–110–M–DLC |
| Plaintiff, | |
| vs. | ORDER |
| SCOTT RHODES, | |
| Defendant. | |

Before the Court is the United States' Motion for Partial Summary Judgment.  (Doc. 63.)  For the reasons discussed below, the Court grants summary judgment on the issue of liability, grants the United States' request for injunctive relief, and requests additional briefing regarding the forfeiture amount.

**FACTUAL BACKGROUND**

*1.  The Truth in Caller ID Act and FCC Implementing Regulations*

The Truth in Caller ID Act amended the Federal Communication Act of 1934, 47 U.S.C. §§ 151–646, to address Congress's specific concerns surrounding the manipulation of caller-identification information.  Truth in Caller ID Act of 2009, Pub. L. No. 111–331, 124 Stat. 3572 (codified at 47 U.S.C. § 227(e)).  The Truth in Caller ID Act makes it unlawful to "cause any caller identification service" in connection with any telecommunications service or IP-enabled voice service "to knowingly transmit misleading or inaccurate caller identification

1

information with the intent to defraud, cause harm, or wrongfully obtain anything of value."[1]  47 U.S.C. § 227(e)(1).  The Federal Communication Commission's ("FCC") regulations implementing § 227(e) similarly provide that no person "shall, with the intent to defraud, cause harm, or wrongfully obtain anything of value, knowingly cause, directly, or indirectly, any caller identification service to transmit or display misleading or inaccurate caller identification information in connection with any voice service or text messaging service."  47 C.F.R. § 64.1604(a).  The Truth in Caller ID Act and the FCC's implementing regulations authorize the imposition of forfeiture against individuals who violate these provisions.  *See* 47 U.S.C. § 227(e)(5)(A)(i); 47 C.F.R. § 1.80(b).  The determination of the forfeiture amount is committed to the discretion of the FCC.  *See* 47 U.S.C. § 503(b)(2)(E).

    *2. Undisputed Facts*[2]

    Around March 2018, Defendant Scott Rhodes began hosting an online "[v]ideo podcast for White Nationalists" called "The Road to Power."  Rhodes is the only person to appear live in any of the podcast episodes and he introduces himself as the "leader of the program" and "host" in each episode.  Rhodes purchased the internet domain "theroadtopower.com" and used it for the podcast.

---

[1] The transmission of misleading or inaccurate caller identification information is more commonly known as "spoofing."

[2] The following facts are either undisputed or the Court finds them to be substantively undisputed and supported by sufficient evidence in the record.  (*See* Doc. 84-2.)

In at least eighteen podcast episodes Rhodes informed viewers they could ask questions by sending emails to theroadtopower@protonmail.com.  Rhodes also made other statements during the podcast about contacting him at the same email address, such as: "Check it out and then let me know what you think. You can email me at theroadtopower@protonmail.com" and "What are your thoughts on it? Email me, theroadtopower@protonmail.com, or call and leave a voicemail message at 415-295-4776."   Rhodes would also answer and discuss viewer emails during episodes of the podcast.

The podcast was also promoted using the "@theroadtopower" account on the social media website Gab.  The Gab account was created using theroadtopower@protonmail.com email.  Rhodes repeatedly discussed the @roadtopower Gab account on episodes of the podcast and responded to comments received via that account.  For example, in an episode from March 27, 2018, Rhodes stated "a viewer hit me up on Gab.AI and asked me to read *Siege* by James Mason."  Rhodes also directed his listeners to "follow us on Gab.AI."  The Gab account is also linked in the "About" section of The Road to Power website.

On or about February 26, 2018, Rhodes purchased the telephone number 415-295-4776 from j2 Web Services, Inc.  In the first eleven episodes of The Road to Power, Rhodes provided his viewers with this phone number as a way "[t]o ask questions to be answered in the next episode, or to suggest topics for discussion."

In an episode from April 2018, Rhodes also stated "please call me at area code 415-295-4776."

On May 15, 2018, Rhodes purchased an $89 monthly subscription for "Power Dialer" software from Electronic Voice Services, Inc. ("EVS"). Rhodes purchased the Power Dialer software using his own name, his 415-295-4776 phone number, his srhodes208@gmail.com email account, and his address in Sandpoint, Idaho. The Power Dialer software enables a user to rapidly dial through lists of telephone numbers, display a caller ID of the user's choice, and play prerecorded messages during phone calls. The Power Dialer requires the user to display a caller ID to the call's recipient but allows the use to select the caller ID to be displayed. The Power Dialer software subscription only allowed Rhodes to download and use the Power Dialer software on one computer. Rhodes continued paying the monthly subscription through November 16, 2018.

　　　　*a. May and July 2018*

EVS call records show that over 1,000 calls were made between May 14 and May 19, 2018, from Rhodes's account. These calls displayed Rhodes's j2 phone number (415-295-4776) in the caller ID; however, the calls did not identify Rhodes as the caller or provide a callback number for Rhodes. Most of the calls were to California telephone numbers. The calls contained anti-Semitic rhetoric directed at Senator Diane Feinstein. During this same timeframe, the @theroadtopower Gab

4

account took credit for thousands of "robocalls" to Californians.[3]  In response to

one of the @theroadtopower Gab posts regarding these calls, one Gab user posted:

"Where do I donate (crypto only), so you can do more?".

In May and June 2018, the FCC received numerous complaints about

upsetting robocalls containing racist, inflammatory, and anti-Jewish rhetoric

received from Rhodes's j2 phone number (415-295-4776).  The EVS call records

link these complaints to calls made from Rhodes's EVS account.  On or about June

1, 2018, j2 deactivated Rhodes's account, stripping him of the 415-227-4776

phone number due to "complaints of harassment."  In a June 10, 2018, podcast

episode Rhodes complained that "Jews got that phone number shut down."

However, EVS records show that until mid-July 2018 Rhodes's EVS

account was used to make calls displaying 415-227-4776 in the caller ID.  The

FCC received several complaints about these calls as well, which described similar

rhetoric to the previous complaints.  In late July, calls made from Rhodes's EVS

account began displaying caller IDs associated with the areas being called.  This

practice is commonly referred to as "neighbor spoofing."  For example, the phone

number 208-255-1488 was displayed when calling recipients with the area code

---

[3] The parties dispute whether the calls constitute "robocalls."  Although that term is not relevant for
purposes of § 227(e), the Court will clarify that prerecorded messages played over the phone are
commonly referred to as "robocalls," and the calls at issue here meet that definition.  *See Loyhayem v.
Fraser Fin. & Ins. Servs., Inc.*, 7 F.4th 1232, 1233 (9th Cir. 2021); *see also* 47 U.S.C. § 227(b)(1)(A)
(prohibiting certain calls made using any automatic telephone dialing system *or* an artificial or
prerecorded voice).

208.  The @theroadtopower Gab account continued to post about the calls,
referencing news coverage and stating that the news media was "blaming" The
Road to Power for the "robocalls."  Rhodes also continued to discuss the calls and
news coverage of the calls on episodes of The Road to Power.

### b.  August and September 2018: Virginia

EVS call records for Rhodes's account show hundreds of calls were made
between August 15 and September 2, 2018, displaying the Charlottesville,
Virginia-area caller ID 434-972-1488 to recipients with Charlottesville-area phone
numbers.  This phone number was not assigned to Rhodes.  Several recipients of
the spoofed phone calls filed police reports.  The calls again contained
inflammatory and racist rhetoric targeting people of African descent and calling for
their expulsion from the United States.  The call ended with the statement "this
message paid for by theroadtopower.com."  The @theroadtopower Gab account
posted about news coverage of the calls.

### c.  August 2018: Iowa

EVS call records for Rhodes's account show thousands of calls made
between August 28 and 30, 2018, displaying the Brooklyn, Iowa-area caller ID
641-522-1488.  This phone number was not assigned to Rhodes.  The majority of
call recipients had Brooklyn and central-Iowa area codes.  Call recipients reported
receiving the following prerecorded message:

[Male Voice 1]: The body of twenty-year-old Mollie Tibbetts was found in a corn field after she was stabbed to death by an invader from Mexico. A biological hybrid of white and his savage Aztec ancestors who also killed with knives during their mass human sacrifices on top of pyramids they didn't build. Some relatives of Mollie Tibbetts are implying that, despite having been murdered by a non-white savage intruder, she would still support the invasion of America by a brown horde currently at a staggering fifty-eight million. But you know in your heart they are wrong. If after her life has now been brutally stolen from her, she could be brought back to life for just one moment and asked, "What do you think now?" Mollie Tibbetts would say:
[Female Voice]: "Kill them all."
[Male Voice 1]: We don't have to kill them all, but we do have to deport them all. The Aztec hybrids, known as Mestizos, are low-IQ, bottom-feeding savages, and it is why the countries they infest are crime-ridden failures. That's now America's fate too unless we refound America as whites-only and get rid of them now. Every last one.
[Male Voice 2]: This message paid for by theroadtopower.com.

Mollie Tibbetts was a resident of Brooklyn, Iowa, who had recently been murdered by a Mexican national. Mollie's father had made comments at Mollie's memorial service thanking and expressing support toward the local Hispanic community. Mollie's father, Robert, received this call at his office line despite living in California at the time and having a California area code. Robert's phone number is the only California number contacted during this campaign. Several call recipients filed complaints with the FCC.

The @theroadtopower Gab account posted about media coverage of the calls. Rhodes also discussed the Iowa calls in a September 2018 episode of The Road to Power. A copy of the prerecorded message was also posted on a SoundCloud account associated with theroadtopower.com.

7

   d. *September 2018: Idaho*

EVS call records for Rhodes's account show hundreds of calls made from September 21 to September 24, 2018, displaying the Sandpoint, Idaho-area caller ID 208-265-0802.  This phone number was not assigned to Rhodes.  The majority of these calls were placed to phone numbers from the Sandpoint area.  Call recipients reported receiving the following prerecorded message:

> [Male Voice 1]: Ben Olson is a cancer on wholesome North Idaho, and cancer must be burned out. Ben Olson is a degenerate bartender with no education or training in reporting, whose co-conspirator bought him a bankrupt arts and entertainment paper, the Sandpoint *Reader*, which he now uses to push his destructive, leftist agenda on our people. Burn out the cancer. Ben Olson blackmailed one of our local business owners, threatened to write about him to harm his business if he didn't evict his residential tenant—someone whose politics Ben Olson doesn't like. Doesn't sound like a real paper, does it? It's not. It's a cancer. And cancers must be burned out. Punish his advertisers for feeding the cancer on our town. Burn out the cancer, Ben Olson, and send a message to the rest of his tiny, leftist cabal that their time is over and it can happen to them too. Burn out the cancer, Ben Olson, or the cancer that he is will spread and kill. Burn it out.

Ben Olson is the publisher of the *Sandpoint Reader*, a Sandpoint, Idaho-based newspaper.  In December 2017 and January 2018, the *Reader* published two reports identifying Rhodes as a "person of interest" in two police investigations: one related to the distribution of racist propaganda at Sandpoint High School and the other related to anonymous threatening phone calls involving a recording of Adolf Hitler.  The *Reader* reported that the threatening phone calls had been traced to a phone number associated

8

with Rhodes and his then-employer.  Rhodes was terminated from his job after the articles were published.  The *Reader* also published articles about the robocalls associated with theroadtopower.com.  Around September 2018, Olson contacted the owner of Rhodes's home in Sandpoint seeking comment for a story about the robocalls.  Shortly thereafter, Rhodes's lease was terminated.

In a September 23, 2018, episode of The Road to Power, Rhodes stated that members of the news media are "literally terrorists who use the power of the organization and of the ad dollars to not merely lie but also to intimidate people and to punish them with persecution meant to cost people their job."  He further stated that "those [members of the media] need to be named; they need to be targeted; they need to be punished; they need to be dealt with by the means available to us now."

In addition to the phone calls discussed above, some businesses that advertised in the *Reader* received targeted messages regarding Ben Olson. On September 24, 2018, multiple advertisers received the following message via email:

> To see what happened to your advertising dollars after they got to Ben Olson at the Reader, see the video below. https://www.youtube.com/watch?v=Chyf48UzTUU And that will keep happening to your ad dollars for as long as you send them to support the blackmailer Ben Olson. Ben Olson recently blackmailed a decades-long resident here, family man, business man, that Olson would write

9

about him to harm him if he didn't evict a residential tenant of his whose politics Olson doesn't like. That is how Olson uses your money you send to him. That is how he uses the paper that was bought for him. For that reason, if you allow Olson to continue his unethical behaviors by advertising with him, you will start getting named next, just as thoroughly and repeatedly to all the townspeople directly as Olson is being named now. Not your business, you the owner, by name. Anyone who now knowingly financially supports his behavior is as guilty as the one doing it.

### e. *October 2018: Florida*

EVS call records for Rhodes's account show hundreds of calls made from August 30 to September 1, 2018, displaying the Florida caller ID 850-222-1488. These records also show hundreds of calls made between October 20 and 23, 2018, using the same caller ID.  This caller ID was not assigned to Rhodes.  The majority of these calls were placed to phone numbers with Florida area codes, many of which are associated with Jewish institutions.  October call recipients reported receiving the following prerecorded message:

> [Male Voice using caricatured accent]: Well hello there. I is the Negro Andrew Gillum and I be asking you to make me governor of this here State of Florida. My esteemed opponent, who done called me monkey [monkeys screeching], is doing a lot of hollering about how expensive my plans for healthcare be. But he be thinking of the white man's medicine, which is very expensive because it uses science and whatnot. But the medicine of my African race be very affordable. For instant, putting the chicken feets under your pillow during the full moon don't cost hardly nothing at all. So I's promise that you make me, Andrew Gillum, the governor every people's what be ailing will get all the chicken feets they need. As to the claim by my esteemed opponent that I don't like the Jews, nothing be further from the truth. It was the Jews who owned the slave trade what done brought us Negroes to America to begin with. And they the ones that been

10

putting Negroes in charge over the white folk. Just like they done after
the Civil War. All the Jews gone vote me, Andrew Gillum [monkeys
screeching], governor of this here State of Florida.
[Male Voice 2]: This message paid for by theroadtopower.com.

The timing of these calls coincided with Florida's 2018 gubernatorial race. In a

September 23, 2018, episode of The Road to Power, Rhodes discussed the August

to September Florida robocalls. In a March 29, 2020, episode, Rhodes again

discussed media coverage of the Florida calls.

### f.   November 2018: Georgia

EVS call records for Rhodes's account show hundreds of calls made

between November 2 and 3, 2018, displaying the Georgia caller ID 770-586-1488.

This caller ID was not assigned to Rhodes. The majority of these calls were placed

to phone numbers with Georgia area codes. Call recipients reported receiving the

following message:

[Speaker]: This is the magical Negro, Oprah Winfrey, asking you to
make my fellow Negress, Stacey Abrams, the governor of Georgia.
Years ago, the Jews who own the American media saw something in
me: the ability to trick dumb, white women into thinking I was like
them and to do, read, and think what I told them to. I see that same
potential in Stacey Abrams. Where others see a poor man's Aunt
Jemima, I see someone white women can be tricked into voting for,
especially the fat ones. And so I promise that every single person who
votes for Stacey Abrams, you're going to get a new car. So you get a
car. And you get a car. And you get a car. And you get a car. Everybody
gets a car. And as far as the [unintelligible] whites who are in the way?
Don't worry about them. Like I said in that famous interview in two-
thousand-thirteen, white racists just have to die.
[Speaker 2]: This message paid for by theroadtopower.com.

The timing of these calls coincided with Georgia's 2018 gubernatorial race.

g. *November and December 2018: Virginia*

EVS call records for Rhodes's account show thousands of calls made from November 27 to December 4, 2018, displaying the Charlottsville, Virginia-area caller IDs 434-972-1488 and 434-924-0420.  Those caller IDs were not assigned to Rhodes.  The majority of these calls were placed to phone numbers with Charlottesville area codes.  Many of these numbers had previously been called in August and September, 2018.  Call recipients reported receiving the following message:

> [Background music: instrumentals from Another One Bites the Dust by Queen]
> [Female Voice]: Who killed Heather Heyer in Charlottesville?
> [Male Voice 1]: The Jew mayor.
> [Female Voice]: Who killed Heather Heyer in Charlottesville?
> [Male Voice 1]: His pet Negro police chief.
> [Male Voice 2]: Together they colluded to create mayhem in order to shut down speech they didn't like by a group that had a permit. They conspired to allow physical assaults by violent leftists against the permitted group as an excuse to declare a public emergency and…
> [Male Voice 3]: Shut it down.
> [Male Voice 1]: Due to the anarchy created by the Negro police chief, on direct order of his Jew mayor boss, a young man drove his car into a crowd blocking the street.
> [Male Voice 2]: An unhealthy, morbidly obese smoker, never struck by any car, was knocked down by the crowd and she died of a heart attack, as admitted by her mother.
> [Male Voice 1]: The fake news use a lying narrative to manipulate you into allowing the persecution of men great enough to speak out against the Jewish agenda for the displacement of whites in America.
> [Male Voice 2]: Which includes disparaging our monuments and our history.

> [Male Voice 1]: Who really belongs on trial for the heart attack of
> morbidly obese Heather Heyer? A Jew Mayor. A Negro police chief.
> [Female Voice]: Try them. Convict them. Punish them.
> [Male Voice 1]: And show them we're no longer going to tolerate a
> Jewish lying press and Jew corruption of the American legal system.
> [Male Voice 4]: This message paid for by theroadtopower.com.

The timing of these calls coincided with jury selection in the trial of James Fields for the killing of Heather Heyer following the "Unite the Right" rally in Charlottesville, Virginia.  A copy of the audio recording used in the November Virginia calls was uploaded to Rhodes's EVS account on or about November 27, 2018.

On December 4, 2018, EVS contacted Rhodes to inform him that they would be terminating his service "effective immediately."  The email stated: "Our phone carrier has informed us that you are spoofing Caller ID numbers when you are making calls. That practice is illegal. Because of this, they are forcing us to terminate your service effective immediately."

### h.  2019: Georgia and New York

In 2019, residents of Georgia reported receiving calls ending with an attribution to theroadtopower.com.  These calls displayed the Georgia caller ID 770-716-1488.  Call recipients reported receiving the following message:

> [Male Voice]: Expecting Negroes to act like real humans was the only
> mistake made by Hannah Payne from Fayette County, Georgia. On
> May 8th, a 21-year-old white American, Hannah Payne, tried to hold a
> male Negro accountable to the standards of actual humans.

13

[Female Voice]: When she stopped him after he committed a hit-and-run, a physical struggle ensued, of course.
[Male Voice]: Because Negroes are provedly more violent.
[Female Voice]: Something every experienced police officer knows.
[Male Voice]: As a result, he got shot, and now Hannah Payne is being charged with murder—something that never would have happened if it was a white, mature male who got shot because he chose to physically struggle with a young female. But due to the antiwhite lie that Negroes are victims, she's been cast as the criminal, when in fact it was the Negro. Negroes aren't Americans.
[Female Voice]: They aren't even fully human.
[Male Voice]: Time to send them all to Africa.
[Female Voice]: They don't fit in here.
[Male Voice]: They don't belong here.
[Female Voice]: In your heart, you know it's true.
[Male Voice]: Hannah Payne did nothing wrong.
[Female Voice]: Tell the District Attorney of Clayton County, Georgia…
[Male Voice]: Free Hannah Payne.
[Male Voice 2]: This message paid for by theroadtopower.com.

On or about December 25, 2019, hundreds of individuals associated with

Barnard College and Columbia University received calls ending with an attribution

to theroadtopower.com.  These calls displayed the New York caller ID 212-796-

5706.  Recipients received the following message:

[Male Voice]: On December 11th, an eighteen-year-old white college student named Tessa Majors died in a Manhattan park from stabbings by three Negroid animals, ages thirteen and fourteen. But who really killed Tessa Majors? Her parents, because they never taught her that Negros aren't fully human and are dangerous animals to be avoided. During her young life, Tessa Majors many times consorted with Negroids little knowing that each of those encounters brought her statistically closer to the one that would end with her dying alone on a cold night, in an empty park, two weeks before Christmas. Just like the foolish Timothy Treadwell, who was eaten alive by a Kodiak bear, under the delusion that they weren't unpredictable wild animals, just

14

because he had previous encounters unharmed. This recording of his final screams could've been similar to the last sounds ever made by white teenager Tessa Majors as she was stabbed over and over by another animal: the Negro.

[Sounds of a person screaming and a bear growling]

[Male Voice]: Negros are less than thirteen percent of the U.S. population but commit over fifty percent of all murders every year. Our civilization is doomed to die if it continues to let the impulsive, low-IQ Negro species live among us. Time to get rid of them all. Return to citizenship being whites only and deport all Negroids to Africa. Until we do, the blame for every future Tessa Majors killed by the Negro sub-human is on all of our heads. And remember to teach your children: around Blacks, never relax.

[Male Voice 2]: This message paid for by theroadtopower.com.

3.  *FCC Proceedings*

On January 31, 2020, the FCC issued a Notice of Apparent Liability for Forfeiture  ("NAL") against Rhodes for violations of the Truth in Caller ID Act and the FCC's implementing regulations.  (Doc. 1-1.)  The NAL was based on "six distinct calling campaigns" identified by the FCC, "each of which targeted voters in districts during political campaigns or residents in communities that had experienced major news events relating to or involving white nationalism, immigration, or other public controversies."  (*Id.* at 2.)  The FCC explained that it had identified these six distinct campaigns by matching the call records with news coverage of calling campaigns for which the FCC Enforcement Bureau had recordings or transcripts of the prerecorded voice messages.  (*Id.* at 4.)  The FCC provisionally found that Rhodes had committed 6,455 violations between May 2018 and December 2018 "by making spoofed robocalls with the apparent intent to

15

cause harm and wrongfully obtain something of value" and proposed forfeiture of $12,910,000. (*Id.* at 2.) Although Rhodes made over 34,277 calls using the EVS Power Dialer software in 2018, the FCC limited the NAL to those calls that it could verify. (*Id.* at 4 n.24.)

On February 25, 2020, Rhodes responded to the NAL with a Request of Cancellation of Proposed Forfeiture. (Doc. 1-2.) Rhodes provided evidence that 1,496 calls made in May 2018 displayed a caller ID belonging to him—the j2 number—and therefore did not violate the Truth in Caller ID Act or the FCC's regulations on spoofing. (*Id.* at 10.) On January 14, 2021, the FCC issued a Forfeiture Order imposing a forfeiture penalty of $9,918,000 against Rhodes for 4,959 violations, or $2,000 per violation. (Doc. 1-3 at 2–3.) The FCC did concede that the 1,496 calls made in May 2018 did not violate § 227(e) or its implementing regulations. (*Id.* at 3.) However, the FCC found that Rhodes committed all remaining violations, consisting of the following:

- *August Iowa Campaign—Mollie Tibbetts.* In late August 2018, Rhodes made 837 prerecorded voice message calls to Iowa residents referring to the apprehension of an illegal alien from Mexico whom prosecutors had charged with the murder of Mollie Tibbetts, a college student from the small town of Brooklyn, Iowa. One of the robocalls reached Ms. Tibbetts's family. Her father answered the robocall because it displayed a local number. Family members told reporters that they suffered emotional distress after listening to the calls.
- *September Idaho Campaign—Sandpoint Reader.* In September 2018, Rhodes made 750 prerecorded voice message calls to

16

consumers throughout Sandpoint, Idaho, attacking the *Sandpoint Reader*, a local newspaper, and its publisher, Ben Olson.

- *October Florida Campaign—Andrew Gillum.* In October 2018, Rhodes targeted Florida gubernatorial candidate Andrew Gillum. The 766 robocalls falsely claimed to be coming from Mr. Gillum.

- *November Georgia Campaign—Stacey Abrams.* In November 2018, Rhodes launched a campaign targeting Georgia gubernatorial candidate Stacey Abrams. The 583 robocalls purported to be from Oprah Winfrey, who was in Georgia campaigning with Ms. Abrams around the time of the robocalls.

- *November Charlottesville Campaign—Fields Trial.* In November 2018, Rhodes made 2,023 robocalls to Charlottesville, Virginia, area residents before and during the jury selection and criminal trial of James Fields. The defendant was charged with murdering Heather Heyer by driving an automobile into a crowd of protesters in Charlottesville.

(*Id.* at 5.)

## PROCEDURAL BACKGROUND

Rhodes did not pay the forfeiture penalty or contest the Forfeiture Order. On September 27, 2021, the United States brought this action, pursuant to 47 U.S.C. § 504(a), to enforce the Forfeiture Order and obtain injunctive relief in the form of a writ of mandamus commanding Rhodes to comply with the Telephone Consumer Protection Act and Truth in Caller ID Act. (Doc. 1 at 2.)

Review of FCC forfeiture orders is governed by 47 U.S.C. § 504(a), which provides:

> The forfeitures provided for in this Act shall be payable into the Treasury of the United States, and shall be recoverable, . . . in a civil suit in the name of the United States . . . : Provided, *That any suit for*

17

*the recovery of a forfeiture imposed pursuant to the provisions of this Act shall be trial de novo . . . .*"

As the Court has already explained, § 504(a) grants the Court subject matter jurisdiction to consider factual challenges to the basis for the Forfeiture Order and the forfeiture amount, but the Court lacks jurisdiction to consider any legal challenges to 47 U.S.C. § 227(e) or 47 C.F.R. § 64.1604.  (Doc. 15 at 8.)  *De novo* review requires a "court [to] make an independent determination of the issues." *United States v. First City Nat. Bank of Hous.*, 386 U.S. 361, 368 (1967).  As such, the Court "is not limited to a review of the administrative record before the FCC, nor do the findings and conclusions of the Commission *in this case* carry any weight whatsoever."  *FCC. v. Summa Corp.*, 447 F. Supp. 923, 925 (D. Nev. 1978).

The United States now moves for summary judgment that the Forfeiture Order is warranted—i.e., that Rhodes is liable for the violations in the Forfeiture Order.  (Doc. 63 at 2.)  The United States also seeks the imposition of a permanent injunction that directs Rhodes to comply with the Telephone Consumer Protection Act and Truth in Caller ID Act and imposes compliance reporting requirements on Rhodes.  (*Id.* at 4; *see also* Doc. 63-1.)  Should the Court grant summary judgment on liability, the United States argues that a bench trial on the forfeiture sum is appropriate.  (Doc. 64 at 6.)

18

## LEGAL STANDARD

This Court can resolve an issue summarily if "there is no genuine dispute as to any material fact" and the prevailing party is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Material facts are those which may affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A factual dispute is genuine when there is sufficient evidence for a reasonable factfinder to return a verdict for the other party.  *Id.*  If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue of fact exists.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

In meeting this burden, conclusory assertions are insufficient, and "non-speculative evidence of specific facts" is required.  *Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1061 (9th Cir. 2011).  In establishing facts, the parties may rely on evidence in an inadmissible form as long as the evidence could be introduced in an admissible form at trial.  *See Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003) (holding that "[a]t the summary judgment stage, we do not focus on the admissibility of the evidence's form. We instead focus on the admissibility of its contents"); *see also JL Beverage Co., LLC v. Jim Beam Brands Co.*, 828 F.3d 1098, 1110 (9th Cir. 2016) (stating that "at summary judgment a district court may consider hearsay evidence submitted in an inadmissible form, so

19

long as the underlying evidence could be provided in an admissible form at trial").

DISCUSSION

## I.      Liability

To grant summary judgment on liability, the Court must find that there is no genuine dispute that Rhodes: (1) *caused* misleading or inaccurate caller IDs to be displayed during the 4,959 calls identified in the Forfeiture Order and Complaint; (2) did so while *knowing* the caller IDs were misleading or inaccurate; and (3) did so with the *intent* to cause harm and/or wrongfully obtain something of value.

### 1.  Causation

The United States argues that there is no genuine dispute that Rhodes is responsible for the spoofed calls identified in the forfeiture order.  (Doc. 64 at 28.) Rhodes maintains that he never used the Power Dialer software himself and never caused the Power Dialer software to display any caller ID.  (*See* Doc. 79-1.) Rhodes also argues that the United States lacks direct evidence that he made any of the calls or caused inaccurate or misleading caller IDs to be displayed.  (*See* Doc. 79 at 12–13.)

"The law makes no distinction between the weight to be given to either direct or circumstantial evidence."[4]  Ninth Circuit Jury Instructions Comm.,

---

[4] "Circumstantial evidence is proof of one or more facts from which you could find another fact," whereas "[d]irect evidence is direct proof of a fact, such as testimony by a witness about what that witness personally saw or heard or did."  Ninth Circuit Jury Instructions Comm., *Manual of Model Civil Jury*

*Manual of Model Civil Jury Instructions*, § 1.12 (2017 ed., updated Aug. 2023);
*see also Hiram v. United States*, 354 F.2d 4, 6 (9th Cir. 1965) ("Circumstantial
evidence is not considered inferior to direct evidence in any respect.").  The United
States has provided sufficient circumstantial evidence to establish that Rhodes
caused the spoofed calls to be made.  Rhodes bought and paid for the EVS Power
Dialer software and the calls at issue were made from Rhodes's EVS account.  In
addition to the call records themselves, a copy of the prerecorded message played
during the November 2018 Charlottsville campaign was found on Rhodes's EVS
account.  Rhodes's EVS account could only place calls from one computer at a
time and required the user to select the caller ID displayed to recipients.  Rhodes
purchased the telephone number 415-295-4776 from j2 Web Services, Inc. and that
phone number was used when purchasing the EVS Power Dialer software.  Rhodes
used the j2 phone number as the caller ID in calls made on the Power Dialer
software from May 2018 to July 2018.

　　The prerecorded messages played during the calls all ended with the
statement "paid for by theroadtopower.com."  That web address is linked to a
video podcast called The Road to Power that Rhodes hosted.  Rhodes was the only
person to appear on The Road to Power.  Rhodes would discuss news coverage of

---

*Instructions*, § 1.12 (2017 ed., updated Aug. 2023); *see also Vuckson v. United States*, 354 F.2d 918, 920
(9th Cir. 1966) ("Circumstantial evidence establishes the fact to be proved through inference based on
human experience.  Direct evidence establishes the fact without the necessity for such inference.").

the various spoofed calls on episodes of The Road to Power and express support for the calls and the impact they had on their recipients. Social media accounts associated with The Road to Power also discussed media coverage of the calls. Rhodes has repeatedly expressed his support for the messages communicated in the calls.

Additionally, the prerecorded message played during the September 2018 Idaho campaign accused Ben Olson of blackmailing a resident of Sandpoint into evicting his tenant "whose politics Olson doesn't like." Rhodes has accused Ben Olson of using threats to convince Rhodes's landlord into ending Rhodes's lease and has made numerous statements regarding Olson's bias against Rhodes, including in a recent filing in this matter. (*See* Doc. 86 at 23 ("Ben Olson is demonstrably hostile to the Defendant for perceived transgressions against Olson's beliefs, and for which Olson not only presented purposely skewed writing about Defendant and harassed his landlord by multiple contacts after landlord telling Olson he didn't want to be involved, but on whom Olson tried to inflict punishment on at least two occasions only to find he couldn't.").)

Based on the foregoing undisputed facts, the Court finds that the United States has met its initial burden. The burden then shifts to Rhodes to establish that a genuine dispute exists as to this material fact. Rhodes has failed to meet his burden. Rhodes's sole basis of contention is his outright and conclusory denial of

the allegations.  In his declaration filed in opposition to summary judgment,
Rhodes simply states he "did not cause the Power Dialer to display any of the
caller IDs in Plaintiff's Complaint," "did not make calls using the Power Dialer in
May, June, and July 2018, nor cause it to display a caller ID," "did not engage in
'neighbor spoofing' by causing the Power Dialer to display caller IDs," and "did
not select caller IDs of Plaintiff's Complaint."  (Doc. 79-1 ¶¶ 12–14, 17.)  Rhodes
makes similar denials in this Statement of Disputed Facts.  (*See* Doc. 80.)

However, Rhodes has not proffered a reasonable alternative explanation in
light of the undisputed facts in this case.  For example, Rhodes does not allege or
demonstrate that a third party co-opted his EVS account without his consent or that
another person was authorized to use his EVS account.  The closest Rhodes comes
to offering an alternative explanation are his statements that other individuals may
have had access to his computer.  (Doc. 84-3, Rhodes Depo. Tr. at 67:5–25.)
However, he denies observing any of those individuals using his EVS account or
directing them to do so.  (*Id.* at 68:1–21.)

"A conclusory, self-serving affidavit, lacking detailed facts and any
supporting evidence, is insufficient to create a genuine issue of material fact," *FTC
v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997), and
"metaphysical doubt" is not sufficient to overcome summary judgment,
*Matsushita*, 475 U.S. at 586.  Rhodes has not offered any direct or circumstantial

evidence to support his position beyond his own self-serving affidavit.
Accordingly, the Court finds that there is no genuine dispute that Rhodes is
responsible for causing the spoofed calls.

### 2. Knowledge

There is also no genuine dispute that Rhodes knew the caller IDs were
misleading and inaccurate.  The United States has offered evidence that none of the
spoofed numbers belonged to Rhodes but, instead, either belonged to businesses,
private individuals, or were not assigned to anyone at the relevant time period.
Rhodes has not offered any evidence to raise a genuine dispute on this issue.
Therefore, there is no genuine disputed that Rhodes acted with the knowledge that
the caller IDs were misleading or inaccurate.

### 3. Intent

The United States also argues that there is no genuine dispute that Rhodes
acted with the requisite intent: (a) to wrongfully obtain things of value, and (b) to
cause harm.  (Doc. 64 at 29, 32.)  As a preliminary matter, the Truth in Caller ID
Act does not require the United States to prove that Rhodes actually caused harm
or obtained something of value, only that Rhodes acted with the intent to achieve
one or both of these aims.  Summary judgment on the issue of intent is appropriate
where the evidence only supports one plausible conclusion and no reasonable
factfinder could find for the non-movant.  *See Provenz v. Miller*, 102 F.3d 1478,

24

1489 (9th Cir. 1996). Because direct evidence of specific wrongful intent is rarely available, intent is typically proven through circumstantial evidence. *See Gen. Cigar Co. v. CR Carriers, Inc.*, 948 F. Supp. 1030, 1036 (M.D. Ala. 1996) ("Because one cannot know another's subjective intent, circumstantial evidence must be relied upon to indicate intent."); *cf. United States v. Dearing*, 504 F.3d 897, 901 (9th Cir. 2007) ("[D]irect proof of one's specific wrongful intent is rarely available. But willfulness may be inferred from circumstantial evidence of fraudulent intent." (internal citation and quotation marks omitted)); *United States v. Rogers*, 321 F.3d 1226, 1230 (9th Cir. 2003) ("It is settled law that intent to defraud may be established by circumstantial evidence").

### a. Intent to Wrongfully Obtain Things of Value

First, to "wrongfully obtain" something means to obtain it through unfair or unjust means. *See Wrongful*, BLACK'S LAW DICTIONARY (11th ed. 2019); O*btain*, BLACK'S LAW DICTIONARY (11th ed. 2019). Thus, "wrongful" conduct is broader than, but inclusive of, illegal conduct. *Cf. United States v. Coss*, 677 F.3d 278 (6th Cir. 2012) (statute criminalizing "wrongful" threats includes more than threats that are "unlawful"). Second, "things of value" is not limited to "tangible things with an identifiable commercial price tag," but also encompasses intangible benefits. *United States v. Schwartz*, 785 F.2d 673, 680 (9th Cir. 1986). For example, the FCC has determined that "[a]voidance of culpability is a benefit that qualifies as a

25

'[thing] of value'" under § 227(e).  *In re Best Ins. Contracts, Inc. & Wilmington Ins. Quotes*, Forfeiture Order, 32 FCC Rcd. 6403, 6413 (2017).

Rhodes continued using the Power Dialer software to place spoofed phone calls even after losing the j2 phone number due to "complaints of harassment." Thus, by using spoofed phone numbers instead of actual phone numbers owned by him, Rhodes avoided losing additional phone numbers.  Spoofing also allowed Rhodes to avoid legal culpability for violating the Telephone Consumer Protection Act of 1991 ("TCPA") and the FCC's regulations.[5]  Additionally, Rhodes gained something of value by attracting attention to his video podcast, website, and associated social media pages.  Rhodes dedicated significant portions of his podcast to discussing the spoofed calls and the attention they had garnered in the media.  Increased web traffic and social media attention certainly holds both tangible and intangible value in today's society, as evidenced by the offer for financial support that Rhodes received from at least one Gab user.  Finally, by using spoofed phone numbers rather than real phone numbers, Rhodes saved

---

[5] The TCPA amended the Communications Act to address Congress's concerns regarding certain practices involving the use of telephone equipment, such as telemarketing and the use of automated telephone equipment.  Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, 105 Stat. 2394 (codified at 42 U.S.C. § 227).  Relevant here, one provision of the TCPA requires that "all artificial or prerecorded telephone messages (i) shall, at the beginning of the message, state clearly the identity of the business, individual, or other entity initiating the call, and (ii) shall, during or after the message, state clearly the telephone number or address of such business, other entity, or individual."  47 U.S.C. § 227(d)(3)(A).  The prerecorded messages played by Rhodes did not meet these requirements.  Another provision prohibits individuals from making calls using "an artificial or prerecorded voice . . . to any . . . cellular telephone service."  *Id.* § 227(b)(1)(A)(iii).  The evidence here shows that at least some of the calls were made to cell phones.

26

money by not having to pay communications companies, such as j2, for phone numbers.  All of the above are "things of value" that Rhodes intended to obtain "wrongfully" because they were part of a scheme of spoofed calls perpetrated by Rhodes that violated the Communications Act and Rhodes's contract with EVS.

Rhodes's arguments in opposition to summary judgment on this issue primarily focus on what sort of intangible benefits can constitute "things of value." Rhodes argues that "value" is construed too broadly by the United States and that anonymity cannot be a thing of value under § 227(e) because "anonymity [is] a fundamental part of [First] Amendment protection[s]."  (Doc. 79 at 22.)

The Court agrees that "things of value" does not encompass everything that has value to a defendant.  However, the things of value discussed above are not overly broad and include both tangible and intangible benefits.  Regarding Rhodes's First Amendment argument, the Court has already explained that legal arguments challenging the constitutionality of the Truth in Caller ID Act or the FCC's implementing regulations must be raised in the circuit court.  However, the Court will note that the Ninth Circuit has already held that the "[e]xposure of a telephone number does not violate the First Amendment right not to speak" nor a "First Amendment right to speak anonymously."  *People of State of Cal. v. FCC*, 75 F.3d 1350, 1362 (9th Cir. 1996).   Additionally, anonymity is not the "thing of

27

value" that Rhodes intended to obtain, anonymity merely facilitated Rhodes's unlawful conduct.

####     b.  Intent to Cause Harm

The FCC has held that the element of "harm" in the Truth in Caller ID Act is "broad" and "encompasses financial, physical, and emotional harm."  *Rules and Regulations Implementing the Truth in Caller ID Act of 2009*, Report and Order, 26 FCC Rcd. 9114, 9122 (2011).  The invasion of privacy through illegal calls is also a cognizable harm under the Communications Act.  *Cf. Krakauer v. Dish Network LLC*, 168 F. Supp. 3d 843, 845 (M.D.N.C. 2016), *aff'd,* 925 F.3d 643 (4th Cir. 2019) ("These calls form concrete injuries because unwanted telemarketing calls are a disruptive and annoying invasion of privacy."); *Smith v. Blue Shield of Cal. Life & Health Ins. Co.*, 228 F. Supp. 3d 1056, 1061 (C.D. Cal. 2017) ("[The TCPA] directly forbids activities that *by their nature* infringe the privacy-related interests that Congress sought to protect by enacting the TCPA.").

The law presumes that Rhodes "intended the natural and probable consequences of his voluntary acts."  *United States v. Garcia-Camacho*, 122 F.3d 1265, 1268 (9th Cir. 1997).  Therefore, the Court finds that Rhodes intended to cause harm by invading peoples' privacy through his illegally spoofed calls.  *See In re Wilmington Ins. Quotes & Best Ins. Contracts, Inc.*, Forfeiture Order, 33 FCC Rcd. 9204, 9218–19 (2018) ("The Commission has previously found, as we do in

this case, that when spoofing is done in conjunction with an illegal robocalling campaign (itself a harmful practice), it indicates an intent to cause harm.").

In addition, the evidence here demonstrates that Rhodes also intended to cause emotional distress to call recipients and physical harm to the targets of his calls.  This is supported by the content of the prerecorded messages and Rhodes's repeated discussion of the emotional impact the calls had on episodes of his podcast.  Furthermore, through "neighbor spoofing" Rhodes was able to target individuals who might be more vulnerable to the message contained in the calls due to their proximity to the relevant precipitating events without arousing suspicion.  Rhodes also targeted individuals he could expect to be particularly impacted by the calls, such as members of the Jewish community and Mollie Tibbett's father.  The September 2018 Idaho campaign went even further by specifically targeting Ben Olson and encouraging listeners to "burn out" Olson from the community.

Rhodes's remaining arguments pertain to what can constitutionally constitute "harm."  Rhodes argues that Supreme Court precedent "prevents liability for infliction of emotional harm due to political speech" and "prevents liability for damages (harm) enacted by boycott."  (Doc. 79 at 22.)  Again, the Court does not have jurisdiction to consider legal challenges to the Truth in Caller ID Act or the FCC's implementing regulations.  Furthermore, the right to freedom of speech

29

guaranteed under the First Amendment does not protect the conduct at issue here because § 227(e) regulates the display of inaccurate caller ID with the intent to harass or wrongfully obtain a thing of value, not political speech. *Cf. United States v. Waggy*, 936 F.3d 1014, 1019 (9th Cir. 2019) (holding that Washington state's telephone harassment statute "regulates conduct with minimal impact on speech" because it prohibits "placing calls with the specific intent to harass."). Additionally, the content of the prerecorded messages goes beyond mere "political speech" or a call for "boycott."

Accordingly, the Court finds that there is no genuine dispute that Rhodes acted with the intent to both wrongfully obtain things of value and cause harm.

## II.   Injunctive Relief

Having found that there is no genuine dispute that Rhodes is liable for the calls identified in the Forfeiture Order and Complaint, the Court must next address whether the United States' proposed injunction is appropriate.

47 U.S.C. § 401(a) authorizes the Court to issues a writ of mandamus commanding Rhodes to comply with the Communications Act. The phrase "writ or writs of mandamus" has been interpreted to include injunctions against persons alleged to be violating the Communications Act and/or the FCC's implementing regulations. *FCC v. Waterbury Hispanic Commc'ns., Inc.*, 109 F. Supp. 2d 80, 82 (D. Conn. 1999); *see also United States v. Medina*, 718 F. Supp. 928, 930 n.6 (S.D.

Fla. 1989) ("Although the statute refers to a 'writ of mandamus,' which usually means an order compelling a federal officer to perform a duty, both the context in which the phrase appears and the courts' application of Section 401(a) make clear that the statute authorizes injunctive relief against anyone violating the Act or regulations."); *Free Speech v. Reno*, No. 98 CIV2680 (MBM), 1999 WL 147743, at *2 (S.D.N.Y. Mar. 18, 1999), *aff'd sub nom. Free Speech ex rel. Ruggiero v. Reno*, 200 F.3d 63 (2d Cir. 1999) (stating that, pursuant to § 401(a), "a district court does have jurisdiction to issue an injunction against a person alleged to be violating the Act when an application is brought by the U.S. Attorney at the request of the FCC").

To be entitled to a permanent injunction a plaintiff typically must demonstrate: "(1) actual success on the merits; (2) that it has suffered an irreparable injury; (3) that remedies available at law are inadequate; (4) that the balance of hardships justify a remedy in equity; and (5) that the public interest would not be disserved by a permanent injunction. *Confederated Tribes & Bands of the Yakama Nation v. Yakima Cnty.*, 963 F.3d 982, 989 (9th Cir. 2020). However, "[t]he function of a court in deciding whether to issue an injunction authorized by a statute of the United States to enforce and implement Congressional policy is a different one from that of the court when weighing claims of two private litigants." *United States v. Odessa Union Warehouse Co-op*,

833 F.2d 172, 174–75 (9th Cir. 1987).  In other words, "the fact that a federal

statute is being enforced by the agency charged with that duty may alter the burden

of proof of a particular element necessary to obtain injunctive relief."  *Id.* at 175;

*see also United States v. Nutri-Cology, Inc.*, 982 F.2d 394, 398 (9th Cir. 1992) ("In

statutory enforcement cases where the government has met the 'probability of

success' prong of the preliminary injunction test, we presume it has met the

'possibility of irreparable injury' prong because the passage of the statute is itself

an implied finding by Congress that violations will harm the public.").

In the context of statutorily authorized injunctive relief, some courts have

adopted a two-part test wherein the government need only demonstrate that the

defendant violated the relevant statute and that there is some likelihood of

recurrent violation.  *See Waterbury Hispanic Commc'ns., Inc.*, 109 F. Supp. 2d at

84 (using the two part test when determining whether to issue a preliminary

injunction requested by the FCC); *SEC v. Cap. Cove Bancorp LLC*, No. SACV 15-

980-JLS (JCx), 2015 WL 9704076, at *5 (C.D. Cal. Sep. 1, 2015) (using the two-

part test when determining whether to issue a preliminary injunction requested

by the SEC and collecting cases in the Ninth Circuit doing the same).  Although

the Ninth Circuit has not expressly adopted this two-part test, it is consistent with

the principles discussed in this circuit, including the general principal that a

"permanent injunction will be granted when liability has been established and there

32

is a threat of continuing violations." *MAI Systems Corporation v. Peak Computer, Inc.*, 991 F.2d 511, 520 (9th Cir. 1993). In light of § 401(a)'s grant of authority to issue injunctive relief, the Ninth Circuit's principles regarding statutory injunctive relief, and the general acceptance of the two-part test by other district courts in the Ninth Circuit, the Court will apply the two-part test in this matter.

The Court has already found that Rhodes violated § 227(e). Therefore, the Court need only determine whether there is some cognizable danger of recurrent violation. This determination must be "based on appropriate findings supported by the record." *FEC v. Furgatch,* 869 F.2d 1256, 1263 (9th Cir. 1989). The Court may consider "the degree of scienter involved; the isolated or recurrent nature of the infraction; the defendant's recognition of the wrongful nature of his conduct; the extent to which the defendant's professional and personal characteristics might enable or tempt him to commit future violations; and the sincerity of any assurances against future violations." *United States v. Laerdal Mfg. Corp.*, 73 F.3d 852, 854–55 (9th Cir. 1995). These factors support the imposition of a permanent injunction.

Violations of § 227(e) require the defendant to act knowingly and with specific intent. The FCC found, and the Court has here found *de novo*, that Rhodes committed 4,959 violations of the Truth in Caller ID Act across five separate campaigns taking place across several months in 2018. Rhodes continued to make

33

unlawful calls after losing his j2 phone number due to "complaints of harassment." There is also evidence that Rhodes continued to make spoofed calls in 2019 even after EVS terminated his contract on December 4, 2018, and warned him that the practice of spoofing was illegal. Rhodes has not taken accountability for his actions and maintains that his conduct and the messages contained in his calls were "political" and "intended for the public good . . . by virtue of being true and related to the public good." (Doc. 31 at 13.) Rhetoric such as this makes it clear that Rhodes feels entitled to engage in the conduct that brings him before this Court and is likely to commit further violations of the Communications Act in the future.

Accordingly, the Court grants the United States' request for a permanent injunction. Every injunction must: "(A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." Fed. R. Civ. P. 65(d). The United States has provided a proposed order of permanent injunction (Doc. 63-1) that meets these requirements. Therefore, the Court will adopt the proposed order as the permanent injunction to be entered in this matter.

## III.    Forfeiture Amount

Having found that Rhodes is liable for the violations alleged in the Complaint and Forfeiture Order, the sole remaining issue is whether the forfeiture amount is appropriate. The United States has not moved for summary judgment on

this issue but urges the Court to hold a two-day bench trial to determine whether the forfeiture sum is appropriate.  (Doc. 64 at 6.)  Rhodes did not directly respond to this request.

The FCC has established base forfeiture sums for various violations of its regulations, the lowest of which is $1,000 per violation.  *See* 47 C.F.R. § 1.80(b)(11).  In determining the amount of forfeiture to impose for violations of § 227(e), the FCC begins with a base forfeiture amount and may adjust upward or downward depending on "the nature, circumstances, extent, and gravity of the violation and, with respect to the violator, the degree of culpability, any history of prior offenses, ability to pay, and such other matters as justice may require."  47 U.S.C. § 503(b)(2)(E); *see also* 47 C.F.R. § 1.80(b)(11).  The forfeiture amount is capped at $11,766 for each violation.  *See* 47 U.S.C. § 227(e)(5)(A)(i); 47 C.F.R. § 1.80(b); Annual Adjustment of Civil Monetary Penalties to Reflect Inflation, 85 Fed. Reg. 2318, 2319 (Jan. 15, 2020).

Here, the FCC started with a base forfeiture of $1,000 then determined that an upward adjustment was warranted after considering the relevant factors.  (Doc. 1-1 at 10.)  The FCC found that Rhodes "designed his spoofed calling campaigns to be as disruptive as possible," (*id.* at 19), and concluded that Rhodes was "highly culpable and unlikely to be deterred absent a substantial penalty," (*id.* at 20).  Accordingly, the FCC applied a 100% upward adjustment to $2,000 per violation.

(Doc. 1-3 at 26.)  Rhodes did not contest the basis for the forfeiture calculation nor assert an inability to pay the proposed forfeiture amount.  (*See* Doc. 1-2.)

It appears that there are no genuine issues of material fact that would preclude summary judgment on this issue.   The Ninth Circuit has explained that "[r]eview of a forfeiture amount is limited to whether it reflects a reasonable application of [47 U.S.C. § 503] and the 'adjustment criteria' set out in [47 C.F.R. § 1.80]." *United States v. Hodson Broad.*, 666 F. App'x 624, 627–28 (9th Cir. 2016).  In that case, the Ninth Circuit upheld the district court's grant of summary judgment as to the forfeiture amount, explaining that "[t]he FCC noted some material supporting [the defendant's] claimed inability to pay—the only downward criteria he argued—but also found that any consequent reduction was offset by multiple upward adjustments for intentional and repeated violations." *Id.* at 628. The court concluded that "[t]he FCC's decision not to adjust downward was reasonable and not an abuse of discretion." *Id.*

The Court may, "[a]fter giving notice and a reasonable time to respond, . . . consider summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute."  Fed. R. Civ. P. 56(f)(3).  Here, it appears that there is no genuine dispute that the forfeiture amount is within the statutorily authorized limit and the FCC reached a determination after considering the appropriate adjustment factors.  This is further

supported by the fact that Rhodes did not raise any objection to the forfeiture amount during the FCC's proceedings. Accordingly, the Court hereby provides notice to the parties that it may grant summary judgment on the amount of forfeiture and requests briefing from the parties on this issue. Additionally, the Court requests that the parties address whether Rhodes has a right to a jury trial on the question of the forfeiture amount should the Court ultimately decline to grant summary judgment on this issue.

## IV.   Miscellaneous Defenses and Objections

Rhodes raises a number of miscellaneous defenses and objections in his response. The Court will briefly address them.

First, Rhodes argues that the United States' motion "relies upon many exhibits that should be inadmissible under" Rules 403 and 404 of the Federal Rules of Evidence. (Doc. 79 at 23.) As to the Rule 403 objections, as already explained, the focus at the summary judgment stage is on whether the contents of the evidence is admissible in any form, not whether the evidence is admissible in its present form. *Fraser*, 342 F.3d at 1036–37. The Court finds that the content of the evidence offered by the United States is admissible. To the extent Rhodes raises concerns over jury confusion or prejudice, these concerns are not relevant at the summary judgment stage. *See Mally v. City of Beaverton*, No. 3:17-CV-01000-JR, 2018 WL 5266841, at *2 (D. Or. Oct. 23, 2018) ("At the summary judgment stage,

Rule 403 objections are unnecessary because there is no jury that can be misled and no danger of confusing the issues."); *Montoya v. Orange Cnty. Sheriff's Dep't.*, 987 F. Supp. 2d 981, 994 (C.D. Cal. 2013) (explaining that the Court "need not exclude evidence at the summary judgment stage for danger of unfair prejudice, confusion of the issues, or any other grounds outlined in Rule 403"). As to the Rule 404 objections, the Court finds that the evidence proffered by the United States is relevant and admissible to prove key issues in this case, including the identity of the responsible party, the need for injunctive relief, and the forfeiture amount.

Second, Rhodes argues that this matter should be dismissed for failure to state a claim upon which relief can be granted. (Doc. 79 at 21.) Rhodes argues that the Forfeiture Order is unenforceable because the FCC failed to abide by 47 U.S.C. § 503(b)(5). (*Id.*) Section 503(b)(5) requires that before a forfeiture may be imposed on certain, non-licensed individuals, the person must receive a "citation" from the FCC and be given a reasonable opportunity for a "personal interview" with an official from the FCC. Unlike § 503(b)(5), however, § 503(b)(3) and (b)(4) authorize forfeiture without an official warning so long as the FCC follows the procedures defined in those respective subsections. 47 U.S.C. § 503(b).

38

The Truth in Caller ID Act is not subject to § 503(b)(5)'s notice requirement.  Section 227(e) has its own forfeiture provision, 47 U.S.C. § 227(e)(5)(A).  Section 227(e)(5)(A) effectively requires compliance with the procedures defined in either § 503(b)(3) or § 503(b)(4) because § 227(e)(5)(A)(iii) expressly incorporates those notice provisions.  However, nothing in § 227(e)(5)(A) expressly requires compliance with § 503(b)(5).  The FCC confirmed this distinction in rules promulgated after the enactment of the Truth in Caller ID Act.  *See Implementation of the Truth in Caller ID Act*, 76 Fed. Reg. 43196, 43202 (July 20, 2011) ("The Truth in Caller ID Act makes no reference to section 503(b)(5) of the Communications Act, . . . [and] that omission suggests that Congress intended to give the Commission the authority to proceed expeditiously to stop and, where appropriate, assess a forfeiture penalty against, any person or entity engaged in prohibited caller ID spoofing without first issuing a citation."). In 2019 the statutory scheme was further clarified when Congress amended Section 227(e) to expressly state that § 503(b)(5)'s citation requirements do not apply. H.R. Rep. No. 116-173, at 17 (2019) (noting that the amendment "provides an additional statutory clarification that no citation is needed to bring enforcement against a violation of the Truth and Caller ID Act, *as is current FCC practice*" (emphasis added)).

39

CONCLUSION

The Court finds that Rhodes is liable for the 4,959 spoofed calls identified in the Forfeiture Order.  The Court also finds that a permanent injunction against future unlawful conduct of this nature is warranted.  Finally, the Court finds that summary judgment may be appropriate on the forfeiture amount and requests additional briefing from the parties on this subject as well as Rhodes's right to a jury trial.

Accordingly, IT IS ORDERED that the United States' Motion for Partial Summary Judgment (Doc. 63) is GRANTED.  The Court finds Rhodes liable for the 4,959 illegally spoofed calls identified in the Forfeiture Order.

IT IS FURTHER ORDERED that the United States' request for injunctive relief is GRANTED.  The Court will separately enter an Order of Permanent Injunction consistent with the United States' proposed order (Doc. 63-1).

IT IS FURTHER ORDERED that the parties shall provide briefs addressing summary judgment on the forfeiture amount.  The parties shall also address whether Rhodes has a right to a jury trial on this issue should the Court ultimately decline to grant summary judgment.  The parties shall comply with the following briefing schedule and constraints:

United States' Brief
(not to exceed 4000 words):                     March 1, 2024

Rhodes's Response
(not to exceed 4000 words):                March 15, 2024

United States' Reply
(not to exceed 2500 words):                March 22, 2024


Dated this 20th day of February, 2024.


_____
Dana L. Christensen, District Judge
United States District Court